UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LEMOND CYCLING, INC.,

               Plaintiff,

v.

TREK BICYCLE CORPORATION,

               Defendant/Third-Party
Plaintiff.

v.

GREG LEMOND

               Third-Party Defendant

Civil No. 08-1010 (RHK-JSM)

**Trek's Counterclaim And Third-Party
Complaint**

Defendant/Third-Party Plaintiff Trek Bicycle Corporation, by its attorneys Gass Weber Mullins LLC and Halleland Lewis Nilan & Johnson, P.A., alleges as follows for its Counterclaim against LeMond Cycling, Inc. and its Third-Party Complaint Against Greg LeMond:

## Parties

1.     Trek Bicycle Corporation ("Trek") is a Wisconsin corporation with its principal place of business located at 801 West Madison Street, Waterloo, Wisconsin, 53594.

2.     LeMond Cycling, Inc. ("LeMond Cycling") is a Minnesota corporation with its principal place of business located in Wayzata, Minnesota.

3.     Greg LeMond ("LeMond" or "Greg LeMond") is the founder of LeMond Cycling.  LeMond is domiciled in Hennepin County, Minnesota.

**Jurisdiction and Venue**

4.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on the complete diversity of citizenship between Trek as defendant/third-party plaintiff, on the one hand, and LeMond Cycling as plaintiff and LeMond as third-party defendant, on the other hand, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     Venue has been deemed by this Court to be proper in the District Court for the District of Minnesota, as reflected in the June 17, 2008 order for transfer of *Trek Bicycle Corporation v. LeMond Cycling, Inc.*, 08-cv-198, from the District Court for the Western District of Wisconsin to the District Court for the District of Minnesota, and consistent with the June 26, 2008 order for consolidation of the Wisconsin action for all purposes with *LeMond Cycling, Inc. v. Trek Bicycle Corporation*, Civil No. 08-1010 (RHK-JSM).  LeMond Cycling and LeMond are subject to personal jurisdiction in this judicial district.

**Factual Background**

6.     Trek has built a reputation for excellent bicycles.  Trek's trademarks have become synonymous with industry-leading quality and innovation, and the goodwill associated with its trademarks has substantial value to Trek's business.  Based on the strength of its trademarks, Trek markets its products to a diverse group of consumers including amateur and professional bicycle racers, cycling enthusiasts, health and fitness enthusiasts, recreational cyclists and families.

7.     Trek markets its products and enhances its goodwill by, among other things, associating the Trek brand with bicyclists whose names, reputations, and public images will reflect favorably upon Trek and enhance the Trek brand.  One such bicyclist is Lance

Armstrong, seven-time winner of the Tour de France. LeMond is well aware of the critical role Trek's associations with these bicyclists plays in maintaining, developing, and enhancing the Trek brand, as Greg LeMond himself has for many years traded on the value of his own name and brand through associations with multiple business partners.

8.      LeMond, a former world class cyclist and three-time winner of the Tour de France, formed LeMond Cycling for the purpose of developing and licensing the various trademarks associated with his name.

9.      On June 29, 1995, Trek, LeMond, and LeMond Cycling entered into a Sublicense Agreement whereby LeMond Cycling, as the licensee of Greg LeMond, granted Trek an exclusive sublicense to sell cycling products bearing the LeMond trademarks ("the Sublicense Agreement"). LeMond elected to sublicense his brand to Trek after his unsuccessful efforts to build and sell bicycles with other business partners.

10.     Pursuant to the Sublicense Agreement, LeMond Cycling and Greg LeMond personally undertook a number of obligations with respect to the development and marketing of Trek products to be marketed and sold under the LeMond brand. Trek, LeMond Cycling, and LeMond entered into this Sublicense Agreement for the express, mutually beneficial purpose of enhancing both the Trek and the LeMond brands. LeMond agreed to personally perform all of the services required of LeMond Cycling under the Sublicense Agreement. Trek, LeMond Cycling and LeMond agreed to invest in the success of their own and each other's brand, to act conscientiously, professionally, reasonably, and in good faith in pursuit of this contractual endeavor, and to refrain from engaging in any conduct detrimental to this endeavor. A copy of the Sublicense Agreement is attached to this Complaint as Exhibit 1.

11.     Consistent with the Sublicense Agreement's central purpose of simultaneously building both the Trek and the LeMond brands, Trek began to take on significant risk and to incur substantial expenses.  Since 1995, Trek has paid LeMond more than $5 million, and has invested millions more to design, manufacture and market LeMond-branded bicycles.

12.     Trek undertook this risk, paid these considerable sums of money to LeMond, and invested the additional, substantial sums of money to develop and market the LeMond brand for the corresponding purpose of enhancing Trek's own brand, goodwill, and sales.  Thus, maintaining the goodwill associated with the LeMond brand, and by association, the Trek brand, was fundamental to the Sublicense Agreement, as reflected repeatedly in the Sublicense Agreement's express provisions:

(a)     The Sublicense Agreement recites that the LeMond brand "has acquired a reputation for a high standard for quality, and through usage, has acquired distinctiveness and has become associated in the public's mind with the business of Greg LeMond …."

(b)     Section 5.02 of the Sublicense Agreement calls for marketing efforts "consistent with the quality and reputation of [LeMond Cycling]" that "properly reflect the image and reputation of [LeMond Cycling] and LeMond."

(c)     Section 8.02 refers to the "reputation and goodwill associated with [LeMond Cycling]," and the corresponding importance of preserving that reputation and goodwill.

(d)     Sections 13.01.01 and 13.02.01 prohibit both Trek and LeMond or LeMond Cycling from "tak[ing] any action which damages or has an adverse impact upon" the other party's respective business or goodwill.

4

(e)     Section 16.03 requires LeMond "to render his services [under the Sublicense Agreement] in a professional and conscientious manner."

13.     On August 10, 1999, Trek, Greg LeMond, and LeMond Cycling entered a First Amendment to the Sublicense Agreement which, among other things, increased the minimum royalty Trek was required to pay LeMond Cycling for use of the trademarks to $350,000 per contract year, extended the term of the agreement to September 30, 2010, and granted Trek two five-year options to renew the agreement until 2020.  A copy of the First Amendment to the Sublicense Agreement is attached to this Complaint as Exhibit 2.

14.     During Lance Armstrong's ascendancy as a public figure, the sport of competitive cycling experienced a surge in public interest, and the entire bicycling industry experienced a corresponding, unprecedented increase in sales.  Because of Trek's unique association with Lance Armstrong, all of Trek's products—including the LeMond-branded Trek products—were poised to enjoy the benefits of Armstrong's meteoric rise in popularity.  Rather than working cooperatively with Trek to ensure that LeMond, LeMond Cycling, and Trek capitalized on the unique marketing opportunities presented by the Armstrong phenomenon, LeMond instead embarked upon a self-destructive course of conduct by attempting to vilify Armstrong and to diminish Armstrong's accomplishments, thereby undercutting the primary purpose of the Sublicense Agreement.

**Greg LeMond Harms Trek and the LeMond Brand**

15.     Contrary to LeMond's contractual promises and Trek's corresponding, contractual expectations, LeMond has repeatedly damaged Trek's brand, goodwill, and business by his relentless public attacks against Lance Armstrong.  LeMond's disparagement of Armstrong has caused substantial damage to both the LeMond and the Trek brands.

5

16.     LeMond also damaged his brand, and therefore damaged Trek, by entering into a business arrangement with a mass merchandiser, contrary to his brand's niche within Independent Bicycle Dealers, and through other conduct that hurt his brand image.  Instead of living up to his contractual commitment to cooperate with Trek to grow a valuable business together, LeMond has for years impaired, and now destroyed, thirteen years' of efforts by Trek and its dealers to develop and benefit from the LeMond brand.

17.     Trek markets its bicycles and bicycle products in the United States through an extensive network of independent bicycle dealers.  These independent bicycle dealers specialize in selling bicycles and bicycle-related products, relying on the high quality of the Trek products and the reputations of the bicyclists associated with these products.

18.     As a signature-line product—bearing the name of LeMond—the success of the LeMond brand and Trek's efforts to market LeMond-branded bicycles depends upon continued public admiration for LeMond, as well as the positive public images of each of the athletes associated with Trek.

19.     Beginning in 2001, LeMond began to publicly disparage Lance Armstrong, who was then the reigning, three-time Tour de France champion.  Many of LeMond's disparaging statements are quoted at length in a March 2008 Complaint that LeMond Cycling served upon Trek and filed on April 8, 2008.  LeMond engaged in these public attacks despite Armstrong's association with the Trek brand, and despite LeMond's knowledge that such attacks would undermine the central purpose of the 1995 Sublicense Agreement.

20.     During the 2004 Tour de France, LeMond repeated and intensified his public disparagement of Armstrong.  LeMond made these statements during television interviews, in national and international newspapers, magazines, trade press and

21.     Predictably, Trek received numerous complaints from customers offended by LeMond's vigorous attacks against Armstrong.  One customer wrote, "I was considering purchasing a LeMond bike but after hearing the comments he has been making about Lance Armstrong the only thing I would use it for is an anchor for my boat.  Have fun selling bikes, what a great spokesperson."

22.     Another customer complaint reflects the predictable diminishment of the LeMond and Trek brands caused by LeMond's public disparagement of Armstrong.  This customer wrote:

> Every year, for the last 4 years, I have purchased a LeMond bike for its quality and robustness.  And of course, because it bears the name of an athlete who once had class and panache.  Perhaps, in the big picture, I am insignificant, but please inform the CEO that he has just lost a once faithful customer.  I can understand the relentless attacks on Armstrong from European sources.  But make me understand what Mr. LeMond has to gain by joining the cacophony???  To further glorify his wins???

23.     Multiple customer complaints emphasized the deterioration of the LeMond and Trek brands resulting from LeMond's public attacks against Armstrong:

- One customer commented, "[d]oesn't Trek sponsor both Lance AND LeMond bikes?  What's going on there?"

- Another customer wrote to express his "disgust," stating:  "I was writing a letter to [LeMond's] Cycle company, when I saw that you own them?  How awkward must that be for you, the best thing ever to happen to the sport and Trek, attacked by the namesake of one of your brands?"

- Still another customer wrote:  "It must be great comfort to the great people at Trek who sponsor Lance Armstrong (which builds and

distributes LeMond bicycles) that they also represent a jerk in Greg LeMond."

24.     Trek president John Burke spoke repeatedly to LeMond about the negative impact of LeMond's public attacks on the LeMond and Trek brands. Burke expressed Trek's concern that LeMond's public outbursts were inflicting significant damage on Trek, contrary to LeMond's obligation to cooperate in the development and enhancement of the Trek brand. Burke reminded LeMond that just as Armstrong's accomplishments and positive public image enhanced both the LeMond and Trek brands, so too did LeMond's public disparagement of Armstrong cause corresponding harm to the LeMond and Trek brands. Although LeMond repeatedly promised Trek that he would refrain from making any more public comments damaging to the Trek and LeMond brands, LeMond subsequently, and repeatedly, reneged on these commitments.

25.     LeMond's disparaging statements have caused substantial damage to the value of the LeMond trademarks he agreed to license to Trek, caused substantial harm to Trek's own brand and damaged Trek's ability to market and sell its products—including the LeMond-branded bicycles. Trek has suffered significant lost sales and has incurred a corresponding, substantial loss of profits directly attributable to LeMond's public attacks against Armstrong.

26.     In August of 2004, Trek notified LeMond and LeMond Cycling that they had materially breached the Sublicense Agreement, entitling Trek to terminate the Sublicense Agreement. Rather than invoking its right to terminate the Sublicense Agreement, however, Trek continued to provide LeMond the benefits of the Sublicense Agreement to allow LeMond time to find another licensee for his brand.

27.     In December of 2004, after LeMond was unable to find another company interested in licensing the now-tarnished LeMond brand, LeMond Cycling attempted to

serve and threatened to file a lawsuit making numerous disparaging statements harmful to Trek and its business interests. LeMond's threatened suit was intended to persuade Trek to withdraw its notification of material breach, and to coerce Trek into continuing its association with LeMond. As it stated at the time in January of 2005, given the damage litigation would cause to Trek and the LeMond brand, Trek was forced to withdraw the Notice of Breach. Trek advised LeMond that it was willing to continue their association, so long as LeMond lived up to his renewed commitment to refrain from any further public attacks against Lance Armstrong that had been so detrimental to the LeMond and Trek brands.

28.     After a meeting with LeMond in April of 2005, Burke sent an email to LeMond confirming their discussions about the damages being caused by LeMond's disparaging public statements concerning Lance Armstrong. Burke confirmed in this email the obvious point that LeMond's public attacks were damaging both LeMond Cycling and Trek, stating: "Trek does not have any problem with you making general comments regarding the negative effects of doping on the sport and the positive steps being done to address it. Just do not publicly comment on specific athletes. Commenting on specific athletes is not good for you, Trek or the LeMond brand."

29.     Burke affirmed Trek's continued interest in working cooperatively with LeMond to further the central goals of the 1995 Sublicense Agreement, writing: "We want to move the public perception back to Greg LeMond, first American to win the Tour, three-time Tour winner, overall great guy and someone who cares deeply about the cleanliness of the sport. Please let me know if you agree."

30.     LeMond affirmed in a responsive, April 12, 2005 email that he would work cooperatively with Trek to build the Trek and LeMond brands, and that he would refrain

from launching any more attacks against Armstrong. LeMond represented to Trek in his email: "I am ready to move on regarding the doping and [Lance Armstrong]."

31. LeMond renewed this commitment in a December 15, 2005 email to Burke, writing:

> I want to reassure you that I have no intentions of going out there and blasting off on [Lance Armstrong]. I want to move beyond this last period and start to enjoy riding the bike and the bike business."

32. Despite these repeated assurances, LeMond again renewed his public attacks against Lance Armstrong and against other professional athletes, again inflicting significant damage upon Trek, the Trek brand, and Trek's business. The predictable onslaught of consumer outrage with LeMond's conduct, and as a result, more negative consumer reactions directed to Trek, soon followed.

33. One Trek customer wrote in response to LeMond's public attacks:

> I recently purchased a LeMond bike and am having an unusual problem. When I place it in the garage next to my Specialized and Trek bicycles it begins to whine and complain that the other bikes are cheaters and that it is the only true "American Champion." I was wondering, if maybe Greg himself would stop being a whining asshole, maybe this piece of shit bike would also stop. Please have him do it publicly so I can bring the bike in to watch it on TV. I suppose this is not covered under warranty.

34. Another Trek customer sent an email stating:

> Name: Former LeMond Fan
>
> Email: lemondsucks@yahoo.com
>
> Comments: Has Greg always been a sniveling, insecure jerk who needs to denigrate others' accomplishments in order to boost his own self esteem? If Greg's bikes display the same quality as he displays as an individual, please keep them far away from me.

35. In the fall of 2007, at a key time for the promotion of the LeMond line in Europe, LeMond once again lashed out against Armstrong. During an interview with *Tour* magazine, one of the most influential European publications devoted to road cycling,

LeMond claimed Lance Armstrong and Trek were to blame for LeMond's recent absence from the public eye: "This is for my problems with Armstrong. I criticized his cooperation with Michael Ferrari and for that reason got into big trouble with Trek. If I had loudly said what I thought this would have been suicide for my business."

36. LeMond's widely published comments not only caused further harm to the Trek and LeMond brands, but also confirmed LeMond's own awareness that such comments would cause harm to their respective business interests.

37. Responding to LeMond's latest public attacks against Armstrong and the Trek brand, one of Trek's employees responsible for marketing and sales in Germany forwarded a copy of the article published in *Tour*, complaining: "Those quotes don't help our image in Germany." Trek's European Director in turn forwarded this complaint to Burke, complaining to Trek about LeMond's latest verbal onslaught against Armstrong and Trek. Trek's European Director noted that LeMond was supposed to be *building up* the LeMond and Trek brands—not *tearing them down*:

> So I bust my balls to get LeMond on the booth at Eurobike and into our GAS dealer programme and then up pops Greg in Tour Magazine (The most influential European/GAS road magazine) and slags off Trek right slap bang in the middle of pre-season when we are trying to get the bikes (the ones with his name on) into the dealers.
>
> The guy is legend and I have the utmost respect for what he achieved in the sport but from a commercial perspective he's an idiot and I don't see any way back for us in Europe.

38. LeMond's latest efforts to undermine the central purpose of the Sublicense Agreement violated § 13.02.01 of the Sublicense Agreement, and constituted a material breach of contract empowering Trek to terminate the agreement immediately. Rather than invoke this right, however, Trek instead elected to once again to continue on with LeMond, through the end of the contract term. In November of 2007, Burke met privately with

LeMond to notify him that Trek would not be exercising its option to extend the Sublicense Agreement beyond its expiration in 2010. When LeMond asked for permission to look for other business partners despite his current obligations under the Sublicense Agreement, Trek not only agreed to permit LeMond to pursue such opportunities, but actually assisted LeMond in his efforts.

39. Failing in his efforts to find a corporate sponsor willing to take a risk on someone who had proven to be such an undependable business partner, LeMond tried one more time to strong-arm Trek into continuing its dysfunctional relationship with LeMond. LeMond once again threatened Trek with additional negative publicity unless Trek capitulated to LeMond's latest demands.

40. On March 20, 2008, LeMond served and threatened to file yet another lawsuit, replete with disparaging comments directed at Armstrong, Trek, and other athletes. LeMond's March 20, 2008 complaint included even more inflammatory allegations against Lance Armstrong and Trek than had been asserted in the 2004 version of the complaint. The 2008-version of the complaint included factual embellishments of the same events that had been recounted in the 2004-version of the complaint, all designed to impose additional pressure on Trek to capitulate to LeMond's demands. In a none-too-subtle reminder that the latest round of negative comments contained in the 2008-version of the complaint could be avoided if Trek were willing to pay LeMond's price, the letter forwarding the complaint reminded Trek that the complaint was not yet "publicly available at this time."

41. Trek recognized that LeMond's repeated repudiations of his most fundamental obligation to Trek under the Sublicense Agreement would never end, and that its association with LeMond and LeMond Cycling had become too toxic to continue.

Faced with a business partner unwilling to respect his contractual obligations and unable to fulfill his professional obligations, Trek concluded that it could no longer continue its association with LeMond.

42. Rather than capitulating to LeMond's latest demands, Trek filed the instant lawsuit seeking judicial confirmation that LeMond and LeMond Cycling's material breaches excused Trek from any further obligations under the Sublicense Agreement. Because it is clear that LeMond is more interested in tearing down the Trek brand than building it up, Trek seeks judicial confirmation that the relationship between LeMond and Trek can and must be terminated.

**FIRST CLAIM FOR RELIEF**
**Declaratory Judgment**

43. All prior paragraphs are incorporated by reference.

44. Trek has complied fully with its obligations under the Sublicense Agreement, and at all times has been entitled to the benefits and entitlements due to it from LeMond and LeMond Cycling pursuant to the Sublicense Agreement. Trek has worked diligently in its pursuit of the goals of the Sublicense Agreement, including development of the LeMond brand, and the marketing of Trek products bearing the LeMond brand in order to maximize the possible sales of that product line. Trek has incurred significant expenses in pursuit of those efforts, meeting and exceeding the specific, contractual "best efforts" requirements imposed upon it under §§ 5.02, 8.01, and 12.01 of the Sublicense Agreement. Trek has paid LeMond Cycling millions of dollars in royalties pursuant to the terms of the Sublicense Agreement, and has satisfied each and every one of its other obligations under the agreement. Trek performed fully under the Sublicense Agreement despite LeMond's and LeMond Cycling's persistent efforts to undermine those efforts, to

diminish the Trek and LeMond brand, and to hinder Trek's ability to develop the brands and to sell LeMond-branded Trek products.

45.     Despite Trek's full, good faith performance, LeMond and LeMond Cycling have materially breached the Sublicense Agreement, and through their deliberate conduct thwarting and undermining the central purpose of the Sublicense Agreement, have repudiated the Sublicense Agreement.  LeMond's and LeMond Cycling's breaches have deprived Trek of the central benefits to which it is entitled under the Sublicense Agreement—namely, (a) association with a positive, LeMond brand image for marketing Trek products, and (b) the cooperation of LeMond and LeMond Cycling in developing the LeMond and Trek brands so as to increase sales of Trek's products.  Not only has LeMond's and LeMond Cycling's conduct caused a significant loss of sales of LeMond-branded Trek products, but their conduct has caused irreparable damage to the LeMond brand, and has tarnished and damaged the Trek brand.

46.     LeMond's and LeMond Cycling's material breaches and repudiation of the Sublicense Agreement excuses Trek from any further obligations under the agreement, and discharges those obligations otherwise available to LeMond and LeMond Cycling.  Section 13.02.01 of the Sublease Agreement expressly authorizes Trek to terminate the Sublicense Agreement in the event that LeMond or LeMond Cycling "takes any action which damages or has an adverse impact upon [Trek] or [Trek's] business or goodwill …."  Trek afforded LeMond and LeMond Cycling multiple opportunities to refrain from this wrongful conduct, and repeatedly insisted that LeMond and LeMond Cycling perform their obligations under the Sublicense Agreement in good faith.  Trek's continued forbearance in the face of LeMond and LeMond Cycling's persistent misconduct was intended to give

LeMond and LeMond Cycling every reasonable opportunity to modify their conduct and to begin performing under the Sublicense Agreement.

47.     The damages and harm LeMond and LeMond Cycling's conduct has caused to Trek and its business is permanent and irreparable.  LeMond and LeMond Cycling's conduct constitutes a material breach and repudiation of the Sublicense Agreement, and specifically violates the termination trigger provisions of § 13.02.01 of the Sublicense Agreement.  LeMond's and LeMond Cycling's conduct has destroyed the essential benefits that were to be provided under the Sublicense Agreement.

48.     Accordingly, Trek is entitled to a declaration that the Sublicense Agreement may be terminated as a result of LeMond and LeMond Cycling's material breach of the express provisions of § 13.02.01 of the Sublicense Agreement, as well as LeMond and LeMond Cycling's material breaches and repudiation of the most fundamental obligations of the Sublicense Agreement, including the obligation of good faith and fair dealing.  Trek is entitled to a judicial confirmation and declaration that as a result of these material breaches, Trek is excused from any further obligations under the Sublicense Agreement, and is entitled to pursue an award of compensatory damages flowing from these breaches and ensuing, early termination.  Trek also requests a declaration of rights governing the orderly severance of the parties' relationship to protect Trek from suffering any additional harm.

## SECOND CLAIM FOR RELIEF
### Breach of Contract (Sublicense Agreement)

49.     All prior paragraphs are incorporated by reference.

50.     LeMond's and LeMond Cycling's conduct materially breached multiple, express provisions of the Sublicense Agreement.  LeMond's and LeMond Cycling's breaches of the Sublicense Agreement have caused substantial damages to Trek, including

15

without limitation a substantial loss of sales of Trek products that otherwise would have been made but for the LeMond and LeMond Cycling's breaches, resulting in substantial, corresponding lost profits.

51.　　Trek is entitled to an award of compensatory damages resulting from these breaches of contract, in an amount to be determined by the jury.

**THIRD CLAIM FOR RELIEF**
**Breach of the Duty of Good Faith and Fair Dealing**

52.　　All prior paragraphs are incorporated by reference.

53.　　LeMond and LeMond Cycling each owed Trek a duty of good faith and fair dealing in the performance of their respective obligations under the Sublicense Agreement. LeMond and LeMond Cycling were obligated to discharge their obligations honestly, diligently, and in a manner that did not undermine or destroy the essential benefits to be conferred under the agreement.

54.　　Although the Sublicense Agreement called for the parties to cooperate in the development of a positive LeMond and Trek brand image, LeMond and LeMond Cycling engaged in a persistent pattern of conduct designed to diminish, tarnish, and destroy the value of Trek's association with the LeMond brand. Such conduct was diametrically opposed to the fundamental purpose of the Sublicense Agreement. LeMond knew that his conduct was harmful to Trek, driven by improper motives, and at odds with his obligations under the Sublicense Agreement, demonstrated by his repeated commitments to refrain from further public attacks against Lance Armstrong and Trek.

55.　　LeMond's and LeMond Cycling's breaches of duty of good faith and fair dealing arising under the Sublicense Agreement have caused substantial damages to Trek, including without limitation a substantial loss of sales of Trek products that otherwise

would have been made but for the LeMond and LeMond Cycling's breaches, resulting in substantial, corresponding lost profits.

56.     Trek is entitled to an award of compensatory damages resulting from these breaches, in an amount to be determined by the jury.

## FOURTH CLAIM FOR RELIEF
### Breach of Contract (Exclusive Distribution Rights)

57.     All prior paragraphs are incorporated by reference.

58.     Trek operates its business through an extensive network of independent bicycle dealers in the United States who have the exclusive right to sell Trek bicycles—including LeMond-branded Trek bicycles—to consumers.  The exclusivity rights of Trek's independent bicycle dealers is the cornerstone of Trek's distribution plan, and confers significant, essential benefits upon these independent bicycle dealers.  Accordingly, Trek and its independent bicycle dealers jealously protect that exclusivity, and do not permit any erosion of those rights by unauthorized usurpers.

59.     Pursuant to paragraph 2.01 of the Sublicense Agreement, LeMond Cycling granted to Trek "the exclusive right and license (without the right to assign the same or grant sublicense thereunder), to use the Mark in the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, sale and distribution of" LeMond bicycles and bicycle frames.  The First Amendment to the Sublicense Agreement retained the language regarding Trek's exclusive right to sell and distribute LeMond Bicycles in the Territory in the Contract Period.

60.     LeMond has many years of experience in the bicycle industry, and is acutely aware of the importance of the Trek-Dealer relationship, as well as the rights of exclusivity enjoyed by the independent bicycle dealers.  LeMond has earned millions of dollars from Trek as a result of this distribution system, and has benefited directly from the

17

continued integrity of that system. LeMond is aware that unauthorized sales of LeMond-branded bicycles outside of the dealer network would harm those dealers, would cause harm to the Trek – Dealer relationships, and would result in loss of profits for both the dealers and Trek.

61.     In addition to the millions of dollars in royalty payments LeMond has received from Trek over the years, LeMond was entitled to receive fifteen free Trek bicycles each year for the personal use of LeMond and his family. Trek also permitted LeMond, as a courtesy to a valued brand personality, to purchase additional Trek bicycles at discounted employee prices. Since 1999, LeMond has taken advantage of these employee discounts, purchasing Trek bicycles with a cumulative retail value exceeding $2,500,000.00. Contrary to his obligation not to violate the exclusive distribution rights he sold to Trek, LeMond has resold, bartered for value or otherwise distributed many or most of these bicycles, causing damage to Trek and its dealers.

62.     In early March 2008, for example, a Trek Dealer sold two LeMond Zurich bicycles to two customers, each with a retail value exceeding $2,800.00. On or about March 15, 2008, one of the two customers who had ordered the LeMond Zurich bicycles informed Trek's dealer that he and the other customer had been able to purchase their LeMond-branded bicycles directly from Greg LeMond himself, at a cost far below the retail price. The customer explained that since they were saving over 50% by buying from LeMond instead of from the dealer, the customers ordered La Victoires, a more expensive LeMond-branded bicycle (with a $5,279.99 suggested retail price), instead of the Zurich bicycles they had ordered from the dealer. The dealer wrote to Trek to complain about LeMond's conduct and the damage caused to his dealership:

> Why would we support a vendor that is deliberately using back-channels
> to sell products in our market? As an immediate resolution to this

> problem, the only fair and practical thing that I can see is to bill
> Mr. LeMond's account for the lost profit $$ that we have foregone as a
> result of his action. Furthermore, going forward, I would like an apology
> and his word that he will not sell around his dealers going forward.

63. When Trek checked its records, it discovered that on or about March 13, 2008, LeMond had indeed purchased two La Victoire bicycles from Trek at the employee discount price—the same models LeMond had agreed to re-sell to the usurped customers of Trek's dealer. This March 13, 2008 purchase was fewer than two weeks after Trek had warned LeMond that his surreptitious re-sale of Trek bicycles was causing damage to Trek and its dealers. LeMond has attempted to purchase additional bicycles at the employee discount rates even after this lawsuit had been filed.

64. Upon information and belief, LeMond has resold, bartered for value or otherwise distributed many or most of the other bicycles that he purchased from Trek at employee discount pricing, improperly usurping the business otherwise available to Trek and its dealers.

65. LeMond's conduct constitutes a breach of contract which has caused substantial damage to Trek. Trek is entitled to an award of compensatory damages in an amount to be determined by the jury.

### FIFTH CLAIM FOR RELIEF
### Actual Attorneys' Fees

66. All prior paragraphs are incorporated by reference.

67. Pursuant to § 13.03 of the Sublicense Agreement, Trek not only is entitled to recover its compensatory damages flowing from LeMond and LeMond Cycling's material breach and repudiation of the agreement and ensuing termination of the Sublicense Agreement, but Trek also is entitled to recover its reasonable attorneys' fees

incurred in this action. Trek thus is entitled to an award of its reasonable attorneys' fees in an amount to be determined by the Court at the conclusion of this action.

WHEREFORE, Trek Bicycle Corporation seeks the following relief:

1.     Pursuant to the First Claim for Relief, a declaration, pursuant to 28 U.S.C. § 2201, that LeMond and LeMond Cycling have materially breached and repudiated the Sublicense Agreement, resulting in a discharge of any further obligations by Trek under the Sublicense Agreement, declaring that Trek is entitled to terminate the Sublicense Agreement; and

2.     Pursuant to the Second, Third and Fourth Claims for Relief, the award of compensatory damages in amounts to be determined by the jury; and

3.     Pursuant to the Fifth Claim for Relief, recovery of its actual attorneys' fees and costs; and

4.     Pursuant to each claim for relief, an order awarding such other and further relief as the Court deems appropriate and equitable.

**TREK DEMANDS A TRIAL BY JURY**

Dated this 22nd day of September, 2008.

**ATTORNEYS FOR DEFENDANT/THIRD-PARTY PLAINTIFF**

GASS WEBER MULLINS, LLC

By: /s/ Ralph A. Weber
    Ralph A. Weber (SBN 1001563)
    Christopher P. Dombrowicki (SBN 1041764)
    Kristal S. Stippich (SBN 1061028)
    309 North Water Street, Suite 700
    Milwaukee, WI 53202
    Telephone: (414) 223-3300
    Fax: (414) 224-6116
    weber@gasswebermullins.com
    dombrowicki@gasswebermullins.com
    stippich@gasswebermullins.com

Erik T. Salveson (Reg. No. 177969)
Amanda M. Cialkowski (Reg. No. 306514)
Benjamin R. Rolf (Reg. No. 386413)
HALLENALND LEWIS NILAN &
JOHNSON, P.A.
600 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN  55402
Telephone (612) 338-1838
Fax:  (612) 338-7858
esalverson@halleland.com
acialkowski@halleland.com
brolf@halleland.com