# EXHIBIT 1

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

ATTORNEYS AT LAW

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
TEL: 612-349-8500 FAX: 612-339-4181
www.rkmc.com

DENISE S. RAHNE
612-349-8433

November 14, 2008

VIA E-MAIL

Ralph A. Weber, Esq.
Gass Weber Mullins LLC
309 North Water Street
Milwaukee, WI 53202

Re:    *LeMond Cycling, Inc. v. Trek Bicycle Corporation*
Case No. 08-CV-01010 (RHK/JSM)
Our File No. 123595-0000

Dear Ralph:

I write regarding several discovery matters. First, we have again sought to coordinate all necessary schedules to accommodate two successive dates in order to reschedule Greg and Kathy LeMond's depositions. We are prepared to make Mr. and Mrs. LeMond available on December 3rd and 4th in our offices. Please let us know if this is acceptable.

Second, during our review of Trek's initial production we have noticed the following initial deficiencies:

1.    Request No. 2: Trek has not produced responsive documents commensurate with the number produced by LeMond Cycling. For instance, while Trek has produced copies of the ultimate agreements between Trek and LeMond Cycling, a minimal amount of correspondence related to the negotiations was produced. Specifically, there is little to no email correspondence responsive to this request in Trek's production, which is surprising in this day and age.

2.    Request No. 3: Trek has produced some documents related to marketing, promotion, and advertising of the LeMond brand primarily in the form of final marketing materials and presentations, but has failed to produce any documents relating to the internal planning for such marketing, promotion, and advertising. Specifically, there is little to no email correspondence responsive to this request in Trek's production, which again is surprising in this day and age.

3.     Request Nos. 4 and 5: It appears that Trek has not produced a complete set of royalty statements, balance sheets, profit and loss statements, expenses, statements of cash flow, or monthly, quarterly, and yearly summaries of the same broken down by product category. In addition, while we have identified a small number of internal financial presentations, we have not been provided the underlying documentation which supports those presentations.

4.     Request No. 11: In light of your most recent correspondence to Mr. Bluming, it is perhaps unsurprising that Trek has not produced any documents related to its plans to promote and maintain the LeMond brand through September 30, 2010. Trek certainly, however, possesses documents related to the decision not to promote and maintain the brand. We have yet to see such documents. Here too, it is odd on its face that no emails have been produced that are responsive to this issue.

5.     Request Nos. 13 and 22: We have received only a small selection of documents responsive to this request. The communications we have received, furthermore, are all dated June, 2001 or August 7, 2001. Now that you have likely reviewed the transcripts of several August 13, 2001 telephone conversations between Mr. LeMond and John Burke, you can understand our belief that the documents you have produced cannot be all documents responsive to this request. Additionally, given the nature of the communications between Mr. Armstrong and Trek that have been produced, we believe there are additional documents, specifically emails, that are still outstanding.

6.     Request No. 16: We believe that there are other communications received by Trek that have not been produced. For example, please see the enclosed letter, bates labeled LCI 05536, addressed to Trek which we did not find in Trek's production.

7.     Request No. 21: We have not received any documents responsive to this request and find it hard to believe, given Mr. Armstrong's regular engagement with the press and publicly scrutinized personal and professional life, including a documented connection to Dr. Ferrari, that there are none.

6.     Request No. 23: We dispute your position that documents related to agreements with Lance Armstrong are irrelevant. In the context of its allegations toward LeMond Cycling and Mr. LeMond, Trek has made the claim that "Trek's Endorsement and Spokesperson Agreement with Lance Armstrong is one if its other valuable business interests. Mr. Armstrong's name, good public image and endorsement of Trek products are of substantial commercial value to Trek." If Trek intends to maintain any semblance of a claim for damages in the present matter, Trek cannot have it both ways and refuse to produce documents related to an asset it claims to have been damaged. LeMond Cycling is entitled to discovery related to this contractual relationship.

7. The document bates labeled TREK 000417 appears to be the first page of a multiple-paged letter. Please produce a complete copy of the letter.

8. Documents in the bates range TREK 005302-006583 appear to be slides from PowerPoint presentations in which different colored lettering was used. Because these slides are printed in black and white, we are unable to read many pages in this range. Please produce these documents in a legible format.

9. There is a significant number of redactions throughout your production, but we have yet to receive a privilege log explaining such redactions. To the extent that you are not claiming privilege, please explain these redactions.

Please supplement Trek's production or provide an explanation as to why Trek is unwilling to do so. Also, please be aware that if Trek has not produced all documents responsive to LeMond Cycling's requests prior to the depositions of Mr. and Mrs. LeMond that it does so knowingly and willingly and without any prejudice to the limitations set forth in Fed. R. Civ. P. 30(d).

LeMond Cycling and Mr. LeMond reserve all rights to bring other deficiencies to Trek's attention as they become apparent throughout the course of discovery.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Denise S. Rahne

DSR/bsb
Enclosures

# EXHIBIT 2

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
TEL: 612-349-8500 FAX: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

DENISE S. RAHNE
612-349-8433

December 9, 2008

*VIA E-MAIL*

Ralph A. Weber, Esq.
Gass Weber Mullins LLC
309 North Water Street
Milwaukee, WI 53202

      Re:    *Trek v. LeMond*
            Our File No.: 123595.0000

Ralph,

I write in response to your letter dated December 4, 2008. First, you will receive the requested index tomorrow. A wave of seasonal illness impacted members of our group, which unfortunately set us back on a few things. Regarding Ms. Huber's deposition, you did not provide any alternatives to the noticed date, which would have assisted in our moving things along. At risk of aiming again at a moving target, I propose January 6. Please confirm that date or provide an alternative that is close in proximity so that we can get this deposition scheduled and move on to other discovery matters.

You also inquired about handheld devices used by Mr. LeMond. As is obvious from the production, the scope of the document search included email from Mr. LeMond's account. Mr. LeMond has used handheld devices to access this account. I am unclear what you would additionally like searched beyond the email account.

Mary Haigh is no longer employed by LeMond Cycling. To the best of our knowledge she did not retain any documents when she left the company and the files she maintained were searched during the document sweep.

We have received Trek's recent supplemental production and are in the process of reviewing it in light of previously noted concerns. I will be in touch once that review is complete.

I look forward to seeing you next week.

          Sincerely,

          ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

          Denise S. Rahne

DSR/klg

# EXHIBIT 3

LEMOND CYCLING, INC.,

        Plaintiff,

v.

TREK BICYCLE CORPORATION,

        Defendant.

Civil No. 08-1010 (RHK-JSM)

**TREK'S FIRST SET OF WRITTEN DISCOVERY TO LEMOND CYCLING, INC.**

Trek Bicycle Corporation, by its attorneys Gass Weber Mullins and Halleland Lewis Nilan & Johnson, P.A., propound the following Interrogatories and Requests for Production to LeMond Cycling, Inc. pursuant to Federal Rules of Civil Procedure 33 and 34.

### Instructions And Definitions

1.      Each Interrogatory and Request to Produce must be responded to specifically. If you object to any interrogatory or request, you are required to state with specificity the basis of the objection.

2.      Any evasive or incomplete answer or response to any interrogatory or request is deemed a failure to answer or respond.

3.      The term "document(s)" is used in the broadest possible sense and refers, without limitation, to the originals (or any copies when originals are not available) and any non-identical copies (whether different from the originals or otherwise), of any written, printed, typed, photostatic, photographed, recorded or otherwise reproduced communication or representation of every kind and description, including, but not limited to, writings, correspondence, notes, minutes, records, messages and internal memoranda, diaries, calendars, receipts, reports, compilations, studies, summaries, analyses, tables and tabulations, graphs, working papers,

tallies, maps, diagrams, charts, plans, photographs, pictures, drawings, file and file folder tabs associated with each original or copy, phone records, audio tapes, video tapes, e-mail or any other computer-stored or computer-readable data, computer printouts, teletype messages and other communications, all other data compilations from which information or communications can be obtained or translated, if necessary, by the respondent through detection devices into reasonably usable form, and any preliminary versions, drafts or revisions of any of the foregoing.

4.      The term "relate to" means mentioning or describing, containing, involving or in any way concerning, pertaining or referring to or resulting from, in whole or in part, directly or indirectly, the stated subject matter.

5.      To "identify" a document means to state:

(a)      The nature or type of the document (*e.g.,* letter, contract, etc.) and the number of pages or units of which it consists;

(b)      Its date, and if it bears no date, the date when it was prepared or received;

(c)      The identity of its author, each signatory or person over whose name it is issued, and each person who received, approved or commented on it;

(d)      The identity of all persons to whom the document was addressed or distributed;

(e)      The last known physical location and address of the original and each duplicate copy, and the identity of its custodian or custodians;

(f)      The general subject matter or content of the document with sufficient particularity to enable it to be identified;

(g)      If the document was, but is no longer, in your possession or subject to your control (*e.g.,* because it has been lost, destroyed, transmitted to

another person, etc.), state what disposition was made of it, the date of such disposition, and the reasons for such disposition; and

(h)     Whether it will be voluntarily produced and made available for inspection and copying.

6.     To "identify" an individual state:

(a)     the individual's full name;

(b)     the individual's address; and

(c)     the individuals phone number.

7.     You are required to make available for inspection and copying all documents requested that are subject to your "control." Without limitation, a document is deemed to be or to have been subject to your "control" if you have or had the right or ability to secure the document or a copy thereof from another person or governmental entity having actual physical possession thereof.

8.     Documents in electronic or magnetic media, including but not limited to e-mail, should be produced in electronic form as well as printed out in hard-copy form.

9.     With respect to any documents sought to be identified herein, but which are withheld by you due to any claim of privilege, list for each document:

(a)     Its type (e.g., memo, letter, etc.);

(b)     Its author(s);

(c)     Its recipient(s);

(d)     Its date;

(e)     Its general subject matter;

(f)     The nature of the work product claim or privilege asserted; and

(g)    The part or portion of the document for which the work product claim or privilege is asserted.

10.    You have a duty to supplement your responses and production of documents as required by Wisconsin Statutes, section 804.01(5). Accordingly, these interrogatories and requests to produce shall be deemed continuing so as to require supplemented answers or responses if further information becomes available, additional documents are obtained or the identity and location of additional persons having knowledge of discoverable matters is learned between the time at which any responses are served and the time of trial.

11.    Throughout these interrogatories the term "LeMond" is used to refer to LeMond Cycling, Inc. The term "Greg LeMond" is used to refer to the individual.

## Interrogatories

**Interrogatory No. 1:** Identify all business entities in which either LeMond or Greg LeMond has had an ownership interest since 1985, including the name of the business entity, address, and a description of the entity's business activities.

**Interrogatory No. 2:** Identify each person and company who have been compensated by LeMond or Greg LeMond in connection with LeMond's or Greg LeMond's business activities, including, but not limited to agents, representatives, independent contractors and employees.

**Interrogatory No. 3:** For LeMond and each entity identified in response to Interrogatory No. 1, state the gross earnings of the entity for the years 1999 through present.

**Interrogatory No. 4:** Did Greg LeMond or LeMond (or anyone acting for or with them) record (via electronic means, audio tape, video tape, or otherwise) any conversation between Greg LeMond and John Burke, or anyone else, relating to any issue raised in LeMond's complaint or answer? If so, identify the date of the communication, the parties who participated

in or overheard the communication, the current location of the recording and any copies, and whether the recording has been transcribed.

**Interrogatory No. 5:** Identify all lawsuits and arbitrations to which either LeMond or Greg LeMond is or was a party, including the caption, case number, jurisdiction, name of court, and date commenced.

**Interrogatory No. 6:** Identify all agents or representatives, including their name, address, and telephone number, who acted on LeMond's or Greg LeMond's behalf in efforts to locate individuals or entities to manufacture, have manufactured, source, distribute or otherwise sell bicycles or bicycle related products bearing any of the LeMond trademarks.

**Interrogatory No. 7:** For each bicycle or bicycle related product manufacturer, sourcing company, distributor, or seller, with whom LeMond, Greg LeMond, or any agent or representative or LeMond or Greg LeMond, at any time, discussed licensing the LeMond trademarks identify:

    (a)      the name of the manufacturer;

    (b)      the name, address, and telephone number of the individual(s) with whom LeMond, Greg LeMond or their agents or representatives communicated;

**Interrogatory No. 8:** Identify all Internet Service Providers or the location of all servers that now, or ever have, hosted a website for LeMond, Greg LeMond, or any entity identified in response to Interrogatory No. 1, and all e-mail addresses, URL addresses, or domain names ever used by Greg LeMond, LeMond, or Kathy LeMond.

**Interrogatory No. 9:** Describe in detail all actions LeMond or Greg LeMond have taken to preserve or dispose of documents relating in any way to the issues raised in LeMond's Complaint and Answer, the termination of the Sublicense Agreement, or the business relationship between LeMond and Trek, including but not limited to the retention or disposal of

computers used since 1995 by Greg LeMond, Kathy LeMond, LeMond, or any employee or representative of Greg LeMond or LeMond Cycling, Inc., including but not limited to Mary Haige.

## Requests For Production Of Documents

**Request No. 1:** All documents concerning oral or written communications with Trek, and anyone acting on Trek's behalf from 1995 through the present.

**Request No. 2:** All documents concerning Trek's performance of its duties under the Sublicense Agreement (original and as amended).

**Request No. 3:** All documents concerning Greg LeMond's and LeMond Cycling Inc.'s performance of their duties under the Sublicense Agreement (original and as amended).

**Request No. 4:** All documents concerning the negotiation of, performance under and litigation concerning the PTI Holdings, Inc. contract.

**Request No. 5:** All documents concerning Greg LeMond's personal appearances on behalf of companies and other groups authorized to use Greg LeMond's name or likeness.

**Request No. 6:** All documents concerning bicycles purchased from Trek by Greg LeMond, LeMond Cycling, Inc.. or any representative of either.

**Request No. 7:** All documents concerning Greg LeMond's statements about Lance Armstrong.

**Request No. 8:** All documents concerning responses or reactions to Greg LeMond's statements about Lance Armstrong.

**Request No. 9:** All documents concerning John Burke, Aaron Mock, Joseph Siefkes, Elisabeth Huber, Lance Armstrong, Betsy Andreu, Frankie Andreu, David Walsh, Bill Stapleton, and Tim Herman.

**Request No. 10:** All documents not previously produced that were described in plaintiff's Rule 26(a)(1) Disclosures, B.1-8.

**Request No. 11:** All documents concerning plaintiff's claimed damages.

**Request No. 12:** All documents that you contend comprise the Sublicense Agreement between Trek and LeMond.

**Request No. 13:** All tax returns for LeMond, Greg LeMond, and all entities identified in response to Interrogatory No. 1.

**Request No. 14:** All annual financial statements for LeMond and all entities identified in response to Interrogatory No. 1.

**Request No. 15:** All documents relating to each lawsuit and arbitration identified in response to Interrogatory No. 5.

**Request No. 16:** All audiotapes, electronic audio files, and transcripts of recorded communications identified in response to Interrogatory No. 4.

**Request No. 17:** All annual filings with the State of Minnesota made by or on behalf of LeMond from 1995 through present.

**Request No. 18:** All contracts between LeMond or Greg LeMond on the one hand, and any business agent, representative, independent contractor and employee on the other hand from 1995 through the present.

**Request No. 19:** All documents relating in any way to LeMond's or Greg LeMond's attempt to start a cycling team sponsored by American Express or Mercury/Viatel.

**Request No. 20:** All documents relating in any way to LeMond's or Greg LeMond's attempt to form a business relationship with StairMaster or Nautilus.

**Request No. 21:** All documents relating in any way to the formation of the business relationship between LeMond or Greg LeMond and Clark Kent and al documents relating to the termination of that business relationship.

**Request No. 22:** All documents relating in any way to the allegations contained in paragraphs 78-80 of LeMond's complaint.

**Request No. 23:** All documents relating in any way to the negotiation and/or termination of the parts and accessories agreement between Trek and LeMond.

**Request No. 24:** All documents relating in any way to the negotiation of the 1999 First Amendment to the Sublicense Agreement.

**Request No. 25:** All documents that you contend support any allegation contained in LeMond's Complaint against Trek or LeMond's Answer to Trek's Complaint.

**Request No. 26.** All individual or joint state and federal tax returns filed by Greg LeMond from 1995 through present.

Dated this 5 day of September, 2008.

**ATTORNEYS FOR DEFENDANT**

**GASS WEBER MULLINS LLC**

By: _____

Ralph A. Weber (SBN 1001563)
Christopher P. Dombrowicki (SBN 1041764)
Kristal S. Stippich (SBN 1061028)
309 North Water Street, Suite 700
Milwaukee, WI 53202
Telephone: (414) 223-3300
Fax: (414) 224-6116
weber@gasswebermullins.com
dombrowicki@gasswebermullins.com
stippich@gasswebermullins.com

**HALLELAND LEWIS NILAN & JOHNSON, P.A.**
Erik T. Salveson (Reg. No. 177969)
Amanda M. Cialkowski (Reg. No. 306514)
Benjamin R. Rolf (Teg. No. 386413)
600 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN 55402
Telephone (612) 338-1838
esalverson@halleland.com
acialkowski@halleland.com
brolf@halleland.com

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| LEMOND CYCLING, INC., | |
|     Plaintiff, | Civil No. 08-1010 (RHK-JSM) |
| v. | **Trek's Counterclaim And Third-Party Complaint** |
| TREK BICYCLE CORPORATION, | |
|     Defendant/Third-Party Plaintiff. | |
| v. | |
| GREG LEMOND | |
|     Third-Party Defendant | |

Defendant/Third-Party Plaintiff Trek Bicycle Corporation, by its attorneys Gass Weber Mullins LLC and Halleland Lewis Nilan & Johnson, P.A., alleges as follows for its Counterclaim against LeMond Cycling, Inc. and its Third-Party Complaint Against Greg LeMond:

### Parties

1.  Trek Bicycle Corporation ("Trek") is a Wisconsin corporation with its principal place of business located at 801 West Madison Street, Waterloo, Wisconsin, 53594.

2.  LeMond Cycling, Inc. ("LeMond Cycling") is a Minnesota corporation with its principal place of business located in Wayzata, Minnesota.

3.  Greg LeMond ("LeMond" or "Greg LeMond") is the founder of LeMond Cycling.  LeMond is domiciled in Hennepin County, Minnesota.

## Jurisdiction and Venue

4.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on the complete diversity of citizenship between Trek as defendant/third-party plaintiff, on the one hand, and LeMond Cycling as plaintiff and LeMond as third-party defendant, on the other hand, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     Venue has been deemed by this Court to be proper in the District Court for the District of Minnesota, as reflected in the June 17, 2008 order for transfer of *Trek Bicycle Corporation v. LeMond Cycling, Inc.*, 08-cv-198, from the District Court for the Western District of Wisconsin to the District Court for the District of Minnesota, and consistent with the June 26, 2008 order for consolidation of the Wisconsin action for all purposes with *LeMond Cycling, Inc. v. Trek Bicycle Corporation*, Civil No. 08-1010 (RHK-JSM).  LeMond Cycling and LeMond are subject to personal jurisdiction in this judicial district.

## Factual Background

6.     Trek has built a reputation for excellent bicycles.  Trek's trademarks have become synonymous with industry-leading quality and innovation, and the goodwill associated with its trademarks has substantial value to Trek's business.  Based on the strength of its trademarks, Trek markets its products to a diverse group of consumers including amateur and professional bicycle racers, cycling enthusiasts, health and fitness enthusiasts, recreational cyclists and families.

7.     Trek markets its products and enhances its goodwill by, among other things, associating the Trek brand with bicyclists whose names, reputations, and public images will reflect favorably upon Trek and enhance the Trek brand.  One such bicyclist is Lance

Armstrong, seven-time winner of the Tour de France. LeMond is well aware of the critical role Trek's associations with these bicyclists plays in maintaining, developing, and enhancing the Trek brand, as Greg LeMond himself has for many years traded on the value of his own name and brand through associations with multiple business partners.

8.    LeMond, a former world class cyclist and three-time winner of the Tour de France, formed LeMond Cycling for the purpose of developing and licensing the various trademarks associated with his name.

9.    On June 29, 1995, Trek, LeMond, and LeMond Cycling entered into a Sublicense Agreement whereby LeMond Cycling, as the licensee of Greg LeMond, granted Trek an exclusive sublicense to sell cycling products bearing the LeMond trademarks ("the Sublicense Agreement"). LeMond elected to sublicense his brand to Trek after his unsuccessful efforts to build and sell bicycles with other business partners.

10.    Pursuant to the Sublicense Agreement, LeMond Cycling and Greg LeMond personally undertook a number of obligations with respect to the development and marketing of Trek products to be marketed and sold under the LeMond brand. Trek, LeMond Cycling, and LeMond entered into this Sublicense Agreement for the express, mutually beneficial purpose of enhancing both the Trek and the LeMond brands. LeMond agreed to personally perform all of the services required of LeMond Cycling under the Sublicense Agreement. Trek, LeMond Cycling and LeMond agreed to invest in the success of their own and each other's brand, to act conscientiously, professionally, reasonably, and in good faith in pursuit of this contractual endeavor, and to refrain from engaging in any conduct detrimental to this endeavor. A copy of the Sublicense Agreement is attached to this Complaint as Exhibit 1.

11.    Consistent with the Sublicense Agreement's central purpose of simultaneously building both the Trek and the LeMond brands, Trek began to take on significant risk and to incur substantial expenses. Since 1995, Trek has paid LeMond more than $5 million, and has invested millions more to design, manufacture and market LeMond-branded bicycles.

12.    Trek undertook this risk, paid these considerable sums of money to LeMond, and invested the additional, substantial sums of money to develop and market the LeMond brand for the corresponding purpose of enhancing Trek's own brand, goodwill, and sales. Thus, maintaining the goodwill associated with the LeMond brand, and by association, the Trek brand, was fundamental to the Sublicense Agreement, as reflected repeatedly in the Sublicense Agreement's express provisions:

(a)    The Sublicense Agreement recites that the LeMond brand "has acquired a reputation for a high standard for quality, and through usage, has acquired distinctiveness and has become associated in the public's mind with the business of Greg LeMond ...."

(b)    Section 5.02 of the Sublicense Agreement calls for marketing efforts "consistent with the quality and reputation of [LeMond Cycling]" that "properly reflect the image and reputation of [LeMond Cycling] and LeMond."

(c)    Section 8.02 refers to the "reputation and goodwill associated with [LeMond Cycling]," and the corresponding importance of preserving that reputation and goodwill.

(d)    Sections 13.01.01 and 13.02.01 prohibit both Trek and LeMond or LeMond Cycling from "tak[ing] any action which damages or has an adverse impact upon" the other party's respective business or goodwill.

4

(e)    Section 16.03 requires LeMond "to render his services [under the Sublicense Agreement] in a professional and conscientious manner."

13.    On August 10, 1999, Trek, Greg LeMond, and LeMond Cycling entered a First Amendment to the Sublicense Agreement which, among other things, increased the minimum royalty Trek was required to pay LeMond Cycling for use of the trademarks to $350,000 per contract year, extended the term of the agreement to September 30, 2010, and granted Trek two five-year options to renew the agreement until 2020.  A copy of the First Amendment to the Sublicense Agreement is attached to this Complaint as Exhibit 2.

14.    During Lance Armstrong's ascendancy as a public figure, the sport of competitive cycling experienced a surge in public interest, and the entire bicycling industry experienced a corresponding, unprecedented increase in sales.  Because of Trek's unique association with Lance Armstrong, all of Trek's products—including the LeMond-branded Trek products—were poised to enjoy the benefits of Armstrong's meteoric rise in popularity.  Rather than working cooperatively with Trek to ensure that LeMond, LeMond Cycling, and Trek capitalized on the unique marketing opportunities presented by the Armstrong phenomenon, LeMond instead embarked upon a self-destructive course of conduct by attempting to vilify Armstrong and to diminish Armstrong's accomplishments, thereby undercutting the primary purpose of the Sublicense Agreement.

### Greg LeMond Harms Trek and the LeMond Brand

15.    Contrary to LeMond's contractual promises and Trek's corresponding, contractual expectations, LeMond has repeatedly damaged Trek's brand, goodwill, and business by his relentless public attacks against Lance Armstrong.  LeMond's disparagement of Armstrong has caused substantial damage to both the LeMond and the Trek brands.

5

16.    LeMond also damaged his brand, and therefore damaged Trek, by entering into a business arrangement with a mass merchandiser, contrary to his brand's niche within Independent Bicycle Dealers, and through other conduct that hurt his brand image. Instead of living up to his contractual commitment to cooperate with Trek to grow a valuable business together, LeMond has for years impaired, and now destroyed, thirteen years' of efforts by Trek and its dealers to develop and benefit from the LeMond brand.

17.    Trek markets its bicycles and bicycle products in the United States through an extensive network of independent bicycle dealers. These independent bicycle dealers specialize in selling bicycles and bicycle-related products, relying on the high quality of the Trek products and the reputations of the bicyclists associated with these products.

18.    As a signature-line product—bearing the name of LeMond—the success of the LeMond brand and Trek's efforts to market LeMond-branded bicycles depends upon continued public admiration for LeMond, as well as the positive public images of each of the athletes associated with Trek.

19.    Beginning in 2001, LeMond began to publicly disparage Lance Armstrong, who was then the reigning, three-time Tour de France champion. Many of LeMond's disparaging statements are quoted at length in a March 2008 Complaint that LeMond Cycling served upon Trek and filed on April 8, 2008. LeMond engaged in these public attacks despite Armstrong's association with the Trek brand, and despite LeMond's knowledge that such attacks would undermine the central purpose of the 1995 Sublicense Agreement.

20.    During the 2004 Tour de France, LeMond repeated and intensified his public disparagement of Armstrong. LeMond made these statements during television interviews, in national and international newspapers, magazines, trade press and

6

21.     Predictably, Trek received numerous complaints from customers offended by LeMond's vigorous attacks against Armstrong.  One customer wrote, "I was considering purchasing a LeMond bike but after hearing the comments he has been making about Lance Armstrong the only thing I would use it for is an anchor for my boat.  Have fun selling bikes, what a great spokesperson."

22.     Another customer complaint reflects the predictable diminishment of the LeMond and Trek brands caused by LeMond's public disparagement of Armstrong.  This customer wrote:

> Every year, for the last 4 years, I have purchased a LeMond bike for its quality and robustness.  And of course, because it bears the name of an athlete who once had class and panache.  Perhaps, in the big picture, I am insignificant, but please inform the CEO that he has just lost a once faithful customer.  I can understand the relentless attacks on Armstrong from European sources.  But make me understand what Mr. LeMond has to gain by joining the cacophony???  To further glorify his wins???

23.     Multiple customer complaints emphasized the deterioration of the LeMond and Trek brands resulting from LeMond's public attacks against Armstrong:

- One customer commented, "[d]oesn't Trek sponsor both Lance AND LeMond bikes?  What's going on there?"

- Another customer wrote to express his "disgust," stating: "I was writing a letter to [LeMond's] Cycle company, when I saw that you own them?  How awkward must that be for you, the best thing ever to happen to the sport and Trek, attacked by the namesake of one of your brands?"

- Still another customer wrote: "It must be great comfort to the great people at Trek who sponsor Lance Armstrong (which builds and

distributes LeMond bicycles) that they also represent a jerk in Greg LeMond."

24.     Trek president John Burke spoke repeatedly to LeMond about the negative impact of LeMond's public attacks on the LeMond and Trek brands. Burke expressed Trek's concern that LeMond's public outbursts were inflicting significant damage on Trek, contrary to LeMond's obligation to cooperate in the development and enhancement of the Trek brand. Burke reminded LeMond that just as Armstrong's accomplishments and positive public image enhanced both the LeMond and Trek brands, so too did LeMond's public disparagement of Armstrong cause corresponding harm to the LeMond and Trek brands. Although LeMond repeatedly promised Trek that he would refrain from making any more public comments damaging to the Trek and LeMond brands, LeMond subsequently, and repeatedly, reneged on these commitments.

25.     LeMond's disparaging statements have caused substantial damage to the value of the LeMond trademarks he agreed to license to Trek, caused substantial harm to Trek's own brand and damaged Trek's ability to market and sell its products—including the LeMond-branded bicycles. Trek has suffered significant lost sales and has incurred a corresponding, substantial loss of profits directly attributable to LeMond's public attacks against Armstrong.

26.     In August of 2004, Trek notified LeMond and LeMond Cycling that they had materially breached the Sublicense Agreement, entitling Trek to terminate the Sublicense Agreement. Rather than invoking its right to terminate the Sublicense Agreement, however, Trek continued to provide LeMond the benefits of the Sublicense Agreement to allow LeMond time to find another licensee for his brand.

27.     In December of 2004, after LeMond was unable to find another company interested in licensing the now-tarnished LeMond brand, LeMond Cycling attempted to

serve and threatened to file a lawsuit making numerous disparaging statements harmful to Trek and its business interests. LeMond's threatened suit was intended to persuade Trek to withdraw its notification of material breach, and to coerce Trek into continuing its association with LeMond. As it stated at the time in January of 2005, given the damage litigation would cause to Trek and the LeMond brand, Trek was forced to withdraw the Notice of Breach. Trek advised LeMond that it was willing to continue their association, so long as LeMond lived up to his renewed commitment to refrain from any further public attacks against Lance Armstrong that had been so detrimental to the LeMond and Trek brands.

28.    After a meeting with LeMond in April of 2005, Burke sent an email to LeMond confirming their discussions about the damages being caused by LeMond's disparaging public statements concerning Lance Armstrong. Burke confirmed in this email the obvious point that LeMond's public attacks were damaging both LeMond Cycling and Trek, stating: "Trek does not have any problem with you making general comments regarding the negative effects of doping on the sport and the positive steps being done to address it. Just do not publicly comment on specific athletes. Commenting on specific athletes is not good for you, Trek or the LeMond brand."

29.    Burke affirmed Trek's continued interest in working cooperatively with LeMond to further the central goals of the 1995 Sublicense Agreement, writing: "We want to move the public perception back to Greg LeMond, first American to win the Tour, three-time Tour winner, overall great guy and someone who cares deeply about the cleanliness of the sport. Please let me know if you agree."

30.    LeMond affirmed in a responsive, April 12, 2005 email that he would work cooperatively with Trek to build the Trek and LeMond brands, and that he would refrain

9

from launching any more attacks against Armstrong. LeMond represented to Trek in his email: "I am ready to move on regarding the doping and [Lance Armstrong]."

31.     LeMond renewed this commitment in a December 15, 2005 email to Burke, writing:

> I want to reassure you that I have no intentions of going out there and blasting off on [Lance Armstrong]. I want to move beyond this last period and start to enjoy riding the bike and the bike business."

32.     Despite these repeated assurances, LeMond again renewed his public attacks against Lance Armstrong and against other professional athletes, again inflicting significant damage upon Trek, the Trek brand, and Trek's business. The predictable onslaught of consumer outrage with LeMond's conduct, and as a result, more negative consumer reactions directed to Trek, soon followed.

33.     One Trek customer wrote in response to LeMond's public attacks:

> I recently purchased a LeMond bike and am having an unusual problem. When I place it in the garage next to my Specialized and Trek bicycles it begins to whine and complain that the other bikes are cheaters and that it is the only true "American Champion." I was wondering, if maybe Greg himself would stop being a whining asshole, maybe this piece of shit bike would also stop. Please have him do it publicly so I can bring the bike in to watch it on TV. I suppose this is not covered under warranty.

34.     Another Trek customer sent an email stating:

> Name: Former LeMond Fan
>
> Email: lemondsucks@yahoo.com
>
> Comments: Has Greg always been a sniveling, insecure jerk who needs to denigrate others' accomplishments in order to boost his own self esteem? If Greg's bikes display the same quality as he displays as an individual, please keep them far away from me.

35.     In the fall of 2007, at a key time for the promotion of the LeMond line in Europe, LeMond once again lashed out against Armstrong. During an interview with *Tour* magazine, one of the most influential European publications devoted to road cycling,

LeMond claimed Lance Armstrong and Trek were to blame for LeMond's recent absence from the public eye: "This is for my problems with Armstrong. I criticized his cooperation with Michael Ferrari and for that reason got into big trouble with Trek. If I had loudly said what I thought this would have been suicide for my business."

36.     LeMond's widely published comments not only caused further harm to the Trek and LeMond brands, but also confirmed LeMond's own awareness that such comments would cause harm to their respective business interests.

37.     Responding to LeMond's latest public attacks against Armstrong and the Trek brand, one of Trek's employees responsible for marketing and sales in Germany forwarded a copy of the article published in *Tour*, complaining: "Those quotes don't help our image in Germany." Trek's European Director in turn forwarded this complaint to Burke, complaining to Trek about LeMond's latest verbal onslaught against Armstrong and Trek. Trek's European Director noted that LeMond was supposed to be *building up* the LeMond and Trek brands—not *tearing them down*:

> So I bust my balls to get LeMond on the booth at Eurobike and into our GAS dealer programme and then up pops Greg in Tour Magazine (The most influential European/GAS road magazine) and slags off Trek right slap bang in the middle of pre-season when we are trying to get the bikes (the ones with his name on) into the dealers.
>
> The guy is legend and I have the utmost respect for what he achieved in the sport but from a commercial perspective he's an idiot and I don't see any way back for us in Europe.

38.     LeMond's latest efforts to undermine the central purpose of the Sublicense Agreement violated § 13.02.01 of the Sublicense Agreement, and constituted a material breach of contract empowering Trek to terminate the agreement immediately. Rather than invoke this right, however, Trek instead elected to once again to continue on with LeMond, through the end of the contract term. In November of 2007, Burke met privately with

LeMond to notify him that Trek would not be exercising its option to extend the

Sublicense Agreement beyond its expiration in 2010. When LeMond asked for permission

to look for other business partners despite his current obligations under the Sublicense

Agreement, Trek not only agreed to permit LeMond to pursue such opportunities, but

actually assisted LeMond in his efforts.

39.     Failing in his efforts to find a corporate sponsor willing to take a risk on

someone who had proven to be such an undependable business partner, LeMond tried one

more time to strong-arm Trek into continuing its dysfunctional relationship with LeMond.

LeMond once again threatened Trek with additional negative publicity unless Trek

capitulated to LeMond's latest demands.

40.     On March 20, 2008, LeMond served and threatened to file yet another

lawsuit, replete with disparaging comments directed at Armstrong, Trek, and other

athletes. LeMond's March 20, 2008 complaint included even more inflammatory

allegations against Lance Armstrong and Trek than had been asserted in the 2004 version

of the complaint. The 2008-version of the complaint included factual embellishments of

the same events that had been recounted in the 2004-version of the complaint, all designed

to impose additional pressure on Trek to capitulate to LeMond's demands. In a none-too-

subtle reminder that the latest round of negative comments contained in the 2008-version

of the complaint could be avoided if Trek were willing to pay LeMond's price, the letter

forwarding the complaint reminded Trek that the complaint was not yet "publicly available

at this time."

41.     Trek recognized that LeMond's repeated repudiations of his most

fundamental obligation to Trek under the Sublicense Agreement would never end, and that

its association with LeMond and LeMond Cycling had become too toxic to continue.

Faced with a business partner unwilling to respect his contractual obligations and unable to fulfill his professional obligations, Trek concluded that it could no longer continue its association with LeMond.

42.    Rather than capitulating to LeMond's latest demands, Trek filed the instant lawsuit seeking judicial confirmation that LeMond and LeMond Cycling's material breaches excused Trek from any further obligations under the Sublicense Agreement. Because it is clear that LeMond is more interested in tearing down the Trek brand than building it up, Trek seeks judicial confirmation that the relationship between LeMond and Trek can and must be terminated.

## FIRST CLAIM FOR RELIEF
### Declaratory Judgment

43.    All prior paragraphs are incorporated by reference.

44.    Trek has complied fully with its obligations under the Sublicense Agreement, and at all times has been entitled to the benefits and entitlements due to it from LeMond and LeMond Cycling pursuant to the Sublicense Agreement. Trek has worked diligently in its pursuit of the goals of the Sublicense Agreement, including development of the LeMond brand, and the marketing of Trek products bearing the LeMond brand in order to maximize the possible sales of that product line. Trek has incurred significant expenses in pursuit of those efforts, meeting and exceeding the specific, contractual "best efforts" requirements imposed upon it under §§ 5.02, 8.01, and 12.01 of the Sublicense Agreement. Trek has paid LeMond Cycling millions of dollars in royalties pursuant to the terms of the Sublicense Agreement, and has satisfied each and every one of its other obligations under the agreement. Trek performed fully under the Sublicense Agreement despite LeMond's and LeMond Cycling's persistent efforts to undermine those efforts, to

diminish the Trek and LeMond brand, and to hinder Trek's ability to develop the brands and to sell LeMond-branded Trek products.

45.    Despite Trek's full, good faith performance, LeMond and LeMond Cycling have materially breached the Sublicense Agreement, and through their deliberate conduct thwarting and undermining the central purpose of the Sublicense Agreement, have repudiated the Sublicense Agreement. LeMond's and LeMond Cycling's breaches have deprived Trek of the central benefits to which it is entitled under the Sublicense Agreement—namely, (a) association with a positive, LeMond brand image for marketing Trek products, and (b) the cooperation of LeMond and LeMond Cycling in developing the LeMond and Trek brands so as to increase sales of Trek's products. Not only has LeMond's and LeMond Cycling's conduct caused a significant loss of sales of LeMond-branded Trek products, but their conduct has caused irreparable damage to the LeMond brand, and has tarnished and damaged the Trek brand.

46.    LeMond's and LeMond Cycling's material breaches and repudiation of the Sublicense Agreement excuses Trek from any further obligations under the agreement, and discharges those obligations otherwise available to LeMond and LeMond Cycling. Section 13.02.01 of the Sublease Agreement expressly authorizes Trek to terminate the Sublicense Agreement in the event that LeMond or LeMond Cycling "takes any action which damages or has an adverse impact upon [Trek] or [Trek's] business or goodwill …." Trek afforded LeMond and LeMond Cycling multiple opportunities to refrain from this wrongful conduct, and repeatedly insisted that LeMond and LeMond Cycling perform their obligations under the Sublicense Agreement in good faith. Trek's continued forbearance in the face of LeMond and LeMond Cycling's persistent misconduct was intended to give

LeMond and LeMond Cycling every reasonable opportunity to modify their conduct and to begin performing under the Sublicense Agreement.

47.     The damages and harm LeMond and LeMond Cycling's conduct has caused to Trek and its business is permanent and irreparable. LeMond and LeMond Cycling's conduct constitutes a material breach and repudiation of the Sublicense Agreement, and specifically violates the termination trigger provisions of § 13.02.01 of the Sublicense Agreement. LeMond's and LeMond Cycling's conduct has destroyed the essential benefits that were to be provided under the Sublicense Agreement.

48.     Accordingly, Trek is entitled to a declaration that the Sublicense Agreement may be terminated as a result of LeMond and LeMond Cycling's material breach of the express provisions of § 13.02.01 of the Sublicense Agreement, as well as LeMond and LeMond Cycling's material breaches and repudiation of the most fundamental obligations of the Sublicense Agreement, including the obligation of good faith and fair dealing. Trek is entitled to a judicial confirmation and declaration that as a result of these material breaches, Trek is excused from any further obligations under the Sublicense Agreement, and is entitled to pursue an award of compensatory damages flowing from these breaches and ensuing, early termination. Trek also requests a declaration of rights governing the orderly severance of the parties' relationship to protect Trek from suffering any additional harm.

## SECOND CLAIM FOR RELIEF
### Breach of Contract (Sublicense Agreement)

49.     All prior paragraphs are incorporated by reference.

50.     LeMond's and LeMond Cycling's conduct materially breached multiple, express provisions of the Sublicense Agreement. LeMond's and LeMond Cycling's breaches of the Sublicense Agreement have caused substantial damages to Trek, including

15