UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LEMOND CYCLING, INC.,

    Plaintiff,

v.

TREK BICYCLE CORPORATION,

    Defendant and
    Third-Party Plaintiff,

v.

GREG LEMOND,

    Third-Party Defendant.

Case No. 08-CV-1010 (RHK-JSM)

**TREK'S MEMORANDUM IN RESPONSE TO PLAINTIFF'S MOTION TO COMPEL**

Defendant and Third-Party Plaintiff Trek Bicycle Corporation ("Trek") provides this memorandum in response to Plaintiff LeMond Cycling, Inc.'s Motion to Compel Responses to Its First Set of Discovery Requests.

## Introduction

There is only one genuine dispute between the parties over Trek's document production; namely, the plaintiff's request for Lance Armstrong's endorsement contracts. Trek's counsel's December 19, 2008 letter discussing LeMond's discovery issues makes plain that as to all issues raised at that time other than the Armstrong contracts, Trek is

working to accommodate LeMond's discovery requests.[1] (*See* 12/19/08 letter from Ralph Weber to Denise Rahne, Declaration of Ralph A. Weber ("Weber Decl."), ¶ 1. Exh. 1).

Trek of course appreciates the broad scope of permissible discovery under the Federal Rules, and has acted accordingly. It also understands there are limits established by "reasonably calculated to lead to the discovery of admissible evidence," and the avoidance of "annoyance, embarrassment, oppression, or undue burden or expense."

This case can and should proceed as competing breach of contract actions between Trek and Mr. LeMond. Despite LeMond's suggestions, the terms of Lance Armstrong's contract with Trek play no role in this dispute. LeMond's brand damaging conduct damaged Trek through diminished sales of LeMond-branded bicycles. Mr. LeMond acknowledged this reality in 2001, when he first attacked Mr. Armstrong, asking Trek to excuse him from a Trek dealer meeting so he would not have to face hundreds of dealers angry at him for disparaging a fellow American athlete. (*See* LCI 02979[2], page 8 from the transcript of a conversation between Greg LeMond and John Burke on August 13, 2001, Weber Decl. ¶ 2, Exh. 2).

Mr. LeMond reiterated his knowledge that his attacks on other athletes were harming his brand when he testified that his attacks had generated such hostility among consumers that he received death threats and had to disconnect his internet link. (*See*

---

[1] Trek's unsuccessful efforts to obtain meaningful Rule 37.1 meet and confer sessions are chronicled in Trek's Motion to Compel Rule 37 Conference, filed December 31, 2008.

[2] Although the taped conversations originally were marked as confidential by LeMond, LeMond elected to attach transcript pages to his filing. Accordingly, Trek assumes LeMond does not object to Trek doing the same thing in this filing.

Greg LeMond 12/15/08 Depo. Tr., at 193-194, Weber Decl., ¶ 3, Exh. 3). Trek likewise received hundreds of emails attacking it and Mr. LeMond, based on Mr. LeMond's attacks on other athletes. (*See* Trek's Counterclaim and Third-Party Complaint, at ¶¶ 19-23; 32-37, Weber Decl., ¶ 4, Exh. 4). Many of these hostile emails included promises never again to purchase a LeMond-branded bicycle. (*Id.*) That business reality, and Mr. LeMond's repeated broken promises to Trek not to damage his brand image, is the focus of Trek's claim. In addition, Trek has claims arising from Mr. LeMond's abusing his privilege to purchase bicycles at employee pricing.

Mr. LeMond, meanwhile, contends that Trek should have sold more LeMond-branded bicycles, notwithstanding the things Mr. LeMond did that made this more difficult. That is the actual focus of his claim, which can get lost amidst the pages of disparaging remarks about other athletes in bicycling, baseball and the Olympics.

Trek will continue to provide full discovery on all issues reasonably calculated to lead to the discovery of admissible evidence. It must object, however, to any improper attempt to invade other business relationships for reasons unrelated to legitimate inquiries in this litigation. Such improper invasions go beyond the scope of legitimate discovery and into the realm of annoyance and oppression. Trek's and LeMond's contract disputes are between them and them alone. Armstrong's Trek contract is not in issue.

## I. Discovery Requests

### Interrogatory 8 and Request 23 – Armstrong Agreements

The Court should be aware that Trek has already produced all communications that it has identified between Trek and Armstrong relating to LeMond or LeMond

3

Cycling. (Request 22, Robbins Decl., Exh. 4). Trek has drawn the line only at LeMond's requests to see Armstrong's Trek contracts, *i.e.,* Interrogatory 8 and Request 23.

LeMond's counsel wrote in support of the requests to see Armstrong's Trek contracts, stating the belief that Trek's damages claim somehow implicated Armstrong contracts:

> "If Trek intends to maintain any semblance of a claim for damages in the present matter, Trek cannot have it both ways and refuse to produce documents related to an asset it claims to have been damaged."

(Robbins Decl., Exh. 3, at 2).

Trek's counsel responded, explaining that LeMond misunderstood Trek's damage claim, and that it was LeMond-branded bicycle sales that were in issue:

> "Mr. Armstrong's contracts with Trek are not part of this litigation, and do not form the basis of Trek's damage claim. Trek would have sold millions of dollars more LeMond-branded bicycles had Mr. LeMond not breached his agreements with Trek. Indeed, Mr. LeMond confirmed for himself that he was causing lost sales of his brand when he secretly recorded a phone call to a dealer in 2004. This secret and improper taping, which you recently turned over, contradicts contemporaneous assertions by Mr. LeMond and his representatives. Trek will prove these lost sales through its expert, and expects to recover these lost profits from Mr. LeMond. I was surprised that Mr. LeMond seemed unaware of Trek's damage claim at his deposition on Monday."

(12/19/08 letter, Weber Decl., Exh. 1, at 3).

LeMond's brief simply ignores the above explanation, and repeats that the Armstrong "Endorsement and Spokesperson Agreements are therefore relevant to Trek's damages claims and must be produced." (LeMond Br. at 7). Again, Trek's damage claim is based on its lost sales of LeMond-branded bicycles, so its Armstrong contracts do not come into play. No proper basis to see these contracts has been suggested.

4

### Request 3 – International Marketing, Promotion and Advertising

There is no dispute here. As Trek's counsel explained, Trek gathered and produced its documents demonstrating its efforts to market, promote and advertise products bearing LeMond's name in any territory outside the United States. Trek did not read the request as seeking "*internal planning* for such marketing, promotion and advertising" outside the United States, as LeMond's counsel later indicated was the intent. (12/19/08 letter, Weber Decl., Exh. 1 at 2) (emphasis supplied). Nonetheless, as Trek's counsel stated on December 19, now that LeMond's counsel explained (or expanded) the request, Trek has agreed to gather any and all such documents from their local and international offices and produce them right away. (*Id.*)

LeMond's December 31 brief for some reason ignores Trek's December 19 explanation and offer. (LeMond Br. at 7-9).

### Request 11 – Trek's Plans for LeMond to September 30, 2010

There is no dispute here. Trek intended to continue selling LeMond-branded bicycles until the end of the contract term next year, and told this to Mr. LeMond in November 2007. (*See* Counterclaim and Third-Party Complaint, at ¶ 38, Weber Decl., Exh. 4). When Mr. LeMond learned that Trek was not planning to extend the contract beyond that date, however, LeMond set in motion a plan to force Trek to buy out his brand at significant cost or to pay him a substantial sum to end the contract early. That plan revolved around the service but not filing of a Complaint filled with disparagement of Trek, Lance Armstrong and other athletes. It appears LeMond believed Trek would capitulate to his financial demands rather than face the publicity caused by LeMond's

5

Complaint, which strategy had worked for LeMond once before, in 2004. (*Id.* at ¶¶ 26-27, 38-40).

This time, Trek was finally fed up with LeMond's conduct and LeMond's strategy failed. Trek elected to face LeMond's disparagement and threats head on, and with this litigation the business relationship came to an end. LeMond understood immediately that the contract was over, as shown through his New York agent's letter of May 28, 2008, claiming rights under "the Agreement <u>now abrogated</u> by Trek." (*See* 11/25/08 letter from Ralph Weber to Sidney Bluming, Weber Decl. ¶ 5, Exh. 5) (emphasis supplied). Although Trek reminded LeMond in its November 25, 2008 letter of LeMond's abrogation assertion last May, LeMond tries to rewrite history stating, "Trek has recently and unilaterally ceased carrying the LeMond brand in the last few weeks . . . ." (LeMond Br. at 8-9). It was LeMond who elected to end the business relationship when he served but did not file a pleading filled with disparagement and personal attack. He knew that meant the end of his business relationship with Trek; he just expected to be paid handsomely in exchange for not filing the pleading.

Thus, as to Trek's pre-lawsuit plans to continue the LeMond brand, those documents have been produced. Trek had no plans to continue the LeMond brand once LeMond demonstrated that he would once again use deceit and improper leverage to harm his business partner of 12 years. Trek's consultations with its lawyers on this subject of course are privileged. Accordingly, there are no documents to produce.

6

### Request 16 – Customer Comments

Again, there is no dispute. Trek produced hundreds of customer comments on October 3, 2008, identified as TREK000054-TREK000638, which covered the period up until the lawsuits. Trek next produced on December 8, 2008 and December 9, 2008 all post-lawsuit comments not previously produced, identified as TREK009464-TREK009927 and TREK011789-TREK011802. When LeMond's counsel asked on Thursday, December 18, 2008 about an email she had received as a "cc" back on April 18, 2008, which was not part of the production, Trek checked the email account to which the email was sent, found the email, and immediately produced it along with all other responsive emails from that account on Tuesday, December 23, 2008, TREK011891-TREK011983. Although repeated searches already have been done, if any additional customer comments are found, at any time, they will likewise be produced.

### Request 24 – Calls to or from Armstrong

To begin, LeMond's counsel raised no issue about this request in its November 14, 2008 letter. (Robbins Decl., Exh. 3 at 2-3 (ending with Request 23)). To keep things moving, putting Rule 37.1 aside, Trek responds as follows:

In July 2001, as Mr. Armstrong was matching Mr. LeMond's American record of 3 wins at the Tour de France, Mr. LeMond elected to undercut Mr. Armstrong's success by suggesting Armstrong's accomplishment was *either* a great comeback from a near-death cancer experience, *or* a great fraud. Understandably, Mr. Armstrong was upset to be attacked by a fellow American cyclist, especially one Mr. Armstrong had greatly admired as a young rider.

A series of phone calls and faxes followed, which ended in Mr. LeMond agreeing that his remarks were unwise and had caused significant anger among bicycle dealers, whom he needed to purchase and resell bicycles carrying his name. As noted above, Mr. LeMond specifically asked Trek's President for permission not to attend Trek's annual dealer meeting so that Mr. LeMond would not have to explain his conduct to hundreds of angry dealers. That request was granted. (*See* Weber Decl., Exh. 2).

Trek has produced its documents from this period, including phone notes of Trek's president who was trying to make peace between two important Trek athletes, together with drafts of the press releases reviewed and ultimately approved by Mr. LeMond. TREK000786-790. LeMond does not explain, and Trek does not know, why LeMond believes there are additional documents.

## II. Redaction/Privilege Logs and Practices

These logs are routine in litigation, and Trek is surprised to see this issue brought before the Court. LeMond's December 31 brief is the first time that LeMond told Trek that it has a problem with Trek's redaction or privilege logs.

Putting the Rule 37.1 meet and confer deficiency to one side (again), Trek believed that its descriptions were appropriate and in full accord with LeMond's own logs. If LeMond wants to use a different format now and change his own approach, Trek would be happy to discuss it. If the Court requires something different, Trek will comply. If the Court would like to see any of the documents Trek withheld or redacted, Trek will submit it for the Court's *in camera* review. As for the timing of when LeMond will get Trek's redaction log for the more recently produced documents, we are working

diligently to complete this very detailed process and will provide them as soon as it is completed. LeMond likewise has required time to prepare his logs. For example, LeMond produced many fewer documents on 10/16/08, 10/24/08, 11/04/08, 11/05/08, 11/06/08, 11/14/08, 11/19/08 and 12/05/08, and did not produce a privilege log until November 26, 2008 and a redaction log until December 5, 2008.

1. Redaction logs and practices

Turning to the merits of the logs, Trek's logs largely track the approach taken by LeMond. Since LeMond cannot assume different standards apply to the two sides, Trek is unsure what the problem is. LeMond's redaction log is less descriptive than Trek's, in that LeMond's log uses descriptions such as "Attorney client privileged information," or "Attorney client communication" (without noting it was for the purpose of rendering legal advice). (*See* LeMond's Redaction Log, Weber Decl., ¶ 6, Exh. 6). In addition, LeMond's redaction log does not list the names of the authors, recipients, type of documents. (*See id.*). Thus, Trek must resort to the actual documents for that information, which is lacking in many of the documents (*see, e.g.,* LCI 1138-39[3]; LCI 5810; LCI 5918).[4] Furthermore, there are documents that are marked "REDACTED" in plaintiff's production that are not listed at all on the redaction log, although documents

---

[3] LCI 1138-39 are described on the redaction log as "Attorney client privileged communication" but the actual documents do not identify the persons engaging in the privileged communication, the date of the communication, the type of communication, etc., that has been redacted.

[4] Trek has not attached the actual LCI documents as an exhibit since they were designated "CONFIDENTIAL" by LeMond and are therefore subject to the protective order. Trek anticipates LeMond will not object to their filing. If objection is made, Trek will bring these to the Court at the hearing (or file them under seal prior to the hearing).

9

subsequent in the bates range are on the log. (*See* LCI 05929; LCI 05936 marked "REDACTED," but not listed on log).

As for LeMond taking issue with particular entries in Trek's redaction log (LeMond Br. at 12, n. 4), plaintiff's own redaction log contains redactions of attorney-client communications forwarding information. Unlike Trek's redaction log, however, LeMond's log does not identify any information about the redacted information (*e.g.*, author, recipient, type of communication, etc.). (*See* LeMond's Redaction Log, LCI 4818-4825, Weber Decl., Exh. 6). Again, the actual documents do not appear to contain the necessary information from which Trek could make a judgment as to whether or not to challenge the asserted privilege.

With respect to the redactions themselves, while Trek's redactions were primarily done by using a black block (which makes plain the area of the document that has been redacted), LeMond's redactions were done in white or clear so that, for the most part, Trek does not know where the redacted information was located on the page. Trek would ask LeMond to re-do the redactions so that the redacted area is apparent.

2. Privilege Logs

The descriptions in LeMond's privilege log for fully withheld documents are generally no more specific than Trek's. For example, LeMond's log is primarily comprised of the generic descriptions: legal advice re "communication with Trek" or "legal strategy" (which appears redundant of the phrase "legal advice"). (*See* LeMond's Privilege Log, Weber Decl., ¶ 7, Exh. 7). Such descriptions provide no more pertinent information to Trek to assess LeMond's claims of privilege than Trek provided to

plaintiff with descriptions such as "legal advice re LeMond." It should also be noted that although LeMond's descriptions appear at first blush to be lengthier because they identify the type of communication (*i.e.* email, fax, etc.) in the description, Trek provided that same information in a separate column in its log, instead of in the description.

The only genuine issue that has arisen thus far concerning assertions of privilege and log description involves LeMond's withholding of a tape recording, which is addressed in Trek's Motion to Compel. (*See* Trek's Memorandum in Support of its Motion to Compel Responses to Trek's First Set of Written Discovery to LeMond Cycling, Inc., at 13 and n. 1, Weber Decl., ¶ 8, Exh. 8). This recording, of Betsy Andreu, came up in Mr. LeMond's deposition when he testified it may have been destroyed. When Trek's counsel followed up with LeMond's counsel about the recording, LeMond's counsel pointed to LeMond's privilege log, LCI PRIV 00202 - LCI PRIV 00203, which describes only "record of client investigation at the direction of counsel to identify potential witnesses," with the author identified as Greg LeMond. First, Betsy Andreu is not mentioned; second, nothing is said about a tape; and third, it is not apparent how a secret tape recording of Betsy Andreu could be described as having been authored by Greg LeMond. If LeMond is withholding a secret tape recording of Betsy Andreu, while he produces other tapes he believes somehow support his cause, then he should be required to make the withholding apparent on his log and now to justify it to this Court.

## Conclusion

Trek regrets taking the Court's time with these mostly routine discovery matters. The details of Armstrong's Trek contracts do not relate to Trek's damage claims, contrary

to LeMond's assertions. Trek's lost profits flow from the millions of dollars of LeMond bicycles that were not sold as a consequence of dealer and consumer hostility toward Mr. LeMond. The balance of the issues raised by LeMond can and should be worked out by counsel.

Dated:  January 8, 2009

                GASS WEBER MULLINS, LLC

                By: /s/ Ralph A. Weber
                    Ralph A. Weber (SBN 1001563)
                    Christopher P. Dombrowicki (SBN 1041764)
                    Kristal S. Stippich (SBN 1061028)
                    309 North Water Street, Suite 700
                    Milwaukee, WI  53202
                    Telephone: (414) 223-3300
                    Fax: (414) 224-6116
                    weber@gasswebermullins.com
                    dombrowicki@gasswebermullins.com
                    stippich@gasswebermullins.com

                    Erik T. Salveson (Reg. No. 177969)
                    Amanda M. Cialkowski (Reg. No. 306514)
                    Benjamin R. Rolf (Reg. No. 386413)
                    HALLENALND LEWIS NILAN &
                    JOHNSON, P.A.
                    600 U.S. Bank Plaza South
                    220 South Sixth Street
                    Minneapolis, MN  55402
                    Telephone (612) 338-1838
                    Fax:  (612) 338-7858
                    esalverson@halleland.com
                    acialkowski@halleland.com
                    brolf@halleland.com

                    **ATTORNEYS FOR DEFENDANT AND THIRD-PARTY PLAINTIFF TREK BICYCLE CORPORATION**