```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                    )
      LeMond Cycling, Inc.,           )   File No. 08 CV 1010
 4                                    )             (RHK/JSM)
              Plaintiff,              )
 5                                    )
      vs.                             )   Saint Paul, Minnesota
 6                                    )   January 15, 2009
      Trek Bicycle Corporation,       )   1:00 p.m.
 7                                    )
              Defendant/Third-Party   )
 8            Plaintiff,              )
                                      )
 9    vs.                             )
                                      )
10    Greg LeMond,                    )
                                      )
11            Third-Party Defendant.  )
      ------------------------------------------------------------
12
                 BEFORE THE HONORABLE JANIE S. MAYERON
13          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                         (MOTIONS HEARING)
14
      APPEARANCES
15      For the Plaintiff:        ROBBINS KAPLAN MILLER & CIRESI
                                  DENISE S. RAHNE, ESQ.
16                                JENNIFER M. ROBBINS, ESQ.
                                  2800 LaSalle Plaza
17                                800 LaSalle Avenue
                                  Minneapolis, Minnesota
18                                55402-2015

19      For the Defendant:        GASS WEBER MULLINS, LLC
                                  RALPH A. WEBER, ESQ.
20                                309 North Water Street
                                  Suite 700
21                                Milwaukee, Wisconsin  53202

22                                HALLELAND LEWIS NILAN & JOHNSON
                                  ERIK T. SALVESON, ESQ.
23                                220 South Sixth Street
                                  Suite 600
24                                Minneapolis, Minnesota
                                  55402-4501
25
```

1      Court Reporter:           CARLA R. BEBAULT, RPR
                                 146 Federal Building
2                                316 North Robert Street
                                 Saint Paul, Minnesota 55101
3

4          Proceedings recorded by mechanical stenography;
       transcript produced by computer.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **P R O C E E D I N G S**

2  **IN OPEN COURT**

3

4  THE COURT:  Good afternoon.  We're here this

5  afternoon in connection with the matter of LeMond Cycling

6  versus Trek Bicycle Corporation, et al, court file number

7  08-1010.  If the attorneys would identify themselves

8  starting first with counsel for Plaintiffs.

9  MS. RAHNE:  Thank you, your Honor.  My name is

10  Denise Rahne from Robbins Kaplan.  I represent LeMond

11  Cycling and Greg LeMond, and I have with me from my office

12  Jennifer Robbins.

13  THE COURT:  I'm sorry, Jennifer?

14  MS. RAHNE:  Robbins.

15  THE COURT:  And on behalf of Defendants and

16  Third-Party Plaintiff?

17  MR. WEBER:  Good afternoon, your Honor.  Ralph

18  Weber and Erik Salveson for Trek.

19  THE COURT:  It's Ralph and can you spell your last

20  name, please?

21  MR. WEBER:  W-E-B-E-R.

22  THE COURT:  All right.  And I'm sorry.

23  Mr. Seltzer?

24  MR. SALVESON:  Salveson, S-A-L-V-E-S-O-N.

25  THE COURT:  All right.  We're here this afternoon

1    to address three motions filed in this case.  Docket number

2    49 is Plaintiff's Motion to Compel Discovery.  Docket 55 is

3    Defendant's Motion to Compel a Rule 37 Conference.  And

4    docket 61, which is Plaintiff's Motion to Compel Responses

5    to Written Discovery.

6          Before we begin with these motions, let me say I

7    am going to grant the motion to -- Defendant's Motion to

8    Compel the Rule 37 Conference, and in fact I'm going to

9    require that the parties have their Meet and Confer right

10   now.  So having reviewed the papers and reviewed the history

11   leading up to these motions, I am not satisfied that the

12   parties have engaged in a proper Meet and Confer to try and

13   resolve their various disputes so you're going to do it

14   right now.

15         We're going to go off the record.  I'm going to

16   leave the courtroom here, as is the court reporter, and I'm

17   going to require you to meet and confer on all of the issues

18   that are the subject of your respective motions.  And when

19   you're done meeting, either you have reached agreement on

20   all, some or none, then you can notify me and I will come

21   back in with the court reporter and we will put on the

22   record what you've agreed to, if anything; what remains to

23   be resolved, and I'll hear argument on those issues that

24   need to be resolved.

25         So with that said, we're going to go off the

1    record here and as soon as you all are ready to have me

2    return into the courtroom here I'll return.  Okay?

3              MS. RAHNE:  Thank you, your Honor.

4              MR. WEBER:  Thanks, Judge.

5              THE COURT:  Okay.  Thank you very much.

6              (Recess taken from 1:04 to 2:30 p.m.)

7              THE COURT:  Let me before we go on the record, let

8    me -- all right.  We're back here on the record in the

9    matter of LeMond Cycling, et al versus Trek Bicycle

10   Corporation.  The parties have had a Meet and Confer on both

11   of their respective Motions to Compel at the requirement of

12   the Court.  So let's do this.  Let's first address

13   Plaintiff's Motion to Compel.  And if Plaintiff's counsel

14   would come up to the podium and tell me what the status of

15   the resolution of that motion is; that is, what issues have

16   been resolved and what issues, if any, remain to be

17   resolved.  And then I'll hear argument on those motions and

18   then we'll do the same with Defendant's motion.

19             MS. RAHNE:  I'm happy to, your Honor.

20             THE COURT:  All right.

21             MS. RAHNE:  Thank you, your Honor.  I think we had

22   a very productive discussion and we have been able to

23   resolve the set of issues related to Trek's production of

24   documents relating to their efforts to promote the LeMond

25   brand.

                    THE COURT:  Let's go through each interrogatory

and document request that is the subject of your motion and

you can tell me whether it's resolved or whether it needs

resolution.

                    MS. RAHNE:  Okay.  This would address request for

production number 3.

                    THE COURT:  So document request number 3 is

resolved?

                    MS. RAHNE:  Correct.  Request for production

number 11.

                    THE COURT:  Yes.

                    MS. RAHNE:  And request for production number 16.

                    THE COURT:  Are all resolved?

                    MS. RAHNE:  Are all resolved.

                    THE COURT:  All right.  And does that mean that

interrogatory number 8 and document 23, along with document

request number 24 and the privilege logs and redaction logs

are not resolved?

                    MS. RAHNE:  Interrogatory number 8 and document

requests 23 and 24 are not resolved.  We do have an

agreement regarding the privilege and redaction logs.

                    THE COURT:  Okay.  So that is resolved as well.

                    As to the items that are resolved, is it your

desire to put the resolution on the record or are you

satisfied that each of you know what the resolution is and

1    I'll simply reflect that the parties have reported that they

2    have resolved those particular discovery requests?

3           MS. RAHNE:  I would like to put something briefly

4    on the record with respect to the results of the issues

5    broadly if I may.

6           THE COURT:  All right.  Let's then -- why don't

7    you put on the record then what the resolution is as to

8    document request 3, 11, 16, and the privilege and redaction

9    logs, and then we'll hear about the remaining discovery

10   items.

11          MS. RAHNE:  Thank you, your Honor.  With regard to

12   request for production 3, 11 and 16, Trek has agreed to our

13   satisfaction to provide all documents and then confirm that

14   they have done so in sufficient time -- and I don't have the

15   date here.  I feel comfortable without putting that on the

16   record, but within sufficient time for us to get the

17   information to our experts so that we can assess initial

18   discovery that we need to take and have our experts begin

19   their work.

20          THE COURT:  All right.  And then on the privilege

21   log?

22          MS. RAHNE:  On the privilege and redaction log,

23   your Honor, we have an agreement that we will help Trek

24   prioritize which ones they will look at additionally.  And

25   that for those that we identify, they will provide

1    additional subject matter information so that we can better

2    assess the privilege and whether we are in a position to

3    make any challenges.

4         THE COURT:  So you're going to give them a list of

5    which ones that you need greater description and they are

6    going to give you a better description as to those.  And

7    then you will be able to decide whether down the road to

8    move on those?

9         MS. RAHNE:  That's correct, your Honor.

10        THE COURT:  Okay.  I'm just making a note here.

11        All right.  Then does that describe the resolution

12   of those issues?

13        MS. RAHNE:  Yes, it does, your Honor.

14        THE COURT:  All right.  Then why don't you go

15   ahead and make argument with respect to the remaining

16   discovery issues.

17        MS. RAHNE:  Thank you, your Honor.  Your Honor,

18   I've been -- over the last 24 hours when I have been getting

19   ready for this, I have been struggling to reconcile Trek's

20   position with regard to the discovery we're seeking as to

21   Trek's business relationship with Mr. Armstrong with its own

22   request and what it's asking of LeMond Cycling.  I think

23   we're speaking in broad terms with both motions, and I

24   obviously won't address Mr. Weber's motion right now, but

25   some reasonable amounts of discovery that seeks admissible

1    information related to the parties' contract, the

2    performance of the contract, and motives with regard to that

3    exact issue.

4              THE COURT:  I'm sorry.  The parties' contract

5    meaning?

6              MS. RAHNE:  The contract between LeMond Cycling

7    and Trek.

8              THE COURT:  All right.

9              MS. RAHNE:  There's a fairly well-founded record

10   and we've tried not to overwhelm the Court with the entire

11   back story on all of the major players in this dispute.  But

12   there's a fairly well-established record and we've tried to

13   give a flavor of it in terms of the relationship and the

14   entanglements between Trek, Mr. Armstrong and LeMond

15   Cycling.  Mr. Armstrong has inserted himself as early as

16   2001 and Trek has repeatedly claimed its business

17   relationship with Mr. Armstrong as a basis for restricting

18   or attempting to restrict Mr. LeMond's conduct in some

19   instances and restricting it in others and making claims as

20   to what was appropriate and not appropriate under the

21   contract.

22             THE COURT:  Under the contract between it and

23   Mr. LeMond?

24             MS. RAHNE:  Correct, your Honor.

25             THE COURT:  All right.

1    MS. RAHNE:  They have claimed at times that

2    Mr. Armstrong is a business asset and I think we've provided

3    the Court with an illustration of that.  I think in an

4    effort to avoid providing the information related to its

5    agreement with Mr. Armstrong, they have now moved away from

6    saying that they are claiming any damage relating to him.

7         That, first off, we find that an interesting

8    shift.  Secondly, it doesn't negate the fact that we're

9    entitled to discovery as to Trek's motives for its treatment

10   of the LeMond brand in light of Mr. Armstrong's involvement.

11        THE COURT:  All right.  So you're saying it still

12   bears on liability?

13        MS. RAHNE:  Absolutely, your Honor.

14        THE COURT:  And that would address interrogatory

15   number 8 and document request number 3 where you were

16   seeking to have them to identify any contractual

17   relationships or agreements with Mr. Armstrong and to

18   produce them?

19        MS. RAHNE:  That's correct, your Honor.  I think

20   it's actually request for production number 23.

21        THE COURT:  All right.  And then I have down that

22   interrogatory 8 asks them to describe the agreements; is

23   that right?

24        MS. RAHNE:  That's correct, your Honor.

25        THE COURT:  And then document request number 4,

24, I'm reading my notes here, sought documents showing any telephone conferences made to or from Mr. Armstrong regarding Trek including calls from Mr. Burke on August 13, 2001.

MS. RAHNE:  Yeah.  And I should correct the record, I think, on that.  Mr. Weber probably would when he had a chance anyway, but it's our understanding from our Meet and Confer actually that we could call this one resolved because Trek is claiming that they have produced everything they have.  I mean, obviously we reserve our right to explore that, but we are taking them on their word at that.

THE COURT:  So that's resolved as well so we're really down to interrogatory 8 and 23?

MS. RAHNE:  That's correct, your Honor.

THE COURT:  Anything further that you wish to say regarding your motion then?

MS. RAHNE:  No, your Honor.

THE COURT:  All right.  Then I'll hear the response by Trek.

MR. WEBER:  Thank you, Judge.

THE COURT:  Thank you.

MR. WEBER:  As to the Armstrong contracts --

THE COURT:  First of all, before you get into interrogatory 8 and 23, has counsel for Plaintiffs

1    accurately described the resolution of their motion with

2    respect to interrogatory -- I'm sorry, document requests 3,

3    11, 16, 24, and the privilege and redaction logs?

4              MR. WEBER:  I believe she has, yes.

5              THE COURT:  Then I'll go ahead and hear your

6    responses to interrogatory 8 and document request 23.

7              MR. WEBER:  Thanks, Judge.  It's important on the

8    Armstrong issue to distinguish between what Trek is

9    producing and what Trek is asking not to have to produce.

10   What Trek has produced are any documents reflecting

11   interchanges, discussions, communications, with

12   Mr. Armstrong concerning Mr. LeMond.  And there were

13   discussions back in 2001 when Mr. LeMond suggested

14   Mr. Armstrong was a fraud and Mr. Armstrong was very upset

15   about that and contacted Trek.  And Trek in turn, Mr. Burke,

16   contacted Greg LeMond and what came out of it was a press

17   release.  So there's no secret that that happened.  And some

18   materials that relate to that, those communications, have

19   been identified and produced, including Mr. Burke's

20   handwritten notes of various conversations, including

21   conversations with Mr. LeMond on that topic back in 2001.

22             What Trek is asking not to turn over are separate

23   contractual agreements with Mr. Armstrong as a spokesperson,

24   as a sponsored athlete of Trek, because those agreements and

25   those contracts between Trek and Mr. Armstrong are not

1    implicated in this dispute. The point of Trek's damage

2    claim is that Mr. LeMond's, as you've seen in the papers,

3    comments were very damaging to his own brand and his line of

4    bikes. And as a result --

5            THE COURT: Go ahead.

6            MR. WEBER: As a result, Trek sold a lot fewer

7    LeMond brand of bicycles than they otherwise would have.

8            So Plaintiffs in seeking materials suggest that

9    they were entitled to the Armstrong contracts on the grounds

10   that it related to Trek's damages, and our point of

11   clarification response is that it does not.

12           THE COURT: I want to find -- just hang on a

13   moment here. I understand from your responsive papers that

14   you say that Plaintiffs are not seeking any -- Trek is not

15   seeking any damages with respect to what impact, if any,

16   Mr. LeMond's alleged comments had on its business with

17   Mr. Armstrong. It's not -- to the extent, for example, it

18   may have affected the sale of bikes with Mr. Armstrong's

19   name on it or other products with Mr. Armstrong's name on

20   it. But when I read your answer and counterclaim, it seems

21   to me that throughout it it seems to imply or suggest that

22   Mr. LeMond's alleged comments impacted the Trek brands, of

23   which Mr. Armstrong's products, to the extent his name is on

24   those brands as well, would suggest to me are implicated as

25   well. So if you could address that.

1          MR. WEBER:  Mr. Armstrong doesn't have his name

2     on -- there is not an Armstrong line of bicycles.

3          THE COURT:  Is there an Armstrong line of any

4     products that are sold by Trek?

5          MR. WEBER:  Not to my knowledge, no.

6          THE COURT:  So to the extent that Mr. Armstrong

7     has a relationship with Trek, what does it have to do with?

8          MR. WEBER:  It enhances and promotes the Trek

9     brand.

10          THE COURT:  Okay.

11          MR. WEBER:  And there were indeed customer

12     comments that said things like, As long as Trek is

13     associated with LeMond, we won't have anything to do with

14     Trek at all.  Not just the LeMond brand of bikes.

15          But we are not attempting to quantify and seek

16     damages for damage that -- lost sales of Trek brand of

17     bikes.  Our damage claim relates to the reduction in sales

18     of LeMond branded bikes.

19          What happened during this period was road bike

20     sales after 1999 went up at a precipitous rate associated

21     with the public attention for road cycling that occurred in

22     that time period, particularly associated with

23     Mr. Armstrong's success in the Tour de France.  So you have

24     roadside sales going like this.  The LeMond sales went at a

25     much lower trajectory.  And what we expect to prove to the

jury is had Mr. LeMond not damaged his brand, his bike line would have followed the industry road bike increases but did not because of the negative consumer and dealer reactions that Mr. LeMond's comments generated.

THE COURT: All right. So your view is that whatever the contractual relationship is, it has no bearing on damages and it has no bearing on liability?

MR. WEBER: Right. It would be things, what are the terms of the compensation that Mr. Armstrong is to receive as being a Trek-sponsored athlete. What are his obligations in turn to Trek under that agreement. It's a spokesperson sponsored-athlete agreement with the terms and conditions accordingly; and we don't see any interplay between those terms and conditions and the issues that would be before the jury.

THE COURT: All right.

MR. WEBER: To the contrary, as I've said at the outset, to the extent that Mr. Armstrong said things to Trek about Mr. LeMond, I think those are fair game and we have turned them over.

THE COURT: All right. Okay. Anything further on interrogatory number 8 and document request number 23?

MR. WEBER: I don't think so.

THE COURT: All right.

MR. WEBER: And as to the -- let me respond to one

1  other comment made.  She's trying to inject motive into a

2  contract action.  And I think the question for the jury

3  would be did the parties perform or not.  And motive is the

4  stuff of torts, not contracts.

5            THE COURT:  I'm sorry, motive is?

6            MR. WEBER:  The stuff of torts, not contracts.

7  You either performed or you did not perform.  And here we

8  have competing breach of contract actions and I think the

9  jury will be asked to assess did LeMond perform on its part;

10  did Trek perform on its part.

11            THE COURT:  All right.

12            MR. WEBER:  Thank you.

13            THE COURT:  Anything further on behalf of the

14  Plaintiffs on this part of the motion?

15            MS. RAHNE:  Not at this time, your Honor.

16            THE COURT:  All right.  Then let's go ahead and

17  hear -- I'll come back to Mr. LeMond's motion in a moment

18  but I do want to hear Trek's Motion to Compel, so whoever

19  will be arguing on behalf of Trek.

20            MR. WEBER:  Do you want to hear the points of

21  resolution first?

22            THE COURT:  Yes, I do.  Same protocol.  If you

23  could share with me what's resolved and what's left to

24  resolve.

25            MR. WEBER:  Sure.

1          THE REPORTER:  I'm having trouble hearing you.

2          THE COURT:  Do we have -- the let's see if I can

3     increase the volume.

4          MR. WEBER:  I'll try to speak louder.  It's that

5     midwestern understated approach.  Sorry.

6          All right.  Interrogatory 2, 3 -- 2 and 3 are

7     resolved insofar as Plaintiff has agreed to provide

8     additional information or confirm they have given all the

9     information with respect to businesses and employees and

10    agents thereof that they identify as cycling-related

11    businesses.  We have a point of disagreement for the Court

12    on our efforts to inquire into Mr. LeMond's business

13    activities outside of areas that they define as cycling

14    related.

15         THE COURT:  So in fact interrogatories 2 and 3 are

16    not yet resolved; is that right?

17         MR. WEBER:  Resolved in part.  And I'm sorry.  I

18    skipped over.  So it's 1 and 2.  There is a remaining issue

19    as to the scope of business interests that they need to

20    identify.  1, 2 and 3.

21         THE COURT:  So in other words to the extent that

22    you sought information having to do with bicycling-related

23    interests, you have resolved that?

24         MR. WEBER:  Correct.

25         THE COURT:  But to the extent you're seeking

1    information about any business entities owned by LeMond or

2    Greg LeMond, those aren't yet resolved?

3           MR. WEBER:  Correct.

4           THE COURT:  All right.  And that's 1, 2 and 3?

5           MR. WEBER:  Yes.

6           THE COURT:  All right.  And now we're onto

7    interrogatory number 4.

8           MR. WEBER:  Number 4 relates to taping.

9           THE COURT:  Yes.

10          MR. WEBER:  And they have agreed to answer the

11   interrogatory.  Identify everyone that Mr. LeMond taped and

12   what the current status is of those tapes.

13          THE COURT:  So that's resolved?

14          MR. WEBER:  That's resolved.

15          THE COURT:  In its entirety?

16          MR. WEBER:  There is an issue that we're going to

17   work on later as to whether a particular tape that has been

18   withheld is going to be turned over.  But that's not going

19   to be raised --

20          THE COURT:  That's the issue relating to whether

21   the assertion of work product was appropriate or not?

22          MR. WEBER:  Exactly.

23          THE COURT:  Okay.  Interrogatory number 5.

24          MR. WEBER:  Resolved and unresolved.  I'm sorry.

25   I think resolved.  You're going to confirm that all lawsuits

1    and arbitrations have been --

2            MS. RAHNE:  With our understanding about not

3    interested in product liability lawsuits.

4            MR. WEBER:  Right.  Exactly.  There are some

5    product liability lawsuits that Mr. LeMond was named as a

6    Defendant nominally, I suppose, and we're not interested in

7    those.

8            THE COURT:  So interrogatory number 5 is resolved?

9            MR. WEBER:  Yes.

10           THE COURT:  So as I understand it -- if I'm taking

11   you out of order it's the way I organized it based on your

12   presentation -- document request 15 sought all documents

13   related to any lawsuits and arbitrations that he was

14   involved in.  Has that been resolved?

15           MR. WEBER:  It has.

16           THE COURT:  So document request 15 has also been

17   resolved?

18           MR. WEBER:  Yes.

19           THE COURT:  Okay.

20           MR. WEBER:  Number 6 and 7 have been resolved.

21   They have agreed to supplement the information response to

22   that.

23           THE COURT:  Okay.

24           MR. WEBER:  Number 8, Internet service providers,

25   they have agreed to supplement and produce that information.

1          THE COURT:  So that's resolved.  All right.

2          MR. WEBER:  Number 9, they have agreed to

3     supplement by identifying --

4          THE COURT:  Hang on just a second.  This is

5     interrogatory number 9?

6          MR. WEBER:  Yes.

7          THE COURT:  I must have missed it in my notes.

8          MR. WEBER:  Page 16 of our brief.

9          THE COURT:  Let me grab that then.

10          MR. WEBER:  It just asks them to identify and

11     preserve all documents; and if there are any documents that

12     are missing, what happened to them.

13          THE COURT:  Right.

14          MR. WEBER:  And they have agreed to identify a

15     couple of limited instances in which documents are possibly

16     missing or in fact missing.

17          THE COURT:  All right.  So that's resolved?

18          MR. WEBER:  Yes.

19          THE COURT:  Okay.

20          MR. WEBER:  Turning to the document requests, 1, 2

21     and 3, they have agreed to resolve and confirm that there

22     are not any documents being withheld on the grounds of

23     relevance.

24          THE COURT:  Just a moment.  Okay.  So that's

25     resolved?

1          MR. WEBER:  Yep.

2          THE COURT:  All right.

3          MR. WEBER:  Number 6, they have agreed to

4    supplement, see if there's some additional documentation

5    concerning bike transactions and accounting for bike

6    transactions.  There were some additional fees charged to

7    some people for bike transactions above what Trek charged

8    Mr. LeMond.  He added a fee and they are going to see if

9    there's documentation concerning what happened to that

10   money.

11         THE COURT:  So that's resolved?

12         MR. WEBER:  That's resolved.

13         THE COURT:  All right.

14         MR. WEBER:  Number 7.  They have agreed to confirm

15   that they are not withholding the documents on the grounds

16   of relevance.

17         THE COURT:  Okay.  So that's resolved.

18         MR. WEBER:  Number 9, the documents regarding a

19   number of witnesses on their Rule 26 list.  They have

20   confirmed as to most that they have not withheld any

21   documents on the grounds of relevance.  Number 2 as to one

22   individual, Betsy Andreu, they have withheld some documents

23   and they will confirm that none of those documents have any

24   impact on any issues relating to the lawsuit.  There's a

25   personal relationship between Mrs. LeMond and Mrs. Andreu.

1          THE COURT:  So that's resolved?

2          MR. WEBER:  Yes.  They are going to see if there's

3     any such documents for Frankie Andreu and confirm one way or

4     another, and the same with David Walsh.  In other words,

5     with the exception of Betsy Andreu, they are not aware of

6     withholding any documents.  As to Betsy Andreu, they will

7     confirm that they are not withholding any.  That some of

8     them are personal, and they will confirm that they are not

9     withholding any non-personal ones that have issues that

10    relate to the lawsuit.

11         THE COURT:  Okay.

12         MR. WEBER:  Number 11, they have confirmed as to

13    damages that they have produced documents they have related

14    to damages.  They are not waiting simply for the expert

15    schedule.

16         THE COURT:  Okay.

17         MR. WEBER:  Number 13, tax returns for Mr. LeMond

18    are still an issue.  They have produced tax returns for the

19    LeMond Cycling, Inc.

20         THE COURT:  So as to Mr. LeMond personally, that's

21    not resolved?

22         MR. WEBER:  Correct.

23         THE COURT:  Otherwise the balance of that document

24    request is resolved?

25         MR. WEBER:  Yes.

1          THE COURT:  Okay.

2          MR. WEBER:  And 15 is resolved.  That's the

3     documents concerning lawsuits.  There are some additional

4     documents relating to a lawsuit with PTI/Target and they are

5     going to see if they can identify those and produce them.

6          THE COURT:  All right.  What about document

7     request 14?  That was all financial statements for LeMond

8     and all entities identified.

9          MR. WEBER:  Same issue as to Mr. LeMond personally

10    versus his businesses.

11         THE COURT:  All right.

12         MR. WEBER:  That implicates two of the remaining

13    issues, one is non-cycling business interests on the one

14    hand, and personal financial information on the other.

15         THE COURT:  All right.  And then document request

16    26.  That's the individual and joint tax returns for

17    Greg LeMond?

18         MR. WEBER:  That's still an issue.

19         THE COURT:  So that's not resolved?

20         MR. WEBER:  Yes.

21         THE COURT:  All right.  So it looks like the

22    issues that remain have to do with the issue that Mr. LeMond

23    produce information about non-cycling interests and number

24    two, tax returns?

25         MR. WEBER:  Right.

1          THE COURT:  Do you want to go ahead then and

2     address those issues?

3          MR. WEBER:  Yes.  As to tax returns, Mr. LeMond is

4     an individual Defendant.  In connection with his handling of

5     bicycles that he was buying from Trek, Trek had extended him

6     the privilege of purchasing bikes at employee discount, a

7     price that is far below what dealers can pay.  And

8     Mr. LeMond, in turn, was, we have learned, taking those

9     bikes and as to some of them bartering them for goods and

10    services.  People that he owed money to, he would give a

11    bike or bikes in payment of amounts that were otherwise due.

12    For example, a builder.  And I believe it may have occurred

13    with respect to some other services like website design.  So

14    he was using his bikes as currency.

15          Secondly, he was, as to some people that were

16    getting bikes, he was adding a markup.  That he would get

17    the bike at employee price from Trek at X, and he would mark

18    it up in the range of 100 or more dollars and keep that

19    money.  As he described it, it was to compensate him for the

20    costs he incurred in ordering the bike for this third person

21    and getting them the bike.  So he saw it, if I'm

22    characterizing his testimony correctly, as a recoupment of

23    his costs.

24          And thirdly, he used bikes to generate goodwill

25    for his other business interests.  So, for example, his

1    principal current other business is a LeMond Fitness

2    business where they sell bikes to health clubs, recumbent

3    bikes and exercise equipment to health clubs.  So there were

4    a number of instances where he was getting bikes at employee

5    pricing and passing them along to the owners of health clubs

6    in an attempt to generate goodwill for his LeMond Fitness

7    business.

8         People -- in one instance the e-mail reads

9    something like so and so is a very wealthy person.  He can

10   get whatever he wants and that's why we have to get him this

11   bike.  And that, of course, are the exact kind of people the

12   dealers want to sell these LeMond branded bikes to.  That

13   dealer has the expense of bricks and mortar employees and

14   with the idea that they are going to sell these bikes to a

15   people in a position to buy them.  So that with respect to

16   his individual -- he's an individual Defendant in those

17   areas.

18        In addition, he had personally guaranteed his

19   obligations of LeMond Cycling under the contract since

20   LeMond Cycling is really nothing more than Greg LeMond's

21   corporate vehicle for licensing his name.  He was asked to

22   and did personally guarantee the obligations of LeMond

23   Cycling, Inc.

24        Now, how does this impact what we're asking the

25   Court to have them do?  First of all, with respect to the

1    personal tax returns, I would like to be able to see whether

2    any of these transactions with the bicycles, for example,

3    show up on the personal tax returns.  He is realizing

4    revenue by using the bikes as currency.  He is realizing

5    revenue by adding a markup to the bike.  And I didn't see

6    any reflection of that in the LeMond Cycling tax returns.

7    If it was there I missed it.  And I would like to see if in

8    turn in his personal returns he is acknowledging whatever

9    amounts of money he's making off of these transactions

10   through barter or for cash.

11            THE COURT:  And what relevance does that have to

12   this breach of what you've characterized as a breach of

13   contract suit?  Let's assume he either is recognizing the

14   revenue or what you find out is it doesn't show up on his

15   personal tax return.  How will that lead to the discovery of

16   admissible evidence at trial?

17            MR. WEBER:  Well, it would not surprise me to find

18   that the transactions are not reflected in either the

19   personal or corporate tax returns.  And I think it will

20   undercut his justification to the jury that these were

21   normal transactions and he was simply recouping business

22   expenses by adding this markup.

23            THE COURT:  And, again, what relevance does that

24   have to whether he breached the contract or whether Trek

25   breached the contract?

1          MR. WEBER:  That he breached his agreement with

2     Trek by abusing his privilege of purchasing bikes at

3     employee prices.  He agreed -- he sold his -- he licensed

4     his name to Trek.  He said, Here, Trek.  You get to use my

5     name to sell and distribute bikes.

6          What we've learned is he set up his own

7     distribution channel distributing LeMond branded bikes as if

8     he were a dealer and earned revenue, direct and implicit

9     revenue, from his self-designated position as a dealer which

10    was in breach of his agreement with Trek that Trek was the

11    exclusive distributor of his bicycles.  He can't

12    simultaneously license his name with exclusivity to Trek for

13    bicycle products and then have a sideline of distribution.

14         THE COURT:  I understand if you -- the revenue

15    shows up on his personal return.  You've already indicated

16    you've looked at his corporate tax return and you can't find

17    his revenue from these bartering-type transactions or other

18    uses that you've found that supposedly he's been involved in

19    with these bikes.  So if the revenue shows up on his

20    personal tax return, I can understand how that would be

21    related to your theory that he was in breach of your

22    contract and the exclusivity provision of the contract.  If

23    the revenue doesn't show up, what's the relevance?

24         MR. WEBER:  It looks like he's running a side

25    business and putting money in his pocket to benefit himself

1    without regard to the impact on Trek and its dealers.  It's

2    not a, as he's now saying, a well-known proper use of his

3    employee pricing agreement.  Why is Trek surprised to learn

4    that I have been doing this?  Trek shouldn't be surprised,

5    wasn't surprised.  It's all above board.  If the

6    documentation shows no, it wasn't documented, it was done

7    secretly, there's e-mails that say don't let the Trek

8    employees know we're doing this, I think the jury will draw

9    inferences from that.  But, again, I'm at a bit of a

10   disadvantage telling the Court what the admissibility basis

11   is until I see the documents.

12              THE COURT:  Okay.  So that addresses the --

13              MR. WEBER:  Tax returns.

14              THE COURT:  -- The tax returns under document

15   requests 13 and 26?

16              MR. WEBER:  Right.  In addition, the tax returns

17   are discoverable and may be admissible on the grounds of

18   mitigation of damage issues.  Trek believed Mr. LeMond's

19   actions ended the agreement for all practical purposes, for

20   legal purposes, when the -- when he served a lawsuit on Trek

21   on the several days after the death of the founder of Trek's

22   memorial service.  And if they, on the other hand, establish

23   to the jury's satisfaction that, no, Trek was not correct in

24   ending the agreement, then there is a question of his

25   damages and his mitigation of damages.

1          And given the interplay between his personal

2     ventures and LeMond Cycling, Inc., we would like to explore

3     what he has been doing and what he should have been doing or

4     what he was or wasn't doing in the period after the

5     termination of the Trek agreement in mitigation of his

6     damages or not.  So we want to get a picture of Mr. LeMond's

7     business activities and we think we need both his personal

8     and broad form business interests in order to explore this

9     mitigation of damage issue.

10          THE COURT:  You terminated or Trek terminated the

11     business relationship and notified him that they were

12     terminating it in 2007?

13          MR. WEBER:  No, in November 2007 -- let me

14     describe it this way.  Under the agreement, which expired

15     under its terms in 2010, Trek in the fall of 2008 had to

16     give Mr. LeMond two years' heads up we're going to renew or

17     we're not.  I assume the evidence will be the notion was it

18     would give Mr. LeMond time to find a new business partner

19     before the expiration of the agreement.

20          A year early in the fall of 2007, Mr. LeMond asked

21     John Burke of Trek, Have you decided what you're going to do

22     in 2010?  Can I have early notice which way you're going?

23     And Mr. Burke told Mr. LeMond in November 2007, We are going

24     to continue the contract through 2010 but we will not be

25     extending it beyond that pursuant to a five-year option that

1    Trek had.  So they were giving him early notice at

2    Mr. LeMond's request, but saying we will continue with the

3    line through that period.

4          At that time Mr. LeMond did two things.  He began

5    preparing a lawsuit that brings us here and he began

6    exploring other business ventures for LeMond branded bikes

7    and other things.

8          Now, as to the second category, he had asked Trek,

9    Okay, is it all right if I go out and look and see if I can

10   find other businesses, and Trek said sure.  And in fact

11   Mr. Burke, after the November conversation, followed up in

12   December saying, Greg, have you decided?  Do you want us to

13   continue the contract through 2010 or are you going to take

14   your brand back early?

15         And what we see in the e-mails is Mr. LeMond

16   putting in place a strategy to serve this lawsuit on Trek,

17   and I believe the evidence will show he expected Trek not to

18   face the publicity associated with the lawsuit but to pay

19   him millions of dollars as he had demanded in 2004 if Trek

20   was going to end the contract then.  I think that's what the

21   jury will conclude.  So that's what happened in the fall of

22   '07.

23         THE COURT:  All right.  As I look at document

24   request number 13, it asks for all tax returns of -- I'm

25   going to focus on Greg LeMond, in response to interrogatory

number 1.  Interrogatory number 1 asks him to identify all
business entities in which he had an ownership interest in
since 1985.  So putting the two together it appears you're
looking for tax returns dating back to -- I don't know if
you're seeking it back to 1985?

        MR. WEBER:  Is it '85 or '95, Judge?

        THE COURT:  It says here in your brief since 1985.
What interrogatory number 1 asks for, document request
number 26 asks for all individual and joint -- individual or
joint state and federal tax returns filed by Greg LeMond
from 1995 to '97.  So, first of all, let's talk about the
time.  How far back are you seeking these tax returns?

        MR. WEBER:  Tax returns since '95 would be fine,
which is the beginning of the relationship with Trek.

        THE COURT:  And why do you need -- on any theories
with relevancy, whether it be mitigation of damages, looking
to see if he was acting contrary to the terms of the
contract in its exclusivity, why do you need tax returns
dating back 13 years?

        MR. WEBER:  Just to get a picture, be able to put
a picture together for ourselves.  And then depending on
what we find, for the jury of, this is what -- this is the
LeMond, Inc., which is really Greg LeMond.  Here is his
business empire over these years.  It may be, it may well
be, that things from '95 to 2000 are of limited relevance.

1    We may not seek their admission.  But there are important

2    events that do go back to 1999, two years before the flare

3    up with Armstrong.  So there may be material in that time

4    period as well.

5            THE COURT:  When does he -- based on the evidence

6    that you have collected to date, when do you find that he is

7    beginning -- the earliest in which he uses his employee

8    discount to get these bikes at basically below market and be

9    able to use them either to barter the bikes for goods and

10   services, use them as currency?  How far back does that

11   date?

12           MR. WEBER:  They have produced documents going

13   back several years.  The contract changed in the year 1999,

14   and I know that there's been an extraordinary amount of

15   activity in the last three years.  Before that, sitting here

16   today, I can't tell you off the top of my head.

17           THE COURT:  So when you say the contract changed

18   in 1999, is that what -- is that when there was a provision

19   put in place that allowed him to buy bikes at an employee

20   discount?

21           MR. WEBER:  He had expanded rights in 1999 or with

22   respect to free bikes.  I don't remember standing here today

23   when he began exercising employee-pricing purchasing.

24   Sorry.  It's my belief he's been doing that for at least six

25   or seven years; but it's been in the past several years that

1       the numbers have gotten extreme.

2              THE COURT:  All right.  That addresses the issue

3       of tax returns.  What about the financial statements of all

4       of the entities that he owns?

5              MR. WEBER:  Right.  That relates to this

6       distinction they are drawing between cycling and non-cycling

7       where they do business.  And as I described, where you have

8       a celebrity athlete with multiple business interests, what

9       he is selling is really his name, his brand, to these

10      various business partners.  That's what draws them to him.

11      That's what he brings to the table, whether that is

12      necessarily cycling related or not.

13             And what we would like to explore with these

14      various business partners he's had over the years, and I

15      think the evidence will show that many of these

16      relationships have ended in acrimony and litigation, and I

17      would -- we would like to explore these other business

18      partners and see, number one, do they have -- did they

19      experience an impact in their business negative as Trek did

20      as a result of Mr. LeMond's attacks on a fellow American

21      athlete.  Number two, did Mr. LeMond engage in a pattern of

22      conduct in the business relationships with those other

23      entities that is similar to the pattern with Trek.

24             Now, I appreciate Rule 404, the evidentiary rule,

25      may -- requires me to show that such activity fall within

certain evidentiary admissibility standards.  But until I
have the information, I can't tell the Court whether it fits
within one of these 404 exceptions, absence of mistake and
so on.  But we need to explore these other business
relationships for that reason.

Thirdly, it may be that we learn from these
business partners that Mr. LeMond was saying or doing
things, sharing things with them about his business
practices with Trek and/or his thoughts about Trek,
Mr. Burke, Mr. Armstrong, in a way that likewise could
produce admissible evidence.

THE COURT:  The negative comments that supposedly
Mr. LeMond made about Mr. Armstrong started in 2001?

MR. WEBER:  Yes.  In the summer of 2001 as
Mr. Armstrong was tying Mr. LeMond's American record,
Mr. LeMond for the first time came out and accused
Mr. Armstrong as being either the greatest comeback or the
greatest fraud.  And the reaction of the public was extreme
and immediate.  That was the time at which Mr. LeMond then
asked for permission not to attend the Trek dealer meeting
because he knew that the Trek dealers were so angry at him
for his comments.

THE COURT:  You've talked about it, both sides
talk about this, that this is really just a contract dispute
on both sides, either you performed or you didn't perform.

1    So I'm still trying to understand.  Let's assume Mr. LeMond

2    has terrible relationships with all the business

3    arrangements he's been in.  Let's assume you're right.  What

4    relevance is that going to have to what you've characterized

5    as simply a contract dispute, either there's performance or

6    not, breach or not?

7         MR. WEBER:  Yes.  It depends on what the

8    relationship of these terrible relationships is.  Number

9    one, if it in turn ties to his public disputes with other

10   athletes, it shows -- it makes it more credible when Trek

11   says, Our business was hurt.  Our sales were hurt.  Our

12   LeMond brand of bicycles sales were hurt because of what he

13   did, if other business partners say, Yeah, we took a hit too

14   when he was doing these things.  That's number one.

15        Number two, it depends on what the nature of the

16   terrible relationship was.  It may be that we will have the

17   basis for the admissibility of pattern and practice evidence

18   that fits within exception to the Rule 404 that meets one of

19   those exceptions like absence of mistake.  It may be that

20   the jury -- that the Court would permit us to put before the

21   jury this evidence to negate arguments of some

22   misunderstanding in the way this is played out.

23        So, again, we appreciate we have to show its

24   ultimate admissibility, but we believe that it is reasonably

25   calculated to lead to the discovery of admissible evidence.

1          THE COURT:  With interrogatory number 2,

2     interrogatory number 1 is asking you to identify basically

3     all the business entities that were owned by him since 1985.

4     And then interrogatory number 2 wants him to identify

5     basically anybody that was associated with those businesses

6     that were compensated by him or those businesses.

7          MR. WEBER:  Right.  The reason as I'm standing

8     here I go to Y85 is because that's when his real -- his

9     cycling businesses, when his -- I should say his

10     professional business really took off as opposed to his

11     simply a cycling career.  So that's why we picked '85.

12          THE COURT:  And why do you need to know every --

13     identify each person and company who has been compensated by

14     him in connection with his business activities, including

15     but not limited to agents, representatives, independent

16     contractors and employees?  Just theoretically what that

17     means is if he employs a cleaning lady, you're asking for

18     him to identify that person.

19          MR. WEBER:  I think it's fair that we wouldn't ask

20     for cleaning ladies.

21          THE COURT:  But right now the way it's worded it

22     does.

23          MR. WEBER:  If they want to object and say they

24     won't provide information about cleaning staff, we're fine

25     with that.  What we're looking for is -- first of all, we

think it's a fairly discrete group of people.  He had a

personal assistant by the name of Muffy Haigh for a number

of years.  More recently his personal matters are being

attended to for -- his business/personal matters are being

attended to by someone else.  So I think it's a fairly short

list.  We would like to know who they are.

Now, we do know that he has had a number of

different agents over the years.  During his cycling career

and thereafter he has had different agents represent him in

an effort to sell his name to various companies.  We would

like to know who all those people are because --

THE COURT:  Didn't they agree to give you the

information with respect to any of his cycling activities so

aren't you going to be getting that anyway?

MR. WEBER:  Well, no, because if I'm an agent for,

for example, ING I think is a big company.  Or there may be

other representatives that represented him in non-cycling

areas selling his name to General Mills or Kellogg's or

things like that.  So, again, I don't think it's a

burdensome list.  I would just like to know who they are.

Who have his employees and agents been over the years.

THE COURT:  Okay.

MR. WEBER:  And they haven't said there are

hundreds, and I don't think there are.  I would just like to

know who they are.

1          THE COURT:  That addresses interrogatories 1 and

2     2.  And then let me just look to see which ones -- I think

3     then the remaining issue --

4          MR. WEBER:  Three is another one.

5          THE COURT:  Right, 3.  Gross earnings of each

6     entity.  Tell me why you want -- so you want to know how

7     much he was earning with these non-business entities?

8          MR. WEBER:  Right.

9          THE COURT:  And you've asked for it since 1999?

10          MR. WEBER:  Right.

11          THE COURT:  What's the relevance there?

12          MR. WEBER:  It gives us a way to know how

13     significant a business venture it was.  If it's a thousand

14     dollars of gross earnings for this business entity, we're

15     not going to pursue it.  If it's a million dollar business

16     entity, then it's something of significance so we're going

17     to look into it more.

18          THE COURT:  What's the relevance?  Let's assume

19     he's got a business entity that sells golf clubs.  What's

20     the relevance of knowing the gross revenue of that golf club

21     business?

22          MR. WEBER:  We're trying to assess its relative

23     importance to him.  If it's a million dollars business

24     during the same time period selling LeMond branded golf

25     clubs, it would be of interest to us to go and see have

1    LeMond branded golf clubs experienced a similar hit on sales

2    as did LeMond branded cycles.  If it's a thousand dollar

3    entity, we're not going to waste our time.

4              THE COURT:  Okay.  Again, so the --

5              MR. WEBER:  So the relevance, the reason we asked

6    for it, for earnings, was to get an assessment of its

7    relative importance in his overall business ventures as a

8    way to narrow discovery going forward.

9              THE COURT:  Okay.  And then I think the next item

10   had to do with all financial statements of all of his

11   entities.  And they have agreed to provide those for -- they

12   were identified in interrogatory number 1, which goes back

13   to 1985; and he has agreed to provide those that are cycling

14   related but not non-cycling related.  So why do you need all

15   of the financial statements for any entities that he has

16   going back to 1985, 23 years?

17             MR. WEBER:  Same thing.  To get an assessment of

18   their relative importance as a guide toward future

19   discovery.

20             THE COURT:  All right.

21             MR. WEBER:  And I'm not sure.  Perhaps I could ask

22   Ms. Rahne which side of the line LeMond Fitness falls in,

23   cycling or non-cycling?

24             MS. RAHNE:  In terms of?

25             MR. WEBER:  The subject we've been talking about.

1              MS. RAHNE:  We have been open about that.

2              THE REPORTER:  I'm sorry?

3              MS. RAHNE:  We've been open about that.

4              THE COURT:  You're producing information related

5       to LeMond Fitness?

6              MS. RAHNE:  To the degree that it's in

7       Mr. LeMond's possession.

8              MR. WEBER:  Well, wait, but not in LeMond

9       Fitness's possession?

10              MS. RAHNE:  No, I don't represent LeMond Fitness.

11       I'd work with you if you want to take discovery from them.

12       Mr. LeMond is a shareholder, but that's an entirely separate

13       entity.  If Mr. LeMond has financial information related to

14       him or his business, we're not withholding that.

15              THE COURT:  All right.  Have I covered those that

16       are at issue?

17              MR. WEBER:  I believe you have.

18              THE COURT:  All right.  We're going to take a

19       short recess here, actually about ten minutes.  I have a

20       conference call that was coming in at 3:30 that I need to

21       take.  So I think we'll do it right now and come back and

22       address your responses.

23              MS. RAHNE:  Thank you, your Honor.

24              THE COURT:  All right.

25              (Recess taken from 3:20 to 3:40 p.m.)

1          THE COURT:  All right.  We'll hear from

2     Plaintiff's counsel with a response.  Actually before you

3     respond, let me just ask one question of Trek's counsel just

4     to clarify.  Document request number 18, which is all

5     contracts between LeMond and/or Greg LeMond since 1995, was

6     that resolved or no?

7          MR. WEBER:  I think it would be the same cycling,

8     non-cycling distinction.  Meaning resolved as to cycling.

9          THE COURT:  But not as to -- that's what I

10    thought.  All right.  Go ahead.

11         MS. RAHNE:  Thank you, your Honor.  I'm struck, as

12    I was when we started this hearing, by the remarkable

13    contrast between Trek's interpretation of the rules of

14    relevance in terms of what it might be required to produce

15    in response to our requests, which we really feel like we

16    have worked to refine and tailor to our case, and Trek's

17    suddenly very broad interpretation of what it thinks is

18    relevant to its case, which we have similarly sought to find

19    compromise on in order to provide Trek with what it fairly

20    needs in order to prove its case without opening the door to

21    what can only be harassment and disparagement to my client.

22         This is a pattern that began when Trek very

23    publicly filed its lawsuit with a PowerPoint presentation

24    which we've provided to your Honor that included, just by

25    example, statements such as Greg informs Trek that no

1    suppliers are interested.  Not true, not a true

2    characterization of the conversation that happened.  My

3    client is going to dispute it.  But Trek felt very

4    comfortable with a conclusory statement of what happened and

5    what the facts were and what the business relationships were

6    being presented to the media, and then being posted on

7    YouTube.  This pattern of practice Mr. Weber wants to talk

8    about has continued into discovery.

9          I see no basis for the things that we're holding

10   our position on.  Mr. LeMond and Mrs. LeMond's tax returns

11   have no bearing on this.  The bike sale issues which they

12   try to characterize as some distribution network that

13   Mr. LeMond has set up, I need to tell you a little bit about

14   those bike sales.  Mr. LeMond had a longstanding right over

15   13 years to purchase bikes at an employee discount through

16   Trek.  He did it openly with them.  They participated.  He

17   never once distributed bikes.  He made very open purchases

18   through Trek, Trek sales, that then were sent to people

19   completely with Trek's knowledge.

20         Mr. LeMond also had the right to purchase

21   initially -- not purchase, but to get for free 10 bikes

22   pursuant to their contract, and then it was 15 starting in

23   1999.  Although due to a misunderstanding between the

24   parties he wasn't allowed to get 15.  He only got 10 until

25   only the last couple years.

1          As my client has frequently said, I'm not sure

2    what they thought Mr. LeMond was going to do with all of

3    these free bikes.  He didn't sell them to make money.  He

4    gave them away frequently.  He didn't make a profit.  There

5    are a couple instances which he has testified openly to

6    where he may have given a bike to somebody who then helped

7    him with his cabinets or helped him with his lighting.  It's

8    our pretty stalwart position that they were Mr. LeMond's

9    bikes at that point and if he decided to give a free bike to

10    somebody who would then interchange them and help him with

11    something on two instances, it doesn't constitute a breach

12    of the agreement.

13          On the employee bike purchasing similarly.  The

14    charges that Trek is now trying to force into some breach of

15    contract, they tended to be things like a $25 administration

16    fee that Mr. LeMond's assistant charged to cover her time

17    and her effort.  It's accounted for on LeMond Cycling's tax

18    returns.  It has no bearing on LeMond's tax returns.  And if

19    Trek can't find it, it's probably because it's a very small

20    admin cost, maybe a couple of hundred dollars a year, maybe

21    $500 a year.  That isn't significant enough to stand out

22    when the accountant is doing the taxes.

23          The end result, and why I think this has become an

24    issue, is Trek needs something to continue to perpetuate its

25    legal theory that the way it's going to get out of its

1    contract with Greg LeMond and protect itself is to prove

2    that he is a bad businessman and to further disparage him

3    and make their own case through their own rhetoric.

4         We see it in their briefs, your Honor.  We see

5    unfounded statements such as Trek is entitled to an

6    identification of all of LeMond's business ventures to

7    demonstrate LeMond's serial failure to abide by his

8    obligations to his business partners.  This is the entire

9    pattern and this is what the discovery is tailored to do to

10   somehow show that Mr. LeMond is a bad businessman, although

11   I'm not sure how it's relevant to the contract anyway.  I do

12   know it's inflammatory, I do know it's personal, and I do

13   know that this case has a very personal aspect.

14        We are fighting tooth and nail to keep this on the

15   higher road.  And we are fighting very hard to keep it to

16   the confines of the contract, to focus in on where we need

17   discovery to prove what's really going on.  And there is a

18   back story and it will become known as the case is

19   developed.

20        But the bottom line is this is a breach of

21   contract action.  And if Trek has damage related to Greg

22   LeMond being a bad businessperson, they would know it by

23   now.  They are not entitled to delve into every single one

24   of his personal other business relationships.

25   Cycling-related businesses we have drawn a line and it is

1    reasonable.  It is Mr. LeMond's bread and butter.  It is who

2    he is.  But the rest of it is just there to further harass

3    and try to further disparage my client.

4           I want to make just one other comment and then if

5    your Honor has any questions.  My colleague has a tendency

6    to make rhetorical statements that are painful to my client

7    who is sitting here in the audience, and which I would like

8    to correct but I don't think there's time here.  But I do

9    want to just for background provide your Honor with the

10   information on what started all of this.

11          Trek has since 2002 perpetuated the idea that

12   Mr. LeMond at one point called Mr. Armstrong a fraud.

13          THE COURT:  Let me ask -- I understand that you

14   would like to be able to let this Court know that your

15   client vehemently disagrees with the characterization that

16   Trek has foisted upon him regarding him personally and

17   business-wise.  But what relevance does this have to the

18   Motions to Compel?  In other words, I'm concerned about how

19   we use our time.

20          MS. RAHNE:  I just have one -- I just want to give

21   one example, if I may.

22          THE COURT:  All right.

23          MS. RAHNE:  In 2001 Mr. LeMond was interviewed by

24   David Walsh from the Times of London, Sunday Times of

25   London; and Mr. Walsh asked Mr. LeMond regarding

1    Mr. Armstrong, who was at that time a very prominent

2    cyclist.  And he said, "Isn't it true that if Lance

3    Armstrong is clean, this is the greatest comeback in the

4    sport?"  And Mr. LeMond said, "That is true."

5         And then he said, "And wouldn't it be true that if

6    he isn't clean, it would be the greatest fraud?"  And

7    Mr. LeMond said, "Yes, that's true, too."

8         That statement was printed.  That statement

9    started all this, and here is how it's relevant, your Honor.

10   LeMond Cycling had an agreement with Trek.  They were to

11   promote and support the brand.  Trek knows that what in fact

12   Mr. LeMond said is what I just said to you.  But because of

13   the complexity of these personalities, Trek chose instead of

14   trying to correct and supporting Mr. LeMond, they instead

15   have participated in the perpetuation that Mr. LeMond is a

16   Lance Armstrong basher.  It's simply not true.  But it also

17   is why we're seeking discovery into the business

18   relationship between Trek and Mr. Armstrong because we think

19   that has implications on their choices in terms of how to

20   affect, promote, and treat Mr. LeMond's brand.  That's how

21   it impacts our Motion to Compel.

22        In terms of how it impacts Trek's Motion to

23   Compel, I just want to make the point that the only thing

24   they are trying to do is to find some sort of causes of

25   action that aren't -- there's nothing tied to the contract.

1    But they are using things that they know not to be true in

2    order to try to create a general sense that he is a bad

3    business person and if we don't get this reigned in now in

4    discovery, it's -- I mean, I don't know where this is going

5    to go.  It's -- the personal aspect of this case is just too

6    sensitive to not be reigned in at this point.

7              THE COURT:  Okay.  Anything further?

8              MS. RAHNE:  No, your Honor.

9              THE COURT:  All right.  Let me just ask -- I was

10   starting to look and then stopped.  Is there a protective

11   order in this case yet?

12             MS. RAHNE:  There is, your Honor.

13             THE COURT:  And I haven't looked for it yet.  Are

14   there different levels of protection, meaning is there an

15   attorneys' eyes only level of protection?

16             MS. RAHNE:  We have a public designation, a

17   confidential and a highly confidential, I would cite

18   attorneys' eyes only.

19             THE COURT:  I just wanted to make sure I

20   understood that.

21             All right.  Anything further on Trek's motion?

22             MR. WEBER:  No, your Honor.

23             THE COURT:  All right.  We're going to just take a

24   very short recess again.  I do want to give the parties my

25   decision here on both Motions to Compel now so I just want

1    to look through my notes to make sure I've got this down

2    correctly and then I'll come back on the bench and give you

3    my decision at that time.

4              (Recess taken from 3:49 to 3:54 p.m.)

5              THE COURT:  All right.  First of all, with respect

6    to Plaintiff's motion as it relates to interrogatory number

7    8 and document request number 23, which has to do with the

8    identifying of any agreement between Lance Armstrong and

9    Trek and then the production of any such agreements, I'm

10   going to deny that motion.  I don't find that the underlying

11   contracts between Mr. Armstrong and Trek have any relevancy

12   or are likely to lead to the discovery of admissible

13   evidence in this case.  Both parties have characterized this

14   basically as a contract dispute; and notwithstanding that,

15   are attempting to get at information that, as I hear your

16   argument, does not appear relevant to me as to whether

17   there's a breach of contract or is there not.  And, if so,

18   by whom.  And taking a look at the underlying agreement that

19   Mr. Armstrong may have or agreements with Trek, I simply am

20   not convinced that that could lead to the discovery of

21   admissible evidence.  And so that motion is denied, that

22   part of the motion.

23             As to Trek's motion against Plaintiffs, I'm going

24   to be granting the motion in part and denying the motion in

25   part as follows:

1        With respect to interrogatory number 1, 2, 3, and

2    document request number 18, I'm denying that motion for the

3    same reason.  I simply do not find to the extent that Trek

4    is seeking information or documents about other business

5    entities that Mr. LeMond may have owned, that this has any

6    relevancy to this breach of contract action or could lead to

7    the discovery of admissible evidence at trial.  And on that

8    basis I am denying the motion.

9        With respect to document requests number 13 and

10   26, which are seeking tax returns, I am going to grant the

11   motion to this extent and that is that the individual or

12   joint tax returns of Mr. LeMond -- and obviously you have

13   already agreed about the bicycle-related entities -- will be

14   produced dating back to 1999.  And they will be produced

15   attorneys' eyes only.

16       As to the tax returns of other entities that are

17   owned by Mr. LeMond, again, I don't see any relevancy to

18   this action or that it could lead to the discovery of

19   admissible evidence.  And I don't see any basis to require

20   the tax returns prior to 1999 be produced.  There's been no

21   evidence submitted to me or even argument of counsel that

22   suggests that conduct prior to 1999 has any bearing on any

23   of the theories that are being put forth by Trek.

24       I do think finding out what Mr. LeMond has done to

25   the extent at all in terms of declaring income or revenues

1    from these employee-related purchases or free bicycles is

2    fair game.  Could lead to the discovery of admissible

3    evidence.  Perhaps they are all accounted for on the LeMond

4    Cycling returns.  A variety of representations have been

5    made by counsel as to whether they are or aren't.  I'm not

6    in a position to determine that, but I do find the

7    individual tax returns of Mr. LeMond or joint tax returns

8    that may lead to the discovery of admissible evidence but

9    only dating back to 1999.  Again, those will be produced

10   attorneys' eyes only and not shared outside of counsel or

11   experts.  In other words, as laid out in your protective

12   order.

13          With respect to document request number 14, which

14   is all financial statements of any entities owned by

15   Mr. LeMond, I'm denying that motion.  Again, I don't find

16   that that information is likely to lead to the discovery of

17   admissible evidence at trial.  While I can certainly

18   understand why you would like to find out how big these

19   entities are, I simply don't find that the information about

20   these other business entities, whether they be people or

21   revenues or financial statements, are relevant to this

22   breach of contract action.  And so I'm denying the request

23   as to document request number 14.

24          And I think that that, therefore, resolves all of

25   the outstanding issues between the parties.

1          Now, in terms of what you've agreed to or what

2     I've ordered be produced, have you talked among yourselves

3     as to, for example, on what you've agreed to, as to what the

4     timeline will be for production?

5          MR. WEBER:  We've had some discussions on timing

6     as to certain documents but I'm confident that we will be

7     able to work that out.

8          THE COURT:  All right.  What about the ones I'm

9     ordering be produced here, which really are the tax returns.

10    That's the only thing that I'm ordering be produced dating

11    back to 1999.  If we set a two-week deadline on that, will

12    that be appropriate?

13         MR. WEBER:  That's fine, Judge.

14         MS. RAHNE:  I obviously need to confer with my

15    client outside of here but I don't anticipate a problem,

16    your Honor.

17         THE COURT:  All right.  Well, if there's an issue

18    with that, we'll say that those tax returns will be produced

19    for attorneys' eyes only for review two weeks from today.

20    If there's an issue you can notify me and we'll modify that

21    part of the order.

22         MS. RAHNE:  Thank you, your Honor.

23         THE COURT:  All right.  I will be issuing an order

24    that will be consistent with the outcome here of what I've

25    ruled and what's been resolved by the parties consistent

1    with what I stated from the bench.  Anything further on

2    behalf of Plaintiffs?

3              MS. RAHNE:  No, your Honor.

4              THE COURT:  Anything further on behalf of the

5    Defendant?

6              MR. WEBER:  No, your Honor.  Thank you very much.

7              THE COURT:  All right.  That concludes this

8    proceeding.

9              And, again, let me just say, obviously when you

10   get together and you talk in person, a lot happens.  And

11   this is the kind of Meet and Confer that you ultimately had

12   here in the court is the kind of Meet and Confer that I

13   would expect the parties to engage in in the future.  Letter

14   writing only goes so far.  And you will know that if you

15   stick with letter writing, you're going to end up doing the

16   same thing in my courtroom again; which is I will make you

17   sit down and confer with each other and/or I will consider

18   denying your motions because you haven't had a proper Meet

19   and Confer.  So I really encourage you to do that in the

20   future.

21             Thank you very much.

22             MR. WEBER:  Thanks, Judge.

23             MS. RAHNE:  Thank you, your Honor.

24             (Court adjourned at 4:01 p.m.)

25                      *      *      *

1

2

3          I, Carla R. Bebault, certify that the foregoing is

4    a correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8                    Certified by:  s/Carla R. Bebault
                                    Carla R. Bebault, RPR, CSR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25