1            UNITED STATES DISTRICT COURT

2               DISTRICT OF MINNESOTA

3    ---------------------------------------------------

4    LeMond Cycling, Inc.,

5              Plaintiff,

6       vs.                          File No. 08-CV-1010

7    Trek Bicycle Corporation,

8              Defendant.

9    ---------------------------------------------------

10

11           THE HONORABLE JANIE S. MAYERON

12           United States Magistrate Judge

13

14

15                      * * *

16           TAPE-RECORDED HEARING

17           TRANSCRIPT OF PROCEEDINGS

18                      * * *

19

20

21

22           Date:   5-26-09

23           Reporter:   Lisa M. Thorsgaard

24

25

Dockets.Justia.com

1                          <u>APPEARANCES</u>

2

3              MS. DENISE S. RAHNE AND MS. KATHERINE

4    K. BRUCE, Attorneys at Law, 800 LaSalle Avenue,

5    Suite 2800, Minneapolis, Minnesota 55402-2015,

6    appeared on behalf of Plaintiff.

7

8

9              MR. ERIK T. SALVESON, Attorney at Law,

10   Suite 600, 220 South Sixth Street, Minneapolis,

11   Minnesota 55402, appeared on behalf of Defendant.

12

13

14             MR. RALPH A. WEBER, Attorney at Law,

15   Suite 700, 309 North Water Street, Milwaukee,

16   Wisconsin 53202, appeared on behalf of Defendant.

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2

3               (NO REPORTER WAS PRESENT — the following

4        transcript of proceedings was prepared from a

5        COPY of the original court tape recording)

6

7                        THE COURT:  Good morning,

8        everyone.  I'm Magistrate Judge Mayeron and

9        we're here this morning in connection with the

10       matter of LeMond Cycling, Inc. versus Trek

11       Bicycle Corporation versus Greg LeMond.  This

12       is Court File No. 08-010.

13            If the attorneys could identify

14       themselves starting first with Plaintiff,

15       LeMond Cycling.

16                        MS. RAHNE:  Good morning, Your

17       Honor.  Denise Rahne, Robins, Kaplan, Miller &

18       Ciresi.  And I have with me from our offices,

19       Katie Bruce.

20                        THE COURT:  Kate, how do you

21       spell your last name?

22                        MS. BRUCE:  B-R-U-C-E.

23                        THE COURT:  All right.  And on

24       behalf of -- and you're representing both

25       LeMond Cycling and Greg LeMond?

```
1                        MS. RAHNE:  Correct, Your

2      Honor.

3                        THE COURT:  And on behalf of

4      the defendant?

5                        MR. WEBER:  Good morning, Your

6      Honor.  Ralph Weber and Eric Salveson for Trek

7      Bicycle Corporation.

8                        THE COURT:  All right.  We're

9      here this morning to entertain the motion by

10     Trek Bicycle Corporation for a protective

11     order.

12         I have reviewed the initial pleadings,

13     the response filed by LeMond Cycling and Greg

14     LeMond and the reply as well, so I'm prepared

15     to hear argument.

16         Who will be arguing?

17                        MR. WEBER:  I will, Judge.

18                        THE COURT:  All right.

19                        MR. WEBER:  Judge, in

20     recognition of the fact you've already read

21     the briefs, let me just summarize very

22     quickly, tell you what I think is the

23     essential legal foundation for our position

24     and I'll be happy to answer any questions you

25     might have.
```

1          On March 20, 2008 Trek was served with

2      a complaint by Mr. LeMond that had very little

3      to do with the parties' relationship and was

4      filled instead with sensationalized

5      allegations about third parties and relatively

6      few allegations about the purported best

7      efforts challenge that Mr. LeMond wanted to

8      bring.

9          At that time it was served under the

10     Minnesota procedure that provides for service

11     without filing that was pointed out in the

12     cover letter to Trek that the complaint was

13     not publicly available at that time, but at

14     the same time under Minnesota procedure and

15     federal procedure the clock was running on

16     removal.

17         Trek and its counsel, of course,

18     anticipated that the damage that was

19     threatened to Trek's reputation through this

20     sensationalized complaint and sought to

21     mitigate the damage that was threatened by

22     returning the proper focus of the dispute to

23     the parties' business relationship, what did

24     each side contend the other had done or failed

25     to do with respect to performing or not

1    performing under the contract, an objective

2    assessment of the parties' relationship quite

3    different from the threatened and served but

4    not filed lawsuit.

5         In that context there was a tremendous

6    overlap of litigation and public impact

7    potential.  And in light of that, our firm

8    retained sophisticated consultants to assist

9    us in anticipating and mitigating the damage

10   that would be done to Trek's image and

11   business.  That estimate our concerns have

12   turned out to have been corroborated by the

13   discovery that has been done to date in two

14   significant respects.

15        First, we deposed Mr. LeMond's former

16   business agent who confirmed that, yes, that

17   Greg had spoken to him about secret tape

18   recordings of Trek's CEO and the use that he

19   would make of those secret tape recordings to

20   leverage Trek should Trek ever wish to

21   terminate the business relationship.  Spoke

22   expressly to his agent about that strategy.

23        Secondly, in the course of written

24   discovery we have now received an e-mail

25   between Mr. LeMond and a reporter for Sports

1    Illustrated in which Mr. LeMond referred to

2    those same secret recordings of the Trek CEO

3    as his trump card in a sick game of blackmail

4    and extortion.

5         Against that unfortunate background it,

6    of course, was necessary for us as Trek's

7    legal counsel to retain the services of

8    sophisticated media consultants.  And I think

9    the context is well described and the legal

10   justification is well described in Judge

11   Kaplan's case out of the Southern District of

12   New York in 2003.  The In Re: Grand Jury

13   Subpoena case in which confidential

14   communications between lawyers and public

15   relations consultants were protected by the

16   attorney-client privilege and work product

17   doctrines.  And at page 330-331 of Judge

18   Kaplan's decision he explains the practical

19   realities of modern day litigation.

20         Judge Kaplan also pointed out that the

21   thinking of the courts in this area has

22   evolved over time.  And some of the early

23   decisions from the '70s and '80s which were

24   less friendly to the position that Trek is

25   bringing before the Court today have been

1      superceded by more recent thinking including a

2      decision for four members of the court by

3      Justice Kennedy.  That's discussed in, again,

4      Judge Kaplan's decision.

5                     THE COURT:  One of the things

6      I noted in not only Judge Kaplan's decision in

7      the In Re: Grand Jury but the other cases that

8      were cited by both sides is that as the court

9      went through the analysis to determine whether

10     the attorney-client privilege or work product

11     doctrine applied which was, my memory being

12     asserted, in tandem with each other.

13                     MR. WEBER:  Right.

14                     THE COURT:  Is, number one,

15     the court had before it a privilege log that

16     listed the documents that were being withheld;

17     and number two, from what I can tell also was

18     conducting an in-camera inspection of those

19     documents.

20          And what has become clear to me

21     particularly now having reviewed your reply is

22     that, in fact, none of the documents are

23     listed on the privilege log unless they happen

24     to be redacted documents that were produced

25     for other reasons to Mr. -- to plaintiff.  And

1      obviously I don't have the documents in front

2      of me to do an in-camera inspection.

3           So in terms of the procedure that the

4      courts engaged in to evaluate the

5      appropriateness of the assertion of work

6      product or attorney client, apart from your

7      objection about relevancy seems to me I'm

8      lacking some of the pieces that I may need in

9      order to evaluate whether these privileges or

10     doctrines have been properly invoked.

11               MR. WEBER:  Right.  I

12     anticipated the Court might raise that because

13     I saw the same thing in the decisions.

14          The procedural context in which this

15     issue came up and thus the reason for our

16     protective order motion were questions that

17     were asked of Trek CEO, John Burke, at his

18     deposition which questions were objected to

19     and, thus, we came before the court in that

20     fairly narrow procedural context of could

21     Mr. Burke or should Mr. Burke answer questions

22     about meetings that were had in the days after

23     March 20 and before April 8 in which these

24     outside consultants were present along with

25     Trek's lawyers.  So that's the narrow position

1    in which the issue was raised.

2         With respect to the broader question of

3    other documents that exist and so on, the

4    initial privilege log that was produced last

5    year or earlier this year, I forget, made a

6    note that it was stopping as of March 20, the

7    date of Mr. LeMond's service of the complaint.

8    And that was expressly made in the privilege

9    log.

10        The particular documents --

11             THE COURT:  So it was your

12   position that to the extent any documents were

13   generated that would qualify for

14   attorney-client or work product after the

15   initiation of the state court suit, March 20,

16   when your client -- of 2008, when your client

17   was served, you weren't listing any of those

18   documents.

19             MR. WEBER:  Right.  Because

20   there was no genuine question I believed as to

21   that they were prepared in anticipation of

22   litigation and a contrary approach would call

23   for the creation of nonstop privilege logs

24   over the course of the litigation.  And it has

25   been my experience that the parties agree that

1     once litigation starts, then there is not a

2     genuine issue about privilege logs thereafter.

3                    THE COURT:  So as a practical

4     matter, given the time line which is that the

5     public relation firm wasn't retained until

6     April 3 of 2008, after the commencement --

7     after the service of the state suit, your

8     position -- so that's why -- that's your

9     explanation as to why they --

10                   MR. WEBER:  Right.

11                   THE COURT:  -- don't show up

12    on any documentation reflecting communications

13    between client or attorney and that PR firm

14    are not on the privilege log except to the

15    extent that they got produced in a redacted

16    form.

17                   MR. WEBER:  Correct.  And we

18    were careful to make that explicit point in

19    the privilege log.

20                   THE COURT:  How many -- if

21    indeed I were to determine that the

22    communications with the PR firm, let's say

23    from April 3, from retention until

24    commencement of the lawsuit in federal court

25    in Wisconsin I guess that would be which would

1    be the -- I don't know if it's state or --

2                    MR. WEBER:  April 8.

3                    THE COURT:  April 8.

4                    MR. WEBER:  Right.

5                    THE COURT:  How many -- if,

6    indeed you were going to have to identify

7    those on a privilege log and/or produce them

8    to me for an in-camera inspection, how many

9    documents or pages are we talking about?

10                   MR. WEBER:  You know, I

11   haven't collected them, Judge.  There was a

12   document request that was due last Thursday

13   asking for those things.

14                   THE COURT:  Right.

15                   MR. WEBER:  But in light of

16   today's hearing, we indicated that we would

17   abide the Court's -- that we would raise the

18   objection and we would see what the Court

19   would do.

20        I would estimate it would be several

21   dozen.  You know, a reasonable number.

22   Certainly not hundreds of documents.

23                   THE COURT:  All right.

24                   MR. WEBER:  But I have not

25   done that.  I have not asked the client to

1    give me their set.

2                    THE COURT:  Okay.

3                    MR. WEBER:  So that is the

4    procedural -- and I appreciate where the Court

5    is coming from but that is -- so we were --

6    this was prompted by the fairly narrow

7    question at the CEO step as to essentially

8    what did you talk about at those meetings with

9    the public strategies people present.  I

10   objected and hence we are here today.

11                   THE COURT:  Okay.

12                   MR. WEBER:  If the Court, of

13   course, wants a privilege log and in-camera

14   review, we, of course, will provide that.

15                   THE COURT:  I'm just trying to

16   recall -- let me make sure I understand.

17        The relief you are seeking with your

18   protective order it appears, number one,

19   you're -- so with your motion it appears that

20   you are seeking not only a protective order

21   from having to produce any documents

22   responsive to the document request but then a

23   protective order basically blessing, for lack

24   of a better word, your instruction to your

25   client that he not share any of the

1    communications with the PR firm --

2                    MR. WEBER:  Correct.

3                    THE COURT:  -- that were

4    objected to at the deposition.

5                    MR. WEBER:  Correct.

6                    THE COURT:  Okay.

7                    MR. WEBER:  And there is a --

8                    THE COURT:  So it's not

9    confined just to documents.  It's also about

10   depositions.

11                   MR. WEBER:  That's correct.

12   And there is another deposition that was

13   noticed by plaintiff's counsel of a public

14   strategies employee, a gentleman by the name

15   of Bill Mashek and that was scheduled for -- I

16   forget the date but recently.

17        But counsel agreed that that likewise

18   would be put off because counsel said if I was

19   going to instruct Mr. Mashek at the deposition

20   not to talk about conversations of the kind

21   that Mr. Burke was instructed not to talk

22   about, that didn't make sense to go out to

23   D.C. and depose him until we had the chance to

24   talk to the Court.

25                    THE COURT:  Okay.

1          MR. WEBER:  And so there is

2     that Mashek deposition which would be of the

3     same type.  So Mashek, Burke, and the most

4     recent set of document requests.

5          THE COURT:  And is it your --

6     again, now I'm doing this from memory but with

7     respect to Mr. Burke's deposition, is it your

8     position or understanding that to the extent

9     that Trek itself or employees were involved in

10    conversations with the PR firm that counsel --

11    was counsel present for all of those

12    communications either in person, by phone, or

13    e-mail?

14          MR. WEBER:  Mr. Burke

15    testified that his general counsel, Bob

16    Burke -- Bob Burns, sorry -- was present at

17    all those meetings.

18          THE COURT:  Okay.  That's what

19    I --

20          MR. WEBER:  It is my

21    recollection that I also was present at all

22    the meetings with Trek employees and public

23    strategies employees or someone from my firm.

24          THE COURT:  Okay.

25          MR. WEBER:  And I think as the

1      Court saw, the retention was done through our

2      firm and so on.

3                      THE COURT:  Okay.

4                      MR. WEBER:  We anticipated

5      that this might become an issue going down the

6      road.

7                      THE COURT:  Go ahead.  I

8      obviously interrupted you with some questions

9      about the procedural posture that were in

10     here.

11                     MR. WEBER:  Right.  Well, I

12     was just going to draw the Court's attention,

13     as you probably have already seen, page 330

14     and 331 of Judge Kaplan's decision where he

15     talks about nor such -- may such advocacy be

16     prudently be conducted in disregard of its

17     potential legal ramifications.  Questions such

18     as whether the client should speak to the

19     media at all, whether to do so directly or

20     through representatives, whether and to what

21     extent to comment on specific allegations and

22     a host of others can be decided without

23     careful legal input only at the client's

24     extreme peril.  That's the text accompanying

25     footnote 42.

1          He goes on to say, Dealing with the

2    media in a high profile case probably is not a

3    matter for amateurs.  Target and her lawyers

4    cannot be faulted for concluding the

5    professional public relations advice was

6    needed.

7          And then Judge Kaplan goes on to list a

8    series of factors about why it was prudent for

9    lawyers to get the PR people involved and how

10   the work -- attorney-client work product

11   protections covered those kinds of

12   communications.  Likewise in this case where

13   given the -- and I think you may recall that

14   we -- well, we discussed last time we were

15   here the prior lead up to the 2008 litigation

16   which was the service of a very similar

17   lawsuit by Mr. LeMond in 2004 when Trek had

18   given him a notice of breach and his threat to

19   go public with sensationalized allegations

20   about high profile athletes then and how Trek

21   at that time had concluded that they would, in

22   light of the threat, withdraw the notice of

23   breach and continue to do business with

24   LeMond.

25          So it had this backdrop together with

1    now, in March of '08, receiving the latest

2    version in which it was quite apparent, if you

3    look at his complaint, what his strategy is.

4         If Trek had not properly responded to

5    that public filing, anticipated public filing,

6    service of complaint, we would be hearing

7    arguments from LeMond that Trek had not

8    properly mitigated its damages.  And indeed in

9    his answer to Trek's complaint, LeMond raised

10   the affirmative defense of Trek's failure to

11   mitigate.

12        So you have a --

13                THE COURT:  So doesn't that at

14   least given it bears on the issue of

15   mitigation, doesn't that -- to the extent that

16   you have raised the issue of relevancy, it

17   seems to me that, at a minimum, while you may

18   not agree that it is relevant to the

19   substantive claims being made by Mr. LeMond,

20   meaning the breach of the covenant of good

21   faith and fair dealing and that Trek did not

22   engage in its best efforts to promote

23   Mr. LeMond, his company and the brand, seems

24   to me what you are saying is this is -- you

25   sought out this PR firm to address the issue

1          of mitigation of damages.  It is pled.  It

2          seems to me what you are saying is yes, if

3          nothing else, it's relevant to damages which

4          is one of the arguments defendant has made.

5                          MR. WEBER:  Right.  As to the

6          public statements I would agree that what Trek

7          said to the public -- and if you look at

8          the -- if you read through the attachment

9          which has the Power Point presentation or if

10         you would have watched the 16-minute

11         presentation that Mr. Burke gave to the

12         employees, you will see it is carefully

13         structured to talk about the parties' business

14         relationship.

15              And as to those public statements, yes,

16         I would agree that those would be relevant to

17         the question of Trek's efforts to mitigate

18         against what Mr. LeMond was threatening.

19              But as to communications among counsel

20         and counsel's consultants that lay behind

21         those public statements, I don't believe that

22         those are relevant to the mitigation.

23                          THE COURT:  Okay.

24                          MR. WEBER:  And even if they

25         were, they would be sheltered.

1          THE COURT:  I'm sorry, they

2     would be --

3          MR. WEBER:  And even if they

4     were, they would be sheltered.

5          THE COURT:  Okay.

6          MR. WEBER:  By the privilege

7     doctrine.

8          THE COURT:  Okay.

9          MR. WEBER:  So while it isn't

10    a bright line, obviously, in the case law to

11    apply to this and admittedly it is an evolving

12    doctrine as acknowledged by the courts in this

13    area, I think given the facts of this case

14    with what Trek was faced with on March 20,

15    2008 and its lawyers' decision to retain

16    consultants to assist them in a lawsuit which

17    Mr. LeMond had already defined as an overlap

18    of litigation and public impact, that the

19    internal discussions among -- involving Trek,

20    its lawyers, and its lawyers' consultants

21    should be protected from disclosure.

22          THE COURT:  And are you

23    still -- obviously your opening brief rests

24    on -- spends quite a bit of time talking about

25    the attorney-client privilege.

1            MR. WEBER:  Yes.

2            THE COURT:  Your reply focuses

3      on work product.

4            MR. WEBER:  Right.

5            THE COURT:  And I don't want

6      to read more into it than you intend but it

7      seems to me that you have, having seen the

8      response by LeMond, shifted gears from -- or

9      shifted focus from asserting the

10      attorney-client privilege to work product.

11            MR. WEBER:  We think it is

12      both.  And the case law I think, one,

13      highlights attorney-client privilege, another

14      work product so we didn't want to give short

15      shift to either.  So we have -- we believe it

16      is protected by both in that the very meetings

17      Mr. Burke was asked about, ones involving

18      himself, his lawyers, other key Trek employees

19      and these consultants, those kinds of

20      communications would be covered by

21      attorney-client privilege.

22            There are different issues discussed in

23      the cases where materials are being sent to

24      consultants with or without the involvement of

25      lawyers in which the attorney-client privilege

1     was found not to apply but attorney work

2     product did.

3           So as to these communications which

4     bring us here today, these meetings, yes, I

5     believe both attorney-client privilege and

6     work product protect them.

7                THE COURT:  And as to then the

8     communications, the documents that they're

9     seeking by way of their discovery, is it your

10    position that they're both covered by

11    attorney-client and work product or is it work

12    product?

13             MR. WEBER:  I would have to go

14    document by document to see if there are

15    documents that by virtue to whom they were

16    sent and whether or not lawyers were involved

17    might be outside attorney-client privilege.

18    But work product, since they were all prepared

19    in anticipation of litigation, would apply to

20    them all.

21             THE COURT:  Okay.  Let me see

22    if I have any other questions.

23          I guess the last question I have is one

24    of the arguments I think that the plaintiff is

25    making is that part of his lawsuit is that

1    Trek wasn't engaged -- breached the covenant

2    of good faith and fair dealing and wasn't

3    engaged in its best efforts to promote

4    plaintiff and its branding company.

5                    MR. WEBER:  Right.

6                    THE COURT:  And that at least

7    events leading up to the formal termination of

8    the relationship which, as I understand,

9    they're saying basically notice of termination

10   is the lawsuit of April 8 of 2008, that at

11   least up until that time the company wasn't

12   engaged in its best efforts to promote it, to

13   promote the plaintiff.

14        Why wouldn't be it relevant to that

15   claim getting at -- apart from the issues of

16   privilege but in terms of relevancy --

17                    MR. WEBER:  Right.

18                    THE COURT:  -- why isn't

19   discussions with the PR firm relevant to that

20   claim of whether Trek was using its best

21   efforts to promote the LeMond product at least

22   up until the date of formal notice of the

23   termination?

24                    MR. WEBER:  Right.  Because

25   Trek will tell you and as is laid out in the

1       Power Point presentation and in the videotaped

2       presentation to employees, that when it

3       received the lawsuit on March 20, which was

4       three days after the memorial service for

5       Mr. Burke's father, the founder of the

6       company, that when on the heels of that it had

7       received this latest salvo from Mr. LeMond,

8       and this was in the context of the prior fall

9       when Mr. LeMond and Mr. Burke, John Burke, the

10      son had met privately and Mr. LeMond had asked

11      what are Trek's plans over the next few years,

12      are you going to renew me after 2010, and he

13      was told no, we will -- Trek will continue the

14      contract under its current term which is 2010.

15      But after 2010 Trek is not going to exercise

16      its option to renew for another five years at

17      which time Mr. LeMond asked, well, could I go

18      out and seek other business partners and

19      perhaps end the deal early if I can transition

20      to someone else, to which Trek said of course

21      and we will provide you some confidential

22      information to assist you in doing that and if

23      we want to wrap this up early before 2010,

24      just let us know.

25              In the meantime, Trek continued

1     developing its products and marketing LeMond

2     bikes and doing everything in anticipation of

3     continuing the contract through 2010.

4     However, when on March 20 Mr. LeMond did what

5     he did, the show was over.  The contract from

6     Trek's viewpoint was repudiated and terminated

7     as is laid out in Trek's lawsuit.

8            So there --

9                     THE COURT:  So your view --

10                    MR. WEBER:  So there is no

11    continuing relationship after March 20.

12                    THE COURT:  Okay.

13                    MR. WEBER:  And Trek will not

14    be contending at trial that, well, between

15    March 20 and April, some day in April, we

16    still viewed this as an ongoing relationship

17    and we were still out there exercising our

18    best efforts, rather Trek very soon after

19    March 20 went against the backdrop of

20    everything that was happening, Mr. LeMond did

21    what he did, trek had had enough and was

22    not -- was no longer going to tolerate the

23    sort -- being treated the way it was being

24    treated.

25                    THE COURT:  Okay.  All right.

1    Thank you very much.

2                    MR. WEBER:  Thank you.

3                    THE COURT:  I will hear from

4    Mr. LeMond's counsel.

5                    MS. RAHNE:  Good morning, Your

6    Honor.

7                    THE COURT:  Good morning.

8

9                    MS. RAHNE:  I want to touch on

10   just a few things and then on a couple of

11   items -- your questions on relevance, I think,

12   have articulated our position better than I

13   could myself so I'm going to spend a brief

14   amount of time there.

15          And then what I'd like to do is just

16   provide a little bit of an explanation of how

17   we think the case law applies to the

18   questions.  We're sort of flying blind.  We've

19   been shooting moving targets a little bit

20   because we're not sure what's out there.

21          What we basically have is the end

22   result of a Power Point presentation that

23   originally we thought was created in house

24   from Trek based on the fact that the press

25   release that predated it was on a Trek media

1       release.  And I think it's included in the

2       materials.

3            It wasn't until the deposition of John

4       Burke that we discovered that the individual

5       who was listed was actually a consultant for a

6       public -- for Public Strategies, Inc., which

7       is why we started that line of inquiry.  We

8       had hoped and planned on simply getting the

9       information related to the creation of this

10      Power Point from Trek.  So just a little bit

11      of a backdrop on that.

12           I want to point out just a few items

13      contextually before I go into my main points

14      starting with the meeting with John Burke,

15      between John Burke and Greg LeMond discussed

16      by Trek's counsel.

17           Just a couple of corrections.  We don't

18      agree necessarily with the explanation for how

19      that meeting went and the outcome from it in

20      terms of the date and how that matters

21      regarding termination.  It's very much our

22      position that --

23                  THE COURT:  Are we talking

24      about the November meeting?

25                  MS. RAHNE:  Correct.

1              THE COURT:  Okay.

2              MS. RAHNE:  It's very much our

3    position that that meeting certainly did

4    occur.  There were discussions about where the

5    parties' relationship was going.  There was

6    some information exchanged.  It actually was

7    the result of receiving that information that

8    solidified the concerns regarding what Trek

9    was doing in the present with Mr. LeMond's

10    brand and which prompted, necessitated in our

11    view the filing of the complaint in the

12    context of the parties' -- terminating the

13    parties' relationship fairly.

14        It's very much our opinion that we were

15    intending and pled in our complaint that Trek

16    was to continue to promote its best efforts

17    and that it was to continue contractual

18    obligations to exercise and meet its covenant

19    of good faith and fair dealing.

20        It's further our position that what was

21    done to, and this leads to my relevance

22    discussion, what was done on April 8, 2008 is

23    contrary to best efforts.  It's the contrary

24    of a covenant of good faith and fair dealing.

25              THE COURT:  In other words,

1  what I understand happened on April 8 is,

2  number one, the suit is begun but with the

3  suit is the notice, formal -- basically is the

4  notice of termination.

5              MS. RAHNE:  Correct.  And we

6  actually -- it's our opinion, Your Honor, that

7  what Trek sought at that time, sought from a

8  judicial officer was the right to terminate

9  based on a breach.

10      In all honesty, Mr. LeMond, at the

11  guidance of his counsel, acted and behaved as

12  if he was still under contract until there was

13  a judicial determination of whether there was

14  a justifiable breach to if you have

15  termination.

16      So we're willing to concede that as of

17  March 20, Trek's -- you know, we know now --

18  decided to treat the contract as terminated.

19  But it was very much our intention with our

20  original lawsuit that we were asking for Trek

21  to continue its best efforts until September

22  of 2010.

23              THE COURT:  Go ahead.

24              MS. RAHNE:  On relevance I

25  just want to reiterate the point.  And again,

1        I think your questions hit on what our belief

2        is in terms of why this is relevant.

3               On the creation of this Power Point,

4        the decisions about what went in, what went

5        out, what to say about the LeMond brand, what

6        not to say about the LeMond brand very much we

7        think speak to Trek's good faith or bad faith,

8        in our opinion, effort to treat the LeMond

9        brand fairly.  So that's our point on

10       relevance.  We think --

11                   THE COURT:  So when you're

12       saying -- given that as of March 20 when Trek

13       is served with your client's suit.

14                   MS. RAHNE:  Right.

15                   THE COURT:  And as you've

16       heard, Trek has said at that point they said

17       game is over, you know, from their perspective

18       and they weren't going to be engaging in any

19       efforts to continue to promote or comply with

20       the terms of the contract is the way I

21       understand it.  So what they're saying is,

22       look, our best efforts, if we had an

23       obligation of good faith and fair dealing or

24       engage in best efforts, when that suit came on

25       March 20, that's over and done.  So anything

1     that we're doing after that point in time

2     really doesn't go to the substance of the

3     lawsuit liability.  What goes to the substance

4     of the lawsuit is what took place before

5     March 20.

6         So why -- and you've said the same

7     thing, you now --

8               MS. RAHNE:  Yeah.  I think I

9     use --

10              THE COURT:  -- understand it's

11    March 20.  So why is anything after March 20

12    in terms of liability relevant?  I understand

13    on damages that's a different discussion we're

14    going to have but on liability.

15            MS. RAHNE:  And I think I

16    misstated, Your Honor.  What I meant was I

17    meant to say April 8.  I understand now that

18    Trek -- we can recognize that as of April 8,

19    when Trek filed its lawsuit, we -- our

20    understanding was that they were seeking the

21    right to terminate based on a breach that had

22    not been proven in our opinion.

23         So in hindsight, we look back and we

24    can recognize that as a date at which to cut

25    off any liability.  March 20, no, I misspoke.

1    I meant to say April 8.

2         We very much -- our filing was -- we

3    requested the relief that they continue to

4    perform through September of 2010.  And so

5    short of any judicial determination that a

6    termination was appropriate, we believe they

7    were under obligation to continue their best

8    efforts.

9         This Power Point presentation happened

10   during that time.  In our opinion it very much

11   speaks to Trek's lack of best efforts, lack of

12   meeting their covenant of good faith and fair

13   dealing in its treatment of the brand.

14              THE COURT:  And then that goes

15   to the second piece which is Mr. Weber saying

16   that, yes, the public statement may be

17   relevant to maybe your theory or his theory on

18   mitigation of damages but the underlying

19   communications that led to that Power Point

20   presentation, that that -- that they are not

21   relevant.  It's what was ultimately

22   communicated to the public that constitutes

23   whether there was good faith and fair dealing,

24   best efforts or mitigation of damages but that

25   the underlying communications leading to that

1      in terms of what the public didn't see really

2      have no bearing on it.

3            So what's the relevance of getting --

4      going behind the door?

5                  MS. RAHNE:  I think it's very

6      much relevant in terms of -- when we tried to

7      probe this with a Trek employee in a

8      deposition, what are the underlying facts that

9      you use to create this, who had the facts, who

10     made the determinations in terms of what went

11     in and what went out, did Trek have contrary

12     positive information that they could have used

13     to present a more balanced view, it's our

14     opinion there was a very biased, one-sided

15     telling of the relationship that has two sides

16     to the story, as most do, and their

17     determinations as to what to share with the

18     public and what to select.

19           I mean, there's a very inflammatory

20     e-mail that was selected to be put in there

21     calling Greg LeMond a commercial idiot.

22     That's a horrible statement to put out there

23     for somebody whose brand you're supposed to be

24     supporting or somebody whose name you're

25     supposed to be supporting.  I think that the

1    determination of selecting that e-mail versus

2    something else very much bears on their

3    performance of their support of the brand or

4    lack of in my opinion.

5                    THE COURT:  And the Power

6    Point presentation was given when in

7    relation -- was it also publicized on April 8

8    or when was it --

9                    MS. RAHNE:  It was released on

10   Trek's web site the same morning that the

11   press conference was held.  And then later

12   that day was the -- I don't know if the Power

13   Point but I know the Power Point with John

14   Burke speaking was also posted on YouTube.

15                    THE COURT:  And when -- was

16   this all the same day that the suit was filed?

17                    MS. RAHNE:  Correct, Your

18   Honor.

19                    THE COURT:  Okay.  All right.

20                    MS. RAHNE:  I want to just

21   speak briefly to the mitigation point and then

22   talk very briefly about how I think the

23   contours of this law apply or don't apply to

24   Trek's claims.

25                    I'm puzzled by the mitigation argument

1    right now.  Trek stood in this courtroom on

2    January 15 and claimed that they would not be

3    quantifying any damages to Trek, that the only

4    place they were quantifying damages was as to

5    LeMond bikes.

6         So I fail to see, though I appreciate

7    the fact that it ties into relevance again, I

8    fail to see how this could be an effort to

9    mitigate anything except potentially their

10   public relations which will lead into my

11   discussion about work product and privilege.

12        If Trek is not going to quantify

13   damages as to Trek bikes, I'm not sure what

14   they're mitigating by this.  If Trek is only

15   quantifying damages as to LeMond bikes, which

16   is what they've said in this courtroom, this

17   didn't mitigate.  It caused more harm.

18                  THE COURT:  Go ahead.

19                  MS. RAHNE:  As to work product

20   and privilege.

21                  THE COURT:  Let's focus on the

22   work product piece of it.

23                  MS. RAHNE:  Absolutely.

24                  THE COURT:  What I understand,

25   time line is, again, March 20, 2008 your

1      client commenced its lawsuit.

2                     MS. RAHNE:  Correct.

3                     THE COURT:  This law firm

4      hires this PR firm on April 3.  The

5      representation is they had no prior

6      relationship.  Meaning Trek had no prior

7      relationship with this PR firm.  In other

8      words, they were hired by the law firm to,

9      from the affidavits, to address the litigation

10     and the fallout and impact on relationship and

11     customer -- and reputation with the customers.

12     It's more -- it's certainly in anticipation of

13     their own litigation but your client's

14     litigation has already begun.  The lawyers

15     are, according to Mr. Weber, in the room or

16     privy to all of the face-to-face or let's say

17     telephonic communications.  Don't know yet

18     about e-mail and other documents.

19          Why isn't this work product?

20                     MS. RAHNE:  Your Honor, in

21     examination of these cases, I think it's clear

22     that there can be times when a consulting firm

23     could contribute to work product.  I think the

24     really important bright line that has to be

25     drawn is it has to be for a litigation

1       purpose.  We can't just call it a litigation

2       purpose based on a time line and then say,

3       therefore, it is.

4              The cases very much distinguish between

5       instances where it's a litigation purpose and

6       when it's a public relations purpose.  This to

7       me is per se public relations.  There was --

8       you know, Trek can say all day that they

9       needed to do this but from a legal

10      perspective, there absolutely was no need to

11      produce this.  They could have answered their

12      complaint.  It would have been as publicly

13      available as Mr. LeMond's complaint.  You

14      know, there was no legal reason why there had

15      to be a Power Point presentation connected to

16      the filing of a lawsuit.

17             Now, as I indicated before, we're sort

18      of flying blind.  I'm willing to concede that

19      there may be communications in there where

20      work product applies.  I don't know that.  I

21      don't have a privilege log.  I don't have -- I

22      mean, I have no description of what the

23      documents are.  It sounds like Mr. Weber

24      hasn't even reviewed them yet.

25             So I don't -- I mean, I think that

1       there are probably very likely documents

2       related to the creation of this that are not

3       going to be covered because it's not a

4       litigation purpose.

5                    THE COURT:  Well, when I talk

6       about a litigation purpose, let's assume that

7       law firm hires PR firm to address the PR from

8       this litigation.  Law firm sits down.  Lawyers

9       sit down, share their strategies, their

10      thinking, how they're going to answer the

11      complaint, what they know about the

12      relationship, why they think Greg LeMond is

13      wrong in terms of his allegations.

14          In other words, lawyers with the client

15      sharing all sorts of information that bears on

16      litigation that the PR consultant will be

17      using to make a decision about what to

18      ultimately put in the PR piece.  And at the

19      same time the PR firm then sends it back to

20      the lawyer and says, look, can you live with

21      this in terms of the litigation because

22      anything we put out in the public is going to

23      come back to -- you know, could haunt your

24      client, is this consistent and gets the

25      lawyer's input back and forth.

1          Why isn't this quintessential work

2      product?

3

4                    MS. RAHNE:  I think two

5      reasons.  First off, and again we --

6                    THE COURT:  And I'm making

7      this all up as you know.

8                    MS. RAHNE:  I think Your Honor

9      is going to be in the best position if -- and

10     I'm very amenable to the idea of an in-camera

11     review because I think you're going to be in a

12     position to get a better view of what's going

13     on.  We can only hypothesize.

14         It's very much my belief, based on the

15     fact that this is what we have to work from,

16     that there was effort to create this and it

17     has a great deal of bearing on my client's

18     claims in terms of what Trek has done to

19     damage his brand.

20         If there are some documents where it's

21     focused more internally toward the litigation,

22     if there's discussions about the complaint, I

23     think that those might be work product.  I

24     think to the degree that there were

25     discussions about the complaint and the focus

1    was on the creation of this, it's our

2    contention that Trek has actually waived it.

3           I don't know how, you know, you can

4    hire just anybody to come in and sit and sit

5    in on these meetings and then say, well, we

6    haven't waived it even though this was the

7    ultimate work product.  This was the ultimate

8    thing that we created and we were calling it

9    part of our litigation when it's not.  This is

10   quintessential public relations product, not

11   legal work product.

12                  THE COURT:  Okay.

13                  MS. RAHNE:  My only other

14   point, Your Honor, is under the work product

15   doctrine, there is the ability for a party to

16   get the discovery of non-opinion work product

17   which we believe this would be if there's

18   substantial need.  I believe we have

19   substantial need.  We have no other way to get

20   at the -- what was selected, what wasn't

21   selected, what was the -- you know, what went

22   in and what went out in terms of telling a

23   very biased story about a brand that was going

24   to become a future competitor of Trek and that

25   Trek was supposed to be supporting.

1              THE COURT:  And the need to

2      know what went in and what went out or what

3      decisions were made as to what to include or

4      not include or how to say it, what's the

5      relevance of that to your suit?

6              MS. RAHNE:  I think it speaks

7      directly to Trek's failure to meet their

8      covenant of good faith and fair dealing.  They

9      were under contract when they created this.

10     And if they made intentional decisions to tell

11     a story that is as biased as this appears to

12     be just on a glance, I think that's a breach.

13     That's absolutely a breach of their covenant

14     of good faith and fair dealing.

15              THE COURT:  Okay.  Anything

16     else that you have?

17              MS. RAHNE:  Not unless you

18     have any other questions, Your Honor.

19              THE COURT:  Let me ask again,

20     we don't know what's been withheld because

21     we've now learned that what's on the privilege

22     log are only documents that were redacted and

23     were produced to your client in some form or

24     another.

25              MS. RAHNE:  Correct.

1          THE COURT:  Is it your

2    position, just so I'm clear, after April 8,

3    are you seeking any communications between the

4    PR firm and counsel and the client or are we

5    only talking about communications leading up

6    to April 8 and the service of the suit?

7          MS. RAHNE:  Just leading up to

8    April 8, Your Honor.

9          THE COURT:  All right.  Those

10   are the only questions that I had.

11          MS. RAHNE:  I have just one

12   other item that --

13          THE COURT:  Yes.

14          MS. RAHNE:  I agreed with

15   counsel for Trek that we would just let you

16   know and get on the record Trek is providing

17   us some international sales documents that

18   have not yet been produced and they have

19   bearing on our expert reports, obviously.  We

20   have a sort of gentleperson's agreement that

21   we're going to reset the date for our exchange

22   of our initial expert reports once that

23   material has been received and our expert has

24   a chance to say how much time he needs.

25          THE COURT:  Okay.

1                   MS. RAHNE:  So I just wanted

2     to let you know that.

3                 THE COURT:  I didn't bring the

4     scheduling order with me but let me just

5     remind you so that when you do present that to

6     me, you keep this in mind.  Although let me

7     just look at the docket.  It may very well

8     say.

9                 MS. RAHNE:  I think they would

10    have been due tomorrow.

11              THE COURT:  Yes.

12              MS. RAHNE:  Rebuttal reports

13    aren't until August 1, I believe.

14              THE COURT:  Okay.  And the --

15    all discovery deadline --

16              MS. RAHNE:  June 8.

17              THE COURT:  Let me just see

18    here.  Discovery due by June 8, 2009 and then

19    there must be -- must have some time for --

20             MS. RAHNE:  Expert discovery.

21             THE COURT:  Expert discovery.

22    All right.

23             MS. RAHNE:  Correct.

24             THE COURT:  Let me just remind

25    you all when you -- if you're going to present

1      anything that is going to modify dates, happy

2      to look at it.  Understand if anything you

3      propose will affect Judge Kyle's dates, his

4      dispositive motion deadline or his trial ready

5      date, he'll be the one deciding whether to

6      move those dates.  In other words, he'll want

7      to look at your reasons and why -- what caused

8      the delay and why couldn't you have done it

9      sooner, et cetera.

10             So it's my way of saying to you if you

11     can come up with a stipulation that doesn't

12     affect him, you're only talking to me.  If it

13     affects his dates, I'll be talking to him.

14                     MS. RAHNE:  That will be our

15     goal.

16                     MR. WEBER:  If I could just

17     weigh in, Judge.

18                     THE COURT:  Sure.

19                     MR. WEBER:  They had asked for

20     some international sales data that was due

21     last Thursday.  Trek hasn't completed pulling

22     all that together but I expect it to be done

23     in a day or two.  And I told counsel that we,

24     of course, would agree to a day-by-day

25     extension of the reports for every day that we

1      go beyond last Thursday --

2                     THE COURT:  I don't anticipate

3      it's --

4                     MR. WEBER:  A very short time

5      frame.

6                     THE COURT:  That's good.  I

7      just want to give you a heads up that if

8      ultimately it affects his dates, I'll be

9      talking to him.

10                    MS. RAHNE:  And you might be

11     pleased to know that we're going to have our

12     own sort of motivation because we do have a

13     mediation scheduled and we have an agreement

14     that we want to have all this on the table

15     prior to mediation.

16                    THE COURT:  Great.

17                    MS. RAHNE:  For our own

18     purposes --

19                    THE COURT:  When is that

20     scheduled?

21                    MS. RAHNE:  June 16.

22                    THE COURT:  And who is your

23     mediator?

24                    MS. RAHNE:  Judge Stone in the

25     Northern District of California.  Former Judge

1      Stone.

2                      THE COURT:  Yep.  Okay.

3      Great.  Wonderful.  All right.

4            Mr. Weber, anything further in

5      connection with your motion?

6                      MR. WEBER:  Thanks, Judge.

7      Couple of things.

8            In listening to counsel, it seems as

9      though they want to make the April 8

10     presentation itself a trial over that

11     presentation.  Why did you put this slide in

12     that was negative to Mr. LeMond and not this

13     other slide that might have been more

14     favorable to him as if the jury is going to be

15     deciding whether Trek's announcement of the

16     filing of the lawsuit and the reasons for the

17     filing of the lawsuit somehow itself is a

18     separate independent claim.  That just doesn't

19     make sense to me.

20           The parties acted as they did up to

21     March 20 in a business relationship and then

22     it shifted to litigation.  And this April 8

23     announcement, again if the Court will look at

24     it, it was an express explanation of here is

25     why the relationship is over and the need to

1    seek court assistance.  So it doesn't make

2    sense to me that somehow the jury would be

3    weighing why did you put this slide in and not

4    that slide.  It just doesn't -- I don't track.

5         Secondly, in terms of what Mr. LeMond's

6    represented reasons were and his desire for

7    this relationship to continue until 2010,

8    well, two additional things I can tell you

9    that in December after the meeting with

10   Mr. LeMond, Mr. Burke followed up by e-mail to

11   Mr. LeMond and said, well, what's up?  Are we

12   going to end early or are we continuing to

13   2010.  Mr. LeMond didn't respond to Mr. Burke.

14        In the meantime, however, he has all

15   sorts of e-mail traffic with third parties

16   telling them that he's going to be filing this

17   lawsuit and hurry up and order your bikes

18   because the relationship is going to be over.

19        And in fact, between March 20 and

20   April 8 there's an e-mail from Mr. LeMond that

21   says I have served notice on Trek -- not that

22   we're going to continue -- I have served

23   notice on Trek that either they buy me out,

24   they buy the brand or I go away, take my brand

25   back but with a price.  So the option of

1        continuing Mr. LeMond knew was over by virtue

2        of what he did on March 20.

3                     THE COURT:  Address the issue

4        of mitigation.  You raised that and then

5        counsel for LeMond said they don't understand

6        your mitigation argument given Trek's position

7        as they aren't seeking damages.  So they

8        don't -- their response that you have a duty

9        to mitigate your damages is somewhat of a

10       surprise.

11                    MR. WEBER:  Yeah, I'm not

12       quite sure -- I mean, you recall we were here

13       previously and seeking defining of the

14       parameters of Trek's counterclaim and

15       quantification of damages.  And she's correct

16       that the lost sales aspect of this is limited

17       to the LeMond bikes.  We have not attempted to

18       show the extent to which Trek bike brand sales

19       were affected by Mr. LeMond's conduct although

20       we believe it was.

21            As to lost bike sales, it is correct

22       that it is the LeMond lost bike sales that

23       we're talking about.

24            In a broader sense, though,

25       particularly from Trek's perspective in the

1    time leading up to April 8, between March 20

2    and April 8, Trek wasn't sure where this was

3    going, that it had to anticipate Mr. LeMond

4    making quite a spectacle of the allegations

5    about third parties that he's laid out in his

6    complaint.  And Trek anticipated that it would

7    damage its brand if he were to do that and

8    needed to mitigate those anticipated damages

9    by a very clear and simple explanation of the

10   business reasons that the contract was over

11   and litigation was being filed.

12        So the mitigation argument I'm talking

13   about is in that time period between March 20

14   and April 8.  We have not gone to -- we have

15   not attempted to assess the dollar impact on

16   the Trek brand aside from the LeMond brand by

17   virtue of what Mr. LeMond has done over the

18   years.

19             THE COURT:  Okay.  You can be

20   seated.  Thank you.

21             MR. WEBER:  Thanks, Judge.

22             THE COURT:  At least

23   preliminarily I'm satisfied that the documents

24   that are being sought by the discovery are

25   relevant to claims related to LeMond's theory

1       of liability and also on the issue of damages.

2       At least that's my preliminary sense based on

3       what the parties have presented to me.

4              That said, in order for me to determine

5       whether the invocation of attorney-client

6       privilege or work product is appropriate I am

7       going to need two things from Trek and,

8       therefore, I'll be taking the motion under

9       advisement.

10             I'm going to need a privilege log

11      identifying the documents involving

12      communications between the PR firm and either

13      your firm or the client that you are claiming

14      are protected either by attorney-client

15      privilege or work product.  So we need a

16      privilege log that contains the appropriate

17      information of the to, from, copied on and the

18      nature of the -- the subject matter.  In other

19      words, consistent with what you've done on

20      your other privilege log.  So I'm going to

21      need that.  That privilege log needs to be

22      served on LeMond's counsel.

23             And then I'm going to need the

24      documents themselves to do an in-camera

25      inspection so I can make a determination as to

1    whether any of them or all of them should be

2    withheld or under what circumstances.

3         So, Mr. Weber, when do you think you

4    can get the privilege log to me and the -- and

5    let me -- and also the documents but let me

6    ask again.  The mediation is scheduled for

7    June when?

8              MR. WEBER:  15th.

9              MS. RAHNE:  15th.

10             MR. WEBER:  Or 16th.

11             MS. RAHNE:  16th.

12             THE COURT:  All right.  As a

13   practical matter, then, let me ask because

14   obviously I don't want to be the one holding

15   up discovery here but I also don't want to

16   encourage the parties to have to incur

17   unnecessary expense if, in fact, this case is

18   going to get resolved.  So if it makes sense

19   to wait and have that production -- creation

20   of the privilege log and the production after

21   the mediation so you can see if it's been

22   resolved, we can certainly do that.  If that

23   doesn't make sense because you need to keep

24   moving on this and you have other things,

25   granted we're already towards the end of May,

1     then I'm going to ask that it get produced to

2     me before the mediation.  But it does occur to

3     me that, you know, this takes time and money

4     to do it and I hate to have the parties incur

5     unnecessary expense if the case can get

6     resolved.

7                    MS. RAHNE:  Speaking from our

8     side, Your Honor, we would very much prefer

9     that we have them prior to the mediation under

10    the same theory under which we're

11    exchanging -- we had discussed

12    (unintelligible) potentially holding up on

13    full-fledged expert reports for similar

14    reasons and Trek had indicated that we want to

15    be able to, you know, have everything on the

16    table, so to speak.

17        I think under that same theory I would

18    very much like to have whatever discovery

19    we're entitled to so we can incorporate into

20    our mediation brief and/or share with the

21    mediator if it has bearing in the case which

22    we believe it does.

23                    THE COURT:  Mr. Weber.

24                    MR. WEBER:  I'm actually --

25    I'm happy to give the privilege log in short

1     order, Judge --

2                    THE COURT:  Okay.

3                    MR. WEBER:  -- so we can keep

4     this moving because if the Court were to

5     conclude that Trek is incorrect, then we would

6     need to proceed with the deposition of the

7     public strategies person that was previously

8     noticed and we want to do that and keep this

9     moving.

10                    THE COURT:  Okay.  You know,

11    as a practical matter, I'll tell you given

12    that we're already at May 26 and your

13    settlement conference is set for June 15, I

14    don't know that we, again depending on when

15    you get this information to me, whether you're

16    going to have a decision in time or a -- and

17    even if you do, whether one or the other of

18    you, whoever loses, won't be appealing it to

19    Judge Kyle in any event.  Meaning, I'm not

20    sure you're going to have an answer on these

21    documents before June 15.  I just want to give

22    you a heads up.

23                    MR. WEBER:  Then I will need a

24    little bit of time to pull everything

25    together, make sure I've got it.

1                    THE COURT:  Okay.

2                    MR. WEBER:  But I'll be happy

3       to do that before June 15.

4                    THE COURT:  Well, can you get

5       the documents to me by a week from today with

6       the privilege log?  Does that work?

7                    MR. WEBER:  I'm afraid because

8       we have more discovery in this case tomorrow,

9       I'm getting the expert reports turned

10      around --

11                   THE COURT:  Okay.

12                   MR. WEBER:  -- if we could

13      look, say, during the week of the 8th.  Say

14      June 10th?

15                   THE COURT:  That's fine but

16      just so you know, you're not going to have an

17      answer by the mediation.

18                   MR. WEBER:  Right.  But she'll

19      have the log, then.

20                   THE COURT:  She'll have the

21      log, then, and know the magnitude of the

22      communications.  I mean, obviously you'll make

23      what assumptions you want to make which is

24      they had other good stuff and they didn't put

25      it in for whatever reasons because they wanted

1    to put the bad stuff in and we're going to

2    disagree with it.  I have a feeling this

3    particular set of discovery will not drive the

4    outcome of your mediation but I say that not

5    knowing what the heck's in those documents.

6                    MR. WEBER:  I don't think so,

7    Judge.

8                    THE COURT:  All right.  Well,

9    why don't we say June 10, then, the privilege

10   log and the documents to me if you can get it

11   sooner so that at least counsel will have an

12   opportunity to examine the privilege log well

13   in advance of your mediation.  That would be

14   helpful for client consideration.

15                   MR. WEBER:  Thanks, Judge.

16                   THE COURT:  All right.  Thank

17   you, very much.

18                   MS. RAHNE:  Thank you, Your

19   Honor.

20

21                       * * *

22

23

24

25

1   STATE OF MINNESOTA   )
                         ) ss.
2   COUNTY OF WASHINGTON)

3

4           BE IT KNOWN, that I transcribed the

5   electronic recording relative to the matter

6   contained herein;

7

8

9           That the proceedings were recorded

10  electronically and stenographically transcribed

11  into typewriting, that the transcript is a true

12  record of the proceedings, to the best of my

13  ability;

14

15

16          That I am not related to any of the

17  parties hereto nor interested in the outcome of

18  the action;

19

20

21          IN EVIDENCE HEREOF, WITNESS MY HAND.

22

23
                        s:/ Lisa M.Thorsgaard
24

25