1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MINNESOTA

3    --------------------------------------------------

4    LeMond Cycling, Inc.,

5              Plaintiff,

6        vs.                        No. 08-CV-1010

7    Trek Bicycle Corporation,

8              Defendant.

9    --------------------------------------------------

10

11            THE HONORABLE JANIE S. MAYERON

12            United States Magistrate Judge

13

14

15

16                     *  *  *

17             TAPE-RECORDED HEARING

18           TRANSCRIPT OF PROCEEDINGS

19                     *  *  *

20

21

22

23              Date:   7-29-09

24              Reporter:   Lisa M. Thorsgaard

25

Dockets.Justia.com

1                    <u>APPEARANCES</u>

2

3              MS. JENNIFER M. ROBBINS AND MS.

4    KATHERINE K. BRUCE, Attorneys at Law, Robins,

5    Kaplan, Miller & Ciresi, 800 LaSalle Avenue, Suite

6    2800, Minneapolis, Minnesota 55402-2015, appeared

7    on behalf of Plaintiff.

8

9

10             MR. RALPH A. WEBER, Attorney at Law,

11   Suite 700, 309 North Water Street, Milwaukee,

12   Wisconsin 53202, appeared on behalf of Defendant.

13

14

15             MR. ERIK T. SALVESON, Attorney at Law,

16   Suite 600, 220 South Sixth Street, Minneapolis,

17   Minnesota 55402, appeared on behalf of Defendant.

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2

3          (NO REPORTER WAS PRESENT — the following

4     transcript of proceedings was prepared from a

5     COPY of the original court tape recording)

6

7                THE COURT:  Good morning

8     everyone.  We're here this morning in the

9     matter of LeMond Cycling versus Trek Bicycle

10    Corporation.  Court file No. 08-1010.

11          If the lawyers could identify

12    themselves starting first with counsel for

13    LeMond.

14                MS. ROBBINS:  Jennifer Robbins

15    on behalf of LeMond Cycling.  And with me is

16    Kate Bruce.

17                THE COURT:  Okay.  Just a

18    moment.  All right.

19          And on behalf of Trek?

20                MR. WEBER:  Good morning, Your

21    Honor.  Ralph Weber and Eric Salveson for Trek

22    Bicycle.

23                THE COURT:  All right.  We're

24    here this morning to address Trek's motion to

25    compel answers to interrogatories and to deem

1    facts admitted and for expenses.

2           I have reviewed the initial submission,

3    the response by LeMond Cycling and Greg LeMond

4    and the reply as well and prepared to hear

5    argument at this time.

6                   MR. WEBER:  Thanks, Judge.

7    Judge, do you have a preference whether I

8    address the request for admissions or the

9    contention interrogatories first?

10                  THE COURT:  It doesn't matter.

11   Why don't you address them in the order of

12   your brief which is the contention

13   interrogatory first.

14                  MR. WEBER:  Okay.  Great.

15          With respect to the contention

16   interrogatories, companies, of course, breach

17   contracts if they do because of specific acts

18   or omissions that conflict with their duties

19   under the contract.  So we have been asking or

20   we did ask what acts and omissions by Trek

21   does LeMond contend violate which duties under

22   the contract.  We are referred by LeMond to

23   their complaint.

24          Well, that isn't very helpful because

25   the complaint spends an awful lot of time

1      talking about the acts or omissions of third

2      parties who aren't in this case including

3      Marion Jones, the sprinter, Bud Selig, the

4      commissioner of baseball and Lance Armstrong,

5      the bicyclist.  So we asked them to specify

6      what acts and omissions by Trek conflicted

7      with what duties under the contract.

8           In addition to referring us to the

9      complaint, they have referenced the

10     anticipated -- then anticipated testimony of

11     their expert.  They have a single liability

12     expert, a gentleman by the name of Jay Townly,

13     and we deposed him last Friday.

14          I understood Mr. Townly to have four

15     things that he pointed to as purported bases

16     for acts and omissions by Trek, two of them

17     specific and two generalized.

18          The first specific was that Trek, he

19     believes, did not have a professional

20     bicycling team that rode LeMond bikes, that

21     that was an insufficient marketing and

22     promotion of the LeMond bikes.

23          Number two, that Trek should have

24     gotten Greg more, Greg LeMond more public

25     appearances to promote his brand.  Those are

1    the two specific.

2          The two generalized, the first related

3    to --

4                  THE COURT:  I'm sorry, Trek

5    should have gotten Mr. LeMond more?

6                  MR. WEBER:  More public

7    appearances.

8                  THE COURT:  Okay.

9                  MR. WEBER:  In support of his

10   brand.

11                  THE COURT:  Okay.

12                  MR. WEBER:  The second two

13   were more generalized.  And I'm going to -- I

14   have a copy of my notes from the deposition

15   since we're just in the process of getting the

16   transcript.

17          The third and fourth were very

18   generalized.  The first related to collateral

19   material that Trek could have put out

20   regarding the brand.  I believe such things as

21   catalogs.  And the fourth related to the sales

22   force.  And he said that Trek should have made

23   the sales -- made sure the sales staff was

24   talking up the product and out explaining the

25   features and the differentiation of the

1        product.

2              And when I asked him to -- what the

3        basis was for that belief that Trek had not

4        done that, he said he'd read the depositions

5        of Trek's marketing manager.  I said, well,

6        what was it about the marketing manager's

7        deposition that specifically said anything

8        about that.  And he said he doesn't recall

9        anything specific, just got a general sense

10       from the deposition, a feel for what they did

11       based on reading these depositions.

12             So if, in fact, LeMond believes that

13       it's too burdensome to identify the acts and

14       omissions of Trek and, in fact, relies upon

15       the testimony of their single liability

16       expert, Townly, I'd be happy to prepare a

17       stipulation that says these are the four bases

18       for their allegations of acts and omissions of

19       Trek and we can move on.  If they have

20       something else, then I think we're entitled to

21       know it.

22             Fact discovery has closed.  Expert

23       discovery will close next week, and it is a

24       simple process to specify what it is you're

25       relying on at the close of fact discovery to

1    claim that Trek did something that it

2    shouldn't have under the contract or failed to

3    do something that it should have done under

4    the contract.  And I simply don't understand

5    their refusal to participate in that very

6    helpful and appropriate exercise at this stage

7    of the case.

8                    THE COURT:  Let me just make

9    sure I'm clear, then.  In your moving papers

10   you reference the fact that they said go look

11   at our complaint and go look at our -- wait

12   for expert opinion.

13                    MR. WEBER:  Right.

14                    THE COURT:  And then you

15   talked about how the expert opinion at that

16   time only addressed damages and did not

17   address liability.  So I take it that since

18   your motion, this deposition of their expert

19   has been taken and it's through the course of

20   the deposition you learned what his opinions

21   would be on the issue of what I would call

22   liability, meaning how is it that Trek

23   breached the various contractual provisions of

24   the contract.

25                    MR. WEBER:  Correct.  And I

1    would like -- because his testimony was not

2    always as clear as I might have wished it to

3    be, if we are going to go down that road, and

4    I'm happy to do this, that we would enter into

5    a stipulation with counsel that here are the

6    Townly opinions or in the usual course, they

7    can answer the interrogatory and say as Townly

8    explained, here are the four items that they

9    believe constitute failures by Trek as opposed

10   to us being uncertain at this stage of the

11   case exactly what they're relying on.

12             THE COURT:  Okay.

13             MR. WEBER:  With respect to

14   the requests for admissions, I think that it

15   occurred to me flying up here today that there

16   may be a very practical resolution to this

17   dispute.  And that is -- I don't know if the

18   Court has had the opportunity to see LeMond's

19   motion -- memorandum in support of its motion

20   for summary judgment.

21             THE COURT:  I did not look at

22   that.  I saw the reference to it and the

23   reference to the exhibits that you talk about

24   in their memoranda where supposedly they were

25   using and relying on e-mails as well --

1           MR. WEBER:  Right.

2           THE COURT:  -- in support of

3     it but I did --

4           MR. WEBER:  Right.  Well, let

5     me give you the particular cites in case the

6     Court wants to refer to it.

7           THE COURT:  All right.

8           MR. WEBER:  If you look at

9     their brief at page 9, they --

10          THE COURT:  Let me grab that.

11          MR. WEBER:  Okay.  You have

12    the --

13          THE COURT:  I have the brief

14    here.

15          MR. WEBER:  Oh, great.

16          THE COURT:  I'm sorry,

17    their --

18          MR. WEBER:  I'm sorry.  This

19    is their summary judgment brief.

20          THE COURT:  Summary judgment

21    brief, I do not have that.  Go ahead.

22          MR. WEBER:  I apologize.

23    Their summary judgment brief at page 9 states,

24    LeMond's stance against doping in professional

25    cycling represents a part of who he is within

1    the cycling community, citing See consumer

2    comments compiled at Robbins Declaration,

3    Exhibit 19.  Okay.

4         And then they continue on that page,

5    Trek has attempted to silence LeMond and when

6    consumers have sought additional facts (See

7    consumer comments compiled at Robbins

8    Declaration, Exhibit 20).  So their brief at

9    page 9 refers to the Robbins declaration and

10   specifically Exhibits 19 and 20 of that

11   declaration.

12        If you then look at the Robbins

13   declaration at page 4, paragraphs 20 and 21.

14                  THE COURT:  Of the Robbins

15   declaration that accompanies the summary

16   judgment motion?

17                  MR. WEBER:  Exactly right.

18                  THE COURT:  I'm sorry,

19   paragraphs 20 and 21?

20                  MR. WEBER:  Yes.  And 20

21   states, Attached to this declaration 19 as

22   Exhibit -- I'm sorry, attached to this

23   declaration as Exhibit 19 is a true and

24   correct copy of a compilation of consumer

25   comments about Greg LeMond labeled LCI, which

1    is the LeMond Cycling Bates designation, 3294

2    to 308.

3           Then paragraph 21 reads, Attached to

4    this declaration as Exhibit 20 is a true and

5    correct copy of, and they give a list of Trek

6    Bates numbers.

7                 THE COURT:  Exhibit -- I'm

8    sorry, in Exhibit 20 are those described?

9                 MR. WEBER:  These are -- it

10   just says they're -- they refer back in the

11   brief as consumer comments.

12                 THE COURT:  Okay.

13                 MR. WEBER:  So first the

14   brief, then the declaration, and then we get

15   to Exhibits 19 and 20 themselves.

16           Exhibit 19 is a blog post and comments,

17   a blog post by a gentleman who's a long-time

18   friend of Mr. LeMond and colleague in the

19   cycling world who writes some supportive

20   comments of Mr. LeMond.

21           But then attached to that at LCI 3297

22   is exactly the kind of commentary that has

23   been in issue in this case.  Someone responds

24   to Mr. Hamsted's blog post by saying, Andy's

25   statement is a clear, articulate, reasoned

1    stance against doping without a single note of

2    personal animus.  Greg's comments cannot be

3    characterized by any of those adjectives.

4    Greg made it personal.  Whatever the reasons

5    for that personal attack it colors his

6    statement, motives, and objectives.  Andy's

7    statement enriches his stature.  Greg's

8    impoverishes his.

9         So the very sort of thing that Trek has

10   been talking about about the damage to the

11   Trek brand.  LeMond has brought these

12   materials forward.  And recall under Rule 56

13   that they are representing to the court that

14   the materials they supply in support of their

15   motion for summary judgment are materials that

16   are admissible in evidence.  So they have

17   provided the Court the very materials, some of

18   them, that we're talking about.

19        If you then turn to LCI 3301, another

20   comment submitted by --

21                  THE COURT:  I'm sorry, LCI?

22                  MR. WEBER:  3301.

23                  THE COURT:  3301 also part of

24   Exhibit 19?

25                  MR. WEBER:  Exactly.

1              THE COURT:  All right.

2              MR. WEBER:  Says Mr. Hamsted

3      seems to have offered some clear and heartfelt

4      thoughts about the problem of doping in the

5      pro ranks.  No mud slinging there, just

6      concern for a sport he knows and loves.  He

7      has also offered an exceedingly charitable

8      reading of LeMond's remarks about Lance

9      Armstrong.  LeMond's words are not just words

10     of concern for cycling generally.  They are an

11     attack on a particular individual, an attack

12     containing suggestions of wrongdoing that are

13     not elliptical, veiled or substantiated.  If

14     LeMond has put his position and livelihood at

15     risk, it is not just and perhaps not chiefly

16     because he has taken a strong stance about

17     doping per se.  I don't know Armstrong or

18     LeMond personally and I don't know who may

19     have started their pissy fit, but whoever

20     started this, I cannot help but think that

21     LeMond's accusations are, given the evidence,

22     an unfounded disgrace.  I say this not because

23     I know Lance to be clean and not because I'm

24     unaware of doping in cycling more generally.

25     I say that because LeMond's published comments

1     about LA on their face seem to be -- seem to

2     go beyond the pail.  To this reader they are

3     more dumb than brave.

4          We then turn to --

5               THE COURT:  I'm sorry, more

6     dumb than?

7               MR. WEBER:  Brave.

8               THE COURT:  Okay.

9               MR. WEBER:  Then we turn to

10    Exhibit 20 also submitted by LeMond.  These

11    are a series of e-mails received by Trek and

12    produced by Trek in discovery and I believe

13    most, if not all of them, contemporaneously

14    back in 2004.

15          And these e-mails appear at, the first

16    one, Trek Bates page 113.  And a consumer

17    wrote, It seems that Greg LeMond has forgotten

18    people are innocent until proven guilty.  Greg

19    adds to the widespread drug speculation in

20    cycling rather than celebrate the TDF, Tour de

21    France.  It's already bad enough with David

22    Miller.  That's the crux of the issue,

23    speculation and no proof.  If he couldn't say

24    anything positive, why didn't he just bite his

25    tongue.  Greg LeMond is an embassador for the

```
 1          sport of cycling.  He needs to act like it.

 2                And a concluding comment which, of

 3          course, is very powerful for a company that is

 4          giving Mr. LeMond millions of dollars to

 5          support that the -- the idea that it would

 6          support their sales, the concluding comment

 7          is, I own a Serotta and will never, in all

 8          caps, buy a LeMond bike.

 9                At Trek 100, again submitted by the

10          plaintiffs, comment:  I will not be buying a

11          LeMond bike because of the nasty remarks Greg

12          LeMond has 'make' about Lance Armstrong.  If

13          I, meaning if Greg can document illegal drug

14          use by Lance, then I would reconsider.

15                Trek 111, I'm not going to buy one of

16          your bikes ever.  Unless you have proof of

17          Lance doping, then shut up.  Every cyclist I

18          know shares this viewpoint.  Signed Eric Vane.

19                Trek 92, Greg LeMond's --

20                     THE COURT:  I get the gist of

21          this, Mr. Weber.

22                     MR. WEBER:  Okay.

23                     THE COURT:  So your practical

24          solution is what?

25                     MR. WEBER:  My practical
```

1    solution is that they have -- they should be

2    stopped from -- in -- from challenging that

3    these documents are authentic and admissible.

4                    THE COURT:  The ones that

5    they've attached themselves as Exhibit 19 and

6    20?

7                    MR. WEBER:  The ones they have

8    attached and along with any others unless

9    there is some distinction to be made in the

10   types or format or circumstances.

11        They picked out a few of these and said

12   these are admissible.  The burden would have

13   to be on them to say why others of the very

14   same ilk and format, content are not.

15        We are not here or we were not here

16   originally on admissibility.  We wanted to

17   know from them, look, do you have any basis to

18   say these are not what they purport to be;

19   namely, consumer comments.  They have

20   suggested no basis and I believe their use of

21   them in support of their Rule 56 submission

22   takes it beyond simply where I thought we

23   would be and I think should conclude the

24   matter.

25        In terms of the rule of evidence

1       involved, it's 901(b)(4) in which the

2       circumstances in which the e-mail was

3       generated and the content of the e-mail

4       provide sufficient indication of authenticity

5       to permit it to be authenticated and used.

6       And ultimately, of course, it's up to the jury

7       to decide whether the items are what they

8       purport to be but certainly more than enough

9       for the preliminary determination of

10      authenticity.

11          And the remarkable Lorraine decision

12      out of Maryland, I'm sure the parties when

13      they were submitting a matter involving a

14      $30,000 lightning strike to a sailboat never

15      anticipated the very scholarly opinion that

16      would result, but such as it is at -- there's

17      a remarkable discussion, a very helpful

18      discussion I should say about 901(b)(4) in the

19      context of e-mails and it refers to, under

20      901(b)(4), that the content and substance of

21      the e-mails taken in conjunction with the

22      circumstances can be very helpful and

23      determinative to the court.

24          Of course and it says courts have

25      recognized this rule as a means to

1       authenticate electronic evidence including

2       e-mails, text messages and the content of web

3       sites, citing a case noting that

4       circumstantial evidence including the presence

5       of the defendant's work e-mail address,

6       content of which the defendant was familiar

7       with, et cetera, would sufficiently

8       authenticate the materials.

9                     THE COURT:  But let me ask a

10      question.  What I understand LeMond is saying

11      is, number one, it's your burden at trial if

12      you want to use these e-mails or blogs to

13      authenticate those documents.

14                    MR. WEBER:  Correct.

15                    THE COURT:  That's number one.

16      It's not their burden, your burden.

17                    MR. WEBER:  Correct.  And we

18      agree.

19                    THE COURT:  So obviously you

20      tried to shorten your burden by asking them to

21      admit that they were authentic.

22                    MR. WEBER:  Yes.

23                    THE COURT:  And they've

24      said -- right now they've refused.  They've

25      said we have insufficient information to

1      admit.

2                          MR. WEBER:  Correct.

3                          THE COURT:  All right.

4      Setting aside the e-mails or blogs that

5      constitute Exhibits 19 and 20 which are part

6      of their summary judgment submission.

7                          MR. WEBER:  Right.

8                          THE COURT:  Setting aside

9      those, and I don't know if those are included

10     within the ones you've asked them to admit or

11     not.

12                         MR. WEBER:  They are.

13                         THE COURT:  All right.

14     Setting aside those, let's assume they're

15     saying we -- we don't know if they're

16     authentic or not.  They are not our records.

17     They didn't come from our e-mails.  They

18     didn't come from our servers.  They're not

19     documents maintained in the ordinary course of

20     business.  In fact, a lot of them came from

21     Trek or Trek found them during the course of

22     discovery or whatever.  That doesn't preclude

23     you from, at the time of trial, arguing under

24     901(b)(4) or what other means you want to

25     argue that these e-mails in your possession or

1    however you obtained them are authentic.

2                    MR. WEBER:  Correct.  Correct.

3                    THE COURT:  All right.  The

4    Lorraine decision isn't about request for

5    admissions.  It's about what's adequate to

6    establish authenticity.

7                    MR. WEBER:  Correct.

8                    THE COURT:  And so it

9    certainly wouldn't preclude you from

10   establishing authenticity based on the fact

11   that, for example, these e-mails that Trek

12   produced to them were obtained by them in the

13   ordinary course of business on their servers

14   and establishing authenticity in that fashion.

15                   MR. WEBER:  Correct.

16                   THE COURT:  All right.  So I

17   just want to make sure I'm not confusing what

18   Lorraine -- Lorraine talks about how to

19   authenticate electronic information.  What

20   Lorraine doesn't assist us on is whether this

21   other party has to agree that it's authentic.

22                   MR. WEBER:  Correct.  Yes.

23                   THE COURT:  All right.

24                   MR. WEBER:  The other cases we

25   cite address the parties' burden in response

1    to request for admissions and they are -- it's

2    simply shrugging your shoulders and saying,

3    well, I don't know, it's not my document isn't

4    enough.  They're a requirement of reasonable

5    inquiry.

6         And that's why we also ask the

7    follow-up interrogatory to say if, in fact, if

8    you refuse to admit the authenticity of these

9    materials, these consumer e-mails and blog

10   posts, then tell us why.  Tell us so that

11   we're not surprised on the eve of trial about

12   some claim when we proceed to have them

13   admitted.  And again, they proffered nothing

14   saying, well, it's your burden.  Well, the

15   requests for admissions are intended to

16   prepare cases for trial and move beyond that.

17        So if they had something that suggested

18   these -- remember authentication is are these

19   what they appear to be.  Do they appear to be

20   consumer e-mails?  Do they appear to be

21   postings on web sites?  If they had anything

22   to suggest that they weren't what they appear

23   to be, it was incumbent upon them to come

24   forward and not do what they did.  The fact

25   that they then used the very same materials in

1    their rule -- in their summary judgment motion

2    takes it far beyond the pail.

3         So their approach is we can use these

4    asserting not just that they're authentic but

5    in fact that they're admissible.  But when you

6    ask us are these authentic, we don't have to

7    say that isn't what this process is all about.

8                   THE COURT:  So your simple

9    solution is what?

10                   MR. WEBER:  I think that they

11    should be given their use and representation

12    to the court that materials of this very

13    nature are not only authentic but admissible,

14    that they should be estopped from denying

15    authenticity or admissibility of any of these

16    materials with I would be happy to allow them

17    a proviso, unless they can show specifically

18    with respect to a particular consumer e-mail

19    or blog posting why they should be allowed

20    relief from the usual rule.

21                   THE COURT:  All right.  So

22    they should be estopped from denying

23    authenticity or admissibility --

24                   MR. WEBER:  Yes.

25                   THE COURT:  -- unless they can

1      come forward with respect to a particular

2      e-mail or blog that's attached here?

3                    MR. WEBER:  Yes.

4                    THE COURT:  All right.  I have

5      no other questions of you.

6                    MR. WEBER:  Thanks, Judge.

7                    THE COURT:  All right.  Maybe

8      you want to address the -- let's talk about

9      the request for admissions because we --

10     they're on my mind right now.

11                   MS. ROBBINS:  Sure, Your

12     Honor.

13                   THE COURT:  So it's the

14     proverbial sword and shield argument.  You've

15     used these e-mails.  You've used these blogs

16     in the summary judgment motions.  Not only

17     ones that were produced by you but ones that

18     were produced by Trek and you're basically

19     representing to the judge that, in fact, these

20     are not only authentic, they're admissible

21     because otherwise you can't use them in your

22     summary judgment motion.  So it -- it appears,

23     then, that you can -- what's good for the

24     goose is good for the gander.

25            If you're going to take the position

1      that these types of blogs and e-mails are, in

2      fact, authentic and admissible, why shouldn't

3      you be at least precluded from arguing that

4      the balance of the ones that Trek has attached

5      to the request for admissions are not also

6      authentic and admissible?

7                  MS. ROBBINS:  Well, I think

8      that the -- this all goes back to the main

9      context as far as this request for admission

10     in general which is we did attach these

11     e-mails to the summary judgment motion.  We

12     attached very few.  And half of them, as you

13     said and as Mr. Weber pointed out, were

14     produced by us in this litigation.  We had

15     more knowledge about the compilation of those

16     documents.

17          And then further, we haven't asked Trek

18     to authenticate 500 pages of documents as Trek

19     has asked of us.  And the bottom line is that

20     we just have no knowledge as to the source of

21     many of the e-mails that Trek has asked us to

22     either admit or deny the authenticity of.  And

23     they were kind enough to de-duplicate the

24     exhibit for Your Honor's exhibit but even with

25     it, it's still almost 500 pages.

1            And if I could actually approach the

2       bench and just hand you an example of some of

3       the e-mails that they are requesting --

4                    THE COURT:  Yes.

5                    MS. ROBBINS:  -- to

6       authenticate.

7                    THE COURT:  Yes.  Do you have

8       a copy to provide to Mr. Weber?

9                    MS. ROBBINS:  Yes, I do.

10                   THE COURT:  All right.

11                   MS. ROBBINS:  As you can see

12      from the examples that I have just handed up,

13      and this was just a cursory look that I took

14      here at Trek's motion, the first example is

15      from someone -- the e-mail address says

16      anonymous@anonymous.com.  There's no way for

17      us to verify the information here, whether

18      this is, in fact, a consumer or a dealer who

19      created this document.

20          The second one says -- there's actually

21      not even a "from" line there.  It just says,

22      in the text of the e-mail, below is the result

23      of your feedback form.  It was submitted by

24      Lance Armstrong.  I'm inclined to think this

25      is not actually from Lance Armstrong.  And

1      again --

2                          THE COURT:  I'm sorry, you're

3      inclined to what?

4                          MS. ROBBINS:  Think that this

5      is not actually from Lance Armstrong and that

6      this is another example here of one that we

7      just will not be able -- we have no knowledge

8      as to the source of this information.

9           The last couple are similar.  The

10     second one is submitted by somebody that's

11     calling themself grow up.  And the last one is

12     from somebody saying their name is LeMond is a

13     jerk.

14          This is the type of thing that we --

15     we're very hesitant to just blanketly either

16     admit or deny authenticity to all of these

17     documents.  Trek propounded one request for

18     admission to deal with all of the e-mails and

19     one request for admission to deal with all of

20     the blogs.  And this, going back to the case

21     law that we found in relation to

22     electronically stored information, is

23     something that should be taken on a case by

24     case basis we believe.  And asking us to

25     authenticate this great number of documents,

1    many of which we have no idea as to the source

2    of information --

3                    THE COURT:  When you say you

4    don't have any idea as to the source, what are

5    we talking about?

6                    MS. ROBBINS:  We are talking

7    about we have no idea who these e-mails

8    actually came from, whether they are in fact

9    from consumers, from dealers.  We don't have

10   any idea as to how the e-mails were captured

11   or, as to the blog posts, how the web sites

12   are compiled to the content of --

13                   THE COURT:  But you relied on

14   the similar types of e-mails and blogs with

15   respect to your motion for summary judgment.

16   And I'm assuming, maybe I'm wrong, that you

17   don't know what the source of those e-mails

18   are.  You don't know what blog -- in other

19   words, how the blog posts, the servers are

20   maintained.  And yet I take it you made a leap

21   of faith that those types of blogs or e-mails

22   are not only authentic but admissible.

23                   MS. ROBBINS:  Well, as to

24   that, we -- we'd -- as I said, we attached

25   very few and we are willing to accept the

1      burden of proving authenticity and

2      admissibility as to those.  We have accepted

3      that as our burden.  Trek here --

4                      THE COURT:  Well, not only

5      accept it as your burden, you've represented

6      to Judge Kyle by attaching them that they, A,

7      are authentic, and B, are admissible.

8                      MS. ROBBINS:  And I can

9      understand that we would then be estoped from

10     arguing that those would not be admissible but

11     as to the other ones, I just don't think that

12     you can, under the rule, say that because all

13     of these are e-mails -- I mean, these are

14     purportedly from different individuals.  The

15     blog posts are from different web sites and we

16     just have no knowledge as to how each of these

17     blog posts are maintained or who provided the

18     information.

19                     THE COURT:  And I understand

20     that you said you don't have any knowledge,

21     but the rule also talks about, then, if you're

22     going to say you have insufficient knowledge,

23     you need to talk about what reasonable inquiry

24     you made in order to obtain knowledge so that

25     you could admit or deny and you haven't

1      answered that interrogatory either.  It sounds

2      like you're just saying we don't know and by

3      implication, we haven't done anything to find

4      out -- to take the blinders off.

5                    MS. ROBBINS:  Well, as far as

6      the reasonable inquiry, for many of these

7      e-mails I actually wouldn't know where to

8      start with a reasonable inquiry.  I wouldn't

9      know how to go about finding out the veracity

10     of this type of information.  But we are

11     willing to, especially with some of the dealer

12     e-mails that are from verifiable sources, we

13     would be willing to authenticate those.

14         The main problem was that this -- our

15     request for admission was directed to all 500

16     e-mails.  And actually, in the context of the

17     requests for admissions, it wasn't just as to

18     these e-mails.  They requested that we admit

19     or deny the authenticity, the admissibility

20     and the -- and get rid of any hearsay

21     objections to over 13,000 pages of documents.

22                    THE COURT:  I didn't see that

23     in the request for admission.  I only saw that

24     they were seeking to ask you to authenticate

25     them.

1             MS. ROBBINS:  Right.  And so

2     after the meet and confer between the parties,

3     it appears, judging by their motion here, that

4     they've dropped the rest of those arguments as

5     to the other 12,000 pages of documents.  But

6     in formulating our response to the

7     interrogatory initially, it was in the context

8     of dealing with 13,000 pages of documents,

9     many of which were -- as these e-mails are

10     created by people for whom we have no idea,

11     and then as well as the production from third

12     parties to the litigation and we felt that we

13     were not in the place we -- the place to

14     authenticate those records either.

15             THE COURT:  You did say that

16     you would be willing to authenticate, if I

17     heard you correctly, a certain subset of

18     e-mails.

19         Is that correct?

20             MS. ROBBINS:  Right.  I think

21     that it would be fair for us to authenticate

22     those with verifiable sources such as -- I

23     believe it's Exhibit 11 has a number of

24     e-mails --

25             THE COURT:  Well, they're not

1      seeking -- I don't think it's Exhibit 11 that

2      they're asking for you to authenticate in this

3      motion.

4                      MS. ROBBINS:  Okay.  Well --

5                      THE COURT:  Unless I misread

6      it.  Let me take a look here.  Let me get that

7      part of it here.  Request No. 1, I don't know

8      if they -- it says for purposes of request for

9      admissions 1, 2 and 3, they define the terms.

10     And then request No. 1 deals with consumer

11     dealer e-mails and letters.  And request No. 4

12     is the blog post.  I don't see a reference to

13     Exhibit 11.

14                     MS. ROBBINS:  Okay.

15                     THE COURT:  Maybe those go

16     hand in hand.

17                     MS. ROBBINS:  Right.  My

18     understanding, and I could have misread the

19     brief, was that Exhibit 10 and Exhibit 11 both

20     provided examples of the e-mail.

21                     THE COURT:  Oh, exhibits to

22     the declaration.  I'm sorry.

23                     MS. ROBBINS:  Yes, Your Honor.

24                     THE COURT:  I'm sorry.

25                     MS. ROBBINS:  That's fine.

1          THE COURT:  So when you say

2     you would be willing to authenticate those

3     with verifiable --

4          MS. ROBBINS:  Right.  Those

5     with verifiable.  A lot of those e-mails have

6     names of actual Trek dealers.  We could

7     certainly look into contacting those

8     individuals.  Those I agree would be -- we

9     would agree to authenticate those documents.

10    But as to the bulk of the rest of the e-mails

11    we really don't have any idea where they came

12    from we are much more hesitant.

13         THE COURT:  And let me -- I

14    don't mean to oversimplify it but given, for

15    example, the one you gave me, the first

16    example from anonymous@anonymous.com, isn't it

17    possible to send an e-mail to

18    anonymous@anonymous.com and attach this e-mail

19    and ask if they sent it to Trek, to Trek

20    consumer?

21         MS. ROBBINS:  We could

22    certainly go through that process.  I mean, I

23    think the concern was that there were so many

24    of these documents and for many reasons

25    anonymous@anonymous.com probably does not even

1    exist.  But we would -- I mean --

2                    THE COURT:  But you don't know

3    that yet.

4                    MS. ROBBINS:  We -- no.  But,

5    Your Honor, I would be willing to find out.

6                    THE COURT:  Some of them

7    don't -- I see.  The other ones don't even say

8    who the "from" is.

9                    MS. ROBBINS:  That's correct.

10                    THE COURT:  The Trek 139, as

11    far as I can tell, doesn't have a "from."

12                    MS. ROBBINS:  Correct, yes.

13    And I believe --

14                    THE COURT:  Although the last

15    one, LeMond is a jerk at jerk@LeMond.com

16    apparently back in 2004.

17                    MS. ROBBINS:  Right.

18                    THE COURT:  Was a viable

19    e-mail address or at least that's the

20    suggestion.

21                    MS. ROBBINS:  Yes.  And we

22    would be willing to go through that process.

23         As I said, I think the main thing here

24    was just in the context of these requests for

25    admissions, this one request for admission

1        that encompassed all of these e-mails was

2        just -- it just didn't ring true with common

3        sense as far as the authentication of

4        documents and what we knew about many of these

5        documents is so very little.

6                    THE COURT:  All right.  Let's

7        talk about, unless you have anything more on

8        the request for admissions, let's address the

9        contention interrogatory.

10                   MS. ROBBINS:  Sure, Your

11       Honor.

12                   THE COURT:  So discovery is

13       over in this case.  Your expert has now

14       testified.  What Mr. Weber has suggested is,

15       from his understanding of your expert's

16       deposition, he's given no basis for stating

17       how it is that Trek has breached its

18       obligations to your clients.  Based on that

19       now, are you willing to enter into a

20       stipulation that those are the four bases for

21       alleging breach or revising supplementing your

22       interrogatories so as to be able to

23       incorporate specifically what it is you're now

24       relying on?

25                   MS. ROBBINS:  Definitely.

1      Actually, Your Honor, I was really heartened

2      to hear Mr. Weber's argument up here today.  I

3      think that a lot of that makes sense.  Given

4      the timing of the original interrogatory that

5      was -- when we did initially rely on our

6      expert reports and now that our liability

7      expert has been deposed, we feel like it would

8      be consistent to go ahead and amend or

9      supplement our interrogatory response.

10          We would ask, though, that we be

11      allowed to supplement at the end of expert

12      discovery which should be closing at the end

13      of next week after rebuttal reports are in

14      just so that all of the information is

15      consistent.

16                    THE COURT:  So in other words,

17      you're no longer opposing that portion of

18      their motion on the contention interrogatory.

19      You are willing to supplement and amend your

20      answer and basically remove the objection and

21      provide the information that you're now

22      relying on to support the claims for breach?

23                    MS. ROBBINS:  Correct.  Yes.

24      The only thing I would ask is that we just

25      clarify that Trek has stated in its brief that

1      it is not seeking all facts as to all of the

2      contentions and we're definitely willing to

3      provide the principal facts, the main facts,

4      but I just wanted to ask for clarification on

5      that.

6                      THE COURT:  All right.  I'll

7      take that up with Mr. Weber, then.  All right.

8           Mr. Weber, let's address the contention

9      interrogatory.  Based on what's been proposed,

10     is that satisfactory that they will supplement

11     and amend their answer to interrogatory No. 11

12     and identify the principal or main facts that

13     they're relying on to establish a breach of

14     the -- in other words, to support their

15     contention?

16                     MR. WEBER:  Yes.  That sounds

17     reasonable, Judge.

18                     THE COURT:  All right.

19                     MR. WEBER:  So long as they do

20     it in good faith and tell us what the sum and

21     substance of it is and aren't overly generic,

22     that's fine.  If we have an issue with it, of

23     course we'll raise it with the Court.

24                     THE COURT:  All right.  Well,

25     I'm assuming that the response would be in

1      good faith.  I mean, the whole point of the

2      contention interrogatory like this at the end

3      of discovery is to make sure there are no

4      surprises to either side and that the point of

5      discovery is to know what the other side is

6      going to say at trial.

7            So I think a contention interrogatory

8      like this at this point is appropriate and

9      given what defendant or what LeMond has said

10     which is they'll supplement, I'm assuming you

11     will come back with a substantive and good

12     faith answer and if you're not satisfied, I

13     will permit you to revisit that issue with me.

14                  MR. WEBER:  Thanks, Judge.

15                  THE COURT:  All right.  Let's

16     talk about the requests for admissions.

17            What I did here, counsel state number

18     one is that to the extent that your e-mails or

19     blogs include Exhibits 19 and 20, that they I

20     think are willing to admit the authenticity

21     and admissibility of those e-mails and blogs

22     because they've relied on it themselves.

23            I also heard them say they would be

24     willing to authenticate -- to go through the

25     process of or take steps to authenticate or to

1    determine whether the e-mails or blogs are

2    authentic to the extent they came from

3    verifiable dealers and also I believe also

4    committed to doing that from e-mails where at

5    least it identifies the "from" line to see

6    whether these -- to do what they need to do to

7    establish whether this was an authentic e-mail

8    from a particular source.

9         If I've got that right on what they are

10   willing to do, is that satisfactory?

11                  MR. WEBER:  Well, not quite,

12   Judge.  I think what they're doing is they're

13   conflating authentication and admissibility.

14   And authentication is no more than do the

15   circumstances indicate and through a variety

16   of tests that this is what it appears to be.

17   And what we're asking them to authenticate is

18   that these are comments from consumers that

19   were received by Trek or posted on various

20   blogs.

21         And so as to the examples that the

22   Court was given which are Trek 173, 139, 93

23   and 79, you will note that each has the header

24   on it of Lisa Smith.  She's a person in the

25   law department to whom when consumer

1      commentary was coming into Trek's web site in

2      July 2004, things were forwarded and printed

3      off by her to keep track of the feedback that

4      was coming in.  And the context, of course,

5      was in 2004 Mr. LeMond gave an interview

6      whereby he said that Lance will do anything to

7      keep his secret.  In response -- and again,

8      authentication is part context.

9           In immediate response to the public

10     airing of those comments, Trek got hundreds of

11     e-mails just like the ones you have here and

12     blog postings.  There was a place on the Trek

13     web site, the LeMond web site, where people

14     could make a comment and that's what we're

15     looking at.

16          Mr. LeMond himself got so many e-mails

17     in response to some of his public commentary

18     on his own separate web site that he had

19     directed that it be shut down.  So the context

20     is he makes a statement, tremendous public

21     response.  Those responses are gathered and

22     kept and produced by Trek and we're now at the

23     stage where we ask them to say, admit that

24     these are items that came into Trek's web site

25     in response to Mr. LeMond's commentary.  Some

1      of them, yes, probably can't be determined

2      who, in fact, these people are but that for

3      purposes of what we're talking about, that

4      isn't what is important.  These are things

5      that came into Trek in response to

6      Mr. LeMond's comments.  Mr. LeMond got the

7      very same sort of thing.

8          So it's not a question of if they

9      thought that these weren't really consumer

10     e-mails, then I would have expected them over

11     the last year to try to do discovery.  And

12     guess what?  There was a guy in Idaho that was

13     writing all these.  These weren't consumer

14     comments.  This was so and so in Idaho.  They

15     haven't done that because it's not true.

16                  THE COURT:  Let me throw out

17     an idea here.  And I'm not saying that the

18     LeMond defendants are going to -- or LeMond is

19     going to agree to this but let me throw this

20     out as an idea.

21          Rather than asking them to authenticate

22     each and every one of these e-mails and blog

23     sites or to admit that these are authentic

24     under Rule 901, if instead it was to ask them

25     to admit that they had no evidence to suggest

1          that any of these e-mails or blogs were not

2          authentic, would that satisfy your desire to

3          find out if they've got anything out there

4          that suggests that it isn't authentic so that

5          you can do what you need to do at trial to

6          establish authenticity.

7                    MR. WEBER:  I think that gets

8          us most of the way there.  And if they had

9          done that in response to the initial request

10         for admission and follow-up interrogatory, I

11         wouldn't ask for more because they were asked

12         specifically to say as to any document that

13         you have reason to believe is not authentic,

14         tell us why.

15                    THE COURT:  So my question is

16         why --

17                    MR. WEBER:  And so they blew

18         us off.

19                    THE COURT:  If they would

20         agree to that today, that they would answer a

21         request for admission to the effect of you

22         have no evidence to admit that the following

23         e-mails are not authentic, would that satisfy

24         your -- which then gives them the option to go

25         collect evidence or to simply rely on it as is

1    and you'll go forward with proving up

2    authenticity at trial, would that satisfy your

3    motion?

4               MR. WEBER:  With all respect,

5    Your Honor, I think in light of the fact that

6    they forced them up here and go through this

7    exercise and not -- and importantly used the

8    very same materials in their submission to

9    Judge Kyle, I don't think -- I think their

10    opportunity to do that has passed.

11               THE COURT:  Okay.

12               MR. WEBER:  And with respect

13    to the assertion that -- and as to these

14    e-mails where you could not go back now five

15    years later and figure out was it or is it a

16    live web site, I would ask the Court to take

17    note of the Resolution Trust Corp. case, the

18    Eighth Circuit decision from 1994 at 17 F.3d

19    1126.

20    And at Note 3, page looks like 1132,

21    the court notes, "As long as the other

22    requirements of the business records exception

23    are met," in this case that these were

24    received by Trek in the ordinary course and we

25    will have custodians that corroborate that, "a

1      custodian or other qualified witness need not

2      have personal knowledge regarding the creation

3      of the document offered or personally

4      participate in its creation or even know who

5      actually recorded the information."  So --

6                    THE COURT:  But wasn't the

7      whole context of the Resolution Trust case

8      about whether it was admissible as a business

9      record exception and not authenticity?

10         When I look at that quote, it actually

11     starts off, "As long as other requirements of

12     the business records exception are met," and

13     then goes on to say, "custodian or other

14     qualified witness need not have personal

15     knowledge regarding the creation of the

16     document offered or personally participate in

17     its creation or even know who actually

18     recorded the information."

19         It appears that Resolution Trust was

20     focusing on what it takes to establish an

21     exception under the business records exception

22     and wasn't addressing the issue of

23     authenticity under Rule 901.

24                    MR. WEBER:  Correct.  Because

25     in Resolution Trust they were talking about

1    the handwritten notes of a bank examiner who's

2    gone and looked to the bank.  And I don't

3    think there was any dispute that the documents

4    were what they purported to be; namely, notes

5    of a bank examiner.  That again,

6    authentication, very low threshold.

7         Likewise here, there's no real dispute

8    that these are consumer comments received by

9    Trek and received by LeMond and that's why

10   they use them.

11        So as to authentication, we should get

12   beyond that hurdle.  I was responding to the

13   suggestion that there should be some

14   significance as they say to the fact that,

15   well, I don't know who the actual writer of

16   this was.  That gets ahead to a hearsay

17   objection and, hence, I've raised the

18   Resolution Trust case.

19                  THE COURT:  Okay.

20                  MR. WEBER:  So it's really not

21   their -- their identifying the anonymity of

22   some of these authors has nothing to do with

23   authenticity; i.e., is this a response

24   received in the consumer web site by Trek.

25                  THE COURT:  Okay.  Anything

1       further on behalf of Mr. LeMond or LeMond

2       Cycling?

3                   MS. ROBBINS:  I have just one

4       quick point, Your Honor, and that is that

5       during the meet and confer, we did ask Trek

6       for more information so that we could properly

7       respond to these requests for admissions and

8       they did not provide it.  If they were to

9       provide information like, for example, we

10      never -- they never did tell us until right

11      just now when Mr. Weber presented that those

12      were kept in the ordinary course of business

13      and explained who Lisa Smith is, we were

14      unaware of that until now.  If we had more

15      information as to these documents, then we

16      could then evaluate them on a case by case

17      basis.

18                  THE COURT:  And I think their

19      response in the reply was that your duty to

20      inquire came before you answered the request

21      for admission and put in insufficient

22      knowledge and not after as part of a meet and

23      confer.

24                  MS. ROBBINS:  Well, I think

25      that given that we were not going to be trying

1      to get these 500 pages of e-mails into

2      evidence that it was not our burden to seek

3      out the information beforehand as to how these

4      documents were kept.  Once Trek has decided to

5      rely on that information at trial, then I

6      think then, as we were discussing, the hurdle

7      then to get those admissible is at that point.

8                    THE COURT:  All right.

9      Anything further?  Anything further?

10                   MR. WEBER:  No, Your Honor.

11                   THE COURT:  Well, on the

12      contention interrogatory, we have agreement of

13      the parties that after the rebuttal expert

14      report is filed, that then LeMond will

15      supplement interrogatory No. 11 and answer it.

16          And so how soon after the expert

17      report, that rebuttal expert report is issued

18      will you be able to provide them with the

19      supplemental interrogatory?

20                   MS. ROBBINS:  I think probably

21      we just need a couple of business days after

22      that --

23                   THE COURT:  When is the

24      rebuttal report due?

25                   MS. ROBBINS:  I believe it's

1      the 7th of August.

2                        THE COURT:  All right.  Why

3      don't we say, then, by August 14.

4                        MS. ROBBINS:  Sure.

5                        THE COURT:  And on the request

6      for admissions, I'll have to take that matter

7      under advisement and I'll issue an order

8      separately on that.

9                        MR. WEBER:  Thank you, Judge.

10                       THE COURT:  All right.  Thank

11     you very much.

12          Anything further on behalf of either

13     party in this matter?

14                       MS. ROBBINS:  No, Your Honor.

15                       THE COURT:  All right.

16

17                         *  *  *

18

19

20

21

22

23

24

25

```
 1   STATE OF MINNESOTA  )
                        ) ss.
 2   COUNTY OF WASHINGTON)

 3

 4        BE IT KNOWN, that I transcribed the

 5   electronic recording relative to the matter

 6   contained herein;

 7

 8

 9        That the proceedings were recorded

10   electronically and stenographically transcribed

11   into typewriting, that the transcript is a true

12   record of the proceedings, to the best of my

13   ability;

14

15

16        That I am not related to any of the

17   parties hereto nor interested in the outcome of

18   the action;

19

20

21        IN EVIDENCE HEREOF, WITNESS MY HAND.

22

23
                    s:/ Lisa M.Thorsgaard
24

25
```