UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LEMOND CYCLING, INC.,                                    CIVIL NO. 08-1010 (RHK/JSM)

      Plaintiff,

v.                                                                                          ORDER

TREK BICYCLE CORPORATION,

      Defendant.

JANIE S. MAYERON, U.S. Magistrate Judge

      The above matter came before the undersigned United States Magistrate Judge for hearing upon Trek's Motion for Protective Order Related to Public Strategies, Inc. [Docket No. 100].

      Denise S. Rahne, Esq. and Kate Bruce, Esq. appeared on behalf of LeMond Cycling, Inc.; Ralph A. Weber, Esq. and Erik T. Salveson, Esq. appeared on behalf of Trek Bicycle Corporation.

      The Court, upon all of the files, records, and proceedings herein, and for the reasons stated on the record, now makes and enters the following Order.

      IT IS HEREBY ORDERED that Trek's Motion for Protective Order Related to Public Strategies, Inc. [Docket No. 100] is GRANTED in part and DENIED in part.

Dated:      October 5, 2009

                               *s/ Janie S. Mayeron*
                               JANIE S. MAYERON
                               United States Magistrate Judge

Dockets.Justia.com

<u>**MEMORANDUM**</u>

**I.     FACTUAL BACKGROUND**

    **A.     <u>The Minnesota Lawsuit</u>**

On March 20, 2008, plaintiff LeMond Cycling, Inc. ("LeMond Cycling") served the Summons and Complaint on defendant Trek Bicycle Corporation ("Trek"). [Docket No. 1.] On April 8, 2008, LeMond Cycling filed the Complaint in Hennepin County District Court for the State of Minnesota ("Minnesota Suit"). <u>Id.</u> On April 9, 2008, Trek removed the case to this Court. <u>Id</u>.

According to the Complaint, on June 29, 1995, LeMond Cycling, a corporation founded by professional bicycle racer, Greg LeMond ("LeMond"), and Trek, a bicycle manufacturer, entered into an agreement ("Agreement") whereby Trek agreed to market the LeMond brand of bicycles, which had been manufactured by LeMond Cycling. Complaint, ¶¶ 5-6, 31. In August 1999, the Agreement was amended, and among other provisions, extended the term of the Agreement until September 30, 2010. <u>Id</u>., ¶ 33.

The Complaint states that among the various provisions of the Agreement, section 5.02 obligates Trek to use its best efforts to promote the sale of Trek's products bearing any part of LeMond Cycling's trademarks in order to maximize the sales of LeMond Cycling; section 8.01 requires Trek to expend a reasonable amount on the marketing, promotion and advertising of LeMond brand of bicycles, both to the trade and to consumers, including corporate advertising; section 16.01 requires LeMond Cycling to cause LeMond to perform in a "professional and conscientious manner"; and section 13.02.01 allows Trek to terminate the Agreement if LeMond Cycling or LeMond

takes any action which damages or has an adverse impact upon Trek or Trek's business.  Complaint, ¶¶ 35, 36, 40, 47.

Lance Armstrong ("Armstrong"), another professional cyclist, also had a contractual relationship with Trek, where he endorsed Trek bicycles and Trek sponsored Armstrong's professional cycling team.  Complaint, ¶ 16.  The Complaint set out a number of articles, comments and claims regarding doping in the cycling field and other fields, that Armstrong has been publicly scrutinized regarding the use of performance enhancing drugs, and efforts by Armstrong and Trek to silence LeMond about his comments.  Id., ¶¶ 20-21, 49-86, 100-103.

For example, LeMond Cycling alleged that prior to 2001 and Trek's relationship with Armstrong, LeMond made public comments regarding the usage of performance enhancing drugs by professional cyclists and the damage such drugs do to athletes.  Complaint, ¶¶ 13-15, 17, 49-50.  Trek never addressed LeMond's comments regarding the use of performance enhancing drugs until 2001.  Id., ¶ 18.  However, since 2001, Trek has systematically sought to silence LeMond's right to comment on the usage of performance enhancing substances.  Id., ¶ 21.

LeMond Cycling also alleged that on numerous occasions, Armstrong took actions or made remarks that were disparaging to LeMond and the LeMond brand.  Complaint, ¶ 23.  According to LeMond, Trek did nothing to protect the LeMond brand from such disparagement, even when LeMond specifically requested that Trek intervene for protection of the LeMond brand.  Id., ¶¶ 23, 146.

LeMond Cycling asserted that since 2004 and possibly earlier, Trek sought to unilaterally wind down its efforts with respect to the LeMond brand, despite contractual

obligations that it exert its best efforts to promote and market the brand.   Complaint, ¶¶ 9, 36, 109-110, 118-122.

On November 20, 2007, Trek's President, John Burke, informed LeMond verbally that Trek would not be renewing its relationship with LeMond Cycling following the termination of the Agreement in September 2010.   Complaint, ¶ 150.

In the Complaint, LeMond Cycling asked the Court to declare that it had not breached the Agreement and that Trek has breached the Agreement.   Complaint, Count One.   Additionally, LeMond Cycling sought to an injunction to maintain the parties' relationship, to prevent Trek from taking any action that would prevent LeMond Cycling from benefiting from the specific performance of the Agreement, and to affirmatively require Trek to comply with all of its contractual obligations.   Id., Count Two.   LeMond Cycling also asserted a claim of breach of contract against Trek, alleging that Trek had failed to satisfy its covenant of good faith and fair dealing, and had failed to exert its best efforts regarding the LeMond brand.   Id., Count Three.

On September 29, 2008, Trek filed a counterclaim against LeMond Cycling and a third-party complaint against LeMond in the Minnesota Suit.   [Docket No. 44.]   Trek alleged that contrary to their contractual promises, LeMond and LeMond Cycling (collectively referred to as "the LeMonds") have damaged Trek's brand, goodwill and business by repeatedly and publicly attacking Armstrong.   Counterclaim, ¶ 15.   Trek sought a declaration that the Agreement may be terminated as a result of the LeMonds material breaches and repudiation of the obligations of the Agreement, including the obligation of good faith and fair dealing; that Trek be excused and discharged from any further obligations under the Agreement; and that Trek be allowed to seek damages

resulting from the breach of the Agreement.   Counterclaim, First Claim for Relief.

Additionally, Trek alleged that the LeMonds breached the Agreement (Second and

Fourth Claims for Relief), and breached the duty of good faith and fair dealing (Third

Claim for Relief).

      **B.**      <u>**Facts Bearing on the Motion before the Court**</u>

On April 1, 2008, Trek entered into discussions with a public relations firm, Public

Strategies, Inc. ("Public Strategies"), to act as a consultant for Trek in connection with

the Minnesota Suit and a separate suit that Trek filed on April 8, 2008, in the Western

District of Wisconsin ("Wisconsin Suit").   <u>See</u> Trek's Privilege Log, Description for Tabs

1; Declaration of Ralph A. Weber, ¶¶ 5 6 [Docket No. 103].   On April 3, 2008, Trek's

counsel, Gass Weber Mullins LLC ("GWM"), retained Public Strategies, and entered into

the Confidentiality and Non-Disclosure Agreement with Public Strategies on the same

day.   Weber Decl., ¶ 5, Ex. E.   According to Trek's counsel, Public Strategies provided

input on Trek's Complaint that was filed in the Wisconsin Suit and contributed to

additional legal decisions made by counsel for Trek.   Weber Decl., ¶ 6.   Additionally,

Trek's counsel indicated that he shared his mental impressions and other confidential

information with Public Strategies, who did the same with him, "with the goal of making

sure that Trek's litigation message was clear and in conformity with its legal strategy in

this action."   <u>Id.</u>   According to Weber, "[t]he input of Public Strategies was beneficial to

our law firm's legal advice to Trek."   <u>Id.</u>

The Confidentiality and Non-Disclosure Agreement between Public Strategies,

Inc. and Trek's counsel, GWM, states in pertinent part:

> **Gass Weber Mullins is retaining Public Strategies in anticipation of
> litigation with Greg Lemond and Lemond Cycling, Inc.   Public**

**Strategies will assist Gass Weber Mullins so that strategic internal and external communications are consistent with and in furtherance of Trek's litigation goals and strategies.**

1.     <u>Purpose</u>.  Public Strategies, Inc. and Gass Weber Mullins LLC wish to pursue, investigate, and, if mutually agreed in writing, enter into a mutual business transaction and relationship.  In this regard, the parties desire to disclose certain confidential business information to each other that the disclosing party desires the receiving party to treat as strictly confidential under the terms of this Agreement.  In addition, Public Strategies will have access to Gass Weber Mullins' mental impressions, legal strategies and other attorney work product.

2.     <u>Definition</u>.  The parties agree that any and all information, in whatever format, provided by the disclosing party to the receiving party, whether verbally or in writing, is proprietary, attorney work product or otherwise confidential to the disclosing party, and is confidential information subject to the provisions hereof (the "Confidential Information").  Confidential Information does not include: (a) information that is or becomes publicly known other than through a breach of this agreement, or (b) is already known to the receiving party on a non-confidential basis at the time of the disclosure as evidenced by written documentation.   Notwithstanding anything to the contrary in this Agreement, it is expressly agreed by the parties that nothing herein obligates a party to disclose any Confidential Information to the other party.

Weber Decl., Ex. E (emphasis in original).

In summary, Trek characterized Public Strategies role as follows:

Contrary to LeMond's assertions, Public Strategies played a vital role in assisting Trek's counsel with the development and implementation of Trek's legal strategy in this case.  (Weber Decl. ¶ 6, Dkt. # 103).  Public Strategies' expert advice to assist Trek and its legal counsel in responding to LeMond was integral to Trek's litigation strategy and mitigation efforts.  Public Strategies had no prior connection to Trek, was retained by Trek's litigation firm, and was not providing any public relations advice or services separate and apart from the formulation and execution of Trek's legal strategy.

There can be no reasonable debate the [sic] Public Strategies' efforts were performed "in anticipation of litigation" between Trek and LeMond.  Public Strategies assisted counsel in implementing Trek's efforts to mitigate the damages caused by LeMond's conduct.  Effective mitigation of damages necessitated the development of a carefully presented public

explanation of the reasons Trek was terminating its contractual relationship with LeMond (an explanation blending legal and factual components) and the contemporaneous filing of Trek's lawsuit.  These communications had to be consistent with, and in furtherance of, Trek's overall litigation objectives.  Public Strategies' work on behalf of Gass Weber Mullins facilitated the rendition of legal advice and the execution of legal strategy, in the same fashion an accountant's input facilitates an attorneys' and client's formulation of strategy in a complex commercial case.  (*Id.*).

Def. Reply, pp. 5-6.

Thereafter, Trek, its attorneys, and employees of Public Strategies communicated with each other regarding drafts and the filing of Trek's complaint against LeMond in the Wisconsin Suit, and regarding communications with employees and others regarding the Minnesota and Wisconsin Suits and Trek's decision to terminate its relationship with LeMond Cycling, including the presentation by President Burke on April 8, 2008, discussed in the next paragraph.  See Trek's Privilege Log, Tabs 23-50.

On April 8, 2008, Trek held a media event during which it announced that it was ending its relationship with LeMond.  The accompanying Power Point presentation was recorded and ultimately posted on YouTube.  See Declaration of Jennifer M. Robbins ("Robbins Decl."), Ex. 8 (printout from YouTube video of the April 8, 2008 presentation). Burke, the President of Trek, stated during deposition that the purpose of the presentation was to publicly announce that Trek was terminating the LeMond brand. Robbins Decl., Ex. 1 (Burke Depo.), pp. 64, 71.  The public announcement was also accomplished through letters to employers, letters to dealers, and press releases.  See i.e. Robbins Decl., Ex. 3 (Media Release dated April 8, 2008).  Public Strategies was involved in the preparation of the PowerPoint presentation as well as with the press releases and letters to bike dealers.  Robbins Decl., Ex. 1 (Burke Depo.), pp. 71.

On April 7, 2009, LeMond Cycling took Burke's deposition.   During the deposition, he was asked:

Q:      What – what did you ask the Public Strategies team to do?

A:      I think what we asked the Public Strategies team to do is here's the decision that has been made, this is – how should we best communicate it. We're not communication professionals, and we want to make sure that the story was properly presented.

Robbins Decl. Ex. 1 (Burke Depo.), p. 66; see also p. 72 ("we wanted to make sure that we were organized in how we put our message out.").   When asked other questions regarding Public Strategies' role, Trek's counsel instructed Burke not to answer on the basis of attorney-client privilege.   Id., pp. 69-71.

On April 17, 2009, the LeMonds served their Third Set of Interrogatories and Requests for Production of Documents.   Weber Decl., Ex. F (Plaintiff's Third Set of Interrogatories and Requests for Production of Documents).   At issue in this motion is Document Request No. 31, which asks for "[a]ll documents related to work done with Public Strategies Inc. related to Trek's relationship with LeMond Cycling, Inc., Greg LeMond or Lance Armstrong."   Id.   Trek objected to Request No. 31 because it sought irrelevant information, and because any responsive documents were protected by attorney-client and work product privileges.   Weber Decl., ¶ 7.   The parties were unable to resolve their differences, and Trek now seeks a protective order to prevent the discovery of all communications, documents, and other information shared by Trek or its attorneys with Public Strategies or produced by Public Strategies to Trek or its attorneys.   Trek has submitted the documents it has withheld on grounds of attorney-client privilege or the work product doctrine for in camera review by the Court.

## II.    DISCUSSION

Trek's argument in support of a protective order is threefold: (1) the information exchanged with Public Strategies is irrelevant; (2) the information is protected by the work product doctrine; and (3) the information is protected by the attorney-client privilege.   Def. Mem., pp. 5-8.   In response, the LeMonds argued that Trek's communications with Public Strategies are relevant to the LeMonds' claims, and because these communications are neither privileged nor work product (and thus, have been waived by disclosure to Public Strategies), they should be disclosed to the LeMonds.  Pl. Mem., pp. 6-12.

### A.    <u>Standard</u>

"Parties may obtain discovery regarding any <u>nonprivileged</u> matter that is relevant to any party's claim or defense," and "[o]rdinarily, a party may not discover documents and tangible things that are <u>prepared in anticipation of litigation or for trial</u> by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. 26(b)(1), (3) (emphasis added). Further, the court may issue a protective order "which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," upon a showing of good cause.  Fed. R. Civ. P. 26(c).  The party seeking the protective order has the burden to establish good cause for the issuance of the order and the party's alleged harm, if a protective order is not granted, must be based on "more than stereotypical and conclusory statements."   <u>Miscellaneous Docket Matter #1  v. Miscellaneous Docket Matter #2</u>, 197 F.3d 922, 926 (8th Cir. 1999) (citations omitted).

In a case in federal court based on diversity, the Court "applies federal law to resolve work product claims and state law to resolve attorney-client privilege claims." Baker v. General Motors Corp., 209 F.3d 1051, 1053 (8th Cir. 2000) (citing Simon v. G.D. Searle & Co., 816 F.2d 397 (8th Cir.1987).  See also Union County, Iowa v. Piper Jaffray & Co., Inc., 525 F.3d 643, 646 (8th Cir. 2008) ("Because this is a diversity case, the determination of whether attorney-client privilege applies is governed by state law."); PepsiCo, Inc. v. Baird, Kurtz & Dobson LLP, 305 F.3d 813, 817 (8th Cir. 2002) ("This Court applies federal law to work product claims.").

"The party asserting the attorney-client privilege or the work-product doctrine bears the burden to provide a factual basis for its assertions."  Triple Five of Minnesota, Inc. v. Simon, 212 F.R.D. 523, 528 (D.Minn. 2002) (citing Hollins v. Powell, 773 F.2d 191, 196 (8th Cir. 1985)); see also In re Grand Jury Proceedings, 791 F.2d 663, 666 (8th Cir. 1986).

### B. Relevancy

Before addressing the merits of the parties' positions, it is important to note that the LeMonds possess a copy of the April 8, 2008 Power Point presentation and the Confidentiality and Non-Disclosure Agreement between GWM and Public Strategies,[1] and they are not seeking copies of Trek's and its attorneys' communications with Public Strategies after April 8, 2008, the date the Wisconsin Suit was filed.  Thus, the limited

---

[1]    The Confidentiality and Non-Disclosure Agreement is listed at Tab 14 of Trek's Privilege Log.  As it has already been disclosed by Trek in support of its motion as Exhibit E to the Weber Declaration, any invocation of protection based on the attorney-client privilege or work product doctrine with respect to this document has been waived. However, the fax cover sheet to the Confidentiality and Non-Disclosure Agreement is not relevant and need not be produced.   Similarly, if Tab 49 is the script of the actual speech given by John Burke to employees on April 8, 2009, it shall be produced as it was communicated to the public via YouTube.

issue presented by Trek's motion is whether the LeMonds are entitled to documents and information shared among Trek, its attorneys and Public Strategies during the time frame of March 20 through April 8, 2008.  See Trek Privilege Log Tabs 1-51 (covering documents from April 1 – 8, 2008).

Trek's contention is that this is a breach of contract case, and that each party's claims depend on the circumstances of the contractual relationship, not what Trek's counsel and Public Strategies shared with each other between service of the Minnesota Suit on March 20, 2008, and the filing of the Wisconsin Suit on April 8, 2008.  Def. Mem., pp. 5-6.  Accordingly, Trek submitted that because the requested information had no bearing on the parties' claims or defenses, the Court should enter the protective order and deny the LeMonds' request for documents and communications shared with Public Strategies.  Id., p. 6.

In response, the LeMonds asserted that since their claims center on Trek's failure to exert best efforts to promote and market the LeMond brand, as well as their attempts to undermine Greg LeMond, communications with Public Strategies regarding Trek's statements about LeMond are relevant.  Pl. Mem., p. 6.  As the LeMonds put it: "The timeline of facts relevant to Trek's breach of the parties' Agreement did not end when Plaintiff served its Complaint on March 20, 2008—a Complaint which sought, in part, **an injunction to maintain the parties' relationship**. (See Compl. (Doc. No. 1-4), at ¶¶ 157-58.)   Rather, Trek's most blatant act of sabotage—Trek's April 8, 2008 presentation— was still to come."  Id. (emphasis in original).  In short, "LeMond Cycling has sought discovery related to the planning and development of this media effort."  Id., p. 2.  Further, the LeMonds maintained that communications with Public Strategies

regarding any statements by Trek about the LeMond brand or Greg LeMond were relevant to their claims for damages. Id. Finally, the LeMonds argued that Trek's assertion that its communications with Public Strategies were irrelevant was belied by their inclusion of documents reflecting communications with Public Strategies in its redaction log. Id., p. 7.

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. See Fed.R.Civ.P. 26(b)(1); see also Minnesota Specialty Crops, Inc. v. Minnesota Wild, 210 F.R.D. 673, 675 (D.Minn. 2002) ("Generally, discovery may inquire into all information, not otherwise privileged, that is relevant to the subject matter of the action, provided that it is reasonably calculated to lead to the discovery of admissible evidence."); Walker v. Northwest Airlines Corp., No. Civ. 00-2604 MJD/JGL, 2002 WL 32539635 at *1 (D.Minn. Oct. 28, 2002) ("In the context of discovery, 'relevant' has been defined as encompassing 'any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'") (quoting Hickman v. Taylor, 329 U.S. 495, 501 (1947)).

The Court finds that Trek's communications with a public relations company that assisted Trek in the development and release of comments about Trek's relationship and the termination of the relationship with the LeMonds are relevant to the LeMonds' claims of the eroding relationship between Trek and LeMond, Trek's alleged diminution of efforts to promote and market the LeMond brand, and ultimately LeMond's claims that Trek breached the Agreement and the covenant of good faith and fair dealing. Further, based on Trek's own admission that Public Strategies was retained to assist Trek in mitigating any damages that might result from the termination of its relationships

with and suit against the LeMonds, (Def. Reply. p. 6), the Court also finds that these communications are relevant to Trek's defense to the LeMonds' claims of damages against it.

That said, this Court does not find that all of the documents withheld by Trek contain information that bears on the deterioration of the relationship between Trek and the LeMonds, Trek's alleged reduction in efforts to promote the LeMond brand as required per the Agreement, or damages.  In particular, based on this Court's in camera review of the documents withheld by Trek, this Court finds that the following documents do not contain information reasonably calculated to lead to the discovery of admissible evidence on these topics and should not be produced to the LeMonds:  Tabs 1-8, 10, 12, 13, 15-17, 19-22, 25, 26, 28, 33, 35, 47, and 48.[2]

The Court now turns to the balance of the documents withheld at Tabs 9, 11, 18, 23, 24, 27, 29-32, 34, 36-46, 49-51[3] to determine whether they are protected from disclosure based on the attorney-client privilege or work product doctrine.

### C.    Attorney-Client Privilege and Work Product Doctrine

Trek contended that all of the communications between Trek, Trek's counsel, and Public Strategies are protected by the attorney-client privilege, as the courts have expanded the privilege to include consultants retained to assist an attorney with developing legal strategies for the client.  Def. Mem., p. 8.  Trek additionally argued that the communications between Trek and Public Strategies are protected by the work

---

[2]    The Court has previously determined that the Confidentiality and Non-Disclosure Agreement at Tab 14 is not subject to protection and should be produced to the LeMonds.  See n.1., supra.

[3]    See n. 1, supra regarding Tab 49.

product doctrine because the doctrine explicitly protects work performed by consultants in anticipation of litigation.

As stated previously, this Court looks to state law to resolve attorney-client privilege claims and federal law to address protection asserted under the work product doctrine.  See Baker, 209 F.3d at 1053  In certain situations, both doctrines protect communications involving independent consultants retained by attorneys and work performed by these consultants.

The attorney-client privilege is defined in Minn. Stat. § 595.02 (b).[4]  The essential elements of the attorney-client privilege are: "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived."  Brown v. Saint Paul City Ry. Co., 62 N.W.2d 688, 700 (Minn. 1954) (quoting 8 Wigmore, Evidence (3 ed.) s 2292).  See also Macawber Engineering, Inc. v. Robson & Miller, 47 F.3d 253, 256 (8th Cir. 1995). ("Under Minnesota law, an attorney-client relationship is established when the parties enter an express or implied contract of representation or when an individual seeks and receives legal advice under circumstances which would lead a reasonable person to rely on such advice."); Simon v. G.D. Searle & Co., 816 F.2d 397, 402 (8th Cir. 1987) (applying Minnesota attorney-client privilege in a diversity action and citing

---

[4]     Minn. Stat. § 595.02 (b) provides: "An attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney or the attorney's advice given thereon in the course of professional duty; nor can any employee of the attorney be examined as to the communication or advice, without the client's consent."

Minn.Stat.Ann. § 595.02, subd. 1(b)); <u>Prior Lake Am. v. Mader</u>, 642 N.W.2d 729, 738 (Minn. 2002) (finding that the attorney-client privilege applies to communications in which legal advice of any kind is sought from a professional legal adviser in his or her capacity as such, the communications relate to that purpose, and the communications were made in confidence.)

Additionally, under Minnesota law, the "privilege extends to a communication prepared by an agent or employee whether it is transmitted directly to the attorney by the client or his agent or employee." <u>Brown</u>, 62 N.W. 2d at 700 (citing <u>Schmitt v. Emery</u>, 211 Minn. 547, 2 N.W.2d 413 (1942). In <u>Schmitt</u>, the Minnesota Supreme Court stated:

> Where a document is prepared by an agent or employe [sic] by direction of the employer for the purpose of obtaining the advice of the attorney or for use in prospective or pending litigation, such document is in effect a communication between attorney and client. The client is entitled to the same privilege with respect to such a communication as one prepared by himself. The agent or employe [sic] as well as the attorney is prohibited from testifying with respect therto [sic] without the client's consent.

<u>Schmitt</u>, 2 N.W.2d at 416; <u>see also</u> <u>In re Beiter Co</u>. 16 F.3d 929, 937-38 (8th Cir. 1994) (expanding attorney-client privilege to independent consultant retained by client to assist attorneys in provision of legal advice); <u>In re Bretto</u>, 231 F.Supp. 529, 531 (Minn. 1964) ("Persons necessary to communications between an attorney and his client also come under the privilege doctrine. The most common example of a necessary party would be an accountant who assists an attorney by clarifying the client's financial affairs so that the attorney may properly advise his client.").

The work product doctrine, as codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, protects materials from discovery that are: (1) documents and tangible things; (2) prepared in anticipation of litigation or for trial; and (3) by or for another party

or by or for that other party's representative, including a consultant.  The "scope of the

work-product protection is broader than that of the attorney-client privilege since items

protected by the work-product doctrine are not confined to confidential communications

between an attorney and a client, but extends protection to all 'documents and tangible

things' that have been prepared in anticipation of litigation, or for trial."  Onwuka v. Fed.

Express Corp., 178 F.R.D. 508, 512 (D.Minn. 1997) (citation omitted).

> [A]s to the third element of proof, the Supreme Court has provided the
> following explanation which, here, appears to be particularly apt:
>
>> [T]he [work product] doctrine is an intensely practical one,
>> grounded in the realities of litigation in our adversary system.
>> One of those realities is that attorneys often must rely on the
>> assistance of investigators and other agents in the
>> compilation of materials in preparation for trial. It is therefore
>> necessary that the doctrine protect material prepared by
>> agents for the attorney as well as those prepared by the
>> attorney himself.
>
> United States v. Nobles, 422 U.S. 225, 239, 95 S.Ct. 2160, 2170-71, 45
> L.Ed.2d 141 (1975).
>
> Consistent with this view, the 1970 amendments to Rule 26 expressly
> extend protection to documents which have been prepared by third
> persons, so long as that preparation was at the direction of an attorney,
> and in anticipation of litigation.

Onwuka, 178 F.R.D. at 513.

In support of its position that its communications with and work performed by

Public Strategies are protected by the attorney-client privilege and work product

doctrine, Trek directed this Court to F.T.C. v. GlaxoSmithKline, 294 F.3d 141 (D.C. Cir.

2002); United States v. Kovel, 296 F.2d 918 (2d Cir. 1961); In re Grand Jury

Subpoenas, 265 F. Supp. 2d 321 (S.D.N.Y. 2003); and In re Copper Market Antitrust

Litig., 200 F.R.D. 213 (S.D.N.Y. 2001).  In opposition, the LeMonds did not dispute that

in certain situations the attorney-client privilege and work product doctrine could protect from disclosure communications with and information regarding work performed by a public relations consultant.  But if the consultant was retained to perform ordinary public relations services, the LeMonds maintained that there was no protection afforded under the attorney-client privilege or work product doctrine, citing to NXIVM Corp. v. O'Hara, 241 F.R.D. 109 (N.D.N.Y., 2007); Calvin Klein Trademark Trust v. Wachner, 198 F.R.D. 53 (S.D.N.Y. 2000); Haugh v. Schroder Investment Mgmt. N. Am., Inc., 2003 WL 21998674 (S.D.N.Y. Aug. 25, 2003); In re New York ReNu with Moistureloc Product Liability Litig., No. MDL 1785, 2008 WL 2338552 (D.S.C. May 8, 2008).

As to the application of the attorney-client privilege, all of the cases cited by Trek and the LeMonds recognize that under certain circumstances, communications with lawyers and work performed by a third party for the purpose of assisting counsel in rendering legal advice can be protected.  See e.g. GlaxoSmithKline, 294 F.3d at 148 (finding "the attorney-client privilege extends also to those communications that [defendant] shared with its public relations and government affairs consultants" where defendant's corporate counsel worked with these consultants in the same manner as they d[id] with full-time employees; indeed, the consultants acted as part of a team with full-time employees regarding their particular assignments and, as a result, the consultants became integral members of the team assigned to deal with issues [that] ... were completely intertwined with [defendant's] litigation and legal strategies.") (internal quotation marks omitted); Kovel, 296 F.2d at 922 ("What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.  If what is sought is not legal advice but only accounting service…or if

the advice sought is the accountant's rather than the lawyer's, no privilege exists."); In re New York ReNu with Moistureloc Product Liability Litig., 2008 WL 2338552, at *9 (after surveying cases which address the application of attorney-client privilege to the retention of a public relations consultant, the court concluded that the privilege was lost when the public relations firm was "providing nothing more than basic public relations advice"); NXIVM Corp., 241 F.R.D. at 140 ("We must reiterate again, at this juncture, that blanket confidentiality clauses invoking the attorney-client privilege and work product doctrine do not necessarily make it so. It is the facts, circumstances, and purpose that determine whether a communication with an attorney will deserve protection and its the anticipation of litigation that will convert a document into legal work product."); In re Grand Jury Subpoenas, 265 F.Supp.2d at 325 ("a client's communications with an accountant employed by his attorney were privileged where made for the purpose of enabling the attorney to understand the client's situation in order to provide legal advice.") (citation omitted); In re Copper Market Antitrust Litigation, 200 F.R.D. at 219 ("In applying the principles set forth by the Supreme Court in Upjohn, there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice."); Haugh v. Schroder Investment Management, 2003 WL 21998674 at *3 (finding that while there was precedent for expanding the attorney-client privilege to those assisting in representing the client, nonetheless, "it is crucial that the party asserting the privilege show that the communication is made so that the client may obtain legal advice from her attorney.") (emphasis in original); Calvin Klein, 198 F.R.D at 54-55 (finding that

documents prepared by a public relations consultant did not qualify for the protection of the attorney-client privilege, where (1) "few, if any, of the documents in issue appear[ed] to contain or reveal confidential communications from the underlying client …, made for the purpose of obtaining legal advice"; (2) the possibility that ordinary public relations advice "may also have been helpful to [the attorneys] in formulating legal strategy is neither here nor there if [the public relations consultant's] work and advice simply serves to assist counsel in assessing the probable public reaction to various strategic alternatives, as opposed to enabling counsel to understand aspects of the client's own communications that could not otherwise be appreciated in the rendering of legal advice;" and (3) the public relations consultant did not "appear to have been performing functions materially different from those that any ordinary public relations firm would have performed if they had been hired directly by [the client], instead of by [the client's] counsel.").

On the other hand, as the court observed in <u>Kovel</u>, "nothing in the policy of the privilege suggests that attorneys, simply by placing accountants, scientists, or investigators on their payrolls…should be able to invest all communications by clients to such person with a privilege the law has not seen fit to extend when the latter are operating under their own steam."  296 F.2d at 921.

Similarly, these very same authorities acknowledge that depending on the facts before the court, the work product doctrine may prevent disclosure of documents prepared by or with the assistance and advice of a public relations consultant in anticipation of litigation.  <u>See</u> <u>e.g.</u> <u>NXIVM Corp</u>., 241 F.R.D. at 141-42 (Court recognized that work product protection is not waived "when the attorney provides the work product

to the public relations consultant whom he has hired and who maintains the attorney's work product in confidence ...[especially] if ... the public relations firm needs to know the attorney's strategy in order to advise as to the public relations[.]"); In re Copper Market Antitrust Litigation, 200 F.R.D. at 221 ("Once it is established that a document was prepared in anticipation of litigation, work-product immunity protects documents prepared by or for a representative of a party, including his or her agent.") (citation and internal quotations omitted); Haugh, 2003 WL 21998674 at *4 (finding that "[o]nce it is established that a document was prepared in anticipation of litigation, work-product immunity protects documents" including "memoranda, … and other materials, whether they are created by an attorney or by an agent for the attorney.") (internal quotation and citation omitted); Calvin Klein, 198 F.R.D at 55 ("I]t is obvious that as a general matter public relations advice, even if it bears on anticipated litigation, falls outside the ambit of protection of the so-called "work product" doctrine embodied in Rule 26(b)(3), Fed.R.Civ.P. *** It does not follow, however, that an otherwise valid assertion of work-product protection is waived with respect to an attorney's own work-product simply because the attorney provides the work-product to a public relations consultant whom he has hired and who maintains the attorney's work-product in confidence. This is especially so if, as plaintiffs here assert, the public relations firm needs to know the attorney's strategy in order to advise as to public relations, and the public relations impact bears, in turn, on the attorney's own strategizing as to whether or not to take a contemplated step in the litigation itself and, if so, in what form.") (citations omitted).

The long-and-short is that all of the authorities cited by the parties stand for the proposition that there are certain situations where communications with and work

performed by a public relations firm retained by a law firm can be protected from disclosure by the attorney-client privilege or work product doctrine, and that the determination is driven by the particular facts presented by each case.

With these principles in mind, based on this Court's review of the evidence presented by the parties, including the Weber Declaration, excerpts from the deposition of Burke, and the in camera inspection of the withheld documents, this Court finds that the documents at Tabs 18, 41, 42, 43, and 46 are protected by the attorney-client privilege, as well as the work product doctrine, because it is evident from the contents of the documents and the information provided by Weber that they bear on legal advice sought or given by GWM and were prepared in anticipation of litigation.  At the same time, the Court concludes that the following documents are governed only by the work product doctrine, but are not protected by the attorney-client privilege because the evidence before the Court does not suggest that the documents were being communicated to or by Public Strategies in order to assist GWM in providing legal assistance to Trek: Tabs 9, 11, 23, 24, 27, 29, 30-32, 34, 36- 40, 44, 45, 50, 51.

As to LeMond's contention that Trek waived any privilege protecting its legally-related communications when it disclosed those communications to Public Strategies, Pl. Mem., pp. 11-12), this Court finds that there has been no waiver.

"Voluntary disclosure of attorney-client communications expressly waives the privilege." United States v. Workman, 138 F.3d 1261, 1263 (8th Cir.1998) (citing Lutheran Medical Center v. Contractors Health Plan, 25 F.3d 616, 622 (8th Cir. 1994); In re Grand Jury Proceedings Subpoena to Testify to Wine, 841 F.2d 230, 234 (8th Cir. 1988)).  Accordingly, sharing attorney-client communications with a third-party can

constitute waiver of the attorney-client privilege.  See In re Bieter, 16 F.3d at 937.

Similarly, "disclosure to an adversary waives work product protection as to items

actually disclosed," (Pittman v. Frazer, 129 F.3d 983, 988 (8th Cir. 1997)), so long as

there is "an intention that the opposing party see the work product."  Gundacker v.

Unisys Corp., 151 F.3d 842, 848 (8th Cir. 1998).

In sum, "[i]f documents [are] merely shared with [a party's accountant] without

some nexus to an attorney giving advice, no privilege would attach and thus would

constitute a waiver if there was a pre-existing privilege."  NXIVM Corp. 241 F.R.D at 137

(citations omitted).  Id. at 139.  "Conversely, an exemption from the waiver accrues if

such communications are shared with an agent of the attorney, which may include

investigators and accountants retained to assist the attorney in rendering legal advice

and instruction."  Id.  "It does not follow…that an otherwise valid assertion of work-

product protection is waived with respect to an attorney's own work-product simply

because the attorney provides the work-product to a public relations consultant whom

he has hired and who maintains the attorney's work-product in confidence."  Calvin

Klein, 198 F.R.D. at 55 (citations omitted).

Here, there is no indication that Public Strategies did not maintain GWM's advice

or work product in confidence, or that Public Strategies advanced the work product for

non-litigation related purposes.  Further, there is no evidence that Trek, GWM or Public

Strategies disclosed any work product to the LeMonds prior to the filing of the

Wisconsin Suit or Trek's presentation to employees and others on April 8, 2008.

Consequently, the Court finds there has been no waiver of the communications this

Court has determined are governed by the attorney-client privilege or work-product doctrine.

Finally, this Court addresses the LeMonds' claim that they have a substantial need to access the communications at issue, and they claim cannot be obtained through other means.  Pl. Mem., pp. 12-13.

> There are two kinds of work product-ordinary work product and opinion work product. Ordinary work product includes [photographs and] raw factual information. See Gundacker v. Unisys Corp., 151 F.3d 842, 848 n. 4 (8th Cir. 1998). Opinion work product includes counsel's mental impressions, conclusions, opinions or legal theories. See id. at n. 5. Ordinary work product is not discoverable unless the party seeking discovery has a substantial need for the materials and the party cannot obtain the substantial equivalent of the materials by other means. See Fed. R. Civ. P. 26(b)(3). In contrast, opinion work product enjoys almost absolute immunity and can be discovered only in very rare and extraordinary circumstances, such as when the material demonstrates that an attorney engaged in illegal conduct or fraud.  See In re Murphy, 560 F.2d 326, 336 (8th Cir. 1977).

Baker, 209 F.3d at 1054; see also re Green Grand Jury Proceedings, 492 F.3d 976, 980 (8th Cir. 2007) (same).

Even assuming that the documents reflected in Tabs 9, 11, 23, 24, 27, 29, 30-32, 34, 36-40, 44, 45, 50, 51 did not constitute the mental impressions, conclusions, opinions or legal theories of counsel, (which is in part true – based on the in camera review of the documents, the Court finds that some documents do reflect counsel's opinion work product, and others do not), apart from merely arguing that they have a substantial need for the information sought and they cannot obtain it elsewhere, the LeMonds have provided the Court with no support for their contention.  For example, the LeMonds asserted that the communications sought are intimately related to their claim that Trek failed in its obligation of good faith and fair dealing by damaging the

LeMond brand through public statements.  Pl. Mem., p. 12.  While it is true that the LeMonds do not have access to the attorney communications and work product behind the PowerPoint presentation, they do have the presentation itself, along with other press releases and publicized information about the termination.  Accordingly, the argument that there is no other way to obtain evidence that Trek allegedly damaged LeMond brand through public statements is unavailing.  The Court does not find that the LeMonds have a substantial need of the materials for the preparation of their case and that they are unable without undue hardship to obtain the substantial equivalent of the materials by other means.  See Fed. R. Civ. P. 26(b)(3).

In summary, the Court concludes the following:

(1)    The following documents shall not be produced to the LeMonds because they do not contain information reasonably calculated to lead to the discovery of admissible evidence on these topics:  Tabs 1-8, 10, 12, 13, 15-17, 19-22, 25, 26, 28, 33, 35, 47, and 48.

(2)    The attorney-client privilege and work product doctrine were properly invoked by Trek with respect to the documents at Tabs 18, 41, 42, 43, and 46, and thus, these documents shall not be produced to the LeMonds.

(3)    The work product doctrine was properly asserted as to the documents at Tabs 9, 11, 23, 24, 27, 29, 30-32, 34, 36-40, 44, 45, 50, 51.

(4)    There has been no waiver of the attorney-privilege or work product doctrine as to the documents set out in paragraphs 2 and 3, and the LeMonds have failed to make the requisite showing to overcome the assertion of the work product doctrine as to the documents listed in paragraph 3.

(5)     The document at Tab 14 shall be produced to the LeMonds, as shall the document at Tab 49, if Tab 14 is the script of the presentation made by Burke on April 8, 2008.

(6)     Trek shall amend its privilege log consistent with this Order.

(7)     The objections to questions seeking attorney-client privileged communications were properly made by Trek's counsel.  <u>See</u> Robbins Decl. Ex. 1 (Burke Depo.), pp. 69-71.

J.S.M.