UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| LEMOND CYCLING, INC., | Case No. 08-CV-1010 (RHK-JSM) |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF TREK'S MOTION FOR SUMMARY JUDGMENT** |
| TREK BICYCLE CORPORATION, | |
| Defendant and Third-Party Plaintiff, | |
| v. | |
| GREG LEMOND, | |
| Third-Party Defendant. | |

### Introduction

Trek and LeMond defined their rights and duties in a detailed licensing agreement. That contract, negotiated over a period of months, sets out specific performance criteria for both parties. For its part, Trek agreed to six-figure guaranteed royalty payments, minimum sales quotas, and to spend a set percentage of net sales for marketing and promoting the products. LeMond does not dispute Trek's performance of these obligations. Instead, he wrongly asserts that the contract's objective performance standards should be disregarded, and that instead the jury should evaluate Trek's performance under an amorphous and subjective "best efforts" standard. Neither the contract nor the law supports LeMond.

Summary judgment is likewise appropriate to affirm, as a matter of law, Trek's right to terminate the agreement. LeMond's extraordinary, persistent conduct damaging Trek's business and goodwill is undisputed. Because the parties expressly bargained for a right of termination in the event of such damaging conduct, summary

Dockets.Justia.com

judgment should be entered on Trek's claim for declaratory relief, and confirming LeMond's liability for breaching the contract.

Upon the resolution of the pending motions before this Court, the sole issue that remains for the jury is deciding the extent of the damages LeMond caused.

## Statement of Undisputed Facts

1.      Trek enjoys a reputation for quality and innovation.  While many of its competitors stumbled financially, with several going bankrupt, Trek has led the industry for many years.  TrekResponse-SMF, ¶-1.[1]

2.      Trek distributes its bikes through a network of Independent Bike Dealers ("IBDs").  These IBDs decide which of many manufacturers' bikes to carry. "Trek's fate is 100 percent in the hands of the person who runs and buys bikes for the bike shop."  Many of these small business owners have modest financial resources, and are very careful about which bikes to carry.  TrekResponse-SMF, ¶-2.

3.      In 1995, Trek was selling Gary Fisher brand mountain bikes as well as Trek brand mountain bikes, and wanted to add a complementary road bike line to sell to IBDs.  Trek approached LeMond about his road bike line, since LeMond was struggling financially as a manufacturer and distributor.  TrekResponse-SMF, ¶¶-4-5. Key to Trek's interest in LeMond was the opportunity to leverage LeMond's positive reputation as an innovative American cyclist who had won the Tour de France in 1986, 1989 and 1990.  Trek, like other companies, enters into licensing agreements with professional athletes "to enhance [its] own brand value and to further [its] business objectives."  TrekResponse-SMF, ¶-6.

---

[1] All references to "SUF, ¶-____" are to the Statement of Undisputed Facts contained in this brief; all references to "TrekResponse-SMF, ¶-____" are to the statement of facts contained in Trek's August 5, 2009 memorandum in opposition to LeMond's motion for summary judgment.  *See* Docket No. 135.

4.      Trek and LeMond extensively negotiated a written agreement governing their rights and obligations.  New York intellectual property attorney Sidney Bluming represented LeMond.  Since the 1970's, Bluming had been involved in "all aspects of licensing," representing "manufacturers, designers, athletes, personalities, retailers, [and] licensing representatives," including Elizabeth Taylor. Bluming Dep. at 5, 110.

5.      Trek's negotiations were handled by Dick Burke, the founder and then-president of Trek, who had no training in law.  Bluming testified that Burke "was the consummate gentleman and a delight to deal with," that he "was a lovely man," and that the negotiations "were [conducted] at an enormously gracious level and courteous level."  Bluming Dep. at 40.  Bluming and Burke exchanged no fewer than twenty-four deal memos, faxes, and draft agreements over the course of their negotiations before finalizing the June 29, 1995 agreement.[2]  Zastrow Decl., ¶-12.

6.      LeMond's agent, Warren Gibson, testified that LeMond had turned to Trek because it "had the best marketing, the best sales force, and the best distribution" system—"[t]hey were the best."  Gibson Dep. at 37-38.  Because LeMond had struggled financially when he had tried to market a line of bikes on his own, TrekResponse-SMF, ¶-5, the agreement granted Trek the exclusive right to market LeMond-branded bicycle products for a period of ten years.  Trek-LeMond Contract, §§ 1.04(a) and 2.01.

7.      The agreement gave LeMond considerable protections.  LeMond was guaranteed minimum royalties of $135,000 per year (later increased to $350,000)—

---

[2] The June 29, 1995 agreement and its August 10, 1999 amendment were submitted to the Court as Exhibits 1 and 8 to the Robbins Declaration filed by LeMond in support of his pending motion for summary judgment.  *See* Docket No. 118.  For the Court's convenience, copies of these two agreements are appended to this brief as Exhibits 1 and 2.

*which LeMond would receive regardless how many LeMond-branded bicycles Trek could sell.*  Trek-LeMond Contract, § 4.01; Amendment, § F.  The agreement also set specific annual sales quotas.  Trek-LeMond Contract, § 12.01.  If Trek failed to achieve these quotas, LeMond had a right to terminate.  *Id.*, § 12.02.

8.     The agreement required Trek to market, promote, and advertise the LeMond products.  Trek-LeMond Contract, § 8.01.  Trek was required to expend a "reasonable amount" on these things, specifying the "reasonable amount [as] the equivalent of approximately three percent (3%) of the Net Sales for each Contract Year."  *Id.*, § 8.01.

9.     While LeMond delegated to Trek the exclusive right and responsibility to develop and execute the marketing, promotion, and distribution of LeMond-branded products, LeMond reserved the right to ensure that Trek's sales and marketing efforts did not denigrate the integrity of the LeMond brand.  *Id.*, §§ 2.01, 8.01.  The brand integrity terms include:

a.   LeMond had the right to protect his brand integrity by approving the LeMond-branded products to be sold by Trek.  Trek-LeMond Contract, §§ 2.01, 5.01.  As Bluming explained, "from [LeMond's] point of view he didn't want bikes that looked like bubble gum machines."  Bluming Dep. at 36.

b.   LeMond had the right to review the content of advertising materials Trek developed to market the LeMond-branded products.  *Id.*, §§ 5.01, 5.05, 5.07, 8.02.

c.   LeMond had inspection rights at Trek's manufacturing facilities, and could halt production if quality control problems were identified.  *Id.*, §§ 5.01, 5.04, 5.08.

d.   Trek was required to exert its "best efforts" to ensure that its promotional efforts were pursued in a manner "consistent with the quality and reputation of [LeMond], and only to retailers … which properly reflect the image and reputation of Licensor and LeMond."  *Id.*, § 5.02.

10.     Four years into the agreement, since bike sales were thriving, LeMond and Trek negotiated to extend the 10-year term by five years, to September 30, 2010.[3] LeMond also granted Trek the option to extend the term another five years, through September 30, 2015.  Amendment, § A.  LeMond negotiated for an increase of his minimum royalties from $135,000 to $350,000 a year.  For the first time, guaranteed royalties were allocated separately to U.S. and non-U.S. sales.  LeMond was guaranteed royalties of $100,000 for sales anywhere outside the United States, and $250,000 for sales within the United States.  *Id.*, § F.

11.     The amendment specified that if U.S. sales exceeded the contractual quotas, the excess U.S. royalties due to LeMond could not be applied to pay down the $100,000 guaranteed international royalties.  *Id.*, §§ D, F.  Thus, even if LeMond earned $450,000 in royalties from U.S. sales in a given year ($200,000 over the guaranteed sum), Trek would pay the full $450,000, plus the *additional* $100,000 minimum royalty payment for non-U.S. sales, *regardless whether Trek had sold a single bike outside the U.S.  Id.*

12.     At the same time, LeMond did not bargain for amending the agreement to impose separate § 12.01 minimum sales quotas for U.S. and non-U.S. sales.  Instead, the amendment maintained the original, aggregate § 12.01 sales volume requirement applicable to both U.S. and international sales.  Similarly, the August 1999 amendment did not require Trek to spend any particular amount of money promoting international sales, instead maintaining the global, aggregate § 8.01 promotional expenditure requirement—still specified as 3% of Net Sales.  *Id.*

---

[3] At the same time, because sales of parts and accessories had not kept pace with the success in the sale of the road bikes, Trek negotiated to relinquish its rights to market LeMond-branded parts and accessories.  LeMond negotiated to increase his guaranteed bike royalty, and then marketed his parts and accessories through a separate $5,000,000 deal he had struck previously with PTI, unbeknownst to Trek. TrekResponse-SMF, ¶¶-66-74.

13.     Trek paid LeMond over $5,000,000 in royalty payments over the course of the parties' relationship, and Trek invested more than $7,500,000 more in marketing, promoting, and advertising the LeMond-branded products.  LeMond Answer ¶-11, Docket No. 48; Siefkes Aff., ¶-2.

## Argument

## I.   LeMond's Breach of Contract Claims Fail as a Matter of Law.

### A. Trek's Satisfaction of the Contract's Objective Performance Standards Defeats LeMond's "Best Efforts" Challenge.

On July 14, 2009, Trek filed a motion to compel LeMond to answer a contention interrogatory stating the precise ways he claimed Trek had breached the Trek-LeMond Contract, and his supporting evidence for such claims.  *See* Docket Nos. 123, 125.  During the July 29, 2009 hearing before Magistrate Judge Mayeron, LeMond agreed to supplement his deficient response interrogatory once his expert reports had been prepared.  On August 17, 2009, LeMond served his amended response which identifies each of the specific contractual and evidentiary bases for his breach of contract claims.  *See* Zastrow Decl., Exh. 6, Interrogatory 11.

None of the claims withstands scrutiny.

### 1.   The Objective Contractual Performance Standards in the Agreement are not Superseded by a Vague and Subjective "Best Efforts" Challenge.

LeMond does not contend that Trek failed to meet the minimum sales obligations imposed by § 12.01, *or* that Trek failed to pay him the guaranteed royalties required by § 4.01, *or* that Trek failed to expend 3% of annual net sales on marketing and promotion expenses as required by § 8.01.  *See* Response to Interrogatory 11.

Instead, LeMond contends that Trek violated §§ 5.02 and 8.01 of the agreement by "failing to maximize sales domestically and internationally through adequate marketing, promotion, and advertising of LeMond-branded products."

Response at 5. This contention rests upon a misreading of the contract and a misapprehension of the law.

LeMond attempts to transplant a "best efforts" clause, contained in § 5.02 of the agreement, into the separate and distinct sections of the agreement that list the objective standards governing Trek's sales and marketing obligations, contained in §§ 4.01, 8.01, and 12.01.

Section 5.02 and its "best efforts" clause appear within the paragraphs of the agreement dedicated to preserving the integrity of the LeMond brand, titled "*Development, Licensor's Approvals and Quality Control.*" In order to protect his brand against being "cheapened" in consumers' minds (e.g. a bike with a "bubble gum machine," Bluming Dep. at 36), section 5 gives LeMond a right to participate in product design; permits LeMond to approve marketing materials; requires Trek to "establish and maintain quality control practices;" requires that necessary legal steps are taken to protect the brand; and permits LeMond to inspect the production facilities to confirm quality controls were in place. *See* §§ 5.01—5.08.

Thus, § 5.02 addresses brand integrity by providing that Trek's efforts to aggressively market and sell LeMond-branded products must be pursued in a manner "consistent with the quality and reputation" of the LeMond brand:

> Licensee shall use its best efforts to exploit the Mark in respect of Licensed Products, and to promote the sale of Licensed Products in the Territory so as to try to maximize sales, *consistent with the quality and reputation of Licensor, and only to retailers* (and distributors who sell to retailers) *which properly reflect the image and reputation of Licensor and LeMond.*

Trek-LeMond Contract, § 5.02.[4]

LeMond cannot *superimpose* this § 5.02 brand-integrity protections so as to *override* the specific §§ 4.01, 8.01, and 12.01 performance standards defining Trek's

---

[4] All emphases in quotations throughout this memorandum have been supplied by Trek.

sales and marketing obligations.  As the district court held in *Vestron, Inc. v. Nat'l Geographic Soc.*, 750 F. Supp. 586, 593 (S.D.N.Y. 1990), a "best efforts requirement *must be reconciled with other clauses* in the contract to the extent possible, *not used as a basis for negating them*."  Read *in context*, nothing in § 5.02 purports to nullify or supersede Trek's specific, objective performance obligations set forth in §§ 4.01, 8.01, and 12.01.

Trek's reading of § 5.02 tracks industry standards governing the drafting of licensing agreements.  In *Digital Equipment Corp. v. AltaVista Technology, Inc.*, 960 F. Supp. 456, 475 n.37 (D. Mass. 1997), for example, the district court reviewed substantially similar "best efforts" language in a licensing agreement, and observed that such "best efforts" clauses are commonly used in licensing agreements *to protect the integrity of the brand*:  "Thus quality control is an affirmative duty placed on trademark owners, and such language is therefore *pro forma* in trademark licensing agreements." (*citing McCarthy on Trademarks*, § 18.16[1-4]).

LeMond's contrary assertion, that § 5.02's best efforts clause applies to sales and marketing, ignores the purpose and the context of § 5.02.  *CKB & Associates, Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 581 (Tex. App. 1991) (cannot impose a "best efforts" obligation contained in one section of the agreement upon another, separate clause).  If § 5.02's best efforts clause were "read into" §§ 4.01, 8.01, and 12.01, this would nullify the specific, objective standards of §§ 4.01, 8.01, and 12.01.  *See Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.*, 249 F.R.D. 530, 534 (N.D. Ill. 2008) ("party obligated to use best efforts only as to activity specifically set forth in the clause"); and *ParaData Computer Networks, Inc. v. Telebit Corp.*, 830 F. Supp. 1001, 1004-05 (E.D. Mich. 1993) (rejects effort to superimpose a "best efforts" obligation upon a section of a contract that contained no such clause).

LeMond's argument for displacing the objective performance criteria in the contract with a vague and subjective "best efforts" standard turns "best efforts" jurisprudence on its head.  Many jurisdictions—*including Minnesota*—will not even *enforce* a "best efforts" clause if it is not linked to specific, measurable, objective performance standards.  *See Hysitron, Inc. v. Frederickson,* 2002 WL 31689530, *6 (Minn. App. 2002) (standardless "best efforts" obligation is too indefinite to enforce).  *See also Kraftco Corp. v. Kolbus,* 1 Ill. App. 3d 635, 274 N.E.2d 153 (1971) (same); and *Barton v. Spinning,* 8 Wash. 458, 460, 36 P. 439 (Wash. 1894) (obligation to "use their best endeavors" is "too indefinite to be the foundation of a right of action").

As the *Kraftco* court concluded, any other rule would subject contracting parties to second-guessing without any objective standards to serve as a measure of their conduct:

> In this case, there was no obligation upon Kolbus other than to use his best efforts.  He had no obligation to sell any specific quantity and no obligation to meet any quotas.  The operation of this contract is wholly dependent upon the actions of Kolbus.  The mere allegation of best efforts is too indefinite and uncertain to be an enforceable standard.  As such, the contract was lacking in mutuality of obligation and unenforceable.

*Kraftco,* 274 N.E.2d at 156.  *Accord Strauss Paper Co., Inc. v. RSA Executive Search, Inc.,* 260 A.D.2d 570, 571, 688 N.Y.S.2d 641, 642-43 (1999) ("Where, as here, a clause in an agreement expressly provides that a party must use its 'best efforts,' *it is essential that the agreement also contain clear guidelines against which to measure such efforts in order for such clause to be enforced.*").

Here, Trek and LeMond carefully drafted an agreement that avoided the difficulties encountered by the contracting parties in *Kraftco, Strauss Paper, Hysitron,* and *Barton.*  Here, Trek *did* have a contractual obligation to sell specific quantities of bicycles, and here, Trek *was obligated* to expend a specific amount of money on promoting those products.  Commenting on the 3% of net sales marketing

expenditure required by the agreement, LeMond's attorney, Sidney Bluming, agreed that it was "in everyone's best interests to have a tangible guideline...." Bluming testified to the importance of establishing 3% as an objective standard, observing: "I mean Trek wouldn't want us to say it would be 10%." Bluming Dep. at 141. LeMond's efforts now to manufacture a breach based on a misapplication of § 5.01's "best efforts" brand-integrity clause would defeat the parties' purpose for including objective performance standards in the agreement for Trek's sales and marketing.

This is particularly true where, as here, LeMond negotiated for substantial guaranteed royalties and other payments to ensure that Trek was motivated to sell LeMond-branded bicycles. Even in those jurisdictions—*unlike Minnesota*—that are willing to enforce a nebulous "best efforts" obligation, those courts still will refuse to entertain a "best efforts" claim if the licensor has protected itself through substantial, contractually guaranteed payments. *See, e.g., Arlaine & Gina Rockey, Inc. v. Cordis Corp.*, 2004 WL 5504978, *49 (S.D. Fla. 2004) (where a licensing agreement "requires a substantial advance royalty payment, courts have consistently refused to read an 'implied duty to exploit' into the agreement, and have granted or affirmed summary judgment dismissing claims alleging breach of an 'implied duty to exploit.'"); *Kardios Systems Corp. v. Perkin-Elmer Corp.*, 645 F. Supp. 506, 509 (D. Md. 1986) (same, and holding that "the existence of a best efforts obligation should not be lightly inferred since such an obligation *subjects the licensee to significant litigation exposure and deprives him of the fundamental power of determining for himself the reasonableness of his marketing efforts*"); *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159 (3rd Cir. 2001) (collecting cases holding that minimum royalty payments provide sufficient protection to a licensor); *Permanence Corp. v. Kennametal, Inc.*, 908 F.2d 98 (6th Cir. 1990) (guaranteed royalties obviate the need to impose additional best efforts obligations); *HML Corp. v. General Foods Corp.*, 365 F.2d 77, 81 (3rd Cir. 1966) (New York law) (same); *Nikoonahad v. Rudolph Technologies, Inc.*, 2009 WL 150948, *3 (N.D. Cal. 2009) (same); *ParaData,* 830

F. Supp. at 1006 (same); *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808-809, 48 Cal. Rptr. 2d 747, 753 (Cal. App. 1995) (same); and *WirelessMD, Inc. v. Healthcare.com Corp.*, 271 Ga. App. 461, 610 S.E.2d 352, 355-356, 464 n.4 (Ga. App. 2005) (same).

Nor is there any basis to read an implied "best efforts" obligation into the performance standards contained in §§ 4.01, 8.01, and 12.01. As the Third Circuit aptly concluded in *HML Corp.*, a licensor like LeMond whose contract includes built-in, bargained-for performance standards cannot impose on the licensee like Trek a standardless "best efforts" obligation:

> In these and similar circumstances *the seller or lessor is not at the mercy of the buyer or lessee* and the terms of the contract which provide a substantial minimum payment therefore negative *an implication* of a duty to promote, drawn from equitable considerations. The choice lies between *implying* a promise to correct an apparent injustice in the contract, as against holding the parties to the bargain which they have made. *The latter alternative has especial force where the bargain is the result of elaborate negotiations in which the parties are aided by counsel ….*

*HML Corp.*, 365 F.2d at 81.

### 2. LeMond's Second-Guessing of Trek's Business Judgment on How Best to Promote the Bikes does not Support a Breach of Contract Claim.

LeMond's "best efforts" challenge rests upon his criticisms of Trek's business judgment on the marketing, promotion and advertising of LeMond-branded products. Even if LeMond were entitled to superimpose a "best efforts" obligation upon the specific performance standards contained in §§ 4.01, 8.01, and 12.01 (which he is not), LeMond's criticisms of Trek's decisions on how best to market the LeMond brand do not give rise to a breach of contract claim.

LeMond entered into the licensing agreement with Trek because—according to LeMond's agent—Trek "had the best marketing, the best sales force, and the best distribution" system—"[t]hey were the best." SUF, ¶-6. Accordingly, LeMond

delegated to the experts at Trek how best to market the LeMond-branded bicycles.
*See* Trek-LeMond Contract, § 2, *Grant of Rights, Services, and Guarantees*; and § 8,
*Advertising and Promotion.*

  While he included language to protect his brand integrity, LeMond did not
reserve the right to dictate to Trek which marketing plans and programs to pursue,
nor did he reserve a right to force Trek to undertake any of the particular means and
methods LeMond now faults Trek for rejecting. *Id.* Given LeMond's failure in
selling bikes on his own, it would have been foolish (for both sides) to supplant
Trek's expertise and judgment in favor of LeMond's.

  Nonetheless, LeMond claims Trek somehow "breached" its obligations when
it did not make the marketing decisions LeMond claims he would have made if he
had been in charge. LeMond contends:

- Trek should have spent even more on marketing and promotions than the 3% of net sales agreed to in the contract.

- Trek should have included Greg LeMond in more promotional activities.

- Trek should have invested in triathlon and more professional cycling teams.

- Trek should have marketed more to consumers rather than to its dealers.

- Trek should have conducted more market research to enhance its promotional efforts.

- Trek should have advertised more in "vertical publications."

- Trek should have improved its training of sales staff to help them differentiate the LeMond-branded products from competing products.

- Trek should have used the "good will associated with LeMond's anti-doping stance" to market the bikes.

Zastrow Decl., Exh. 6, Interrogatory 11 at 6.

Where, as here, a licensor delegates the marketing of a product line to his licensee, the licensee has the right to exercise its independent business judgment on how best to market those products. After all, that is exactly what the licensor has hired the licensee to do. *See, e.g., Vestron,* 750 F. Supp. at 593 (rejecting best efforts challenge to defendant's "reasonable marketing decisions"); and *Woodlake VEF-IV, LLC v. Cooperative Agency, Inc.*, 2008 WL 763229, *4 (Minn. App. 2008) (summary judgment dismissal of "best efforts" challenge to landlord's efforts to market and re-let property). Trek's departure from the LeMond "how to" manual for the promotion of road bikes does not give rise to a breach of contract claim.

In *Joel Popkin and Co. v. Wharton Econometric Forecasting Assoc., Inc.*, 659 F. Supp. 343 (D. D.C. 1987), the licensor asserted a "best efforts" breach of contract challenge to its licensee's methods of marketing and promoting the licensor's products based on criticisms similar to those asserted by LeMond: "JPC alleges that Wharton breached its duty under Section 5 by unnecessarily restricting its marketing efforts and expenditures, by employing incompetent marketing personnel, and by failing to make personal computer applications of the Models available in a timely manner." *Id.* at 349.

Noting that the defendant indisputably had "expended 'substantial financial resources' and devoted 'numerous marketing personnel' to marketing the Models," *id.* at 350, the district court rejected any after-the-fact second-guessing of the defendant's business decisions:

> *In essence, JPC has done nothing more than allege that Wharton made a number of bad business decisions, yet these are just the sort of decisions delegated by Section 5 to Wharton's judgment.* The fact that Wharton stood to lose 95 percent of the potential profits, compared to JPC's five percent, negates any unsupported inference of intentional mismanagement. *In short, JPC chose to bargain away its right to "second guess" Wharton's business judgment, and Wharton's motion for summary judgment is granted on the "best efforts" issue.*

*Id.* at 350.

Here, just as in *Joel Popkin*, Trek devoted substantial resources to the LeMond-branded products, repeatedly supporting these efforts through expenditures in excess of the "3% of net sales" amount required by § 8.01 of the contract.  SUF, ¶-8.  Trek of course devoted enormous personnel resources to the promotion of the LeMond-branded bicycle products, distributing LeMond-branded products through its established dealer network (e.g., Titus Aff., ¶-1-4, Docket No. 138).

Perhaps most importantly, it is undisputed that these marketing efforts yielded stellar results, achieving a high-water mark of over $16,000,000 in annual sales of LeMond-branded products.  SUF, ¶-10.  LeMond's agent testified that if LeMond had not impeded Trek's efforts through his serial, public castigations of Armstrong, Trek's marketing program would have yielded annual sales of $30 to $40 million.  TrekResponse-SMF, ¶-59.

Even where the parties fail to specify performance criteria in their contract (unlike here), the courts refuse to countenance nebulous "best efforts" challenges if the defendant undertook substantial marketing efforts.  In *Johns v. Rexam Medical Packaging*, 2005 WL 1308319 (M.D. Ga. 2005), for example, the parties neglected to impose any specific sales quotas in their contract.  *Id.* at *4.  The district court rejected on summary judgment plaintiff's second-guessing of the defendant's chosen means and methods:

> Defendant's efforts were substantial and reasonable given the expectations of the project and the positions of the parties at the outset of the venture.
>
> ***
>
> *Defendant was entitled to exercise its own business judgment in determining the extent of its efforts, provided its efforts were within the range of the reasonable expectations of the parties.*

*Id.  Accord Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 235 (3rd Cir. 2001) (upholding defendant's "right to exercise sound business judgment in its marketing

programs"); *Knight Industries, Inc. v. Turner Marketing, Inc.,* 157 Ga. App. 177, 276

S.E.2d 860 (1981) (rejecting "best efforts" challenge and concluding that "*the court was*

*precluded as a matter of law from any subjective evaluation of those [marketing] efforts*").

Emphasizing the unfairness of such second-guessing through litigation, the

Second Circuit rejected the licensor's "best efforts" challenge as a matter of law:

> If a trier of fact is free to determine whether such decisions are
> sound or valid, *the publisher's ability to rely upon its own experience and
> judgment in marketing books will be seriously hampered.* We believe that once
> the obligation to undertake reasonable initial promotional activities has
> been fulfilled, the contractual language dictates that *a business decision by
> the publisher to limit the size of a printing or advertising budget is not subject to
> second guessing by a trier of fact as to whether it is sound or valid.*

*Zilg v. Prentice-Hall, Inc.,* 717 F.2d 671, 680 (2nd Cir. 1983).

Like the district court in *Joel Popkin,* the Second Circuit warned against the

adverse business consequences of judicial second-guessing of such efforts, *id.,* and

ruled that it would not countenance standardless "best efforts" challenges to

discretionary business decisions:  "As explained above, we think the contract between

P-H and Zilg left the decisions in question to the business judgment of the publisher,

the author's protection being in the publisher's experience, judgment and quest for

profits."  *Id.* at 682.

LeMond *might* have bargained for an even greater marketing investment by

Trek beyond the 3% of net sales called for by the agreement— and perhaps in

exchange Trek would have bargained for reducing the amount of **LeMond**'s

guaranteed royalty payments.  He didn't.  LeMond *might* have bargained for the right

to participate in specific trade shows and promotional events if he had been willing to

spend more time on the road supporting his bike sales.  He didn't.[5]  LeMond *might*

---

[5] LeMond actually bargained to *limit* his personal participation in promotional
activities when he negotiated the August 1999 amendment.  Amendment, § C.

have bargained for the right to override Trek's judgment on whether and how often to sponsor triathlons and cycling teams, to advertise directly to consumers, to expend specific sums on conducting market research, or to publish ads in "vertical" publications.  He didn't.  LeMond *might* have insisted on specific sales training in the agreement, but once again, he didn't.

LeMond's marketing criticisms find no support in the parties' agreement. LeMond ran his own business into the ground, and then partnered with Trek to take advantage of Trek's proven expertise.  LeMond's "I could have marketed better" breach of contract claim should be dismissed as a matter of law.

### 3. LeMond's Criticisms of European Sales do not Support a Breach of Contract Claim.

LeMond asserts that Trek should have sold more bicycles in France and throughout Europe.  LeMond's effort to parlay this assertion into a claim for breach of contract is particularly unfounded in light of the decisions he made when entering into the August 1999 amendment.

LeMond bargained in 1999 for two separate minimum royalty obligations in § 8.01—a $250,000 minimum royalty for sales in the United States, and a separate, $100,000 minimum royalty for sales outside of the United States.  SUF, ¶-10. LeMond *did not* bargain for a corresponding requirement that Trek meet any specific § 12.01 sales quota for international bike sales.  To the contrary, he agreed to maintain the *single, aggregate sales quota* established in the original agreement.  *Id.*

If LeMond had wanted to obligate Trek to sell a particular number of bikes in Europe, he could have bargained for such a requirement.  He didn't. [6]  LeMond

---

[6] If LeMond had bargained for a clause requiring Trek to expend greater resources and efforts in Europe, he would have been required to give up something else for this in return.  LeMond likely declined to pursue such a course because he knew—as did Trek—that there were formidable barriers to successfully marketing a road bike line in Europe endorsed by an American athlete.  *See* Zastrow Decl., Exh. 11, Briscadieu

elected instead to bargain for more guaranteed cash through increased royalties. LeMond's "poor international sales" breach of contract claim should be dismissed.

### 4. Trek had no Obligation to Invite LeMond to any Particular Trade Show.

LeMond's interrogatory response also asserts that Trek breached § 2.02.03 of the agreement by failing to invite LeMond to certain promotional events, and for failing to reimburse LeMond for his travel expenses for one of those events. *See* Zastrow Decl., Exh. 6, Interrogatory 11 at 6.

Section 2.02.01 provides, however, that "*[a]s and when requested by [Trek],* LeMond shall be required to personally participate in the promotional activities described in §§ 2.02.01 and 2.02.02. Trek was required to reimburse LeMond for his expenses if and when Trek requested that LeMond participate in such functions. *Id.*, § 2.02.03. Nothing in the Trek-LeMond Contract requires Trek to invite LeMond to any particular promotional event—or to reimburse LeMond for events LeMond decided, unilaterally, to attend.

### B. LeMond's Claim that Trek Violated § 5.01 of the Agreement is Unsupported by any Facts.

LeMond asserts a breach of § 5.01 premised upon Trek's "development of a new road bike line which bore similarities to the LeMond bicycle line" after Trek terminated the agreement. LeMond Response to Interrogatory 11 at 5. The contract and the facts contradict this assertion.

First, § 5.01 does not prohibit Trek from marketing road bikes which merely bear "similarities" to the LeMond bicycle line. Such a prohibition would be absurd,

---

Report. LeMond's claim based on "deficient" sales in Europe is an effort to get "something for nothing"—seeking to hold Trek to performance standards in Europe that were not "bought and paid for" by LeMond when he entered into the original and amended agreements.

of course, because one would be hard-pressed to find two road bikes manufactured by anyone that do not bear some "similarities' to each other.  Such "similarities" are what make them "road bikes" rather than "mountain bikes," "BMX bikes," or "cruisers."

Section 5.01 *actually* provides:  "All designs and sketches which are or become unique to Licensed Products *and become associated in the public's mind with Licensor, LeMond or the Mark*, shall not be utilized by Licensee or any third party, after the Contract Period, without Licensor's express further approval."  LeMond does not contend—much less adduce evidence in support of his interrogatory response—that any bikes sold by Trek post-termination employ designs "associated in the public's mind" with LeMond.

To the contrary, Aaron Mock and John Burke, the two witnesses cited by LeMond in asserted support of this claim (*See* Zastrow Decl., Exh. 6, Interrogatory 11), testified directly opposite to LeMond's claim.  *See* Burke Dep. at 58-59 ("I think they're different.  As I sit here today, I think they're different."); and Mock Dep. at 135-136 ("The bikes look extremely different than what a LeMond does.  I think anybody walking in a store, an average consumer, you know, there would never be any question in their mind of -- you asked for differentiation -- that it would be extremely difficult for someone to look at a Fisher, and say, oh my gosh, that's a LeMond.  I just can't see it that way.  I don't know if that could happen.").[7]

Second, LeMond has not identified any damages in support of this claim.  *See* Zastrow Decl., Exh. 7, LeMond Rule 26 Itemization of Damages at 4-5; and Zastrow Decl., Exhs. 8 and 9, LeMond Damages Reports.

---

[7] The "similarities" testified to by Mock involved, as he explained, planning documents for bikes that were still on the drawing board and thus *never existed* in the LeMond line.  Mock Dep. at 138.

LeMond's breach of contract claim premised upon Trek's purported violation of § 5.01 must be dismissed.

### C. LeMond is not Entitled to any More Money from Trek Based Upon Being "Shorted" on Free Bikes.

LeMond asserts a breach of § 5.03 based on the allegation that he did not receive the full amount of free bikes to which he was entitled each year.[8] LeMond's § 5.03 claim fails for two reasons.

First, LeMond's § 5.03 bike-shorting claim fails because, once again, LeMond failed to identify or substantiate any damages associated with this claim, as required by Fed. R. Civ. P. 26.  *See* LeMond Rule 26 Damages Itemization at 4-5.  LeMond likewise failed to substantiate any such damages claim in the expert damages reports.

Second, LeMond *never even asked* for more bikes during the contract years he contends he was shorted.  In February 2008, just before he once again attempted to leverage Trek with the threat of a new-and-improved lawsuit, LeMond demanded that Trek pay him in cash for the value of bikes he could have requested—but did not request—during prior contract years.  As Trek explained, LeMond's contractual right to receive a certain number of free bikes was conferred on an annual basis, and could not be retroactively invoked in subsequent years.  Nor was there any contractual entitlement to receive cash in lieu of free bikes.  *See* Trek-LeMond Contract, § 5.03 ("During each Contract Year…."); and Zastrow Decl., Exh. 10.

The whole point of providing LeMond with free bikes, of course, was to market and protect the LeMond brand by ensuring that LeMond and his family were riding current model year bikes.  TrekResponse-SMF, ¶-75,  Huber Dep. at 38, 135.

---

[8] This issue surrounding LeMond's entitlement to an annual allocation of free road bikes is separate and distinct from the issues raised in LeMond's summary judgment motion surrounding LeMond's profiteering through the purchase of Trek road bikes at employee-discount prices.

If LeMond did not ask Trek to send him the full number of bikes in a particular contract year, Trek had no contractual obligation, years later, to pay LeMond the cash value of bikes LeMond *could have*—but *did not*—request in those prior contract years.

Because Trek did not breach any obligations under § 5.03, and because once again LeMond has not substantiated any damages for this purported claim, LeMond's claim must be dismissed.

## II.   TREK IS ENTITLED TO SUMMARY JUDGMENT CONFIRMING ITS RIGHT TO TERMINATE THE AGREEMENT.

### A.   Trek had a Right to Terminate if LeMond took any Action that Damaged or Adversely Impacted Trek's Business or Good Will.

The Trek-LeMond Contract identifies specific circumstances and conduct giving rise to a termination right.  It is undisputed that LeMond engaged in such specified conduct, entitling Trek to summary judgment.

Trek agreed to pay millions of dollars under the licensing agreement to *positively impact* the company's sales and goodwill.  Accordingly, § 13.02.01 of the agreement gave Trek the corresponding, specific right to terminate the agreement in the event LeMond "takes any action which damages or has an adverse impact upon [Trek] or [Trek's] business or goodwill, or if LeMond is convicted of a felony involving moral turpitude or gross dishonesty."

Such business or goodwill-damaging conduct was deemed to be so material that, unlike other causes for termination contained in the agreement, there was no ability to "cure" a § 13.02.01 violation.  *Compare* § 13.02.01 (no right to cure) *with* §§ 13.01.04 (right to cure), 13.01.05(right to cure), 13.02.03(right to cure), and 13.02.04 (right to cure).

**B. LeMond's Serial Public Attacks against Trek, Lance Armstrong and Other Athletes Adversely Impacted Trek's Business and Good Will.**

While LeMond may dispute the *amount* of the damage to Trek's business and goodwill caused by his public attacks on Lance Armstrong, other athletes and Trek, there is no dispute that LeMond *engaged* in this conduct, and that the conduct was damaging to Trek's business and goodwill.

Trek already chronicled LeMond's repeated public attacks on one of the most important members of the Trek team—Lance Armstrong, the seven-time Tour de France champion and most powerful spokesperson for Trek's bicycle products. *See* TrekResponse-SMF, ¶¶-12-46.

Trek also chronicled the undisputed evidence of the adverse impact of LeMond's conduct on Trek's business and goodwill. TrekResponse-SMF, ¶¶-47-65. LeMond's conduct alienated many of Trek's two most important constituencies—(1) Trek's independent bicycle dealers who decide whether to carry LeMond and other Trek brand bicycles in their stores, and (2) these dealers' customers, who decide whether to buy Trek's bicycles from these dealers. TrekResponse-SMF, ¶¶-19, 23-24, 32, 34, 40-41, 43.

LeMond has acknowledged the hostility his comments engendered among Trek's dealers. On the heels of the international adverse publicity he generated with his "greatest fraud" attack on Armstrong, LeMond urged Trek not to require him to attend the upcoming, annual Trek dealer show where he would face hostile dealers, telling Burke:

> I do not feel like being in front of 300 Trek dealers quizzing me, talking about it, why did you say that, *it's not going to be a pretty picture for me.*

TrekResponse-SMF, ¶-19.

LeMond also has acknowledged the hostility his comments engendered among consumers. LeMond's website bulletin board was deluged with so many hostile

consumer comments on the heels of his ESPN attacks against Armstrong that he was forced to shut down his server.  TrekResponse-SMF, ¶-24.

LeMond was well aware that his repeated public attacks against Lance Armstrong were bad for business, as he repeatedly promised Trek that he would refrain from further public attacks on Lance Armstrong, and get back to focusing on the business of selling bikes.  TrekResponse-SMF, ¶¶-20, 27, 30, 33.

LeMond's conduct harmed Trek's business and goodwill among dealers and consumers in the most fundamental way possible—through the loss of sales.  Dan Thornton is one of the Trek independent bike dealers who decide whether to sell Trek bikes in their stores.  Thornton's testimony—by way of example only—stands unrefuted:

- "*We lost a lot of money on LeMond as a result of LeMond's comments.  The LeMond bikes were distressed and stopped selling.*  We still have a LeMond we can't sell."

- "*Even if Trek were still selling LeMond, we would not have carried it.*  It was a dead name in our stores."

- "Why can't he keep quiet?  [He's] really making himself look like a jerk. ...  *Now what do we say when customers say, 'He's a jerk, I wouldn't ride a bike with his name on it?'*"

Thornton Aff., TrekResponse-SMF, ¶¶-34-35.

Dan Titus is a Trek employee who regularly interacts with the independent bike dealers.  Titus' testimony—by way of example only—stands unrefuted:

- "*As a result of the comments*, many of the dealers with whom I dealt were less enthusiastic about and committed to the LeMond line, which *resulted in lost sales by Trek to these dealers.*"  A sampling of these comments from dealers include:

  o "Per our conversation Thursday evening, *it is in the best interest of PC Bike to remove all LeMond merchandise from our store.*" (Jake Scully)

o "Unless Mr. LeMond is in possession of proof of wrongdoing by Trek's greatest de facto spokesperson, *his name has no place in my store*." (Jake Scully)

o "Lake Mary [dealer] *has been getting killed with LeMond's latest words*." (Lake Mary dealer)

o "One of Karen's customers was buying a LeMond when it became available and *now he is declining to buy the bike*." (Lake Mary dealer)

o "What is this idiot thinking? … *I'm almost ashamed to have his name on the bicycles on my floor*." (Zion Cyclery)

o "*I'm sure as hell not going to buy one of that a******'s bikes*.'" (Nor Door dealer)

o "Chris Zane, my largest [Trek] dealer *had a customer cancel an order* for a [LeMond-branded] *Tete de Course* as well as another wanting to sell his 1 year old [LeMond-branded] *Tete de Course* that was built up especially for him." (Chris Zane)

o "*I won't shop at a store that sells LeMond*.' Yikes. … WOW. This is not good." (Andrew Young)

o "I was going to wait until the dealer show to bring this up, but *Greg's comments made me sick*.  I don't have to tell you that any sane person in the bike industry, much less a cycling legend, would do or say anything to blackball [Lance Armstrong,] the person bringing [cycling] to the forefront of [the] media for the first time.  This was simply asinine!" (The BikePros)

Titus Aff., Docket No. 138 and TrekResponse-SMF, ¶¶-23, 32, 53.

Equally importantly, the direct communications from consumers expressing their anger at LeMond, their hostility towards Trek for its continued association with LeMond, and their vows never to purchase another Trek product, stand unrefuted:[9]

---

[9] There are hundreds of consumer communications to Trek authenticated in the Jason Schumacher affidavit.  TrekResponse-SMF, ¶-24.  Some—but not all—of these communications are the subject of a pending motion addressing the admissibility of such communications.  Trek's instant summary judgment motion, however, does not depend upon the outcome of that motion.  Trek has cited in this brief only consumer

- "How stupid is the owner of your company??? *How can condemning Lance Armstrong be good for your business?*" (Greg P.)

- "*I really don't see how TREK would allow LeMond, who is connected to TREK, to say such bizarre, off the wall things about Armstrong* and tolerate it." (Rick S.)

- "It seems that Greg LeMond has forgotten people are innocent until proven guilty. *** *I own a Serotta and will NEVER buy a LeMond bike.*" (Matt Hatley)

- "*I will not be buying a LeMond bike* because of the nasty remarks Greg LeMond has [made] about Lance Armstrong." (Mike D.)

- "*I'm not going to buy one of your bikes. Ever.* Unless you have proof of Lance doping, then shut up. Every cyclist I know shares this viewpoint." (Eric B.)

- "*Greg LeMond's recent unsubstantiated comments about Lance Armstrong [have] led me to scratch LeMond bicycles from my list* of future dream bikes. His comments are irresponsible, unfounded, and undermines the sport of cycling in the U.S." (Brad C.)

TrekResponse-SMF, ¶-24. This is just a sampling of the backlash to Trek, its business, and its goodwill caused by LeMond's conduct.

Finally, the international furor created by LeMond's public attacks—and the corresponding negative impact caused to Trek's good will—also are undisputed:

- LeMond's attacks were published nationally and internationally, through the print, radio, internet, and television media. TrekResponse-SMF, ¶¶-13-46.

- LeMond's attacks were published in the London Times (TrekResponse-SMF, ¶-13):

---

communications whose admissibility is not in dispute, since they were submitted as admissible evidence by LeMond himself.

# THE SUNDAY TIMES



"When Lance won the prologue to the 1999 Tour, I was close to tears. When I heard he was working with Michele Ferrari, I was devastated. If Lance is clean, it is the greatest comeback in the history of sport. If he isn't, it would be the greatest fraud"
- Greg LeMond, three-times winner of the Tour de France

- LeMond's attacks were repeatedly aired on ESPN's *Sports Center* (TrekResponse-SMF, ¶-22):





"There are fears that some in France do not want *an American* to win a record straight sixth Tour…"

"Meanwhile, *fellow American* and former Tour winner Greg LeMond also fired off a blast at Armstrong about possible drug use…"

- And yet again on *Sports Center* (TrekResponse-SMF, ¶-48):

 

> LeMond doesn't know "how long [Armstrong] can continue to convince anyone of his innocence," and claims "Lance will do anything to keep his secret."

- LeMond's attacks were publicized and ridiculed on ESPN's *Mike & Mike Show*. TrekResponse-SMF, ¶¶-36, 38):

 

> LeMond is up for the award because of his attacks on Armstrong as "another American rider who denies, denies, denies."
>
> "Last we checked, Lance Armstrong has never tested positive."

***



"But your winner this week … is the cyclist Greg LeMond, who … always seems to take the opportunity to throw Lance Armstrong [under] the bus."

While LeMond may quarrel about the *amount* of the damages flowing from his conduct, LeMond cannot dispute *the fact* of the damage and adverse impact he inflicted upon Trek's business and goodwill.

### C.  Trek's § 13.02.01 Termination Rights can be Enforced by Summary Judgment.

Courts will of course enforce the express terms of agreements freely entered into between two parties.  Thus, courts in Minnesota, Wisconsin, and the Eighth Circuit have held that the specific termination rights set forth in the parties' written agreements must be enforced.  *State v. City of Neillsville,* 218 Wis. 2d 516, 524-525, 581 N.W.2d 548, 552 (Ct. App. 1998); *Wausau Medical Center, S.C. v. Asplund,* 182 Wis. 2d 274, 294, 514 N.W2.d 34, 43 (Ct. App. 1994) (express termination rights cannot be trumped by "good faith" claim); *1985 Robert Street Associates v. Menard, Inc.*, 403 N.W.2d 900, 901 (Minn. App. 1987); *Retail Associates, Inc. v. Macy's East, Inc.*, 245 F.3d 694, 699 (8th Cir. 2001); *Shain v. Washington Nat'l Ins. Co.*, 308 F.2d 611 (8th Cir. 1962).

*Accord Jones Distributing Co., Inc. v. White Consol. Industries, Inc.*, 943 F. Supp. 1445 (N.D. Iowa 1996) (invocation of express right to terminate cannot give rise to breach of contract); and *SNB Farms, Inc. v. Swift and Company*, 2003 WL 22232881, *5 (N.D. Iowa 2003) (same).

This principle applies equally to the contractual right to terminate based on conduct harmful to the reputation and goodwill of a business. In *Computer Currents Pub. Corp. v. Jaye Communications, Inc.*, 968 F. Supp. 684, 688-89 (N.D. Ga. 1997), the federal district court upheld the licensor's contractual right to terminate the licensing agreement immediately as a result of conduct by the licensee causing "damage to the reputation of the Mark, Licensor or Licensor's other licensees." *Accord FB&I Bldg. Products, Inc. v. Superior Truss & Components,* 727 N.W.2d 474, 479 (S.D. 2007) ("when contracting parties specifically provide for a resolution in the event that contract conditions are not met, then we must defer to their agreement").

Where, as here, the evidence of the prohibited conduct is undisputed, the right of termination can be resolved on summary judgment. *See, e.g., Gibson Guitar Corp. v. Elderly Instruments, Inc.*, 2006 WL 1638404, *5-6 (M.D. Tenn. 2006) (summary judgment entered confirming licensee's contractual right to terminate based on licensor's conduct threatening "harm to [licensee's] trademark and commercial reputation"); *Kjos v. American Fam. Ins.*, 2003 WL 21792115, *3-5 (Minn. App. 2003) (summary judgment affirming termination due to "numerous" customer complaints); *Galaviz v. Post-Newsweek Stations*, 2009 WL 2105981, *8-9 (W.D. Tex. 2009) (evidence of misconduct entitled terminating party to summary judgment); and *Sportfolio Publications, Inc. v. AT&T Corp.,* 320 F.3d 75 (1st Cir. 2003) (summary judgment based on prohibition of conduct that "adversely affected" the "public image or goodwill"). *See also Gross v. Gilless*, 26 S.W. 3d 488, 493-94 (Tenn. Ct. App. 1999) (breaching party's conduct generated adverse publicity harmful to the defendant's reputation as a matter of law); *McGarry v. Stain Anthony of Padua Roman Catholic Church*, 704 A.2d 1353,

1357-58 (N.J. Super. A.D., 1998) (summary judgment due to "negative publicity" and conduct bringing "disrepute upon the principal or upon the business"); *R.A.C. Motors, Inc. v. World-Wide Volkswagen Corp.*, 314 F. Supp. 681, 683 n.2, 685 (D.C. N.J. 1970) (summary judgment based on conduct harmful to franchisor's business and reputation); and *O'Brien v. Ohio State University*, 2007 WL 2729077, *25-35 (Ohio App. 2007) (unreported, dissent) (termination of basketball coach justified based on recruiting violations and associated publicity that "reflects adversely" on the university).

As one of Trek's customers put it:  "How stupid is the owner of your company??? How can condemning Lance Armstrong be good for your business?" TrekResponse-SMF, ¶-24.  The answer, of course, is that it was not good for business.  Section 13.02.01 simply memorializes the obvious—no business can be expected to continue a relationship with a partner who publicly castigates the company and its most valuable spokesperson.

This Court can and should rule as a matter of law that LeMond's undisputed conduct was an event of termination under § 13.02.01, entitling Trek to terminate the agreement.[10]  The jury then can consider the evidence presented at trial to assess the full amount of damages sustained by Trek resulting from LeMond's conduct.

## Conclusion

Trek is entitled to the summary judgment dismissal of LeMond's breach of contract claims against Trek because the undisputed evidence demonstrates Trek

---

[10] A ruling that Trek had a right to terminate the agreement pursuant to the express provisions of § 13.02.01 of the agreement would render moot Trek's corresponding claim that LeMond materially breached the implied covenant of good faith and dealing; that LeMond's material breach was so significant as to constitute a repudiation of the contract by LeMond; and that such repudiation entitled Trek to declare the contract terminated and to pursue all damages flowing from LeMond's breach.  *See* Trek's Counterclaim, ¶¶-46-48, Docket No. 44.

satisfied and exceeded the specific performance criteria agreed upon by the parties in their written agreement.

Trek is entitled to summary judgment on its affirmative claims for declaratory relief, confirming Trek's entitlement to terminate the licensing and endorsement agreement based upon the undisputed facts demonstrating conduct giving rise to a right of termination under § 13.02.01 of the agreement.

This lawsuit should proceed to trial on one issue only—the jury's assessment of the amount of damages flowing from LeMond's breach of the express and implied terms of the licensing and endorsement agreement he entered into with Trek.

GASS WEBER MULLINS LLC

Dated:  October 9, 2009

s/Ralph A. Weber
Ralph A. Weber (WI SBN 1001563)
Paul F. Heaton (WI SBN 1000858)
Christopher P. Dombrowicki (WI SBN 1041764)
309 North Water Street, Suite 700
Milwaukee, WI 53202
Telephone: (414) 223-3300
Fax: (414) 224-6116
weber@gasswebermullins.com
heaton@gasswebermullins.com
dombrowicki@gasswebermullins.com

HALLELAND LEWIS NILAN & JOHNSON, P.A.

Erik T. Salveson (Reg. No. 177969)
Amanda M. Cialkowski (Reg. No. 306514)
Benjamin J. Rolf (Reg. No. 386413)
600 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 338-1838
Fax: (612) 338-7858
esalveson@halleland.com
acialkowski@halleland.com
brolf@halleland.com

**ATTORNEYS FOR
TREK BICYCLE CORPORATION**