# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

LeMond Cycling, Inc.,

      Plaintiff,

v.

Trek Bicycle Corporation,

      Defendant/Third-Party Plaintiff,

v.

Greg LeMond,

      Third-Party Defendant.

Civil No. 08-1010 (RHK-JSM)

**MEMORANDUM OF LAW IN OPPOSITION TO TREK'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION……………………………………..............……………...............1

STATEMENT OF DISPUTED AND UNDISPUTED FACTS.........................................2

ARGUMENT......................................................................................................15

I.    SUMMARY JUDGMENT IS INAPPROPRIATE ON LEMOND'S CLAIM THAT TREK FAILED TO USE ITS "BEST EFFORTS" TO MAXIMIZE SALES. ..................................................................15

    A.    Sections 5.02 And 8.01 Of The Sublicense Imposed Independent, Fully Enforceable Obligations Upon Trek. ...............16

        1.    Trek's Argument that it complied with minimum marketing requirements is irrelevant....................................19

        2.    Trek's argument that Section 5.02 is limited to "brand integrity" or "quality" fail. ....................................................20

        3.    Trek's argument that its "business judgment" precludes summary judgment fails. .....................................21

    B.    There Are Material Issues Of Fact Concerning Whether Trek Exerted Its "Best Efforts.".................................................22

II.    TREK IS NOT ENTITLED TO SUMMARY JUDGMENT ON LEMOND'S REQUEST FOR DECLARATORY RELIEF. ......................25

    A.    Trek Has Conceded That Material Questions Of Fact Exist On Whether Its Termination Under Section 13.02.01 Of The Sublicense Was Proper....................................................................25

    B.    Trek's Argument That Termination Clauses Are Enforceable Misses the Point. ..............................................................26

        1.    Courts will enforce termination clauses, but not when questions of fact exist...........................................................26

        2.    None of Trek's "reputational" harm cases support its motion …………………………………………………...……27

CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

Page No.

*Baron Fin. Corp. v. Natanzon*,
    509 F. Supp. 2d 501 (D. Md. 2007) ....................................................... 21

*Barton v. Spinning*,
    8 Wash. 458 (1894) .............................................................................. 17

*Bloor v. Falstaff Brewing Corp.*,
    601 F.2d 609 (2d Cir. 1979) ................................................................. 21

*Cement, Sand & Gravel Co. v. Agric. Ins. Co.*,
    30 N.W.2d 341 (1947).......................................................................... 15

*City of Marshall, Minn. V. Heartland Consumers Power Dist.*,
    384 F.3d 517 (8th Cir. 2004)……………………………………………15

*Computer Currents Publ'g Corp. v. Jay Commc'ns, Inc.*,
    968 F. Supp. 684 (N.D. Ga. 1997) ...................................................25-26

*Deluxe Pattern Corp. v. Laser Design, Inc.*,
    1995 WL 434433 (Minn. Ct. App. 1995)............................................. 16

*Digital Equip. Corp. v. Altavista Tech., Inc.*,
    960 F. Supp. 456 (D. Mass. 1997)....................................................... 19

*Dunn v. Nat'l Beverage Corp.*,
    729 N.W.2d 637 (Minn. Ct. App. 2007) ........................................ 16, 21

*Elbow Lake Coop. Grain Co. v. Commodity Credit Corp.*,
    251 F.2d 633, 637 (8th Cir. 1958)……………………………………17

*FB & I Bldg. Prods., Inc. v. Superior Truss & Components*,
    727 N.W.2d 474 (S.D. 2007)............................................................... 26

*Franklin High Yield Tax-Free Income Fund v. County of Martin*,
    152 F.3d 736 (8th Cir. 1998)............................................................... 16

*Fritz v. Schroeder*,
    2003 WL 21264495 (Minn. Ct. App. 2003) (unpublished) ................... 16

*Galaviz v. Post-Newsweek Stations*,
   2009 WL 2105981 (W.D. Tex. 2009) ................................................... 26

*Gibson Guitar Corp. v. Elderly Instruments, Inc.*,
   2006 WL 1638404 (M.D. Tenn. 2006) ................................................. 26

*Gross v. Gilless*,
   26 S.W.3d 488 (Tenn. Ct. App. 1999) ................................................. 26

*Hillside Enters. v. Carlisle Corp.*,
   69 F.3d 1410 (8th Cir. 1995) ........................................................ 16, 20

*Hysitron, Inc. v. Frederickson*,
   2002 WL 31689530 (Minn. Ct. App. 2002) ...................................... 16, 17

*Interstate Mktg. Corp. v. Equip. Servs., Inc.*,
   2006 WL 1547867 (Tenn. Ct. App. 2006) ............................................ 18

*Joel Popkin & Co. v. Wharton Econometric Forecasting Assocs., Inc.*,
   659 F. Supp. 343 (D.D.C. 1987) ......................................................... 20

*Johns v. Rexam Med. Packaging*,
   2005 WL 1308319 (M.D. Ga. 2005) .................................................... 20

*Jones Distrib. Co., Inc. v. White Consol. Indus., Inc.*,
   943 F. Supp. 1445 (N.D. Iowa 1996) ................................................. 25

*Kjos v. Am. Family Ins.*,
   2003 WL 21792115 (Minn. Ct. App. 2003) .......................................... 26

*Kraftco Corp. v. Kolbus*,
   274 N.E.2d 153 (1971) ...................................................................... 17

*Lanier Worldwide, Inc. v. TOPAC Acquisition Corp.*,
   2006 WL 852084 (Minn. Ct. App. 2006) (unpublished) ....................... 16

*Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co.*,
   477 F.3d 583 (8th Cir. 2007) ............................................................ 18

*McGarry v. Saint Anthony of Padua Roman Catholic Church*,
   704 A.2d 1353 (N.J. Super. Ct. App. Div., 1998) ................................. 26

*Metropolitan Ventures, LLC, v. GEA Assocs.*,
    717 N.W.2d 58 (Wis. 2006) …………………………………………………….16

*Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs.*,
    928 F.2d 299 (8th Cir. 1991)…………………………………………………16, 20

*Mor-Cor Packaging Prods., Inc. v. Innovative Packaging Corp.*,
    328 F.3d 331 (7th Cir. 2003)………………………………………………….21

*O'Brien v. Ohio State Univ.*,
    2007 WL 2729077 (Ohio Ct. App. 2007)………………………………………..27

*Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*,
    908 F.2d 1363 (7th Cir. 1990)………………………………………………….21

*Retail Assocs., Inc. v. Macy's E. Inc.*,
    245 F.3d 694 (8th Cir. 2001)………………………………………………….25

*Shain v. Wash. Nat'l Ins. Co.*,
    308 F.2d 611 (8th Cir. 1962)………………………………………………….25

*State v. City of Niellsville*,
    581 N.W.2d 548 (Wis. Ct. App. 1998)………………………………………..25

*Telex Corp. v. Data Prods. Corp.*,
    135 N.W.2d 681 (1965)……………………………………………….15, 18, 20

*Wassau Med. Center, S.C. v. Asplund*,
    514 N.W.2d 34 (Wis. Ct. App. 1994)………………………………………….25

*Zilg v. Prentice Hall, Inc.*,
    717 F.2d 671 (2d Cir. 1983)………………………………………………...20

*1985 Robert Street Assocs. v. Menard, Inc.*,
    403 N.W.2d 900 (Minn. Ct. App 1987)………………………………………..25

## INTRODUCTION

Trek's Motion for Summary Judgment should be denied for the fundamental reason that numerous material questions of fact preclude it.  These facts support the claims of Greg LeMond and LeMond Cycling, Inc. (collectively, "LeMond") that Trek failed to comply with the binding terms of the parties' licensing arrangement—and in particular, that Trek failed to use its "best efforts" to "maximize" the sale of LeMond-branded bicycles, as it was required to do at all relevant times.

Rather than addressing these facts head on, Trek attempts to rewrite the parties' agreement so that the facts do not matter.  Trek's principal argument is that a "best efforts" clause to <u>maximize</u> sales can be satisfied by complying with various <u>minimum</u> "efforts" requirements specified elsewhere in a contract.  That argument fails.  Under black-letter Minnesota law, a contract must be read so as to enforce each of its provisions.  *Telex Corp. v. Data Prods. Corp.,* 135 N.W.2d 681, 685-86 (1965).  There are a myriad of disputed material facts concerning whether Trek used its "best efforts" to maximize sales of LeMond-branded bicycles, which precludes summary judgment.

Trek also argues, contrary to what it said in its opposition to LeMond's summary judgment motion, that there are no disputed issues of fact concerning LeMond's purported breach of the "moral turpitude" clause in the parties' agreement.  Trek cannot plausibly change its argument now.  In any event, none of the cases cited by Trek support its position that summary judgment is appropriate where, as here, there are numerous disputed issues of fact concerning LeMond's conduct.

## STATEMENT OF DISPUTED AND UNDISPUTED FACTS

### The Sublicense and Trek's Obligations

1.     Pursuant to a sublicense dated June 29, 2005 ("Sublicense"), Greg LeMond granted Trek an exclusive license to his name and image for use in selling bicycles and bicycle frames.  (Sublicense, § 2.)[1]   The Sublicense was initially set to expire on September 30, 2005, but was extended until September 30, 2010 by agreement of the parties.  (Trek SOF, ¶ 10.)[2]

2.     Trek and LeMond entered into the Sublicense after arm's-length negotiations.  Trek identified its counsel, Weiss, Berzowski, Brady & Donahue, as its representative for purpose of communications relating to the Sublicense.  (Sublicense, § 22.)

3.     The Sublicense is a complete, integrated agreement between the parties. Trek represented and warranted in the Sublicense that it had obtained all necessary approvals and authorizations to enter into the deal.  (Sublicense, § 19.)  Trek further agreed that all portions of the Sublicense were binding, that the document represented the parties' entire agreement, and that headings in the agreement were for the convenience of the parties only and had no substantive meaning.  (Sublicense, §§ 25-28.)

---

[1]  To avoid duplication and confusion, documents previously submitted to the Court in connection with the pending motions for summary judgment will not be resubmitted. The Sublicense is Exhibit 1 to the Memorandum of Law in Support of Trek's Motion for Summary Judgment.

[2]  "Trek SOF" refers to the referenced paragraph in the "Statement of Facts" section in Trek's Memorandum of Law in Support of Summary Judgment.

4.      Section 5.02 of the Sublicense requires Trek to:

> use its best efforts to exploit the Mark in respect of Licensed Products, and to promote the sale of Licensed Products in the Territory so as to try to maximize sales, consistent with the quality and reputation of Licensor, and only to retailers (and distributors who sell to retailers) which properly reflect the image and reputation of Licensor and LEMOND.

(Sublicense, § 5.02.)   The proviso at the end of Section 5.02 prohibits Trek from "maximizing sales" in any fashion that is inconsistent with LeMond's image and reputation as a world class athlete, or that otherwise reflects poorly on LeMond's name and image.  (Sublicense, § 5.02.)

5.      Section 8 of the Sublicense requires Trek to spend a reasonable amount of time and money promoting and marketing LeMond bicycles, with a minimum cash expenditure (3% of Net Sales) expressly called out.  Sections 4 and 12 of the Sublicense guarantee LeMond a minimum return—in the form of a minimum royalty and minimum sales obligations—on the exclusive license he granted Trek.  The purpose of these independent sections is to establish minimum payment and performance standards, thereby limiting and defining LeMond's downside risk.

6.      Sections 4, 8, and 12 do not supplant, supersede, or replace Trek's obligation under Section 5.02 to exert its "best efforts" to "maximize sales."  All of these sections are independent contractual clauses with different meanings and independent purposes.

7.      For example, Trek's CEO, John Burke, stated that Trek's "best efforts" obligation went beyond its obligation to spend 3% of Net Sales to market LeMond bicycles under Section 8.01.  In fact, Burke testified that Section 5.02 required Trek to

"show," "market," and "sell the product" in a manner that is <u>equivalent</u> to Trek's efforts to show, market, and sell its "other brands."  (Deposition of John Burke ("Burke Dep.") at 37:15-37:19.)[3]

8.      Trek failed to meet its obligations under Section 5.02 of the Sublicense. Trek did not exert its best efforts to "maximize sales" of LeMond-branded bicycles, and did not exert equal efforts showing, marketing, and promoting the LeMond brand as compared to its non-LeMond brands.

9.      On the contrary, as set forth below, Trek exerted substantially <u>less</u> effort to promote and sell LeMond-branded bicycles than it did to promote and sell its non-LeMond branded bicycles.  (Deposition of Jay Townley ("Townley Dep.") at 131-145.)[4] Trek also failed to comply with basic industry standards in "show[ing]" and "market[ing]" both Greg LeMond and LeMond-branded bicycles in the territories for which it had an exclusive license.  (Burke Dep. at 37:15-37:19.)

**Select Evidence that Trek Failed to Use Its "Best Efforts" in the United States**

10.      For the nine-year period from 2000 until 2008, Trek's data establishes that sales of LeMond-branded road bikes trended downward, or were flat.  (Townley Report

---

[3]  Cited testimony from the Deposition of John Burke is attached to the Declaration of Joseph M. Windler ("Windler Decl.") as <u>Exhibit A</u>.

[4]  Cited testimony from the Deposition of Jay Townley is attached to the Windler Decl. as <u>Exhibit B</u>.

at 9-10, *see* Charts 5 and 6, compiling Trek-supplied data.)[5]  During that same period of time, sales of Trek's other road bikes trended significantly up.  (*Id.*)

11.    In the United States, sales of Trek's non-LeMond road bikes increased from $40 million in 2000 to approximately $90 million in 2005, settling at just under $80 million each of the next three years.  (Townley Report at 9-10, *see* Charts 5 and 6, compiling Trek-supplied data.)  Sales of LeMond bicycles, by contrast, remained at or very near $10 million per year during the same time period.  (*Id.*)  The projections of LeMond's expert, Jay Townley, put these sales at approximately one-half of the amount he would have expected the LeMond brand to achieve.  (*Id.*, Chart 7.)

12.    The "high water mark" of sales of LeMond bicycles—to which Trek refers in its motion (Plaintiff's Memorandum of Law In Support of Summary Judgment, ("Mot.") at 14)—actually happened in 2001.  (Townley Report at 9-10, *see* Charts 5 and 6, compiling Trek-supplied data.)  Over the next six years, Trek never sold more LeMond bicycles in the United States.  (*Id.*)  Over that same period of time, sales of Trek-branded bicycles more than doubled.  (*Id.*)

13.    LeMond maintains that this shortfall can only be explained by the fact that Trek did not use its "best efforts" to maximize sales of LeMond-branded bikes in the United States.  That is in fact what the evidence shows.

14.    In 2004 and 2005, LeMond began to receive complaints from bike dealers who stated that they wanted to, and could, sell more LeMond bikes.  These same dealers

---

[5]  The Townley Report is attached to the Windler Decl. as <u>Exhibit C</u>.

could not, however, obtain them from Trek. Trek told the dealers that the LeMond brand was being discontinued. (Greg LeMond Declaration ("G. LeMond Decl."), ¶ 18.)[6]

15.    In or about the year 2005, Trek began to manufacture a road bicycle that directly competed with the top-of-the-line LeMond road bicycle. (Mock Dep. at 125:6-21.)[7] Trek's new bicycle, called the Trek "Madone," was marketed as superior to, and a substitute for, LeMond's premier "Tete de Course" bicycle. (Mock Dep. at 125:13-21.)

16.    Trek encouraged its dealers to promote the Madone instead of the Tete de Course, and to push customers to purchase the Madone instead of all competing bikes, including LeMond's Tete de Course. (Windler Decl., Ex. E.) Trek made such statements despite the fact that Aaron Mock, a Trek production manager, stated that he did not believe that the Madone was a better road bike than the Tete de Course. (Mock Dep. at 127:19-21.)

17.    Trek's promotional materials for the LeMond brand, by contrast, did not encourage dealers to favor or promote the Tete de Course over the Madone. (Windler Decl., Ex. E.; Townley Dep. at 136-141.)

18.    In 2006, Trek further distanced itself from LeMond and his brand by requesting that he not attend the 2006 annual Trek dealer show in Madison, Wisconsin,

---

[6]  A copy of the Declaration of Greg LeMond was filed with Plaintiff's Motion for Summary Judgment.

[7]  Cited testimony from the Deposition of Aaron Mock is attached to the Windler Decl. as <u>Exhibit D</u>.

one of Trek's largest marketing events.[8] (Complaint ¶ 129; Trek Answer ¶ 129; G. LeMond Decl. ¶ 18; Declaration of Jennifer M. Robbins In Support of Plaintiff's Motion For Summary Judgment ("Robbins Decl."), Ex. 34, at LCI 12345.) Trek discouraged LeMond, who wanted to attend, despite Trek's knowledge that LeMond promotes his brand very well in person, as acknowledged by Ira Langer, one of Trek's national managers. (G. LeMond Decl. ¶ 23; Deposition of Ira Langer ("Langer Dep.") at 18:6-19:9.)[9]

19.     In 2007, Trek failed to invite LeMond to attend its 2007 Trek 100 charity ride, an event he had previously participated in to increase goodwill associated with the LeMond brand. (Complaint ¶ 126; Trek Answer ¶ 126; G. LeMond Decl. ¶ 22.)

20.     In August of that same year, LeMond was neither invited nor provided any official notification of the annual Trek dealer show in Madison, Wisconsin—a critical marketing event for Trek and for all of its non-Trek brands. (G. LeMond Decl. ¶ 19; *see* Mock 8/13/07 email to LeMond, Declaration of Kathy LeMond ("K. LeMond Decl."), Ex. D.)[10] LeMond learned the date and location of the 2007 dealer show through a chance conversation with a Trek dealer in Seattle, Washington. (G. LeMond Decl. ¶ 19.)

---

[8]  This slight came well after the parties had resolved an earlier, 2004, contract dispute concerning LeMond's alleged statements about Lance Armstrong and Dr. Michele Ferrari. (*See generally*, Mot. pp. 15-16).

[9]  Cited testimony from the Deposition of Ira Langer is attached to the Windler Decl. as <u>Exhibit F</u>.

[10]  A copy of the Declaration of Kathy LeMond was filed with Plaintiff's Motion for Summary Judgment.

LeMond asked Trek that he be allowed to go to the Trek dealer show, and then traveled there, at his own expense, to help promote LeMond-branded products. (G. LeMond Decl. ¶ 19.)

21.    While attending the 2007 Trek dealer show, no Trek employee could direct LeMond to the location of the "break-out" room where LeMond-branded products were being presented to dealers.  (G. LeMond Decl. ¶ 20.)  The official printed materials for the show indicated locations of break-out sessions for all of Trek's products, but made not mention of LeMond-branded products.  (G. LeMond. Decl. ¶ 20.)

22.    Ultimately, LeMond found his bicycles, which were presented along with Trek's "Gary Fisher" brand (at the time, a mountain bike brand).  There was no signage in the exhibition hall indicating that LeMond-branded products were being presented in that (or any other) area.  (G. LeMond. Decl. ¶ 20.)  There was signage for Trek's other brands.

23.    LeMond was approached at the show by numerous dealers who expressed concern that Trek's CEO, John Burke, had not mentioned the LeMond brand during his opening speech, a speech in which every single brand in the Trek family was mentioned except the LeMond brand.  (Mock Dep. at 149:5-14.)   These dealers were concerned about whether new LeMond-branded bikes were being planned and whether the brand was being discontinued.  (G. LeMond Decl. ¶ 19.)

24.    LeMond also spoke with Aaron Mock, a Trek product manager responsible for LeMond-branded products.  Mock indicated that he too was concerned that the LeMond brand was not mentioned in John Burke's speech and that he understood such

failure to be an intentional decision made by Trek's upper management.  (G. LeMond Decl. ¶ 21; Mock Dep. at 149:5-14.)  Mock and his team wanted to continue with the LeMond brand because they believed it was a good brand.

      25.    Emails between Mock and Trek's CEO, Burke, demonstrate that Burke's decision not to mention the LeMond brand in any of the product presentations led dealers to speculate that Trek was dropping the LeMond brand.  (Mock Dep. at 152:5-153:3.) Dealers are not likely to promote the sale of a bicycle whose future is uncertain. (Deposition of Malcolm Davies ("Davies Dep.") at 70:7-16; Townley Dep. at 30:3-7.)[11]

      26.    LeMond also learned at the 2007 Trek show that Trek had not prepared or consulted with him regarding a new LeMond bicycle design.  Mock told LeMond that in order for a new design to be ready, consistent with Trek policy announced at the show, the design would have to be developed and approved within one week.  (G. LeMond Decl. ¶ 21.)  The need for new LeMond road bikes and products was particularly urgent in August 2007 since, at the time, most of the then-current LeMond-branded designs were in the second year of their life-cycle and would be phased out by the end of 2008, consistent with Trek's publicly announced product roadmap.  (G. LeMond Decl. ¶ 21.)

      27.    On November 20, 2007, with almost three years remaining on the Sublicense, Burke verbally informed LeMond that Trek would not be renewing its

---

[11]  Cited testimony from the Deposition of Malcolm Davies is attached to the Windler Decl. as <u>Exhibit G</u>.

relationship with LeMond.  (Burke Dep. at 136:18-137:1; Complaint ¶ 150; Trek Answer ¶ 150.)

28.     In response to Trek's decision to wind down the brand, which was obviously inconsistent with its obligations under the Sublicense, LeMond filed a lawsuit seeking to hold Trek to the bargain the two of them had negotiated, asking this Court to enjoin Trek from terminating the Sublicense before its end date, September 30, 2010.

29.     Trek responded by planning and preparing a devastating personal attack on LeMond, his brand, and his personal reputation.   Trek prepared its attack with the assistance of the Austin, Texas public relations firm "Public Strategies."  (Burke Dep. at 64:15-65:1.)

30.     On April 7, 2008, Trek began circulating a "Media Advisory" that notified all Trek employees, as well as members of the media, that Trek would make a public a presentation the next day, on April 8.   Trek promoted this presentation widely, and provided call-in numbers so members of the press and the general public could attend. (Robbins Decl., Ex. 39.)

31.     On April 8, 2008, Trek held its press conference, aided by a PowerPoint presentation ("Presentation")[12] that it had prepared with Public Strategies.   The Presentation is full of spite, vitriol and hatred for LeMond.  Among other things, Malcom Davies, the General Manager of Trek's European Division, refers to LeMond as an

---

[12] A copy of the Presentation is attached to the Robbins Decl. as <u>Exhibit 16</u>.

"idiot." (Presentation, p. 23.)  The Presentation also referred to LeMond as a "whining sore loser and a detriment to our sport." (Presentation, p. 20.)

32.     As Trek's CEO, John Burke, has subsequently acknowledged, and as is plainly obvious, Trek's Presentation had devastating personal and professional effects on LeMond, his family, his public image, and the sales of his bicycles.  (Burke Dep. at 86:17-23; 132:11-13.)  That was, in fact, the intent of the Presentation.  To further prolong the damage and public humiliation, Trek posted a video of the Presentation on the popular Internet video website known as "YouTube," where it was accessible by the general public for months.  (Burke Dep. at 80:22-81:6.)

33.     The Presentation not only damaged LeMond, it caused Trek to lose loyal customers, and undermined Trek's purported stance as an anti-doping advocate.  For example, Trek's CEO acknowledged that in the wake of the attack, Trek lost business from some in the anti-doping movement.  (Burke Dep. at 132:7-9.)

34.     In August 2008, Trek debuted its first Gary Fisher road bike, which has replaced the LeMond brand.  (Mock Dep. at 42:1-12.)

### Select Evidence that Trek Failed to Use Its "Best Efforts" in Europe

35.     Pursuant to the Sublicense, Trek had an exclusive license to sell LeMond-branded bicycles in most major European countries.  As in the United States, Trek had an obligation to use its "best efforts" to maximize sales in Europe.  (Sublicense, § 5.02.) Trek failed to do so.

36.     LeMond has been and remains a popular figure in Europe.  He receives frequent requests for interviews from reporters and media sources from Europe,

especially from France, Spain, England, Holland, Belgium, and Germany. (G. LeMond Decl. ¶ 17.)  LeMond has been frequently approached by French bike distributors with requests to distribute his bikes.  (*Id*.)  Trek's CEO, Burke, has acknowledged that in France LeMond's popularity was substantially higher than Lance Armstrong's.  (Burke Dep. at 39:16-40:4.)

37.    Despite LeMond's popularity, and the potentially large market for bicycles sold under his name, LeMond-branded road bicycles suffered dismal sales in Europe for the life of the Sublicense.  (Townley Report at 13; LCI Chart 29.)  Trek's own sales figures show this.

38.    Gross European sales of non-LeMond Trek-branded bicycles grew at a relatively constant rate during the period 2000 through 2008, exceeding $40 million in 2008.  (Townley Report at 13-15, Chart 29, Table A.)  Gross sales of LeMond-branded road bicycles, by contrast, were very modest, and totaled only $438,375 in 2008. (Townley Report at 13-15, Chart 29, Table A.)

39.    On a per unit basis, sales of LeMond-branded bicycles were nearly non-existent from 2000 through 2003.  (Townley Report at 13, Chart 29.)  While sales of LeMond-branded bicycles increased from 2004 through 2007, the increase was exceedingly modest in comparison with the rapid increase in sales of Trek-branded bicycles.  (Townley Report at 13-14, Chart 29-A.)

40.    Trek did an especially poor job selling LeMond-branded bicycles in France, a country in which LeMond has always enjoyed a strong reputation and image.  One Trek

document shows that in 2004, Trek's sales of non-LeMond bicycles in France totaled almost $2.7 million, while sales of LeMond bikes totaled $0.  (Davies Dep., Ex. 191.)[13]

41.    Trek's CEO, John Burke, admitted at his deposition that he "probably" could have sold more LeMond bikes in France by himself than the entire Trek organization did.  (Burke Dep. at 148:4.)  As was true elsewhere in Europe, Trek had an exclusive license to sell LeMond-branded bicycles in France, which meant that LeMond could not seek alternate avenues to exploit his name and image.

42.    The dismal performance of LeMond bicycles in Europe is readily explained by Trek's marketing failures.  LeMond first recommended to Trek that it place his brand with a professional European cycling team as early as 1996; yet Trek never did so. professional team sponsorship in Europe for LeMond made great business sense—LeMond won the Tour de France three times—and winners of other prominent races won on his bikes.  (LeMond Decl. ¶ 5; Townley Report at 8; Townley Dep. at 57:4-58:6.)

43.    Sponsorship of a professional team was and is industry standard for top brands.   Giant, Specialized, and Trek all have sponsored or currently do sponsor professional teams.   (Trek has done so with its other brands.)   (Townley Dep. at 120:16-19, 122:17-20; Townley Report at 7.)  Even newly established bicycle brands like Cervelo and Felt have sponsored pro cycling teams.  (Townley Report at 7.)  Cervelo, a company founded in 1995, rapidly established itself in both the European and North American markets as a leading brand by investing in professional sponsorship.  (Townley

---

[13]  Davies Dep. Ex. 191 is attached to the Windler Decl. as Exhibit H.

Report at 7.)  Although Trek believed that the LeMond brand of road bike was superior to Cervelo's, Trek did not obtain a pro team sponsorship for LeMond.  (Mock Dep. at 82:14-82:18; Langer Dep. at 37:13-37:20.)

44.     Instead, rather than properly marketing LeMond bicycles in Europe, Trek again distanced itself from LeMond and his brand with years left on the Sublicense, just as it did in the United States.

45.     For example, in 2007, LeMond participated in "L'Etape de Tour," an organized French bike ride that allows approximately 8,000 cyclists to race over the same route as a Tour de France stage (approximately 170 km), typically over mountain roads in either the Pyrenees or French Alps.  L'Etape de Tour is an important marketing event for French bicycling, and Trek had a marketing booth at the event.  Despite LeMond's presence at the race, and his immense popularity in France, Trek failed to display a single LeMond-branded bicycle.  (G. LeMond Decl. ¶ 17.)  The head of Trek's French division disagreed with Trek's decision, as he told LeMond of his interest in marketing LeMond bikes, which was based on his impression that, given LeMond's strong reputation, they would be more popular than the Trek brand.  (G. LeMond Decl. ¶ 17.)

46.     Finally, although it was industry practice in Europe that former Tour de France winners such as LeMond would be present at the Euro-Bike industry show in Europe to support their brands, Trek never asked LeMond to attend.  (Davies Dep. at 77:22-24.)  Trek also failed to promote LeMond-branded bicycles at the important Paris industry show, instead promoting its line of Trek-branded bicycles.  (Davies Dep. at 38:18-41:19.)

- 14 -

**ARGUMENT**

I.   **SUMMARY JUDGMENT MAY NOT BE GRANTED ON LEMOND'S CLAIM THAT TREK FAILED TO USE ITS "BEST EFFORTS" TO MAXIMIZE SALES.[14]**

LeMond's principal breach of contract claim is based on Section 5.02 of the Sublicense, which required Trek to use its "best efforts" to maximize sales of LeMond-branded bicycles:

> Licensee <u>shall use its best efforts to exploit the Mark</u> in respect of Licensed Products, <u>and to promote the sale of Licensed Products</u> in the Territory <u>so as to try to maximize sales</u>, consistent with the quality and reputation of Licensor, and only to retailers (and distributors who sell to retailers) which properly reflect the image and reputation of Licensor and LEMOND.

(Sublicense, § 5.02) (emphasis added).   LeMond's breach claim also rests on Trek's obligation to "expend a reasonable amount on the marketing, promotion and advertising of" LeMond bicycles, "<u>consistent</u> with its promotion of comparable lines of products." (Sublicense, § 8.01 (emphasis added).)   There is nothing confusing, ambiguous, or doubtful about Trek's obligations under these two *separate* promises.   In the first, Trek promised to use its best efforts to maximize LeMond sales. In the second, Trek promised

---

[14] Trek is also not entitled to summary judgment on LeMond's claim that Trek violated § 5.03 of the Sublicense and Section F of the Amendment. The record clearly shows that through 2007, Trek only provided ten free bikes per year. (*See* Deposition of Elisabeth Huber at 50:14-51:2.) (Cited testimony from the Deposition of Elisabeth Huber is attached to the Windler Decl. as <u>Exhibit I</u>.)   Section 5.03 of the Sublicense and section F of the 1999 Amendment provide that Trek "shall provide" Mr. LeMond "at no charge" 15 bicycles per year.   Nowhere in §§ 5.03 or F, is Trek's obligation to provide the free bikes qualified in any way by "upon request of LeMond" language.   The fact that Mr. LeMond did not expressly request the bikes is irrelevant and does not excuse Trek's obligation to perform.

to spend a <u>reasonable amount</u> on "marketing, promotion, and advertising" of LeMond bikes, with a specified minimum amount.   Trek's Motion for Summary Judgment attempts to conflate these two, and other, separate promises.   The Court should not reward this obfuscation, and should hold Trek to each of its independent promises.

The evidence shows that Trek failed to use its best efforts to maximize sales of LeMond bikes.   Among other things, the evidence shows that:   (1) despite LeMond's popularity and strong reputation, Trek sold far fewer LeMond bicycles in the United States and Europe than it could have if it were using its "best efforts" (SOF, ¶¶ 10-45);[15] (2) with years left on the Sublicense, Trek began winding down its efforts to develop, market, and sell the LeMond brand (*id.*), and, (3) in response to LeMond's efforts to preclude this wind down, Trek planned, prepared and executed a public betrayal of LeMond that was calculated to destroy his name, his image, and his current and future business interests. (*Id.*)   Whether this conduct breached Trek's obligations under the Sublicense is a question for the jury.

### A.    Sections 5.02 And 8.01 Of The Sublicense Imposed Independent, Fully Enforceable Obligations Upon Trek.

In Minnesota and elsewhere in the Eighth Circuit, it is axiomatic that a contract should be read in a manner that enforces the entire agreement, that terms should be given their plain meaning, and that words are to be read in accordance with their obvious contractual purpose, rather than by isolating them from their context.  *City of Marshall,*

---

[15] "SOF" refers to the referenced paragraph in the "Statement of Disputed and Undisputed Facts" section in this Memorandum.

*Minn. v. Heartland Consumers Power Dist.*, 384 F.3d 517, 519 (8th Cir. 2004); *Telex Corp. v. Data Prods. Corp.,* 135 N.W.2d 681, 685-86 (1965); *Cement, Sand & Gravel Co. v. Agric. Ins. Co.,* 30 N.W.2d 341, 345 (1947).

There is simply nothing ambiguous, incongruous, or inconsistent about Sections 5.02 or 8.01 of the Sublicense, which means that both these provision must be enforced as written:  Trek was required, at all times, to use its "best efforts" to "maximize sales" of LeMond bicycles, <u>and</u> to spend a "reasonable amount" promoting LeMond bicycles, "consistent with its promotion of comparable lines of products."  (Sublicense, §§ 5.02, 8.01.)  Trek cannot be permitted to escape from either of these complementary obligations.

"Best efforts" clauses such as the one on Section 5.02 are routinely litigated, and enforced, in the Eighth Circuit and elsewhere.  *See Franklin High Yield Tax-Free Income Fund v. County of Martin*, 152 F.3d 736, 740 (8th Cir. 1998) (best efforts clause enforced); *Hillside Enters. v. Carlisle Corp*., 69 F.3d 1410, 1415 (8th Cir. 1995) (same); *Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs.*, 928 F.2d 299, 301 (8th Cir. 1991) (same).[16]  Trek's argument that such clauses are unenforceable in Minnesota,

---

[16]   They are also enforced in Minnesota and Wisconsin state courts.  *Dunn v. Nat'l Beverage Corp.*, 729 N.W.2d 637, 649 (Minn. Ct. App. 2007) (whether party used "best efforts" is "a jury question"); *Metropolitan Ventures, LLC v. GEA Assocs.*, 717 N.W.2d 58, 69 (Wis. 2006) ("when a contract requires that a party use its 'best efforts' to fulfill its contractual obligations, the notion of 'best efforts' incorporates the concept of good faith"); *Lanier Worldwide, Inc. v. TOPAC Acquisition Corp.*, No. A05-1088, 2006 WL 852084, at * 4 (Minn. Ct. App. 2006) (unpublished) (plaintiff had "the right to hold" the defendant to a "best efforts" clause in dealer agreement); *Fritz v. Schroeder*, No. C8-02-
(continued...)

which is premised solely on the decision in *Hysitron, Inc. v. Frederickson*, No. C2-02-865, 2002 WL 31689530, at *5 (Minn. Ct. App. 2002), is wrong. *Hysitron* deals with an alleged oral promise to use one's "best efforts" during an at-will job, and the holding is that such evidence could not support a promissory estoppel claim after an employee quit. (*Id.*) That case provides no support for Trek's position where, as here, a written contract contains an express "best efforts" promise.[17]

Lacking legal support for its claim that Section 5.02 is unenforceable, Trek attempts to create contractual ambiguity where there is none. This effort, addressed below, fails. *Elbow Lake Coop. Grain Co. v. Commodity Credit Corp.*, 251 F.2d 633, 637 (8th Cir. 1958) (on summary judgment, contractual "ambiguity cannot be created by the mere assertion of a party to it").

---

(...continued from previous page)

1251, 2003 WL 21264495, at *2 (Minn. Ct. App. 2003) (unpublished) (express best efforts clause in purchase agreement was enforced); *Deluxe Pattern Corp. v. Laser Design, Inc.*, No. C9-95-51, 1995 WL 434433, at *3 (Minn. Ct. App. 1995) (unpublished) (defendant was likely to prevail on best efforts claim under distribution agreement).

[17] Trek's other cases are also inapposite. *See Kraftco Corp. v. Kolbus*, 274 N.E.2d 153 (1971) (oral "utterances of an informal character," including one party's promise to use his "best efforts" in distributing product, did not form a binding contract because there was no mutuality of obligation); *Barton v. Spinning*, 8 Wash. 458 (1894) (no contract formed where $1.00 was exchanged for a promise to use "best endeavors" to convey a purchase option in land, so there could be no action for specific performance of such conveyance). The common thread of these cases is that, standing alone, an oral promise to use one's "best efforts" to do something cannot, without more, legally form a contract. That principle is inapposite.

1.    **Trek's argument that it complied with minimum marketing requirements is irrelevant.**

Trek first argues that its obligation to use "best efforts" to "maximize sales" under Section 5.02 has no meaning or purpose, and is in fact unenforceable, because <u>other</u> sections of the Sublicense impose upon Trek (i) minimum sales obligations (§ 12.01); (ii) minimum guaranteed royalty payments (§ 4.01); and (iii) minimum marketing and promotion expenses (§ 8.01).   (Trek Memorandum of Law in Support of Summary Judgment ("Trek Mot.") at 6-7.)  Trek is wrong.

This argument rests on a fallacy—namely, that "minimum obligations" are the same thing as "best efforts."  They are not.  Minimum obligations are a way to limit and define *downside* risk—here, the risk is that Trek would fail to sell any LeMond bicycles, despite using their "best efforts" to "maximize sales."  (Sublicense, § 5.02.)  Section 5.02, by contrast, was bargained for by LeMond to ensure that Trek would be held to the highest possible standard—the "best efforts" standard—when attempting to maximize his *upside* potential.  Trek's reading of the Sublicense would give no effect to this carefully negotiated upside protection, and would improperly read Section 5.02 right out of the Sublicense.  *Telex Corp. v. Data Prods. Corp.,* 135 N.W.2d 681, 685-86 (1965).[18]

---

[18]   Trek is likewise wrong to suggest that "minimum obligations" and a "best efforts" requirement cannot coexist.  In fact, they routinely do.  *See, e.g., Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 586 (8th Cir. 2007) (describing how plaintiff "Matrix agreed to use its 'best efforts to foster and develop the products' and to maximize sales.  It further agreed to meet certain minimum average annual sales levels over a five year period."); *Interstate Mktg. Corp. v. Equip. Servs., Inc.*, No. M2005-00208-COA-R3-CV, 2006 WL 1547867, at *1 (Tenn. Ct. App. 2006) ("IMC agreed to
(continued...)

- 19 -

> **2.     Trek's argument that Section 5.02 is limited to "brand integrity" or "quality" fails.**

Trek next argues that Section 5.02 of the Sublicense does not mean what it says: that "[Trek] shall use its best efforts . . . to promote the sale of Licensed Products in the Territory so as to try to maximize sales. . . ."  (Sublicense, § 5.02.)  Trek's position is that, notwithstanding this clear language, Section 5.02 *has nothing to do with* maximizing sales.  (Trek Mot. at 7-8.)  Trek argues, instead, that Section 5.02 is solely concerned with the "integrity" of the LeMond trademark because (i) Section 5 is titled, in part, "Quality Control," and  (ii) immediately after commanding Trek to use its "best efforts" to "maximize sales," Section 5.02 tacks on the proviso that such sales be maximized in a manner that is:

> [C]onsistent with the quality and reputation of Licensor, and only to retailers (and distributors who sell to retailers) which properly reflect the image and reputation of Licensor and LEMOND.

(Sublicense, § 5.02.)

Trek's argument fails.  Section 5's title reads: "Development, Licensor's Approval and Quality Control." (Sublicense, § 5.)  Trek's argument ignores the first word of the heading—"Development"—focusing instead (and wrongly) on the words "quality control."  Trek's argument also overlooks the plain meaning of the text.  Section 5.02

---

(...continued from previous page)

use its best efforts to maximize product sales in its territory. . . . Paragraph 2 of the contract provided that IMC would 'achieve a reasonable minimum sales volume level as established . . . from time to time[.]'  The sales volume level was set forth in Exhibit B.").

- 20 -

expressly links the concept of "best efforts" with the obligation to "maximize sales," and then precludes Trek from fulfilling its obligation by diluting or damaging the LeMond brand—for example, by selling LeMond bicycles to disreputable distributors or retailers. The "brand integrity" proviso in Section 5.02 is plainly a <u>limit</u> on how Trek may go about "maximizing sales" of LeMond bicycles, and nothing more. The decision in *Digital Equipment Corp. v. Altavista Technology, Inc.*, 960 F. Supp. 456 (D. Mass. 1997), cited by Trek, makes this exact point. *Id.* at 473-74 (contractual provision put limit on how trademark could be used).

### 3. Trek's argument that its "business judgment" precludes summary judgment fails.

Finally, Trek attempts to equate LeMond's claim under Section 5.02 to a usurpation, or "second guessing," of its sound "business judgment." (Trek Mot. at 11-16.) This effort misses the point. It is irrelevant that LeMond did not "reserve the right" to micromanage Trek's marketing and promotion decisions—in Trek's words, that LeMond did not have the right to "dictate . . . which marketing plans and programs to pursue." (Trek Mot. at 12.) That is in fact the reason why LeMond bargained for a "best efforts" clause: because he wanted to leave the day-to-day business and marketing decisions to Trek while having confidence that Trek would, <u>at all times</u>, exercise the utmost diligence in attempting to "maximize sales," as Section 5.02 requires. These concepts—marketing discretion and the obligation to maximize sales—are not mutually

exclusive.[19]  *Telex.  Corp.*, 135 N.W.2d at 685 (stating that contracts should be read to

give the entire agreement effect). Both should be enforced, and a jury should be permitted

to weigh Trek's business judgment against the Section 5.02 "best efforts" standard.

> **B.    There Are Material Issues Of Fact Concerning Whether Trek Exerted Its "Best Efforts."**

Compliance with a "best efforts" clause is a question for the jury.  *Minneapolis*

*Cmty.  Dev.  Agency  v.  Lake  Calhoun  Assocs.*, 928  F.2d 299,  301 (8th  Cir. 1991)

(compliance with best efforts obligation was a jury question); *Hillside Enters. v. Carlisle*

*Corp.*, 69 F.3d 1410, 1415 (8th Cir. 1995) (plaintiff presented evidence that could have

led the jury to reasonably conclude that Continental breached the agreement by failing to

use its expertise and best efforts); *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908

F.2d 1363, 1373 (7th Cir. 1990) (whether plaintiff failed to use best efforts is a jury

question); *Mor-Cor Packaging Prods., Inc. v. Innovative Packaging Corp.*, 328 F.3d 331,

334 (7th Cir. 2003) (whether compliance with a "best efforts" provision is a question of

fact as it involves "the application of a standard . . . to the particular circumstances of the

case"); *Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 515 (D. Md. 2007) ("the

finder of fact will be in the 'best position' to determine the sufficiency of a promisor's

---

[19]   Trek's reliance on the decision in *Joel Popkin & Co. v. Wharton Econometric Forecasting Assocs., Inc.*, 659 F. Supp. 343, 350 (D.D.C. 1987) to support its argument on this point is misplaced.  Among other things, the party against whom the "best efforts" claim was asserted had the absolute, unilateral discretion to cancel the contract at any point after a date certain.  Trek had no such ability.  Both *Johns v. Rexam Medical Packaging*, No. 3:01-CV-14, 2005 WL 1308319, at *4 (M.D. Ga. 2005) and *Zilg v. Prentice Hall, Inc.*, 717 F.2d 671, 680 (2d Cir. 1983), also cited by Trek, involved the implied covenant of good faith and fair dealing, not an express "best efforts" clause.

efforts"); *Dunn v. Nat'l Beverage Corp.*, 729 N.W.2d 637, 649 (Minn. Ct. App. 2007) (whether party used "best efforts" is "a jury question").

Here, there are multiple disputed issues of fact concerning Trek's compliance with Section 5.02.  First and foremost, Trek's obligation under Section 5.02 required Trek to use <u>no less</u> effort and diligence in selling LeMond-branded bicycles as it used in selling its non-LeMond bicycles—as the inclusion of the word "best" before "efforts" implies. *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979) (best efforts clause violated where distributor took steps to promote competing product in derogation of the obligation to maintain a high sales volume for the plaintiff's product); *Olympia Hotels Corp.*, 908 at 1373 (7th Cir. 1990) (noting that "best efforts is a familiar term in contract parlance," and its meaning can be gauged by looking at the promisor's performance under similar circumstances).  The undisputed evidence here demonstrates that Trek exerted significantly <u>less</u> effort marketing and promoting the sale of LeMond branded bicycles than it did promoting its other brands.  (SOF, ¶¶ 16-26.)  This discrepancy is a *per se* violation of the best efforts clause.

The evidence also shows that Trek's efforts did not meet the bicycling industry standard for "best" efforts.  Despite LeMond's urging, and notwithstanding his status as a three-time Tour de France winner, Trek never associated LeMond's bicycles with a professional European team—something that was necessary to maximize sales.  (SOF, ¶¶ 46-47.)  Trek repeatedly refused to appropriately market and show LeMond bicycles at important domestic and international bicycle shows.  (SOF, ¶¶ 22-26, 48.)  Beginning in 2004 and 2005, Trek began telling dealers that LeMond's bicycles were being

discontinued.  (SOF, ¶ 15.)  John Burke, Trek's CEO, officially informed LeMond that his bikes were being discontinued in November 2007, approximately three years before the Sublicense was set to expire.  (SOF, ¶ 29.)  These are not the actions of a company using its "best efforts" to maximize sales.

In April 2008, in response to LeMond's lawsuit asking this Court to enforce Trek's obligations under the Sublicense (including holding Trek to the agreement for its remaining duration), Trek committed the ultimate act of betrayal.  (SOF, ¶¶ 32-35.) Unbeknownst to LeMond, Trek conspired with a public relations agency, Public Strategies, to create a PowerPoint Presentation skewering Greg LeMond, along with his image, reputation, and bicycles.  (SOF, ¶¶ 31-35.)  These are the acts of a company exerting its "best efforts" to destroy, not promote, a brand.

If "best efforts" is to have any meaning whatsoever, it must, at a minimum, mean that Trek was not free to (1) wind down its marketing, promotion, and sales efforts well before the end of the license term; (2) support another professional cyclist, Lance Armstrong, to the detriment of LeMond;  (3) abandon the LeMond brand in Europe, despite numerous requests by LeMond and others to market it there; (4) promote other Trek lines and brands over, and in direct competition with, the LeMond brand to its detriment; (5) fail to invite LeMond to trade shows and public events so that he could not positively support the LeMond brand; and (6) fail to support LeMond as he spoke out against the publicly acknowledged dangers of drugs in cycling and sports in general, to the detriment of LeMond.

## II.   TREK IS NOT ENTITLED TO SUMMARY JUDGMENT ON LEMOND'S REQUEST FOR DECLARATORY RELIEF.

### A.   Trek Has Conceded That Material Questions Of Fact Exist On Whether Its Termination Under Section 13.02.01 Of The Sublicense Was Proper.

Trek has moved for summary judgment concerning its "right to terminate" the Sublicense pursuant to Section 13.02.01.  (Trek Mot. at 20-29.)  This motion implicates Trek's and LeMond's requests for declaratory relief, both of which raise the question whether LeMond breached Section 13.02.01 of the Sublicense—the basis for Trek's purported "proper" termination.  (Complaint ¶¶ 152-156, 157-58.)  To prevail on this motion, therefore, Trek must argue and establish that there are no genuine issues of material fact with respect to (1) whether LeMond's conduct constituted a material breach of Section 13.02.01, or (2) whether that breach caused damages.  (Trek Mot. at 20-29.)  Unfortunately, these arguments put Trek in the awkward position of arguing against itself.

Trek has asserted a counterclaim under Section 13.02.01 (Trek's Counterclaim and Third-Party Complaint ("Counter Compl."), ¶¶ 49-51), and in June 2009 LeMond moved for summary judgment on that claim and others.  (LeMond Memorandum of Law in Support of Summary Judgment, pp. 30-32.)  On August 5, 2009, Trek opposed LeMond's motion for summary judgment with respect to Section 13.02.01 on the grounds that: (1) there are disputed issues of fact with respect to the purported breach of Section 13.02.01, supported by evidence that "Trek . . . will present at trial,"; (2) the question whether a party has materially breached a contract is one for the jury; and,

(3) there are disputed issues of fact with respect to damages for any breach.  (Trek's Memorandum in Opposition to Summary Judgment at 28-35.)  Trek's August 5th position simply cannot be reconciled with its current one.  There are material questions of fact on Trek's termination claim.

### B. Trek's Argument That Termination Clauses Are Enforceable Misses the Point.

#### 1. Courts will enforce termination clauses, but not when questions of fact exist.

Trek asserts that courts in Minnesota, Wisconsin, and the Eighth Circuit hold that "specific termination rights set forth in the parties' written agreements must be enforced." (Trek Mot. at 27.)  That may be true, but it is beside the point.  LeMond does not claim that Section 13.02.01 of the Sublicense is unenforceable, or that Trek's termination of the Sublicense under Section 13.02.01 would, if grounds existed for the termination, constitute an act of "bad faith."   LeMond's claim is, instead, that the conditions under which Trek could rightfully terminate pursuant to Section 13.02.01 were <u>never met</u>.  Trek's Minnesota, Wisconsin, and Eighth Circuit authority has no bearing on that claim.  *See State v. City of Niellsville*, 581 N.W.2d 548, 552 (Wis. Ct. App. 1998) (no dispute concerning the City's right to terminate, as there is regarding Trek's here); *Wassau Med. Center, S.C. v. Asplund*, 514 N.W.2d 34, 43 (Wis. Ct. App. 1994) (an act contemplated and permitted by the plain language of a contract cannot be characterized as an act of bad faith); *1985 Robert Street Assocs. v. Menard, Inc*., 403 N.W.2d 900, 901 (Minn. Ct. App 1987) (landlord had undisputed right to terminate a lease); *Retail Assocs., Inc. v. Macy's E. Inc*., 245 F.3d 694, 699 (8th Cir. 2001) (at-will agreement); *Shain v. Wash. Nat'l Ins.*

*Co.,* 308 F.2d 611, 617 (8th Cir. 1962) (no dispute over right to terminate); *Jones Distrib.*

*Co., Inc. v. White Consol. Indus., Inc.*, 943 F. Supp. 1445 (N.D. Iowa 1996) (unilateral

"without cause" termination right.)

In his Motion for Summary Judgment, LeMond asserts that his conduct did not

violate Section 13.02.01, and submits supporting evidence.  (*See* Mot. at pp. 6, 8-16,

30-32.)  Regardless of the facts surrounding the question or any alleged breach by

LeMond, LeMond's motion rests on the fact that Trek has failed to present any

competent evidence that LeMond's conduct *caused* Trek any damages.[20]  That is an

independent ground for summary judgment—in other words, a ground on which the

Court may grant LeMond's motion regardless of disputed issues of fact concerning

LeMond's conduct.

### 2.    None of Trek's "reputational" harm cases support its motion.

Trek cites two out-of-jurisdiction cases for the proposition that termination clauses

are upheld even where they turn on harm to the "reputation" or "goodwill" of the

terminating party.  (Trek Mot. at 28.)  Again, that is simply not the issue.  LeMond has

never claimed that Section 13.02.01 of the Sublicense is unenforceable by virtue of the

fact that Trek's right to terminate turns on whether LeMond's conduct has caused

"damage[]" to or had an "adverse impact" upon Trek's "business or goodwill."

LeMond's claim is simply that no such conduct has occurred, and that Trek has suffered

---

[20]  Trek's evidence of LeMond's purported breach, by contrast, rests almost entirely
on rank hearsay.

no causally connected damage.   Neither *Computer Currents Publ'g Corp. v. Jay Communications, Inc*., 968 F. Supp. 684, 688-89 (N.D. Ga. 1997) (improper use of trademark justified immediate termination of license agreement under unambiguous termination clause), nor *FB & I Building Products, Inc. v. Superior Truss & Components*, 727 N.W.2d 474, 479 (S.D. 2007) (undisputed material breach of distribution agreement justified its immediate termination) have any bearing on the claims here, or for that matter on Trek's motion.

Trek's remaining authority is a jumble of cases, which, when read together, give the impression that courts routinely grant summary judgment where a right to terminate turns on reputational or business harm, or is supported by "customer complaints."[21] (Trek Mot. at 28-29.)  That impression is incorrect.  Most of the cases in Trek's string of citations are mistakenly characterized, irrelevant, or both.  All are distinguishable.  *See Kjos v. Am. Family Ins*., No. C6-03-23, 2003 WL 21792115, at *3-5 (Minn. Ct. App. 2003) (termination of agency agreement proper after agent lied and admitted harming agency); *Galaviz v. Post-Newsweek Stations*, No. SA-08-CA-305, 2009 WL 2105981, at *8-9 (W.D. Tex. 2009) (television reporter fired after engaging in multiple highly publicized domestic disputes, including with one of the subjects of her reporting, under clause in employment agreement that prohibited actions bringing television station into "scandal"); *Gibson Guitar Corp. v. Elderly Instruments, Inc*., No. 3:05-0523, 2006

---

[21] The "consumer complaints" that Trek extensively relies on are plainly inadmissible hearsay.

WL 1638404, at *5-6 (M.D. Tenn. 2006) (motion to dismiss, no dispute about right to terminate the agreement, as the defendant acknowledged marketing "counterfeit" goods in express violation of its deal with Gibson); *Gross v. Gilless*, 26 S.W.3d 488, 493-94 (Tenn. Ct. App. 1999) (upholding merit board's decision to fire police officer for "unbecoming" conduct after he was caught on tape watching a woman disrobe, while on duty, in the dressing room of a strip club); *McGarry v. Saint Anthony of Padua Roman Catholic Church*, 704 A.2d 1353, 1357-58 (N.J. Super. Ct. App. Div., 1998) (church musician properly terminated because he was an at-will employee, and admitted receiving and using drugs on church property).

One of the "reputational harm" cases Trek cites, *O'Brien v. Ohio State University*, No. 06AP-946, 2007 WL 2729077, at *25-30 (Ohio Ct. App. 2007), is particularly notable because it plainly supports denial of Trek's motion. Trek cites the dissent in *O'Brien* for the proposition that evidence of "adverse[]" publicity is enough to "justif[y]" termination of a contract. But this provides no support for Trek's motion—most obviously because the *O'Brien* majority found otherwise, but also because *O'Brien* was an appeal following a full trial on the merits, and resulted in a ruling that actually favors LeMond's claims here. The trial court ruled that defendant Ohio State University wrongfully terminated O'Brien's employment contract as head coach of the men's basketball team, *id.* at *1, *20, notwithstanding the alleged "adverse" publicity and controversy surrounding O'Brien's decision to make a loan to a basketball recruit, and a resulting internal and NCAA investigation, *id.* at *18. The trial court ruled for Coach O'Brien after finding, among other things, that OSU's claims of "reputational harm

- 29 -

[were] . . . exaggerated." *Id.* The court of appeals upheld that ruling. *Id.* at *20. Trek's claims of harm are similarly exaggerated here.

## <u>CONCLUSION</u>

For the foregoing reasons, Trek's motion should be denied.

WINTHROP & WEINSTINE, P.A.

Dated: October 30, 2009

 s/Joseph M. Windler
Robert R. Weinstine, #115435
Joseph M. Windler, #387755
225 South Sixth Street
Suite 3500
Minneapolis, Minnesota 55402
Telephone: (612) 604-6400
Facsimile: (612) 604-6800
rweinstine@winthrop.com
jwindler@winthrop.com

James A. DiBoise (Cal. No. 83296)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market St., Spear Tower, Suite 3300
San Francisco, CA 94105
Bus:     (415) 947-2000
Fax:     (415) 947-2099
Email: jdiboise@wsgr.com

ATTORNEYS FOR PLAINTIFF LEMOND CYCLING, INC. AND THIRD-PARTY DEFENDANT GREG LEMOND

4832992v1

- 30 -