UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| LEMOND CYCLING, INC., | Case No. 08-CV-1010 (RHK-JSM) |
| Plaintiff, | |
| v. | **REPLY MEMORANDUM IN SUPPORT OF TREK'S MOTION FOR SUMMARY JUDGMENT** |
| TREK BICYCLE CORPORATION, | |
| Defendant and Third-Party Plaintiff, | |
| v. | |
| GREG LEMOND, | |
| Third-Party Defendant. | |

**Introduction**

Trek's summary judgment motion seeks (1) dismissal of LeMond's claims for breach of contract; and (2) confirmation of Trek's right to terminate the contract due to LeMond's violation of § 13.02.01. The former is based on Trek's undisputed compliance with the performance criteria in the parties' negotiated agreement. The latter is premised upon the undisputed fact that LeMond engaged in conduct inflicting significant harm upon Trek's business and good will.

LeMond's response to the first motion does not dispute Trek's compliance with the contractual performance standards, but instead, argues that those standards should be jettisoned in favor of a standardless "best efforts" challenge. Neither the contract nor the law support LeMond's arguments.

LeMond's response to the second motion, similar to the first, does not dispute that LeMond engaged in the relentless attacks against Trek and its most popular

spokesperson, Lance Armstrong. LeMond instead relies upon an unfounded "hearsay" objection to Trek's proffered evidence, asserting this "challenge" in a footnote unadorned by any citation to the record or case law, and unsupported by any explanation, analysis, or rationale. LeMond fails utterly to come forward with opposing *evidentiary facts* to overcome Trek's motion.

Summary judgment should be entered accordingly.

## Argument

I. **LEMOND FAILS TO IDENTIFY A SINGLE *MATERIAL* ISSUE OF FACT TO OVERCOME TREK'S ENTITLEMENT TO SUMMARY JUDGMENT DISMISSAL OF LEMOND'S CLAIMS.**

   A. **Trek's "Best Efforts" Obligation to Pursue its Marketing and Sale of LeMond-Branded Products without Harming the Integrity of the Brand does not Override the Specific Performance Standards in the Parties' Agreement.**

LeMond does not dispute that Trek has met the contractually-defined performance standards negotiated by the parties and set forth in §§ 4.01, 8.01 and 12.01 of the licensing agreement. *See* LeMond SOF, ¶¶ 1-46.

Instead, LeMond sets out to re-write the parties' contract, arguing that § 5.02's "best efforts" clause superimposes conflicting, undefined performance obligations upon Trek. A review of the language, structure, and context of § 5.02 demonstrates the fallacy of LeMond's proffered interpretation.

The LeMond-Trek licensing agreement is the result of lengthy negotiations and meticulous drafting. Trek SOF, ¶¶ 4-5. The agreement is carefully structured and organized, each section and clause addressing separate and discrete rights and obligations. Section 4.01 confers minimum royalty rights on LeMond, § 8.01 mandates specific marketing expenditures by Trek, and § 12.01 obligates Trek to achieve a specific volume of sales. Section 5, in turn, contains multiple clauses

protecting the value and integrity of the LeMond brand.  It is within this context that the disputed "best efforts" language is found:

Trek – LeMond Licensing Agreement
Context and Purpose of Clauses

§1 — Definitions
§2 — Grant of Rights, Services and Guarantees
§3 — Earned Royalty
§4 — **Minimum Royalty**
§5 — **Development, Licensor's Approvals and Quality Control**
§6 — Use and Registration of Mark
§7 — Infringement of Mark
§8 — **Advertising and Promotion**
§9 — Books and Records
§10 — Indemnification
§11 — Products Liability Insurance
§12 — **Sales Obligations and Right of Termination**
§13 — Expiration or Termination

Section 5.02 is not the *source* of Trek's marketing and sales obligations, nor does it *define the standards* governing Trek's obligations.  Section 5.02 merely provides that *when discharging* its sales and marketing obligations, Trek must do so in a manner that does not tarnish the brand.  Such "best efforts" clauses to ensure brand integrity are *pro forma* in licensing agreements, and "must be reconciled with other clauses in the contract to the extent possible, not used as a basis for negating them."  *Digital Equipment Corp. v. AltaVista Technology, Inc.*, 960 F. Supp. 456, 475 n.37 (D. Mass. 1997); *Vestron, Inc. v. Nat'l Geographic Soc.*, 750 F. Supp. 586, 593 (S.D.N.Y. 1990).

If, as LeMond contends, § 5.02's "best efforts" obligation had been intended to override the specific performance standards in the contract, the agreement would

have so provided, perhaps stating: "Trek must exert its best efforts to exploit the mark, promote products, and maximize sales, notwithstanding the specific performance criteria of §§ 4.01, 8.01 and 12.01 of the agreement." The contract includes no such language. Further, if the parties had intended to superimpose a "best efforts" obligation upon the requirements of §§ 4.01, 8.01 and 12.01, that language would have been included in those specific sections.

### B. LeMond Ignores Minnesota Law Precluding the Enforcement of a Standardless Best Efforts Clause.

Even if the parties had intended § 5.02's "best efforts" language to govern the performance obligations contained in §§ 4.01, 8.01 and 12.01—and the plain language confirms they did not—LeMond's efforts to substitute a standardless best efforts obligation in place of the objective performance criteria agreed upon by the parties is precluded by controlling Minnesota law.

Trek previously cited *Hysitron, Inc. v. Frederickson*, No. C2-02-865, 2002 WL 31689530, at *5 (Minn. Ct. App. 2002), for the proposition that in Minnesota, a mere "best efforts" obligation is "an indefinite promise, insufficient to form the basis of a contractual obligation." *Id.* at *6.

LeMond seeks to brush *Hysitron* aside by arguing that the *Hysitron* court was interpreting an "oral best efforts clause." LeMond Brief at 18. LeMond does not explain why the enforceability of a best efforts obligation should stand or fall based upon whether the contract happened to be oral or in writing. Further, LeMond's contention that *Hysitron* involved an "oral" agreement is simply wrong—the agreement in *Hysitron* was memorialized in writing. *Id.* at *1, 6.

LeMond's efforts to distinguish *Kraftco Corp. v. Kolbus*, 1 Ill. App. 3d 635, 274 N.E.2d 153, 156 (1971), *Barton v. Spinning*, 8 Wash. 458, 460, 36 P. 439 (Wash. 1894), and *Strauss Paper Co., Inc. v. RSA Executive Search, Inc.,* 260 A.D.2d 570, 571, 688

4

N.Y.S.2d 641, 642-43 (1999), are similarly unavailing.  *Kraftco, Barton,* and *Strauss Paper* reached the same conclusion as *Hysitron*—a standardless "best efforts" obligation simply is too vague to create an enforceable contract.  *Id*.  Significantly, *LeMond has not been able to find a single decision in the entire United States* supporting his contention that a "best efforts" obligation could somehow trump specific performance standards in the parties' agreement.  *See* LeMond Brief at 15-24.[1]

Oddly, LeMond cites *Deluxe Pattern Corp. v. Laser Design, Inc.*, No. C9-95-51, 1995 WL 434433, at *3 (Minn. Ct. App. 1995), in support of his position.  But the contract in that case *included* contractual performance standards, setting "a first term gross sales goal of $750,000.00," and the defendant in *Deluxe Pattern* had failed to sell *any products*—much less achieve the contractual performance standards.

Remarkably, LeMond also relies upon *Hillside Enterprises v. Carlisle Corp.*, 69 F.3d 1410, 1415 (8th Cir. 1995), in which the Eighth Circuit merely held the defendant to the objective performance criteria contained in the parties' agreement.  Contrary to LeMond's contention that "best efforts" clauses can *override* specific performance standards, the *Hillside* court held that the defendant's "best efforts" obligation was *tied* to these specific performance standards, and the Eighth Circuit premised its affirmance upon the *defendant's failure to achieve those performance standards.  Id.*

Similarly, LeMond cites *Lanier Worldwide, Inc. v. TOPAC Acquisition Corp.*, No. A05-1088, 2006 WL 852084, at *4 (Minn. Ct. App. 2006), for the proposition that an amorphous best efforts standard will support an enforceable agreement.

---

[1] LeMond also ignores—entirely—the decisions cited by Trek that refuse to entertain a best efforts challenge if the licensor has protected itself through substantial, contractually guaranteed royalty payments such as LeMond bargained for here.  *See* Trek Principal Brief at § I.A.1 (cases cited).

*Lanier*, however, specifically noted that the contract included *seven different performance criteria*, and on that basis, concluded there was an enforceable agreement. *Id.* at *3-4.

Perhaps most remarkable is LeMond's reliance upon *Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 586 (8th Cir. 2007). In *Matrix Group*, the distributor had "agreed to meet certain minimum average annual sales levels over a five year period." *Id.* at 586. The court observed that sales had peaked at $3 million, and later tapered down to $865,000 in the final year. *Id.* at 586. Notwithstanding the plaintiff's "best efforts" criticisms of defendant for this decline, the Eighth Circuit noted that the defendant had "met the contract's minimum sales requirements at all times during the contract period." *Id.* at 586. Nothing in the *Matrix Group* decision states or implies that a "best efforts" challenge could *override* contractual performance standards.

LeMond also cites a number of decisions examining a best efforts commitment to accomplish a single, discrete task that could not depend upon interim performance standards—obtaining county approval to levy taxes, *Franklin High Yield Tax-Free Income Fund v. County of Martin*, 152 F.3d 736, 740 (8th Cir. 1998), clearing title to a plot of land, *Fritz v. Schroeder*, No. C8-02-1251, 2003 WL 21264495, at *2 (Minn. Ct. App. 2003), obtaining easements to property, *Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs.*, 928 F.2d 299, 301 (8th Cir. 1991), or soliciting limited partnership approval of a purchase, *Metropolitan Ventures, LLC v. GEA Associates*, 2006 WI 71, 291 Wis. 2d 393, 717 N.W.2d 58.

Lastly, LeMond cites two decisions that have no bearing on the enforcement of a "best efforts" clause. *See Dunn v. National Beverage Corp.*, 729 N.W.2d 637, 649 (Minn. Ct. App. 2007) (examining the inapplicable, *statutory* best efforts obligation in Minn. Stat. § 336.2-306(2)); *Interstate Marketing Corp. v. Equipment Services, Inc.*,

6

No. M2005-00208-COA-R3-CV, 2006 WL 1547867, at *1 (Tenn. Ct. App. 2006) (holding does not even address "best efforts" issues).

LeMond's reliance on decisions grappling with how to enforce a "best efforts" clause that imposes no objective performance standards misses the mark. Here, the parties *avoided this morass* by negotiating for specific performance standards. LeMond's invitation to discard these standards in favor of an undefined "best efforts" standard would gut these important contractual terms.

### C. LeMond's Multiple Criticisms of Trek's Marketing Efforts are Irrelevant and Unfounded.

The French artist Georges-Pierre Seurat advanced impressionist painting through his use and development of "pointillism," a brush stroke technique employing tiny, multi-colored dots to create the image. A myopic examination of only a discrete portion of Seurat's canvas would yield a confusing and misleading portrait:



Seurat's *Sunday Afternoon on the Island of La Grande Jatte* must be viewed in its entirety to ensure that the truth and meaning of the portrait is not lost amongst the pixels:



LeMond's skewed presentation to this Court is an exercise in pointillism without the benefits of perspective. Trek invites this Court to step back a few feet from the canvas to view Trek's performance in perspective and in context.

**1. Debating the efficacy or wisdom of Trek's marketing efforts does not support a breach of contract claim.**

Anyone armed with a law degree and a word processor can review a twelve-year commercial relationship and identify "disputed" facts concerning the quality and success of either party's performance. Such post-termination flyspecking of performance, however, is not germane to the resolution of Trek's motion. *See, e.g., Vestron,* 750 F. Supp. at 593; *Woodlake VEF-IV, LLC v. Cooperative Agency, Inc.*, 2008 WL 763229, *4 (Minn. App. 2008); and *Joel Popkin and Co. v. Wharton Econometric Forecasting Assoc., Inc.*, 659 F. Supp. 343 (D. D.C. 1987).

Even if LeMond were entitled to launch a "best efforts" challenge in the face of Trek's undisputed satisfaction of each performance standard in the contract—and

8

he is not—LeMond's criticisms of Trek do not withstand scrutiny. LeMond's criticisms fall into six categories:

(1) Trek should have spent even more on promotions;

(2) Trek should have sold more bikes in Europe;

(3) Trek's annual sales of LeMond-branded bikes were lower in 2002-2007 than during the high-water mark year of 2001;

(4) Trek allegedly began to "wind down" its promotional efforts in 2006, and gave LeMond-branded bikes second-class treatment;

(5) Burke gave LeMond early notice in November of 2007 of Trek's decision not to exercise its five-year renewal option; and

(6) Trek committed the "ultimate act of betrayal" when it held the April 2008 press conference.

As will be seen, these criticisms do not hold water.

### 2. LeMond's skewed portrayal of Trek's performance does not withstand scrutiny.

First, the contract between Trek and LeMond specifically defines the amount of money Trek was required to spend on promotions. Trek-LeMond Contract, § 8.01. If LeMond had wanted Trek to spend even more money on promotions, he could have structured the deal differently—perhaps giving up some of the lucrative, guaranteed royalties in exchange for the additional upside potential of investing even more money to grow sales. Further, Trek spent millions more than it was required to spend to develop a full line of LeMond road bikes. On the eve of this lawsuit, the *LeMond Reno Double* road bike designed by Trek won *Bicycling Magazine's* prestigious "Editor's Choice" award:

9



8/5/09 Trek Brief, SOF, ¶ 51.

Second, LeMond's criticism of Trek's sales in Europe ignores the facts. Four years into their relationship, Trek and LeMond amended the agreement to increase the guaranteed royalties, and to allocate $100,000 of those royalties to European sales. Not only did the 1999 amendment maintain the single, aggregate sales quota for U.S. and non-U.S. sales, but LeMond did not negotiate for any allocation of marketing expenditures directed to Europe.

Sponsorship of professional cycling teams in Europe costs a great deal of money. LeMond did not bargain for Trek to spend limitless sums of money to market the brand. If LeMond and his counsel believed that Europe was the promised land of LeMond-branded road bikes, the 1999 amendment would have reflected this belief. LeMond did not negotiate for any particular promotions

expenditure in Europe, nor did he negotiate for any minimum sales in Europe. LeMond has no basis to claim entitlement to such benefits now.

Third, LeMond's contention that Trek should be faulted for lower annual sales of LeMond-branded bikes in 2002 through 2008 than in 2001 is pure chutzpah. Sales of LeMond-branded products tapered off after 2001 because LeMond embarked on a course of conduct that destroyed the power of his brand. 8/5/09 Trek Brief SOF, ¶¶ 9-46. In any event, a post-2001 decline in sales does not give rise to a "best efforts" claim. *See Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 586 (8th Cir. 2007) (notwithstanding a decline in sales and the plaintiff's "best efforts" criticisms, the defendant had "met the contract's minimum sales requirements at all times during the contract period.") LeMond's efforts to manufacture a "best efforts" challenge based on sales volume would render the sales quotas in the contract meaningless.

Fourth, LeMond's premature "wind down" theory ignores both the contract and the facts. Assuming that LeMond's "wind down" allegations were accurate and supported by the record—and they are not—they are not germane to summary judgment.

LeMond points to Trek's failure to invite him to the 2006 annual dealer show as evidence of Trek's decision to wind down the brand. What really happened—and it is undisputed—is that in April of 2006 Trek hosted a special media event—the *Tour de Georgia*—devoted solely to unveiling and showcasing the 2007 *LeMonde Triomphe* frame:



**LeMond Proudly Displays the *Triomphe* Frame**

Trek flew in many of its top dealers at great expense, and LeMond attended as the event's "star" attraction. Second Zastrow Decl., Exh.12, Gore Dep. at 66, 72. LeMond's suggestion of a 2006 "wind down" is flatly inconsistent with these special promotional efforts.

LeMond was not invited to the August 2006 annual dealer show because shortly after the April 2006 *Tour de Georgia*, LeMond publicly lambasted Lance Armstrong, accusing Armstrong of threatening "my wife, my business, my life." Zastrow Decl., Exh.69. Trek had no contractual obligation to invite LeMond to the 2006 dealer show, and its reluctance to spoil the show by inviting LeMond on the heels of his harmful comments—resulting in his earning ESPN's *Just Shut Up* award—does not violate any "best efforts" obligation.

LeMond also premises his "wind down" theory on the alleged attention his products did—or did not—receive at Trek's 2007 annual dealer show, and on complaints that Trek should have launched yet another LeMond-branded bicycle in 2007. Yet Trek had *just launched* a LeMond model 100-150 grams lighter than the prior season, generating great excitement among Trek's dealers. Second Zastrow Decl., Exh.12, Gore Dep., at 74-75. Further, Trek was not even required to feature LeMond products at its annual dealer show, much less launch any particular quantity of new product lines.

Nor does LeMond's claimed ignorance of the timing of the 2007 annual dealer show make sense. Trek's annual dealer show was just that—annual. Trek held the show each and every August in Madison, Wisconsin. LeMond's claimed ignorance of the occurrence and timing of the August 2007 show is absurd. If LeMond really did not know when Trek's annual show was to be held, he could have picked up the phone and asked. LeMond also ignores that Trek flew in dealers to showcase the LeMond *and* Trek brands in June of 2007. Second Zastrow Decl., Exh.12, Gore Dep. at 75.

Fifth, LeMond tries to prop up his "best efforts" challenge based on Burke's decision to give LeMond the courtesy of a confidential, advance notification of Trek's decision not to exercise its renewal rights. *See* Second Zastrow Decl., Exh.13, Burke Dep. at 136-37 ("I want to let you know now we're not going to renew the contract after 2010. We're going to honor the contract, but this will allow you some time to go out there and put together another deal or do whatever you want to do.") LeMond cannot premise a "best efforts" claim based on early notification of non-renewal.[2]

---

[2] LeMond's contentions are disingenuous in the extreme. Internal emails reveal that LeMond knew full well prior to the November 2007 Burke notification meeting that his relationship with Trek was coming to an end. *See* 6/4/2007 LeMond email,

13

Sixth, LeMond's criticism of Trek's April 2008 public announcement of its reasons for terminating its relationship with LeMond cannot support a breach of contract claim. Trek's announcement *came on the heels* of LeMond's most recent attempt to extort money from Trek by commencing litigation with a "confidential," unfiled complaint filled with scandalous allegations irrelevant to his prayer for relief. 8/5/09 Trek Brief, SOF, ¶¶ 45-46. Trek's April 2008 press conference bringing the disinfectant of sunshine to LeMond's conduct was an act of self-defense—not "betrayal." More to the point, Trek's press conference to announce its reasons for terminating the contract—regardless of Trek's alleged motives—simply is not germane to whether (a) Trek breached its contract with LeMond, or (b) LeMond breached his contract with Trek.

### 3. LeMond's new "Parallel Efforts" Theory of Liability is as untimely as it is unfounded.

LeMond contends in his reply brief that Trek is liable for a "best efforts" breach because it did not market the LeMond-branded road bikes on a par with its marketing of the Trek-branded bikes.

Trek had to file a motion to compel to get LeMond to provide a meaningful response to a contention interrogatory ferreting out the basis for LeMond's breach of contract claims. LeMond's supplemental response has been submitted to this Court. Zastrow Decl., Exh.6, Interrogatory 11 at 6. Nowhere does LeMond disclose his intent to pursue this theory at trial. Having failed to identify this theory in his court-ordered interrogatory response, this theory of relief should be rejected by this Court. *See generally Deli v. Univ. of Minnesota,* 863 F. Supp. 958, 960 (D. Minn. 1994) (overruled on other grounds).

---

LCI 10353 ("there is going to be hell to be paid [for LeMond's latest attacks on Armstrong] and good old John Burke will be calling me to say it is over").

More importantly, the theory is flawed. The parties' agreement does not require Trek to employ the same marketing plan for LeMond and Trek models. When LeMond signed up with Trek in 1995, the LeMond-branded bikes were sold by the sales force responsible for Fisher Mountain bikes—not the sales representatives for the Trek-branded bikes. Further, the testimony cited by LeMond to substantiate this claim simply does not support the propositions for which it is cited. For example, Aaron Mock did not testify that Trek marketed the *Madone* to replace the LeMond *Tete de Course*. To the contrary, Mock testified that Trek's sales representatives responsible for marketing the *Tete de Course* touted *that* bike—rather than the *Madone*—as the superior choice. *Cf.* LeMond SOF, ¶ 15, *with* Second Zastrow Decl., Exh.14, Mock Dep. at 125-129.

Most fundamentally, LeMond's argument ignores the reality he embraced when he signed with Trek in 1995 and extended the deal in 1999—namely, that the LeMond-branded road bikes would be sold by Trek along with Fisher and Trek-branded bikes—all competing for a limited pool of consumer dollars. Trek SOF, ¶ 3. LeMond protected himself from any concerns about internal competition among Trek-manufactured bikes through the simple expedient of contracting for substantial guaranteed annual royalties, contractual sales quotas, and mandatory expenditures on promotions. Since LeMond received far more value in each of these three categories than the contract guaranteed, it is fair to say that these contractual protections served their purpose.

**II. LEMOND HAS NOT SUBMITTED ANY EVIDENTIARY FACTS TO OVERCOME TREK'S *PRIMA FACIE* MOTION FOR SUMMARY JUDGMENT AFFIRMATION OF TREK'S TERMINATION RIGHTS.**

Trek's second motion seeks confirmation of its right to terminate the Trek-LeMond licensing agreement. The contract provides that Trek may terminate the

contract if LeMond "takes any action which damages or has an adverse impact upon [Trek] or [Trek's] business or goodwill…." *See* § 13.02.01. Trek has submitted an avalanche of undisputed evidence establishing that LeMond engaged in precisely such conduct, thus entitling Trek to terminate the contract as a matter of law. *See* Trek Principal Brief at § II. LeMond's response is two-fold.

First, LeMond advances the *non-sequitur* that because Trek opposed LeMond's motion for a summary judgment ruling that *Trek* breached the contract, Trek somehow is precluded from seeking summary judgment on *LeMond's* breach. Trek's basis for summary judgment is premised upon different facts than asserted by LeMond in support of his motion. LeMond perpetrated serial public attacks against Trek and its most popular spokesperson, Lance Armstrong, causing huge turmoil and a loss of sales. Relying upon these facts in support of summary judgment is in no way inconsistent with opposing LeMond's groundless motion.

Second, LeMond contends in a footnote—unburdened with any citation to the law or to the record—that Trek's summary judgment motion is premised upon hearsay. This contention fails for multiple reasons, including (1) the dealer testimony establishing the lost sales caused by LeMond's public attacks is not "hearsay;" (2) Trek limited its summary judgment reliance upon consumer emails that *LeMond himself submitted to this Court as admissible evidence* in support of his own summary judgment motion; (3) the consumer emails are not hearsay, because they are not offered to prove the truth of the matter asserted (*i.e.,* whether or not LeMond is or is not a traitor, a jerk, a whiner, etc.), but only to show the fact of consumer reaction; and (4) even if all of the consumer emails were ignored, the undisputed dealer testimony—standing alone—establishes the harm caused by LeMond's violation of § 13.02.01.

### Conclusion

LeMond's decision to pursue a vendetta against Trek and Lance Armstrong came with a price. LeMond chose to pursue a course of conduct that caused substantial harm to Trek, and this conduct indisputably gives rise to Trek's right of termination. Because LeMond has not submitted any admissible, opposing evidentiary facts, summary judgment can and should be entered accordingly. *See* Fed.R.Civ.P. 56(e)(2).

For each of the reasons set forth above, Trek requests that its motion for summary judgment be granted in its entirety.

Dated:  November 4, 2009.

        GASS WEBER MULLINS LLC

        s/Ralph A. Weber
        Ralph A. Weber (WI SBN 1001563)
        Paul F. Heaton (WI SBN 1000858)
        Christopher P. Dombrowicki (WI SBN 1041764)
        309 North Water Street, Suite 700
        Milwaukee, WI 53202
        Tel: (414) 223-3300; Fax: (414) 224-6116
        weber@gasswebermullins.com
        heaton@gasswebermullins.com
        dombrowicki@gasswebermullins.com

        HALLELAND LEWIS NILAN & JOHNSON, P.A.

        Erik T. Salveson (Reg. No. 177969)
        Amanda M. Cialkowski (Reg. No. 306514)
        Benjamin J. Rolf (Reg. No. 386413)
        600 U.S. Bank Plaza South
        220 South Sixth Street
        Minneapolis, MN 55402
        Tel: (612) 338-1838; Fax: (612) 338-7858
        esalveson@halleland.com
        acialkowski@halleland.com
        brolf@halleland.com

        **ATTORNEYS FOR**
        **TREK BICYCLE CORPORATION**