## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

LeMond Cycling, Inc.,

       Plaintiff,

                               Civ. No. 08-1010 (RHK/JSM)
                               **MEMORANDUM OPINION
                               AND ORDER**

v.

Trek Bicycle Corporation,

       Defendant and Third-Party
       Plaintiff,

v.

Greg LeMond,

       Third-Party Defendant.

James A. DiBoise, Wilson Sonsini Goodrich & Rosati PC, San Francisco, California, Christopher F. Nelson, Wilson Sonsini Goodrich & Rosati PC, Seattle, Washington, Joseph M. Windler, Robert R. Weinstine, Winthrop & Weinstine, Minneapolis, Minnesota, for LeMond Cycling, Inc. and Greg LeMond.

Ralph A. Weber, Paul F. Heaton, Gass Weber Mullins LLC, Milwaukee, Wisconsin, Erik T. Salveson, Halleland Lewis Nilan & Johnson, PA, Minneapolis, Minnesota, for Trek Bicycle Corporation.

## INTRODUCTION

In this action, Plaintiff LeMond Cycling, Inc. ("LeMond Cycling") and Defendant

Trek Bicycle Corporation ("Trek") each allege the breach of a sublicense agreement

between the parties.  Currently pending before the Court are the parties' cross-motions

for summary judgment.  For the reasons set forth below, the Court will grant each motion in part and deny each in part.

## BACKGROUND

## I.      The contractual relationship between LeMond Cycling and Trek

LeMond Cycling is a Minnesota corporation founded by Greg LeMond ("LeMond"), a world-famous cyclist and three-time winner of the Tour de France. (Compl. ¶ 1.)  Trek manufactures and sells a variety of bicycles and bicycle accessories worldwide.  (Id. ¶ 4.)  It distributes its products through a network of independent bike dealers ("IBDs").  (Gore Dep. Tr. at 77-78.)

LeMond licensed his name and image to LeMond Cycling.  (Compl. ¶ 2.)  In 1995, LeMond Cycling and Trek entered into a sublicense agreement (the "Sublicense Agreement") granting Trek the use of the name and trademark "Greg LeMond Cycles" and other similar trademarks utilizing the name "Greg LeMond."  (Robbins Decl. Ex. 1.) Under the Sublicense Agreement, Trek was granted the exclusive right to design, manufacture, promote, and sell LeMond-branded bicycles, thereby leveraging LeMond's reputation as a champion cyclist.  (Id.)  During this same time period, the parties also entered into a secondary sublicense agreement whereby Trek was granted the right to manufacture and sell LeMond-branded bicycle accessories (the "Accessories Agreement").  (Id. Ex. 2.)

II.	**The PTI Agreement**

In 1999, when the LeMond-branded accessories had not been a profitable product

line, Trek approached LeMond Cycling desiring an early termination of the Accessories

Agreement.  (Bruke Dep. Tr. at 14.)  LeMond Cycling agreed to this termination in

exchange for several amendments to the Sublicense Agreement (the "1999

Amendment").  (Robbins Decl. Ex. 8.)  Such amendments included the extension of the

Sublicense Agreement, increased royalties, and additional free bicycles for LeMond.[1]

(Id.)

Under the 1999 Amendment, LeMond Cycling agreed not to enter into an

accessories sublicensing agreement with several listed entities.  (Id. Exs. 8, 86.)  "Mass

merchants," such as Wal-Mart or Target, were not included on this list of entities,

although such inclusion was considered and rejected.  (Id. Ex. 86.)  Nevertheless, Trek

emphasized the importance of not distributing LeMond-branded accessories to a mass

merchant because such distribution would be inconsistent with the "high-end" nature of

LeMond-branded bicycles.  (Burke Dep. Tr. at 14, 114-15.)  LeMond stated that he

would not take LeMond-branded accessories to any mass merchant.  (Id. at 14.)  LeMond

Cycling, however, did enter into an accessories sublicense agreement with Protective

Technologies, Inc. (the "PTI Agreement") in the spring of 2000, which allowed PTI to

sell LeMond-branded accessories in Target stores.  (Gibson Dep. Tr. at 10; Burke Dep.

---

[1] Under the Sublicense Agreement, LeMond was entitled to five free bicycles per year.  (Robbins Decl. Ex. 1.)  The 1999 Amendment increased this number to fifteen.  (Id. Ex. 8.)

Tr. at 14-16.)  Trek contends that that PTI Agreement harmed its ability to sell LeMond-branded bicycles.  (Burke Dep. Tr. at 114-15.)

### III.   LeMond's access to free bicycles and employee pricing

Pursuant to the Sublicense Agreement and the 1999 Amendment, LeMond was entitled to fifteen free bicycles each year "for the personal use of LeMond and his family."  (Robbins Decl. Exs. 1, 8.)  In addition, although not described in the Sublicense Agreement, LeMond was allowed to purchase bicycles at employee-discount pricing.[2] (Huber Dep. Tr. at 34-38.)  The precise terms of the employee-pricing arrangement cannot be discerned from the record.  However, over the parties' thirteen-year business relationship, LeMond purchased over $2,500,000 worth of bicycles from Trek at the employee-discounted price.  (Countercl. & Third Party Compl. ¶ 61.)

Trek was aware that approximately 70% of these bicycles went to persons other than LeMond and his family.[3]  (Huber Dep. Tr. at 51.)  Nevertheless, Trek asserts that LeMond "grossly abused" his free/employee-priced bicycle privileges by: (1) selling bicycles for personal profit, (2) bartering with the bicycles, and (3) utilizing the bicycles for unrelated business ventures.  (Trek Mem. in Opp'n at 25 (citing Gibson Dep. Tr. at 26-34; LeMond Dep. Tr. at 43-49, 109-111).)

---

[2] It appears that LeMond's right to obtain employee-priced bicycles was never reduced to writing.

[3] LeMond worked with a specifically assigned Trek employee, Elisabeth Huber, in obtaining his free and discounted bicycles.  (Huber Dep. Tr. at 34-36.)

**IV.    LeMond's public commentary regarding "doping" and Lance Armstrong**

Lance Armstrong is one of the world's most famous cycling champions.  Although unclear from the record, counsel for Trek asserted at oral argument that Trek became associated with Armstrong, and Armstrong endorsed Trek bicycles in the late 1990s.

The use of illegal enhancement drugs, commonly referred to as "doping," has become a matter of great concern in professional cycling.  (Robbins Decl. Ex. 14.) Beginning in 1999, LeMond has made several statements, reported in the press, advocating against doping in cycling.  (Id. Exs. 15, 18-19.)  In particular, LeMond has publicly commented on Armstrong and doping on several occasions.

In 2001, LeMond stated that he was "devastated" and "deeply saddened" to learn of Armstrong's association with Dr. Michele Ferrari, an Italian doctor widely believed to have provided performance-enhancing drugs to cyclists.  (Id. Exs. 22, 24.)  Also in 2001, LeMond was quoted in the Sunday Times as stating, "if Lance is clean, it is the greatest comeback in the history of sport.  If he isn't, it would be the greatest fraud."  (Id. Ex. 24.) In 2004, LeMond was quoted in a French newspaper stating, "Lance is ready to do anything to keep his secret . . . I don't know how he can continue to convince everybody of his innocence."  (Id. Ex. 26.)  In 2006, LeMond was quoted as stating that Armstrong had "threatened" his wife, business, and life.  (Zastrow Decl. Ex. 69.)  Finally, in 2007, LeMond was quoted as stating, "I criticized [Armstrong's] cooperation with Michele Ferrari and for that reason got into big trouble with Trek.  If I had loudly said what I thought this would have been suicide for my business."  (Id. Ex. 72.)

According to Trek, LeMond's statements regarding Armstrong created a "flurry of negative media reports" and IBD and customer "backlash." (Trek Mem. in Opp'n at 6-14.) After each public statement, Trek requested LeMond to desist from making comments regarding doping and specific athletes. (Burke Dep. Tr. at 151-52.) In addition, Trek sent LeMond Cycling a letter in 2004 informing it that LeMond's public commentary was in breach of § 13.02.01 of the Sublicense Agreement, which prohibits LeMond Cycling from taking any action that damages Trek's business or goodwill. (Robbins Decl. Ex. 31.) Trek later withdrew this notice. (Id. Ex. 32.)

## V.      Marketing and promotion of LeMond-branded bicycles

The Sublicense Agreement contains several provisions relating to Trek's marketing, promotion, and advertising of LeMond-branded bicycles. (Id. Ex. 1.) First, it provides that Trek must expend a "reasonable amount," defined as three percent of the net sales for each contract year, to market, promote, and advertise LeMond-branded bicycles. (Id. § 8.01.) Second, it provides that Trek must use "its best efforts to exploit the [LeMond brand,] . . . and to promote the sale of [LeMond-branded bicycles] . . . so as to try to maximize sales, consistent with the quality and reputation of [LeMond]." (Id. § 5.02.) It also provides for minimum sales quotas and royalties. (Id. §§ 4.01, 12.01.)

Over the course of the parties' business relationship, Trek expended over $7,500,000 on marketing, promoting, and advertising LeMond-branded products. (Siefkes Aff. ¶ 2.) Notwithstanding, LeMond Cycling asserts that Trek did not use its "best efforts" to maximize the sales of LeMond-branded bicycles. It specifically asserts that: (1) the sales of its bicycles trended downward or were flat when Trek's comparable

bicycles were trending significantly upward; (2) several IBDs were unable to obtain

LeMond bicycles from Trek when requested; (3) Trek marketed its own bicycles as

superior to LeMond-branded bicycles; (4) Trek exerted more promotion and marketing

efforts on its own brand than on the LeMond brand; [4] (5) LeMond was excluded from

several important dealer shows and marketing events; (6) Trek failed to sponsor a

professional cycling team or promote the LeMond brand at important European

marketing shows; and (7) Trek was "winding down" its marketing and promotion of

LeMond-branded bicycles two years prior to the termination of the Sublicense

Agreement.  (LeMond Cycling Mem. in Opp'n at 4-16 (citing Windler Decl. Ex. C;

LeMond Decl. ¶¶ 18-22; Mock Dep. Tr. at 127, Ex. 187)).)

## VI.    Current lawsuit

In 2007, Trek informed LeMond Cycling that it would not be renewing the

Sublicense Agreement after its express termination date in 2010.  (Burke Dep. Tr. at 136-

37.)  LeMond Cycling then commenced the instant action, claiming that Trek had failed

to use its "best efforts" in developing and promoting LeMond-branded bicycles as

required by the Sublicense Agreement.  (Compl. ¶¶ 157-62.)  In response, Trek filed suit

in the United States District Court for the Western District of Wisconsin, which was later

---

[4] Trek asserts that LeMond Cycling is precluded from asserting that Trek's marketing efforts supporting the LeMond brand were not on par with the efforts supporting other Trek brands. (Trek Reply Mem. at 14.)  Specifically, Trek asserts that this theory was not contained in LeMond Cycling's interrogatory responses and therefore, LeMond Cycling is barred from relying on such a theory at summary judgment.  The Court does not agree.  LeMond Cycling's interrogatory responses assert that Trek violated the Sublicense Agreement by failing to promote LeMond bicycles on a level "consistent with its promotion of comparable lines of products." (LeMond Cycling Resp. to Interrogs. No. 11.)

transferred to this Court and consolidated with the present action.[5]  Trek seeks a

declaration that it did not breach the Sublicense Agreement and rightfully terminated it as

a result of LeMond Cycling and LeMond's breach of the Agreement and the duty of good

faith and fair dealing.  (Countercl. & Third Party Compl. ¶¶ 43-65.)

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the

material facts in the case are undisputed.  Id. at 322; Mems v. City of St. Paul, Dep't of

Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the

evidence, and the inferences that may be reasonably drawn from it, in the light most

favorable to the nonmoving party.  Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721,

723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir.

1997).  The nonmoving party may not rest on mere allegations or denials, but must show

through the presentation of admissible evidence that specific facts exist creating a

genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986);

Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

Where, as here, the Court confronts cross-motions for summary judgment, this

approach is only slightly modified.  When considering the defendant's motion, the Court

---

[5] Trek initially moved to transfer the present action to the Western District of Wisconsin, but its Motion was denied.  See LeMond Cycling, Inc. v. Trek Bicycle Corp., Civ. No. 08-1010, 2008 WL 2247084 (D. Minn. May 29, 2008) (Kyle, J.).

views the record in the light most favorable to the plaintiff, and when considering the

plaintiff's motion, the Court views the record in the light most favorable to the defendant.

Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc., 293 F.3d 402, 404

(7th Cir. 2002).  "Either way, summary judgment is proper if the record demonstrates that

there is no genuine issue as to any material fact."  Id.

## ANALYSIS

### I.      LeMond Cycling and LeMond's Motion

Trek asserts that LeMond Cycling and LeMond breached the duty of good faith

and fair dealing by entering into the PTI Agreement and breached the Sublicense

Agreement by abusing the right to obtain free and employee-priced bicycles and making

public commentary regarding Armstrong and doping.[6]  LeMond Cycling and LeMond

move for summary judgment on each of these claims.[7]

---

[6] The Court requested Executive Summaries in this matter.  The summaries were to succinctly
state the relevant arguments and facts contained in the parties' voluminous briefs and were not
intended to be a vehicle through which the parties could assert new arguments.  Nevertheless, in
its Executive Summary, Trek asserts for the first time that LeMond Cycling and LeMond
breached § 16.03 of the Sublicense Agreement through LeMond's "unprofessional" conduct.
(Trek Executive Summ. at 3.)  Like arguments made for the first time in a reply brief, this
argument will not be considered.  Berbig v. Sears Roebuck & Co., 568 F. Supp. 2d 1033, 1040
n.10 (D. Minn. 2008) (Kyle, J.).

[7] As a federal court sitting in diversity, the Court must apply state substantive law.  Erie R.R. Co.
v. Tompkins, 304 U.S. 64, 78 (1938); Oriental Trading Co. v. Firetti, 236 F.3d 938, 944 (8th Cir.
2001).  However, the parties dispute which state's law – Minnesota's or Wisconsin's – applies.
Trek asserts that Wisconsin law governs this dispute, but acknowledges that there is no
"significant disparity concerning the instant issues between Wisconsin and Minnesota law."
(Trek Mem. in Opp'n at 29 n.8.)  LeMond Cycling and LeMond do not directly address the
choice-of-law issue, citing Minnesota and Wisconsin law in their memoranda.
      Upon review, the Court finds that no actual conflict exists between Minnesota and
Wisconsin law on the legal issues presented by the present Motions.  Therefore, a choice of law
need not be made.  See W.S.A., Inc. v. Liberty Mut. Ins. Co., 7 F.3d 788, 791 n.2 (8th Cir. 1993)
(quoting Hague v. Allstate Ins. Co., 289 N.W.2d 43, 46-47 (Minn. 1978)) ("[I]t is unnecessary to

A.     The PTI Agreement

LeMond Cycling and LeMond assert that the PTI Agreement cannot constitute a breach of the implied duty of good faith and fair dealing as a matter of law.  The Court agrees and this claim will be dismissed.

"[E]very contract includes an implied covenant of good faith and fair dealing."  In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995).[8] This duty prevents a party from unjustifiably hindering the other party's performance of contractual duties.  Id.  In addition, the duty of good faith and fair dealing prevents the "evasion of the spirit of the bargain and abuse of a power to specify terms."  Crosstown Holding Co. v. Marquette Bank, N.A., No. A04-1693, 2005 WL 1154271, at *4 (Minn. Ct. App. May 17, 2005).  However, the duty of good faith and fair dealing "is not actionable . . . when the alleged 'bad faith' actions involve the performance of terms that are not part of the contract."  Port Auth. of Winona v. Winona Marine, Inc., No. CX-94-2204, 1995 WL 107161, at *1 (Minn. Ct. App. Mar. 14, 1995).

The PTI Agreement is not actionable as a breach of the implied covenant of good faith and fair dealing because it is outside the scope of the Sublicense Agreement.  The 1999 Amendment expressly provided a list of entities with which LeMond Cycling could

make a choice of law unless one state's law would be 'outcome determinative' by reason of an actual conflict.").  Therefore, the Court will apply Minnesota law.

[8] LeMond Cycling and LeMond assert that Trek's good faith and fair dealing claim must fail because Minnesota law does not recognize this cause of action apart from an underlying breach of contract claim.  (LeMond Cycling Reply Mem. at 10.)  However, the Court need not address this argument because even if the requisite contract claim were asserted, the PTI Agreement would not constitute a breach of the implied covenant of good faith and fair dealing.

not sublicense its accessories brand.  The parties contemplated and decided against the

inclusion of the mass merchant on this list.  Accordingly, Trek cannot now assert that the

PTI Agreement is a breach of the implied covenant of good faith and fair dealing.

Moreover, the PTI Agreement does not prevent or hinder Trek's ability to perform its

responsibilities under the Sublicense Agreement.  See Countrywide Servs. Corp. v. SIA

Ins. Co., 235 F.3d 390, 393 (8th Cir. 2000) ("[T]he implied duty of good faith and fair

dealing does not extend so far as to undermine a party's general right to act on its own

interests in a way that may incidentally lessen the other party's anticipated fruits from the

contract.") (internal quotation marks and citation omitted).  Accordingly, the PTI

Agreement is not a breach of the duty of good faith and fair dealing.

**B.    LeMond's use of free and employee-priced bicycles**

Trek asserts that LeMond Cycling and LeMond breached the Sublicense

Agreement through the wrongful use of the free and employee-priced bicycles.  Section

5.03 of the Sublicense Agreement, provides: "During each Contract Year, [Trek] shall

provide LeMond, at no charge, three (3) high end and two (2) low end [bicycles] for the

personal use of LeMond and his family, provided that during the Contract Period

LeMond shall ride no other bicycles."  (Robbins. Decl. Ex. 1.)  The 1999 Amendment

increased the number of free bicycles to fifteen.  (Id. Ex. 8.)  The Agreement has no

provision regarding LeMond's access to employee-priced bicycles.

Trek asserts that LeMond's use of the free and employee-priced bicycles violates

its exclusive right to sell LeMond-branded bicycles under the Sublicense Agreement and

also violates the Agreement's provision limiting the use of the free bicycles to LeMond's

"personal use." (Trek Mem. in Opp'n at 25.)  The Court finds that even if LeMond's use of the free and employee-priced bicycles constitutes a breach of contract, such a breach has been waived.  Waiver is the "voluntary relinquishment of a known right."  Flaherty v. Indep. Sch. Dist. No. 2144, Chisago Lakes Schs., 577 N.W.2d 229, 232 (Minn. Ct. App. 1998).  "The question of waiver is largely one of intention.  It need not be proved by express declaration or agreement, but may be inferred from acts and conduct not expressly waiving the right."  Flaherty, 577 N.W.2d at 232.

In this case, Trek processed each of LeMond's bicycle orders and has never previously asserted a breach of the Sublicense Agreement resulting from these orders. Moreover, Trek shipped the bicycles to the third-party purchasers, and processed the credit cards of several third-party purchasers.  (Huber Dep. Tr. at 22, 70-71; Robbins Decl. Ex. 13.)  Trek does not deny that it allowed LeMond to purchase hundreds of bicycles, valuing $2,500,000, over a period of thirteen years.  (Countercl. & Third Party Compl. ¶ 61.)  Trek never sought information regarding LeMond's use of such bicycles. (Huber Dep. Tr. at 52-53.)  Accordingly, the Court finds that any claim stemming from such authorized purchases has been waived.

### C.   LeMond's public commentary

Trek asserts that LeMond Cycling and LeMond violated § 13.02.01 of the Sublicense Agreement through LeMond's public comments regarding Armstrong and doping.  Section 13.02.01 provides that LeMond Cycling and LeMond shall not "take[] any action which damages or has an adverse impact upon [Trek] or [Trek's] business or goodwill."  (Robbins Decl. Ex. 1.)  According to Trek, when LeMond repeatedly

criticized Armstrong, the negative consumer and IBD feedback harmed the LeMond

brand and Trek's ability to sell LeMond-branded bicycles.

### 1.    Breach

LeMond Cycling and LeMond assert that LeMond's public statements cannot

constitute a material breach of the Sublicense Agreement as a matter of law.  The Court

does not agree.[9]

The interpretation of contract language is a question of law for the Court.

Travertine Corp. v. Lexington-Silverwood, 683 N.W.2d 267, 271 (Minn. 2004).

Unambiguous contract language is "given its plain and ordinary meaning."  Minneapolis

Pub. Hous. Auth. v. Lor, 591 N.W.2d 700, 704 (Minn. 1999).  In this case, the

unambiguous language of the Sublicense Agreement broadly prohibits LeMond Cycling

and LeMond from taking any action that "damages or has an adverse impact upon" Trek.

(Robbins Decl. Ex. 1.)  Accordingly, Trek can establish a breach of the Sublicense

Agreement by establishing that LeMond Cycling or LeMond caused it to incur damages

or suffer an adverse impact.

In this case, the question of breach raises a genuine issue of fact for the jury to

resolve.  There is sufficient evidence in the record to support the inference that LeMond's

public commentary regarding Armstrong caused harm to the LeMond brand, and

---

[9] LeMond Cycling and LeMond argued for the first time in the Reply that LeMond's public commentary is not actionable under the doctrine of waiver.  (LeMond Cycling Reply Mem. at 9.) However, the Court does not address arguments made for the first time in a reply brief.  Berbig, 568 F. Supp. 2d at 1040 n.10.  Moreover, even if the Court were to consider this argument, the record demonstrates that Trek objected to LeMond's public commentary when made and expressly reserved its rights when such objections did not immediately result in litigation. (Robbins Decl. Ex. 32.)

therefore, was harmful to Trek.  Trek received numerous consumer complaints

expressing a negative response to LeMond's public commentary.  (Robbins Decl. Ex.

20.)  IBD complaints were also received, with one IBD stating that LeMond's public

commentary "killed the [LeMond] line and hurt our sales" to such a degree that "[t]he

LeMond bikes were distressed and stopped selling."  (Thornton Aff. ¶¶ 4-5.)  Moreover,

several Trek employees have testified that LeMond's public commentary made it difficult

to sell LeMond-branded bicycles.[10]  (Titus Aff. ¶ 5; Gore Dep. Tr. at 78-80; Davies Dep.

Tr. at 70-71.)[11]

---

[10] LeMond Cycling and LeMond assert that the consumer and IBD complaints, as well as the
testimony of Titus and Thornton relying upon such complaints, are hearsay and thus cannot be
considered by the Court.  However, such complaints are not offered to prove the truth of the
matter asserted, but rather to demonstrate a negative consumer reaction.  See Armco, Inc v.
Armco Burglar Alarm Co., 693 F.2d 1155, 1160 (5th Cir. 1982) (admitting consumer phone calls
to demonstrate consumer confusion).  Moreover, the complaints are admissible under Federal
Rule of Evidence 803(3) to show the declarant's then-existing state of mind.  Morris Jewelers,
Inc. v. Gen. Elec. Credit Corp., 714 F.2d 32, 34 (5th Cir. 1983) (affirming the admission of
customer letters to establish the state of mind of the writers); Rainforest Cafe, Inc. v. Amazon,
Inc., 86 F. Supp. 2d 886, 902 (D. Minn. 1999) (Davis, J.) (distinguishing Duluth News-Tribune
v. Mesabi Publ'g, Inc., 84 F.3d 1093, 1098 (8th Cir. 1996)) (admitting consumer statements to
demonstrate their confusion).

　　　LeMond Cycling and LeMond also assert that the testimony of Titus, Thornton, and Gore
is inadmissible speculation because such witnesses have no factual support for their opinion that
LeMond's public commentary regarding Armstrong harmed the sales of LeMond-branded
bicycles.  However, these witnesses received several consumer complaints and observed
decreased sales of LeMond-branded bicycles.  Based on these experiences, these witnesses can
give an opinion regarding the causation of such decreased sales "rationally based on [their]
perception."  Fed. R. Evid. 701.

[11] LeMond Cycling and LeMond assert that they have not taken any "action" that has damaged
Trek because LeMond's public statements are not "actions" but "words."  (LeMond Cycling
Reply Mem. at 5.)  Accordingly, LeMond Cycling and LeMond argue that LeMond's words do
not meet the prerequisites of § 13.02.01, which requires a harmful "action."  (Robbins Decl. Ex.
1.)  The Court disagrees.  The plain and ordinary meaning of the word "action" certainly
encompasses LeMond's decision to speak to the press regarding Armstrong.  In fact, Webster's
Third New International Dictionary defines the word "action" as "a voluntary act of will."
Webster's Third New Int'l Dictionary 21 (1961).

## 2.     Causation and damages

LeMond Cycling and LeMond assert that Trek has failed to put forth any evidence that LeMond's statements were the cause of Trek's damages, and therefore, the claim should be dismissed.

"A party seeking lost profits from a breach of contract must prove that the breach caused the loss." Quality Bus. Forms of Minneapolis, Inc. v. Secured Choice, Inc., No. C1-02-1764, 2003 WL 21525249, at *2 (Minn. Ct. App. July 1, 2003). "Causation is generally a question of fact left to the finder of fact." Id. A plaintiff need not present direct proof of causation, instead a plaintiff must provide "a sufficient basis to support a reasonable inference" that its damages resulted from the defendant's conduct. Hydra-Mac, Inc. v. Onan Corp., 450 N.W.2d 913, 921 (Minn. 1990).

Sufficient evidence exists from which a jury could reasonably infer that Trek suffered damages as a result of LeMond's public commentary. As described above, several witnesses have testified that LeMond's statements harmed Trek's ability to sell LeMond-branded bicycles. (Burke Dep. Tr. 11-14; Titus Aff. ¶¶ 4-6; Thornton Aff. ¶¶ 4-5; Davies Dep. Tr. at 68-74.) In addition, Trek has obtained the expert report of Professor John R. Nevin quantifying its damages.[12] Nevin notes that during the time period in which LeMond made his public commentary, the sales of LeMond-branded bicycles experienced no growth when the road bicycle industry in general was

---

[12] LeMond Cycling and LeMond assert that Professor Nevin's expert report does not opine on whether LeMond's public statements caused Trek's damages. However, causation is a question of fact to be determined by the jury. Secured Choice, 2003 WL 21525249, at *2. As described above, there is sufficient evidence in the record for a jury to reasonably infer causation.

experiencing unprecedented sales.  (Robbins Decl. Ex. 9.)  A jury could reasonably infer,

depending on how the evidence unfolds at trial, that the LeMond brand's lack of growth

was caused by LeMond's statements.  See Cardinal Consulting Co. v. Circo Resorts, Inc.,

297 N.W.2d 260, 268 (Minn. 1980) (finding that evidence of the profitability of other

similar businesses was evidence of plaintiff's lost profits).  Accordingly, because genuine

issues of material fact exist, the Court will not grant summary judgment as to Trek's

claim of breach of the Sublicense Agreement for LeMond's public commentary regarding

Armstrong and doping.[13]

## II.    Trek's Motion

Trek also moves for summary judgment on the claims asserted against it by

LeMond Cycling.  LeMond Cycling contends that Trek breached the Sublicense

Agreement through: (1) its failure to utilize "best efforts" in the sale and promotion of

LeMond-branded bicycles; and (2) its failure to provide LeMond with all free bicycles

required under the Sublicense Agreement.[14]  Trek moves for summary judgment on both

---

[13]  The Court has reservations with respect to the viability of this claim and bases its denial of
summary judgment on the record now before it.  Whether this claim will survive a Rule 50
motion for judgment as a matter of law, when the record is more fully developed at trial, remains
to be seen.

[14] LeMond Cycling, in its interrogatory responses, asserted that Trek breached § 5.01 of the
Sublicense Agreement by developing "a new road bike line which bore similarities to the
LeMond bicycle line."  (LeMond Cycling Resp. to Interrogs. No. 11.)  LeMond Cycling also
asserted that Trek breached § 2.02.03 of the Sublicense Agreement by failing to invite LeMond
to certain promotional events and failing to reimburse LeMond for travel expenses.  (Id.)  Trek
moved for summary judgment on these claims (Trek Mem. in Supp. at 17-19), but LeMond
Cycling has failed to respond to these portions of Trek's Motion.  Accordingly, the Court will
grant Trek's Motion as to these claims.

of these claims and also moves for summary judgment regarding its right to terminate the Sublicense Agreement.  Each issue is addressed below.

### A.    "Best efforts"

LeMond Cycling contends that Trek breached § 5.02 and § 8.01 of the Sublicense Agreement by "failing to maximize sales domestically and internationally through adequate marketing, promotion, and advertising of LeMond-branded products." (LeMond Cycling Resp. to Interrogs. No. 11.)

### 1.    Section 5.02

LeMond Cycling asserts that Trek breached § 5.02 of the Sublicense Agreement by failing to use its "best efforts" in "maximizing sales" of LeMond-branded bicycles. Section 5.02 provides:

> [Trek] shall use its best efforts to exploit the Mark in respect of Licensed Products, and to promote the sale of Licensed Products in the Territory so as to try to maximize sales, consistent with the quality and reputation of [LeMond Cycling], and only to retailers (and distributors who sell to retailers) which properly reflect the image and reputation of [LeMond Cycling] and LeMond.

(Robbins Decl. Ex. 1.)

In this case, the unambiguous language of the Sublicense Agreement requires Trek to use its "best efforts" to "maximize sales" of LeMond-branded bicycles.  Best-efforts clauses are enforceable in Minnesota.  Woodlake VEF-IV, LLC v. Coop. Agency, Inc., No. A07-577, 2008 WL 763229, at *4 (Minn. Ct. App. Mar. 25, 2008).[15]  However,

---

[15] Trek argues that a best-efforts clause is unenforceable in Minnesota, relying upon Hysitron, Inc. v. Frederickson, No. C2-02-865, 2002 WL 31689530, at *6 (Minn. Ct. App. Dec. 3, 2002). However, Hysitron is distinguishable because the case involved an at-will employee's oral

determining whether a party has exerted its "best efforts" is dependent upon the factual circumstances surrounding the contractual agreement.  Martin v. Monumental Life Ins. Co., 240 F.3d 223, 233 (3d Cir. 2001).  Accordingly, compliance with a best-efforts clause is a question of fact for the jury.  Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs., 928 F.2d 299, 301 (8th Cir. 1991) (applying Minnesota law); Dunn v. Nat'l Beverage Corp., 729 N.W.2d 637, 644 (Minn. Ct. App. 2007).

Trek argues that § 5.02 is a "brand integrity" clause that is inapplicable to Trek's sales and marketing obligations.  (Trek. Mem. in Supp. at 7.)[16]  Section 5.02 does provide that Trek must promote the LeMond brand "consistent with the quality and reputation of [LeMond]."  (Robbins Decl. Ex. 1.)  However, if the Court interprets § 5.02 solely as a brand-integrity clause, the language regarding the maximization of sales would be effectively read out of the contract.  This the Court cannot do, as "[i]t is not ordinarily the function of courts to . . . set aside contract provisions fully considered and agreed upon

---

promise to give her "best efforts," which was found to be too indefinite to support a promissory-estoppel claim.  Id. at *6.  Moreover, while the Minnesota Supreme Court has not addressed this issue, several Minnesota courts have interpreted and applied best-efforts clauses.  Woodlake, 2008 WL 763229, at *4; Dunn v. Nat'l Beverage Corp., 729 N.W.2d 637, 649 (Minn. Ct. App. 2007); Fritz v. Schroeder, No C8-02-1521, 2003 WL 21264495, at *2 (Minn. Ct. App. June 3, 2003); Deluxe Pattern Corp. v. Laser Design, Inc., No. C9-95-51, 1995 WL 434433, at *3 (Minn. Ct. App. July 25, 1995).

[16] In support of this argument, Trek notes that § 5.02 is located under the heading "Development, Licensor's Approvals and Quality Control."  (Trek. Mem. in Supp. at 7.)  However, Section 28 the Sublicense Agreement provides that "[t]he headings of the paragraphs herein are . . . not to be considered part of this Agreement in construing the same."  (Robbins Decl. Ex. 1.)  Accordingly, the Court declines to give the contract headings any interpretive weight.

between the parties." Telex Corp. v. Data Prods. Corp., 135 N.W.2d 681, 687 (Minn. 1965).[17]

Trek further asserts that the Court should not impose a subjective best-efforts obligation upon it, which would effectively displace the "objective standards governing Trek's sales and marketing obligations, contained in §§ 4.01, 8.01, and 12.01." (Trek. Mem. in Supp. at 7-9.) Simply stated, Trek requests that the Court ignore the obligations imposed upon it by § 5.02. However, "[t]he intention of the parties must be gathered from the entire instrument." Telex, 135 N.W.2d at 685 (internal quotation marks and citation omitted). Accordingly, the Court will not disregard the best-efforts requirement, which was carefully negotiated and included by the parties in the Sublicense Agreement.

The best-efforts clause does not displace or negate other contractual obligations. See Vestron, Inc. v. Nat'l Geographic Soc'y, 750 F. Supp. 586, 593 (S.D.N.Y. 1990) ("A best efforts requirement must be reconciled with other clauses in the contract to the extent possible, not used as a basis for negating them."). Sections 4.01, 8.01, and 12.01 provide for minimum royalties, reasonable amounts to be expended on marketing, promotions, and advertising, and minimum sales requirements. (Robbins Decl. Ex. 1.) Such obligations are separate and distinct from Trek's commitment to use its best efforts. These obligations protect LeMond Cycling if Trek's best efforts do not result in

---

[17] Trek asserts that a similar best-efforts clause was interpreted as a brand-integrity clause in Digital Equip. Corp. v. Altavista Tech., Inc., 960 F. Supp. 456, 475 (D. Mass. 1997). However, this clause did not contain a requirement to "maximize sales," as is present here. Instead, the clause in Altavista provides that the licensee was required to "use its best efforts to ensure that all products sold and services rendered while using the Mark shall be of a high standard and of such style, appearance and quality as to protect and enhance the Mark and the goodwill associated therewith." Id.

substantial bicycle sales.[18]  In contrast, the best-efforts clause ensures Trek's continued

incentive to maximize the sale of LeMond-branded bicycles even if all other contractual

obligations are met.[19]

Finally, Trek asserts that LeMond Cycling's best-efforts claim constitutes the

"second-guessing of Trek's business judgment," which cannot give rise to a breach of

contract claim.  (Trek. Mem. in Supp. at 11.)  However, the best-efforts clause would be

rendered meaningless if Trek's business judgments could not be analyzed.  Moreover,

LeMond Cycling's best-efforts claim goes beyond allegations that Trek made "bad

decisions" regarding its marketing and promotion of LeMond-branded bicycles.  See Joel

Popkin & Co. v. Wharton Econometric Forecasting Assocs., Inc., 659 F. Supp. 343, 350

(D. D.C. 1987) (holding that "bad business decisions" are insufficient to establish a

breach of a best-efforts clause).  For example, LeMond Cycling has put forth evidence

indicating that Trek was "winding down" its efforts to market and promote the LeMond

brand two years prior to the termination of the Sublicense Agreement.  (LeMond Decl.

---

[18] Trek cites Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co., 477 F.3d 583 (8th Cir.
2007), in support of its contention that meeting minimum sales requirements set forth in a
contract satisfies a best-efforts obligation.  (Trek Reply Mem. at 11.)  However, Matrix does not
address the merits of the plaintiff's best-efforts claim.  Id. at 588-89.  Trek's quotation of a
sentence located in the opinion's factual recitation is misleading.

[19] Trek further argues that because the Sublicense Agreement and the 1999 Amendment provide
for substantial minimum royalties, the best-efforts clause should not be enforced.  (Trek. Mem.
in Supp. at 10-11.)  However, the cases cited by Trek in support of this contention provide that a
best-efforts obligation should not be inferred when a licensing agreement provides for substantial
minimum royalties.  See e.g. Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 168-69
(3d Cir. 2001) (finding that "an implied obligation is unwarranted").  Thus, the cases cited by
Trek are inapposite because in this case, the best-efforts requirement is an express term of the
Sublicense Agreement.

¶¶ 18-21.)[20]  Such an allegation goes beyond the simple "second-guessing" of Trek's

business decisions.  See Franklin High Yield Tax-Free Income Fund v. County of Martin,

Minn., 152 F.3d 736, 740 (8th Cir. 1998) (applying Minnesota law) (holding that a

reasonable jury could find a breach of a best-efforts clause when defendants exerted no

effort to accomplish their contractual duty).  While a "best-efforts clause can be satisfied

by any of a wide range of possible levels and types of performance that comport with the

exercise of good faith," Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc., 249

F.R.D. 530, 533 (N.D. Ill. 2008) (internal quotation marks and citation omitted), a

reasonable jury could conclude from the evidence that Trek was not using its good faith

"best efforts" to "maximize sales" of LeMond-branded bicycles.  Accordingly, the best-

efforts claim will not be dismissed.

### 2. Section 8.01

Section 8.01 provides that:

> During each Contract year, [Trek] shall expend a reasonable amount on the
> marketing, promotion and advertising of Licensed Products, both to the
> trade and to consumers (including corporate advertising), consistent with its
> promotion of comparable lines of Products. It is understood that a
> reasonable amount is the equivalent of approximately three percent (3%) of
> the Net Sales for each Contract Year.

(Robbins Decl. Ex. 1.)  LeMond Cycling asserts that Trek breached § 8.01 by failing to

expend a "reasonable amount on the marketing, promotion and advertising of [LeMond-

---

[20] In its Reply, Trek asserts that it was not "winding down" its promotion and marketing of the
LeMond brand, but was actively promoting and advancing it at great expense.  (Trek Reply at
11-13.)  This assertion simply demonstrates that there is a genuine issue of material fact to be
resolved at trial regarding Trek's marketing and promotion efforts.

branded bicycles] . . . consistent with its promotion of comparable [Trek bicycles]." The Court does not agree.

Section 8.01 clearly defines the phrase "reasonable amount" as "approximately three percent (3%) of the Net Sales for each Contract Year." (Id.) Thus, the unambiguous contract language provides that if Trek expended three percent of its net sales on marketing, promotion, and advertising, it satisfies its obligations under § 8.01. Because LeMond Cycling does not contend that Trek failed to expend three percent of its net sales on such promotion activities, this claim fails.[21]

## B.    Free Bicycles

LeMond Cycling asserts that Trek breached § 5.03 of the Sublicense Agreement by failing to provide the full amount of free bicycles required under the contract. (LeMond Cycling Resp. to Interrogs. No. 11.) Section 5.03 provides that, "[d]uring each Contract year, [Trek] shall provide LeMond, at no charge, three (3) high end and two (2) low end [bicycles] for the personal use of LeMond and his family." (Robbins Decl. Ex. 1.) The 1999 Amendment increased the number of free bicycles to fifteen. (Id. Ex. 8.)

Trek asserts that LeMond Cycling's claim under § 5.03 should be dismissed because LeMond Cycling never requested the bicycles during the years they were due and owing, and therefore, the right to such bicycles cannot be retroactively invoked. The Court agrees. Section 5.03 unambiguously provides that LeMond was entitled to the

---

[21] Trek asserts that because § 8.01 establishes the "reasonable amount" of money to be expended on marketing, promotion, and advertising, it cannot have breached the "best-efforts" clause. However, expending an appropriate amount of dollars on marketing, promotion, and advertising is not the equivalent of utilizing best efforts.

requisite amount of free bicycles <u>each contractual year</u>.  (Robbins Decl. Ex. 1.)  By not

requesting such bicycles within the contractual year, LeMond knowingly waived his right

to such bicycles.  <u>Flaherty</u>, 577 N.W.2d at 232.  This makes intuitive sense, as Trek

would not know what "high end" and "low end" bicycles to send to LeMond if such

bicycles were not requested.  Accordingly, LeMond's claim under § 5.03 of the

Sublicense Agreement will be dismissed.

### C.    Termination of Sublicense Agreement

Finally, Trek asserts that it is entitled to summary judgment confirming its right to

terminate the Sublicense Agreement as a result of LeMond Cycling and LeMond's

material breach.  (Trek Mem. in Supp. at 20-30.)  Specifically, Trek asserts that

LeMond's public commentary regarding Armstrong constituted a breach granting Trek

the right to terminate the contract as a matter of law.  The Court does not agree.

For the purposes of LeMond Cycling's Motion for Summary Judgment addressed

above, the Court held that, viewing the evidence in the light most favorable to Trek, that

there is a genuine issue of material fact regarding whether LeMond's public commentary

damaged or had "an adverse impact upon [Trek] or [Trek's] business or goodwill,"

thereby constituting a breach of the Sublicense Agreement.  Now, for purposes of its

Motion for Summary Judgment, Trek asserts that "there is no dispute that . . .

[LeMond's] conduct was damaging to Trek's business and goodwill," establishing

LeMond Cycling and LeMond's breach of the Sublicense Agreement as a matter of law.

(Trek Mem. in Supp. at 21.)

For purposes of Trek's Motion, the Court must view the evidence in the light most favorable to LeMond Cycling and LeMond.  Examining the evidence in this light, there is a genuine issue of material fact as to whether LeMond's commentary actually <u>caused</u> damage to Trek.  Causation is generally a question of fact for the jury.  <u>Quality Bus</u>, 2003 WL 21525249, at *2.  While as described above, Trek has put forth sufficient evidence from which a reasonable jury could infer that LeMond's statements caused Trek to suffer damages, the jury could also reasonably determine that such an inference is inappropriate.  Accordingly, summary judgment will not be granted.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, it is **ORDERED** that LeMond Cycling and LeMond's Motion for Summary Judgment (Doc. No. 114) is **GRANTED** in part and **DENIED** in part and Trek's Motion for Summary Judgment (Doc. No. 185) is **GRANTED** in part and **DENIED** in part.

Dated: December 4, 2009                    s/ Richard H. Kyle _____
                                              RICHARD H. KYLE
                                              United States District Judge